No. 26-12769-AA

# In the United States Court of Appeals for the Eleventh Circuit

FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS,
Petitioner–Appellee,

v.

UNITED STATES OF AMERICA,
Respondent–Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NO. 1:26-CV-02777 (Hon. William R. Ray, II)

## OPENING BRIEF FOR THE UNITED STATES

J. DANIEL BISHOP
Special Attorney to the Attorney General and United States Attorney for the Middle District of Norh Carolina
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
(336) 332-6333
Dan.Bishop@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2(b), the undersigned hereby certifies that the following is a complete list of persons and entities who have a known interest in the outcome of this appeal:

1. Bishop, J. Daniel, United States Attorney and Special Attorney to the Attorney General;
2. Bolen, John P., counsel for petitioner-appellee;
3. Duffey, Michael, counsel for petitioner-appellee;
4. Eisen, Norman Larry, counsel for petitioner-appellee;
5. Fehlan, Kirsten, counsel for Media Intervenors;
6. Fulton County Board of Registration and Elections, petitioner-appellee;
7. Ghali, Kamal, counsel for petitioner-appellee;
8. Jo, Y. Soo, counsel for petitioner-appellee;
9. Jonas, Stephen Allen, counsel for petitioner-appellee;
10. Josephson, Matthew Allan, counsel for petitioner-appellee;
11. Lowell, Abbe David, counsel for petitioner-appellee;
12. Media Intervenors in the district court proceeding:
    a. Advance Publications, Inc., is not a publicly held corporation and no publicly held corporation owns 10% or

more of its stock

b. Bloomberg L.P., the publisher of Bloomberg News, is a limited partnership; its general partner is Bloomberg Inc.; and no publicly held corporation owns 10% or more of Bloomberg L.P.'s limited partnership interests

c. Cable News Network, Inc. is ultimately a wholly owned subsidiary of Warner Bros. Discovery, Inc., a publicly traded corporation. Warner Bros. Discovery, Inc. has no parent company and, to the best of Cable News Network, Inc.'s knowledge, no publicly held company owns 10% or more of Warner Bros. Discovery, Inc.'s stock

d. The EW. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock

e. Gray Local Media, Inc., doing business as WANF, is a subsidiary of Gray Media, Inc. Gray Media, Inc. is a publicly traded corporation, and no parent company or publicly held company holds 10% or more of its stock

f. NBCUniversal Media, LLC, doing business as NBCUniversal News Group. is a wholly owned, indirect subsidiary of Comcast Corporation, which is publicly traded. Comcast Corporation does not have a parent company, and no other publicly held company owns 10% or more of its stock

g. The New York Times Company, a publicly traded company, has no parent company and no publicly held corporation owns 10% or more of its stock

h. Pro Publica, Inc., a non-profit corporation, has no parent corporation and issues no stock

i. Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and

Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly held corporation that is traded on the Toronto Stock Exchange and Nasdaq Global Select Market (NASDAQ). There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares

j. WP Company LLC, doing business as The Washington Post, is a wholly owned subsidiary of Nash Holdings LLC, which is privately held and does not have any outstanding securities in the hands of the public.

13. Ray II, William R., United States District Judge;

14. Schell, Jacquelyn Nicole, counsel for Media Intervenors.

/s/ Dan Bishop

## STATEMENT REGARDING ORAL ARGUMENT

This appeal raises important questions about a district court's authority to quash a grand jury subpoena in the context of an investigation of national significance. The United States therefore requests oral argument.

# TABLE OF CONTENTS


STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF AUTHORITIES ................................................................ iv

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED ......................................................................... 1

STATEMENT OF THE CASE ............................................................. 2

I. COURSE OF PROCEEDINGS ................................................ 2

II. STATEMENT OF FACTS ....................................................... 2

A. The Investigation Into Election Irregularities ...................... 2

B. Proceedings On The Board's Motion to Quash ................... 5

C. The District Court Quashes the Subpoena ........................ 10

III. STANDARD OF REVIEW ................................................... 13

SUMMARY OF ARGUMENT ......................................................... 14

ARGUMENT .................................................................................... 16

I. THE BOARD FAILED TO SHOW THAT COMPLIANCE WITH THE SUBPOENA WOULD BE UNREASONABLE OR OPPRESSIVE UNDER THE *R. ENTERPRISES* STANDARD ......................................................... 16

A. Legal Framework ........................................................ 17

B. Because The Subpoena In This Case Sought Information Pertinent To The Grand Jury's Investigation And Did Not Impose Onerous Compliance Burdens, The District Court Erred In Quashing It ............................................................ 21

II. EVEN IF BALANCING WERE PERMISSIBLE, THE DISTRICT COURT ABUSED ITS DISCRETION IN ASSESSING BOTH THE BURDENS THAT COMPLIANCE POSED TO THE BOARD AND THE GOVERNMENT'S NEED FOR THE INFORMATION ......... 27

A. The Board Did Not Make The Threshold Showing, As Required To Trigger Balancing, That Compliance With The Subpoena Gravely Intruded On Any Protected Interest ........ 28

B. The District Court's Premature Reliance On The Statute Of Limitations Erroneously Understated The Government Interests In Obtaining The Subpoenaed Information ........ 34

1. The possible expiration of the statute of limitations for certain offenses does not render compliance with a subpoena unreasonable or oppressive under Rule 17(c)(2). ........ 35

2. The district court's limitations analysis was mistaken in any event........ 43

C. Any Overbreadth Concerns Can Be Addressed By Modifying, Rather Than Quashing, The Subpoena........... 50

CONCLUSION ........ 51

## TABLE OF AUTHORITIES

Page(s)

Cases

*Blair v. United States*,
250 U.S. 273 (1919) .......... 18

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir.1981).......... 1

*Branzburg*,
408 U.S.......... 33

*Cedar Rapids, Iowa*,
734 F. Supp. 875 (N.D. Iowa 1990).......... 42

*City of S. Miami v. Governor*,
65 F.4th 631 (11th Cir. 2023) .......... 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 30

*Coson v. United States*,
533 F.2d 1119 (9th Cir. 1976)..........16, 39, 40, 48, 50

*Fraser v. United States*,
834 F.2d 911 (11th Cir. 1987).......... 37

*Grunewald v. United States*,
353 U.S. 391 (1957) ..........8, 9, 12, 16, 48, 49

*In re Grand Jury (G.J. No. 87-03-A)*,
845 F.2d 896 (11th Cir. 1988).......... 13

*In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum*,
555 F.2d 1306 (5th Cir. 1977).......... 23

*In re Grand Jury Proceeding*,
842 F.2d 1229 (11th Cir. 1988) .................................................................. 24

*In re Grand Jury Proceedings No. 92-4*,
42 F.3d 876 (4th Cir. 1994) ........................................................................ 47

*In re Grand Jury Subpoena (Kent),*
646 F.2d 963 (5th Cir. June 1, 1981) .............................................................. 1

*In re Grand Jury Subpoena Bierman*,
765 F.2d 1014 (11th Cir. 1985) ...................................................................... 1

*In re Grand Jury Subpoena Dated August 14, 2019*,
964 F.3d 768 (8th Cir. 2020) ........................................................................ 29

*In re Grand Jury, John Doe*, No. G.J. 2005-2,
478 F.3d 581 (4th Cir. 2007) ........................................................................ 29

*Kimmelman v. Morrison*,
477 U.S. 365 (1986) ..................................................................................... 41

*Koon v. United States*,
518 U.S. 81 (1996) ....................................................................................... 13

*Musacchio v. United States*,
577 U.S. 237 (2016) ................................................................................ 7, 36

*Paez v. Secretary*,
947 F.3d 649 (11th Cir. 2020) ........................................................................ 4

*Pickens v. Hollowell*,
59 F.3d 1203 (11th Cir. 1995) .............................................................. 4, 37, 38

*Sands v. McCormick*,
502 F.3d 263 (3d Cir. 2007) ..................................................................... 37, 38

*Sharma v. Hirsch*,
121 F.4th 1033 (4th Cir. 2024) ...................................................................... 30

*Smith v. United States*,
568 U.S. 106 (2013) .......... 36

*State v. Pearson*,
858 S.W.2d 879 (Tenn. 1993) .......... 41

*Trump v. Vance*,
591 U.S. 786 (2020) .......... 33

*Trump v. Vance*,
977 F.3d 198 (2d Cir. 2020) .......... 39

*U.S. Currency v. $70,670.00 in U.S. Currency*,
929 F.3d 1293 (11th Cir. 2019) .......... 13

*United States v. Arlt*,
252 F.3d 1032 (9th Cir. 2001) .......... 49

*United States v. Ayala-Bello*,
995 F.3d 710 (9th Cir. 2021) .......... 47

*United States v. B. G. G.*,
53 F.4th 1353 (11th Cir. 2022) .......... 13

*United States v. Batchelder*,
442 U.S. 114 (1979) .......... 45

*United States v. Briggs*,
514 F.2d 794 (5th Cir. 1975) .......... 42

*United States v. Calandra*,
414 U.S. 338 (1974) .......... 17, 18, 23, 36

*United States v. Campa*,
529 F.3d 980 (11th Cir. 2008) .......... 48

*United States v. Capers*,
708 F.3d 1286 (11th Cir. 2013) .......... 13

*United States v. Dionisio*,
410 U.S 1 (1973) ....................17, 19, 20, 27, 45

*United States v. Johnson*,
319 U.S. 503 (1943) ....................18, 19

*United States v. Morton Salt. Co.*,
338 U.S. 632 (1950) .................... 23

*United States v. Najjar*,
283 F.3d 1306 (11th Cir. 2002).................... 36

*United States v. Nickels*,
502 F.2d 1173 (7th Cir. 1974).................... 39

*United States v. Nixon*,
418 U.S. 683 (1974) .................... 19

*United States v. Picketts*,
655 F.2d 837 (7th Cir. 1981).................... 39

*United States v. R. Enterprises, Inc.*,
498 U.S. 292 (1991) ....1, 2, 6, 9, 10, 11, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 33, 35, 38, 41, 44, 45, 47

*United States v. Sells Eng'g, Inc.*,
463 U.S. 418 (1983) .................... 18

*United States v. Smukler*,
991 F.3d 472 (3d Cir. 2021).................... 37

*United States v. Zolin*,
491 U.S. 554 (1989) .................... 26

*Wiwa v. Royal Dutch Petroleum, Co.*,
392 F.3d 812 (5th Cir. 2004).................... 50

Statutes

18 U.S.C. § 4 .......... 45

18 U.S.C. § 1001 .......... 45

18 U.S.C. § 1512 .......... 45

18 U.S.C. § 1519 .......... 45

18 U.S.C. § 3231 .......... 1

18 U.S.C. § 3282 .......... 37

18 U.S.C. § 3290 .......... 37

18 U.S.C. § 3292 .......... 37

18 U.S.C. § 3293 .......... 37

18 U.S.C. § 3331 .......... 42

18 U.S.C. § 3333(a) .......... 42

18 U.S.C. § 3731 .......... 1

28 U.S.C. § 1291 .......... 1

52 U.S.C. § 20511(2)(B) .......... 3

52 U.S.C. § 20701 .......... 3, 12, 46

52 U.S.C. § 20702 .......... 46

Ga. Code Ann. § 50-18-77 .......... 34

Ga. Code Ann. § 50-18-72(a)(21) .......... 34

Rules

Fed. R. Crim. P. 6(e) ....................................................................8, 13

Fed. R. Crim. P. 6(e)(6) .................................................................... 32

Fed. R. Crim. P. 6(e)(2)(B)(vi) .......................................................... 32

Fed. R. Crim. P. 6(e)(3)(C) ................................................................ 42

Fed. R. Crim. P. 17(c) ....................................................................... 20

Fed. R. Crim. P. 17(c)(2) ............................ 5, 11, 14, 15, 22, 24, 27, 30, 35, 50

Fed. R. Crim. P. 41(g) ......................................................................... 3

Fed. R. Crim. P. 58(b)(1) .................................................................... 47

Other Authorities

Crim. Proc. § 8.8(a) (Nov. 2025 update)............................................ 39

Criminal Prosecutions: *United States v. Wild*,
90 Harv. L. Rev. 1550 (1977) ......................................................... 41

Fed. Prac. & Proc. § 276 (4th ed. 2026)............................................ 35

Grand Jury Law & Prac. § 9:25 ...........................................39, 40, 41

## JURISDICTIONAL STATEMENT

The United States appeals the district court's July 7, 2026, order granting a motion to quash a grand jury subpoena. DE37.[1] The government filed a timely notice of appeal on August 6, 2026, within 30 days of that order. DE38. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291. *See In re Grand Jury Subpoena Bierman*, 765 F.2d 1014, 1018 (11th Cir. 1985), *vacated in part on other grounds*, 788 F.2d 1511 (11th Cir. 1986); *In re Grand Jury Subpoena (Kent)*, 646 F.2d 963, 967 (5th Cir. June 1, 1981).[2]

## ISSUES PRESENTED

1. Whether the district court erred in quashing a grand-jury subpoena seeking a list of election workers from a county election board, even though it satisfied the reasonableness standard from *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991), based on an approach that instead weighed the government's investigatory need for the information against the competing compliance burden to the election board.

[1] References in this brief are to district court docket entries (DE), followed by the page number (*e.g.*, DE10:1 for page one of docket entry 10).

[2] All decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, constitute binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

2. Whether, if the district court was permitted to conduct a balancing of interests notwithstanding *R. Enterprises*, the court abused its discretion in concluding that the subpoena imposed severe burdens on the board and that the expiration of the limitations period for certain offenses rendered the government's need for the information minimal.

## STATEMENT OF THE CASE

### I. COURSE OF PROCEEDINGS

In April 2026, a grand jury sitting in the Northern District of Georgia issued a subpoena to the Fulton County Board of Registration and Elections (Board). DE1-1. The Board moved to quash the subpoena on multiple grounds. DE1. After holding a hearing and receiving supplemental submissions, the district court granted the motion to quash and denied the government's cross-motion to enforce the subpoena. DE37. This appeal follows.

### II. STATEMENT OF FACTS

#### A. The Investigation Into Election Irregularities

Federal officials are investigating irregularities in the November 2020 General Election that occurred in Fulton County, Georgia. Two facets of that investigation are relevant here.

*First*, in late January 2026, an FBI agent submitted a search warrant application to a magistrate judge seeking permission to seize Fulton County's

2020 election records. DE9-1:11. The magistrate judge issued the warrant after finding probable cause to believe that certain irregularities described in the agent's supporting affidavit, if intentionally caused, would demonstrate criminal violations of 52 U.S.C. § 20701 and 52 U.S.C. § 20511(2)(B). DE9-1:21. Section 20701 provides for imprisonment up to one year, and a fine up to $1,000, for an election officer's willful failure to retain pertinent voting records for a 22-month period following the date of a presidential election. DE9-1:22. Section 20511(2)(B) makes it a felony to "knowingly and willfully deprive[] ... the residents of a State of a fair and impartially conducted election process, by ... the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held." 52 U.S.C. § 20511(2)(B). The FBI seized more than 600 boxes of Fulton County's 2020 records pursuant to the warrant. DE9-1:1.

In February 2026, the Board moved for return of property under Federal Rule of Criminal Procedure 41(g). DE9-1:1. That motion was assigned to Judge Boulee, who denied it after multiple rounds of briefing and an evidentiary hearing. DE9-1.[3] The Board argued in that case that the government's execution

[3] The government appended Judge Boulee's 68-page opinion in *Pitts, et al., v. United States*, No. 1:26-cv-809 (N.D. Ga.), to its opposition to the motion to quash in this case, DE9-1, and argued without objection that the district court

of the warrant "callously disregarded" constitutional rights—the showing required for relief under this Court's Rule 41(g) precedents—because (*inter alia*) the statute of limitations had expired "for the two potential offenses" listed in the affidavit. DE9-1:39. Judge Boulee rejected that contention, noting "the complexities in determining whether a statute of limitations defense is viable, the limited amount of evidence in the record," and the affiant agent's "assertion that at least part of the investigation involves activities that occurred during the limitations period"—*viz.*, a witness's account that "ballot images may have been modified as recently as January 11, 2024." DE9-1:52. In so holding, Judge Boulee relied on this Court's recognition that "whether a valid statute of limitations defense exists is not a cut and dry matter" and that "[t]he existence of a statute of limitations bar is a legal question that is appropriately evaluated by the [prosecutor] or by a court *after* a prosecution is begun," *Pickens v. Hollowell*, 59 F.3d 1203, 1207-08 (11th Cir. 1995) (emphasis added). DE9-1:52-53.

*Second*, two weeks before Judge Boulee denied the Board's Rule 41(g) motion in *Pitts*, a grand jury in the Northern District of Georgia issued a subpoena directing the Board to provide the names and personal information (including home addresses, personal telephone numbers, and email addresses)

---

below could take judicial notice of the records of that coordinate court. DE9:1 n.1 (citing *Paez v. Secretary*, 947 F.3d 649, 651-52 (11th Cir. 2020)).

of "Election Staff Members who served in the November 2020 General Election," including employees, contractors, and volunteers who assisted in handling, transporting, counting, reviewing, and auditing ballots, as well as election workers who participated in other ways such as by reviewing voter qualifications or staffing mobile voting locations. DE1-1:3. The subpoena had a return date of May 5, 2026, and permitted the Board to send the responsive records to an FBI agent in lieu of appearing before the grand jury. DE1-1:1, 3.

### B. Proceedings On The Board's Motion to Quash

The day before the subpoena's return date, the Board filed on the public docket a motion to quash the subpoena under Federal Rule of Criminal Procedure 17(c)(2), appending a copy of the subpoena as an attachment. DE1. The motion, which the district court later sealed (DE11-1:1-2), sought relief on six grounds: (i) the subpoena's purpose was politically motivated and designed to harass and intimidate Board workers; DE1:7-11; (ii) the subpoena could not serve a proper purpose because the statute of limitations had expired for any wrongdoing connected to the 2020 General Election, *id.* at 12-14; (iii) the subpoena was overbroad, *id.* at 14-18; (iv) the subpoena burdened election workers' First Amendment rights and would chill participation in elections, *id.* at 18-21; (v) the subpoena intruded on Georgia's sovereignty in administering

elections, *id*. at 22-24; and (vi) the subpoena's demand to produce records to the FBI was improper, *id*. at 24-25.

The district court stayed enforcement of the subpoena pending the government's response. DE3. Meanwhile, the Board moved to unseal both the docket and its motion to quash (including the attached subpoena). DE7. In joining that request, which the government opposed (DE16:9-10), a group of media intervenors asserted that the usual secrecy attendant to grand-jury proceedings had been lost because the Board, as "the grand jury witness," had "disclosed the existence of the Subpoena, publicized the fact that it moved to quash the Subpoena, and even filed the Motion to Quash on the public docket." DE11:2. The district court granted the motion to unseal by minute order and later issued a written order explaining its ruling. DE14; DE36.

The government opposed the motion to quash and cross-moved to enforce the subpoena. DE9; DE10. The government explained at the outset that "the subpoena seeks only one thing: records identifying persons reasonably likely to be able to shed light on the irregularities in the Fulton County 2020 election." DE9:2-3. The government also explained that grand juries have wide latitude to investigate potential crimes or to confirm that no crimes occurred, and that a court's ability to inquire into a grand jury's purposes and investigatory steps is strictly circumscribed. *Id.* at 3-6 (citing *United States v. R. Enterprises, Inc.*, 498

U.S. 292 (1991)). The government argued that the subpoena's request "for a list of employees and workers involved in the 2020 Fulton County election" was plainly relevant to "producing information bearing on an investigation of that election," *id.* at 7, and offered to provide information to the court for *in camera* review to "clarify the need for identification of potential witnesses across [the Board's] in-person voting operations as well as couriers and central elections administration staff." *Id.* at 3.

Regarding the Board's legal arguments, the government contended that multiple factors—including that a magistrate judge had already found probable cause to seize the Board's records—refuted any suggestion that the subpoena was overbroad or intended to harass. DE9:7-9, 12-15. The government also explained why the Board's First Amendment and sovereignty claims lacked merit. *Id.* at 9-12, 17. As for the statute of limitations, the government argued both that the issue was not ripe because timeliness is an affirmative defense to be raised post-indictment, *id.* at 15-16 (citing *Musacchio v. United States*, 577 U.S. 237, 248 (2016)); and that resolving the limitations issue would be premature because the investigation was still in its preliminary stages and might yet uncover "subsequent criminal acts, or acts in furtherance of a criminal conspiracy" that could extend the limitations period. *Id.* In making this latter argument, the government pointed to Judge Boulee's Rule 41(g) decision in the *Pitts* case,

which had relied in part on evidence that stored images of 2020 ballots "may have been modified as recently as January 11, 2024," suggesting that potential obstructive criminal conduct stemming from the 2020 election may have continued within the limitations period. *Id.* at 16 (quotations marks omitted).

On May 19, 2026, the district court held a hearing on the motions to quash or enforce the subpoena and the pending motions to unseal. DE16. The court accepted submission of several exhibits from the Board (later docketed under seal), DE16:32; DE17, as well as a declaration from the lead case agent that the government proffered for *in camera* submission. DE16:67-68, 85-86. The court also heard argument from the parties on, *inter alia*, how the grand-jury secrecy protections in Federal Rule of Criminal Procedure 6(e) would limit the dissemination of any information provided in response to the subpoena and whether the potential expiration of the statute of limitations for crimes relating to the November 2020 General Election provided a basis for quashing the subpoena. *E.g.*, DE16:42-44, 61-64, 68-69, 72-77.

In response to the government's argument concerning acts that could extend a criminal conspiracy into the limitations period, the Board cited for the first time the Supreme Court's decision in *Grunewald v. United States*, 353 U.S. 391 (1957), which held that the statute of limitations for a conspiracy offense begins to run once "the central criminal purposes of [the] conspiracy have been

attained," and that later "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy," do not extend the life of the conspiracy for limitations purposes. *Id.* at 401-02. After the hearing, the district court ordered the government to submit a supplemental brief addressing *Grunewald* and other legal authorities and to make a second, *in camera* submission addressing potential theories of wrongdoing. DE15:1-2.

In its public supplemental brief, the government argued that *Grunewald* did not undermine its theory of relevance because, "[u]ntil a specific conspiracy or other criminal charge is identified and defined, it is impossible to determine when its 'main criminal objectives' are complete, and whether specific acts of concealment are part of those objectives or merely cover-up afterward." DE19:2. The government explained that the investigation had uncovered potential evidence of ongoing attempts to obstruct "inquiries and investigations" into the 2020 election, including evidence that some ballot image files from 2020 may have been altered in 2024 and others may have been overwritten when tabulator tapes were reused during the 2022 election. *Id.* at 3. The government also argued that a balancing test drawn from Justice Stevens's concurring opinion in *R. Enterprises*, which the district court had mentioned at the motions hearing (DE16:22-23), was "not the law" because it conflicted with the majority's position in that case that grand jury investigations should be largely immune

from judicial supervision. DE19:5-16. The government also separately submitted *in camera* a sealed supplemental brief providing further information about the investigation and the subpoena's relevance.[4]

### C. The District Court Quashes the Subpoena

The district court granted the Board's motion to quash and denied the government's cross-motion to enforce the subpoena. DE37:27-28. The court recognized that "[g]rand juries operate with broad investigatory powers" and that, "[w]hen analyzing a subpoena, courts must begin with the presumption …, 'absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority.'" DE37:10-11 (quoting *R. Enterprises*, 498 U.S. at 11). The court stated, however, that it retained the authority to quash a

[4] At the May 19, 2026 Motion Hearing, the United States provided the Court an affidavit from FBI Special Agent Hugh Evans for the district court to review *in camera*. Following the hearing, the United States filed a Motion for in camera review of a supplemental brief (DE32) addressing the Court's request for "any arguments concerning any potential theory of wrongdoing that it contends supports the subpoena at issue." (DE15.) A copy of the brief was submitted to the Court's chambers email. Neither the affidavit nor the supplemental brief appears on the docket. When the district court granted Petitioner's motion, it deemed the United States' motion for *in camera* review and the Petitioner's opposition to that motion moot. (DE37 at 23 n.18.) In the Order, the Court noted that it had reviewed and considered these in camera materials as part of its decision. (*Id.*) (noting that the motion for in camera review "was granted by implication since the Court reviewed these materials."). The United States has filed a motion in the district court to supplement the record with these materials (DE44.) As of the filing of this brief, the motion is still pending.

subpoena "if it determines that 'compliance would be unreasonable or oppressive.'" *Id.* at 12 (quoting Fed. R. Crim. P. 17(c)(2)). The court reasoned that the "unreasonable and oppressive" standard requires "a case-by-case, fact specific inquiry," *id.*, and that Justice Stevens's concurrence in *R. Enterprises*, though not binding, "persuasive[ly]" described how to conduct such an inquiry while respecting the grand jury's prerogatives. *Id.* at 13-15. Under that standard, a district court must "balance the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other." *R. Enterprises*, 498 U.S. at 303 (Stevens, J., concurring in part and concurring in the judgment).

Applying that standard, the district court first concluded that the government's need for the subpoenaed information was "low" because the applicable statute of limitations had expired no later than January 7, 2026. DE37:16-19. The court rejected the government's arguments that a statute-of-limitations analysis was premature at the grand-jury stage and that "the possibility of criminal obstruction" in the years following 2020 provided a permissible basis for the subpoena. *Id.* at 20. The court instead took the view that "[a]ny alleged criminal conspiracy to interfere with the results of the 2020 Election was completed on December 14, 2020, when the Georgia Electors met to cast their vote, or at the latest on January 7, 2021, when the Congress certified

the results," *id.*, and that obstructive acts intended to cover up misconduct in 2020 could not extend the statute of limitations under *Grunewald*, *id.* at 20-21. Although purporting to recognize that acts such as the "alleged failure to preserve records" as required under 52 U.S.C. § 20701 "arguably would not be barred by the statute of limitations," *id.* at 5, the court believed that this potential crime did not establish a sufficient need for the subpoenaed information because it was a misdemeanor that did not require grand jury presentment and it bore no apparent relevance to the identities of election workers in 2020, *id.* at 5, 23-25.

On the other side of the balance, the district court concluded that the subpoena placed a high burden on the Board because "a large disclosure of [election workers' personal identifying] information threatens to chill participation in future elections." DE37:25. Although conceding that "questioning poll workers *may* yield some evidence," the court concluded that "the disclosure of the requested information would cause substantial harm to Fulton County's interest in enlisting poll workers and other election volunteers in the future, at least during the current Administration which seems so laser focused to cast the 2020 Election as illegitimate, even though it changes nothing practically." *Id.* at 27. In reaching that conclusion, the court did not mention the protections that federal law affords information subpoenaed by a grand jury, *see*

Fed. R. Crim. P. 6(e), or the Board's role in publicizing the subpoena's request for information that would allow investigators to identify election workers.

Having decided to quash the subpoena on other grounds, the district court did not reach the Board's arguments related to improper motivation and harassment or overbreadth. DE37:13 n.10. And, although the court expressed doubt that the Board could "assert alleged first amendment claims on behalf of its employees or volunteers," it also declined to reach that constitutional objection to the subpoena. *Id.*

## III. STANDARD OF REVIEW

An order quashing a grand jury subpoena is reviewed for abuse of discretion. *See United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d 896, 898 (11th Cir. 1988). That standard, though deferential, "is not toothless." *United States v. B. G. G.*, 53 F.4th 1353, 1360 (11th Cir. 2022). "A district court abuses its discretion when it applies an incorrect legal standard, relies on clearly erroneous factual findings, or commits a clear error of judgment." *United States v. $70,670.00 in U.S. Currency*, 929 F.3d 1293, 1300 (11th Cir. 2019). And "a district court cannot properly exercise its discretion where it is 'guided by erroneous legal conclusions.'" *B. G. G.*, 53 F.4th at 1360 (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

## SUMMARY OF ARGUMENT

The district court abused its discretion in quashing a grand jury subpoena that sought limited information that would not have been onerous for the Board to produce: namely, a list of election workers who could shed light on possible irregularities in the November 2020 General Election. This Court should reverse that decision on either of two grounds: that the district court misapplied the law by conducting a balancing test or that the court erred as a matter of law in assessing the interests on both sides of the balance.

**I.** The district court committed a threshold legal error when it quashed the subpoena by balancing governmental need against the burden to the Board in complying. The Supreme Court's decision in *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991), confirms the wide investigative berth afforded to federal grand juries, the presumed regularity of grand-jury proceedings, and the limited grounds on which a witness can legitimately challenge a grand-jury subpoena under Federal Rule of Criminal Procedure 17(c)(2). No such grounds existed here. The information sought by the subpoena was reasonable under the *R. Enterprises* standard, and the Board did not establish that compliance would trench on constitutional rights or a privilege or impose excessive costs.

That should have been the end of the district court's inquiry. Instead, the court drew from Justice Stevens's partial concurrence in *R. Enterprises* a test that

deems compliance with a subpoena unreasonable or unduly burdensome under Rule 17(c)(2) if the government's investigatory need does not outweigh the competing burden to the subpoena recipient in compliance. But that standard is contrary to the *R. Enterprises* majority, which engaged in no such balancing. It would also raise the very same concerns that led the Court in *R. Enterprises* to reject application of the multifactor test for enforcing trial subpoenas in the grand-jury context. The district court's approach also does not, as it believed, find support in the plain text of Rule 17(c)(2).

**II.** Even if balancing were permissible, the district court abused its discretion in assessing the interests on both sides of the balance. The court's conclusion that compliance would impose a "severe" burden on the Board rested on the notion that word of the grand-jury's inquiry would chill election workers and volunteers from participating in future elections. But that conclusion gave no weight to the Board's role in publicizing the subpoena; grand-jury secrecy restrictions, on which the Supreme Court has repeatedly relied in rejecting subpoena challenges; and provisions of Georgia law that undermine any expectation that the identifying information of election workers employed by the county would be free from grand-jury scrutiny.

On the other side of the balance, the district court assessed the governmental need to be low because the grand jury's investigation could

purportedly yield no prosecutable offenses given the expiration of the statute of limitations. But the court identified no appellate precedent supporting that approach. And with good reason: the statute of limitations is a waivable defense to be raised by a particular defendant (if at all) post-indictment, not a ground for a witness to resist a grand-jury subpoena.

Moreover, the court erred even if the limitations period is a relevant factor because its own opinion identified at least one offense that would not necessarily be time-barred, and the grand jury can consider facts from outside the limitations period in evaluating (among other things) scienter. *See, e.g., Coson v. United States*, 533 F.2d 1119, 1120 (9th Cir. 1976). Nothing in *Grunewald v. United States*, 353 U.S. 391 (1957), which arose in a post-trial posture, is to the contrary.

## ARGUMENT

### I. THE BOARD FAILED TO SHOW THAT COMPLIANCE WITH THE SUBPOENA WOULD BE UNREASONABLE OR OPPRESSIVE UNDER THE *R. ENTERPRISES* STANDARD

The grand-jury subpoena in this case sought to identify individuals who could provide information about how the November 2020 General Election was conducted in Fulton County. That request could yield information relevant to an investigation that, through other means, has already revealed potential irregularities in the conduct of that election. The subpoena was therefore proper,

and the district court erred in quashing it under a balancing test derived from a separate Supreme Court concurrence.

**A. Legal Framework**

1. "A grand jury has broad investigative powers to determine whether a crime has been committed and who has committed it." *United States v. Dionisio*, 410 U.S 1, 15 (1973); *see United States v. Calandra*, 414 U.S. 338, 343-44 (1974) ("The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement," and its "investigative power must be broad if its public responsibility is adequately to be discharged."). A grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991) (quotation marks omitted). It may "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *Id.* And its work does not end "until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *Id.* (quotation marks omitted). In those respects, the grand jury functions as "'a grand inquest, ... the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an

accusation of crime.'" *Calandra*, 414 U.S. at 343 (quoting *Blair v. United States*, 250 U.S. 273, 282 (1919)).

In order to shield the innocent from unwarranted public approbation, and to avoid tipping off the guilty, the grand jury conducts inquiries and other proceedings in strict secrecy. *See, e.g.*, *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424-25 (1983) ("Grand jury secrecy ... is as important for the protection of the innocent as for the pursuit of the guilty.") (quotation marks omitted). Those proceedings are afforded a strong presumption of regularity. *R. Enterprises*, 498 U.S. at 300. The Supreme Court has rejected efforts to "cast upon the government the affirmative duty of proving such regularity," *United States v. Johnson*, 319 U.S. 503, 513 (1943), or to otherwise force the government to disclose admissible evidence of crime before allowing an investigation to proceed, *R. Enterprises*, 498 U.S. at 297-99.

For one thing, such requirements would subvert the purpose of the grand jury's inquiry. "The identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning," and thus "the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." *R. Enterprises*, 498

U.S. at 297 (brackets and quotation marks omitted). And even if it were possible to make such a showing at the outset of an investigation, "'saddl[ing] a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the fair and expeditious administration of the criminal laws.'" *Id.* at 298-99 (quoting *Dionisio*, 410 U.S. at 17). "Nothing could be more destructive of the workings of our grand jury system or more hostile to its historic status." *Johnson*, 319 U.S. at 513.

2. The Supreme Court applied these principles most recently in *R. Enterprises*, 498 U.S. at 292. There, the Court reversed a decision requiring the government to satisfy the three criteria for enforcing a *trial* subpoena set forth in *United States v. Nixon*, 418 U.S. 683 (1974)—*i.e.*, relevancy, admissibility, and specificity—in order to enforce a *grand-jury* subpoena. 498 U.S. at 296. The Court based that result on the significant differences between trials and grand-jury proceedings, reaffirming precedents that had declined to extend many "rules and restrictions" from the trial stage to the grand-jury setting. *Id.* at 298 (explaining that hearsay restrictions and the Fourth Amendment exclusionary rule do not apply to grand-jury proceedings). The Court reasoned that applying *Nixon*'s "multifactor test … would invite procedural delays and detours while courts evaluate the relevancy and admissibility of documents sought by a particular subpoena," which "frustrate the public's interest in the fair and

expeditious administration of the criminal laws.'" *Id.* at 298-99 (quoting *Dionisio*, 410 U.S. at 17). It also concluded that the *Nixon* standard "threatens to compromise" grand-jury secrecy and "affords the targets of investigation far more information about the grand jury's internal workings than the Federal Rules of Criminal Procedure appear to contemplate." *Id.* at 299.

In reaching its conclusion, the Court recognized that a grand jury's investigatory powers are "not unlimited," and that the grand jury is not (for example) "licensed to engage in arbitrary fishing expeditions" or select targets out of an intent to harass. 498 U.S. at 299. The Court also recognized that a grand-jury subpoena can be challenged under Federal Rule of Criminal Procedure 17(c) "if compliance would be unreasonable or oppressive." *Id.* (quotation marks omitted). The Court explained, however, that "an appropriate standard of reasonableness" under Rule 17(c) had to account for "the strong governmental interests in affording grand juries wide latitude, avoiding minitrials on peripheral matters, and preserving a necessary level of secrecy." *Id.* at 300. The Court thus reiterated the strong presumption in the law "that the grand jury acts within the legitimate scope of its authority" and that the subpoena recipient "bears the burden of showing unreasonableness." *Id.* at 300-01. And it held that, when a subpoena is alleged to be unreasonable "on relevancy grounds, the motion to quash must be denied unless the district court

determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *Id.* at 301.

Applying that standard, the Court held in *R. Enterprises* that the district court had correctly denied the subpoena recipients' motions to quash. 498 U.S. at 301-03. The district court, the Court explained, could have found "a reasonable possibility that the business records" of the subpoenaed companies "would produce information relevant to the grand jury's investigation into the interstate transportation of obscene materials," where the record showed that the three companies were owned by the same person and at least one of the three had shipped sexually explicit materials into the relevant district. *Id.* at 302. Because nothing more was required to satisfy the reasonableness standard, *id.* at 302-03, and because the companies had not alleged that the subpoenas were "too indefinite" or "compliance would be overly burdensome," *id.* at 301, they were not entitled to relief under Rule 17(c). The Court expressed no view on the companies' First Amendment challenge to the subpoenas. *Id.* at 303.

### B. Because The Subpoena In This Case Sought Information Pertinent To The Grand Jury's Investigation And Did Not Impose Onerous Compliance Burdens, The District Court Erred In Quashing It

1. The Board's reasonableness challenge to the subpoena fails under the *R. Enterprises* standard. "[T]he general subject of the grand jury's investigation"

here, *see* 498 U.S. at 301, is the existence of potential irregularities in the conduct of the November 2020 General Election in Fulton County. That investigation follows a magistrate judge's issuance of a search warrant based on a finding of probable cause to believe that evidence of certain federal election crimes would be found in Fulton Country's records. DE9-1:21-22. As the government explained in an *in camera* submission, execution of that search warrant yielded information that—as the district court put it—a number of the seized 2020 ballots "look suspicious." DE37:5 n.4.

Against that backdrop, the grand jury's request for "[r]osters of Election Staff Members who served in the November 2020 General Election," DE37:7, is reasonable under Rule 17(c)(2). The requested records would allow the grand jury to identify individuals who could potentially shed light on the irregularities under investigation. In particular, the records would identify witnesses who could explain how the November 2020 General Election was conducted in Fulton County and who may be able to provide information about the ballots uncovered during execution of the search warrant that appeared to be suspicious. That information is pertinent to the grand jury's inquiry into whether wrongdoing occurred and would be pertinent even if it served entirely to dispel any suspicion of criminal wrongdoing. *See R. Enterprises*, 498 U.S. at 297 ("[T]he grand jury 'can investigate merely on suspicion that the law is being violated, or

even just because it wants assurance that it is not.'") (quoting *United States v. Morton Salt. Co.*, 338 U.S. 632, 642-43 (1950)). There is, in short, "a reasonable possibility" that the subpoenaed records "would produce information relevant to the grand jury's investigation." *See id.* at 302. The district court therefore had no basis to quash the subpoena as unreasonable under the *R. Enterprises* standard.

The district court also had no basis to quash the subpoena on any other ground mentioned in *R. Enterprises* or the Supreme Court's prior grand-jury precedents. The Board did not assert that compliance would "violate a valid privilege," *Calandra*, 414 U.S. at 346, or that the subpoena's terms were vague or "indefinite." *R. Enterprises*, 498 U.S. at 301. Nor did the district court find that producing the records would be costly or "overly burdensome" in the way that the Court noted in *R. Enterprises* or that lower courts have considered in analogous contexts. *See id.*; *see also, e.g.*, *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum*, 555 F.2d 1306, 1307-08 (5th Cir. 1977) (reversing district court order quashing subpoena based on costs of compliance). To the contrary, the court recognized at the hearing on the motion to quash that the Board could likely produce the information "relatively easily from a logistical standpoint" and that compliance would not "be an undue burden from a logistical standpoint." DE16:22. And, although the Board did raise a First Amendment objection to compliance (DE1:19-22), the district court expressed "doubt[s]"

about the validity of that claim and did not rest its ruling on that ground. DE37:13 n.10; *cf. In re Grand Jury Proceeding*, 842 F.2d 1229, 1232 (11th Cir. 1988) (rejecting claim that enforcement of grand jury subpoena would violate movants' freedom of expressive association).

2. The district court, however, understood Rule 17(c)(2) to furnish authority to quash the subpoena after "weigh[ing] the Government's investigatory need for the personal information of election workers against the competing burden that [the Board] will suffer in compliance." DE37:13. The court derived that balancing test from Justice Stevens's partial concurrence in *R. Enterprises*, which would have interpreted Rule 17(c) to "require[] the district court to balance the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other." 498 U.S. at 303 (Steven, J., concurring in part and concurring in the judgment). The district court erred in following the concurrence rather than the *R. Enterprises* majority, and its remaining reasons for resorting to balancing lack merit.

To start, the district court's balancing approach cannot be reconciled with the majority opinion in *R. Enterprises*, which conducted no interest-balancing whatsoever. To the contrary, in applying Rule 17(c)(2)'s reasonableness standard to grand-jury subpoenas, the Court in *R. Enterprises* refused to extend "[t]he multifactor test" applicable to trial subpoenas to the grand-jury stage

because of the starkly different principles that govern at that stage. 498 U.S. at 298-302. The Court worried about the delays and risk of minitrials that such a test would entail, the threat to grand-jury secrecy its application would pose, and about forcing the government to proffer information about the investigation—including through *in camera* submissions that are a departure from typical adversarial proceedings. *Id.* at 298-302.

The kind of balancing that the district court conducted in this case—and that Justice Stevens favored—is antithetical to the concerns that animated the *R. Enterprises* majority opinion.[5] Justice Stevens envisioned district court authority to inquire into the grand jury's "degree of need" for requested information upon an initial showing that could consist of an objection as pedestrian as "the mere cost" of complying "in terms of time, money, and effort." 498 U.S. at 305 (Stevens, J., concurring in part and concurring in the judgment) (analogizing need-burden balancing to "the parallel context of pre-trial civil discovery"). But that sort of inquiry would entail precisely the "procedural delays and detours"

---

[5] Indeed, Justice Stevens recognized that the Court did not follow his approach, faulting the majority for "attempt[ing] to define the term 'reasonable' in the abstract, looking only at the relevance side of the balance." 498 U.S. at 304. For that reason, it is unsurprising that Justice Stevens did not join the portion of the majority opinion (Part III) that "define[d]" Rule 17(c)'s reasonableness standard as applied to grand-jury subpoenas. *See id.* at 306 (joining only "in Parts I and II of the Court's opinion").

that the Court warned about in *R. Enterprises*, *see* 498 U.S. at 298, as district courts unfamiliar with a particular grand jury investigation get up to speed on its subject matter and scope. Moreover, to inform a district court about those matters, the government may have to resort to *ex parte*, *in camera* submissions to adequately protect grand-jury secrecy and avoid disclosures to "the targets of investigation," *id.* at 299, thus departing from principles of adversarial presentation and placing additional burdens on courts. *See United States v. Zolin*, 491 U.S. 554, 571 (1989).

The district court's remaining grounds for engaging in balancing also lack merit. The court thought it permissible to follow Justice Stevens's approach on the theory that the subpoena recipient in *R. Enterprises* "challenged [the] subpoena for its 'relevance' rather than its reasonableness," DE37:14-15 n.12; *see id.* at 19 n.16, and the majority opinion addressed only the relevance issue. That is incorrect. The Court in *R. Enterprises* stated that its "task was to define" a "reasonableness limitation on grand jury subpoenas," "[t]o the extent that Rule 17(c) imposes" one. 498 U.S. at 300. The Court thus articulated general principles governing unreasonableness challenges to grand-jury subpoenas, of which "relevance" is one variant. *Id.* at 301.

The district court also suggested that, apart from Justice Stevens's concurrence, balancing-of-interests follows from "the plain meaning of

'reasonable'" in Rule 17(c), which the court understood to be "fair, sensible, and logical." DE137:14 n.11. But even if the word "reasonable" has that meaning (the court cited no source so providing), Rule 17(c)(2) does not actually feature the term "reasonable," much less use it in isolation. Rather, the Rule is written in the negative, authorizing courts to quash or modify subpoenas "if compliance would be *un*reasonable or oppressive." Fed. R. Crim. P. 17(c)(2) (emphasis added). And as explained above, the Supreme Court in *R. Enterprises* gave that phrase a particular construction in the grand-jury context, one that forecloses the balancing approach that the district court adopted. *See also Dionisio*, 410 U.S. at 15-16 & n.14 (finding no reason to require, based on supposed intrusion on witness, that a grand jury make "a preliminary showing of reasonableness" before directing witness to make a voice recording).

## II. EVEN IF BALANCING WERE PERMISSIBLE, THE DISTRICT COURT ABUSED ITS DISCRETION IN ASSESSING BOTH THE BURDENS THAT COMPLIANCE POSED TO THE BOARD AND THE GOVERNMENT'S NEED FOR THE INFORMATION

Even if Rule 17(c)(2) authorizes courts to balance governmental need against the burdens of compliance in the grand-jury context, the district court abused its discretion in conducting that analysis here. Justice Stevens's partial concurrence in *R. Enterprises* (and lower court decisions citing it) permit balancing under Rule 17(c)(2) only after the challenger makes a threshold showing that compliance would gravely intrude on a protected interest. The

district court committed a clear error of judgment in finding that the Board made that showing, where any chilling effect is attributable to the Board's decision to publicize the subpoena and the court failed to consider both the secrecy protections that normally attend grand-jury proceedings and pertinent provisions of Georgia law. And even if that threshold ruling were defensible, the district court erroneously understated the countervailing government interests by elevating the role of the statute of limitations at the grand-jury stage and misapplying the statute-of-limitations analysis.

### A. The Board Did Not Make The Threshold Showing, As Required To Trigger Balancing, That Compliance With The Subpoena Gravely Intruded On Any Protected Interest

Under Justice Stevens's partial concurrence in *R. Enterprises*, before a court can inquire into the government's need for subpoenaed information, the party challenging the subpoena bears the initial burden of showing (*inter alia*) "that compliance would intrude significantly on [its] privacy interests, or call for the disclosure of trade secrets or other confidential information." 498 U.S. at 305 (Stevens, J., concurring in part and concurring in the judgment).[6] Out-of-circuit

[6] Justice Stevens also stated that the movant could satisfy its initial burden by "demonstrat[ing] that compliance would have First Amendment implications" or, in some circumstances, by pointing to the "costs in terms of time, money, and effort of responding to a dragnet subpoena." 498 U.S. at 305. As explained above, the district court did not accept the Board's claim of First

authorities cited by the district court (DE37:15 n.13) likewise recognize judicial authority under Rule 17(c) "to quash a subpoena that intrudes gravely on significant interests outside the scope of a recognized privilege, if compliance is likely to entail consequences more serious than even severe inconveniences occasioned by irrelevant or overbroad requests for records." *In re Grand Jury, John Doe*, No. G.J. 2005-2, 478 F.3d 581, 585 (4th Cir. 2007) (quotation marks omitted); *see In re Grand Jury Subpoena Dated August 14, 2019*, 964 F.3d 768, 773 (8th Cir. 2020) (applying grave-intrusion standard).

Here, although the district court did not expressly apply this grave-intrusion standard, the court apparently concluded that the Board had showed that compliance would entail such an intrusion because it "would chill the participation of election workers and impair Fulton County's ability to administer its elections." DE37:16 (quotation marks omitted). For three reasons, the district court abused its discretion in reaching that conclusion.[7]

---

Amendment implications here, DE37:13 n.10, and separately rejected any suggestion of an undue logistical burden on the Board, DE16:22.

[7] These same reasons show why, if the district court permissibly engaged in balancing under the *R. Enterprises* concurrence, the court committed a clear error of judgment in deeming compliance to pose a "severe" burden to the Board that outweighed the government's interest in the information. DE37:25.

First, the district court overlooked that the Board itself caused any chilling effect by appending the subpoena to its publicly filed motion to quash and, after the district court sealed that filing, moving to unseal the materials. DE1; DE7; *see* DE11-1:1-2 (media intervenors' explanation that motion and subpoena were initially filed on public docket and that the Fulton County Commission Chairman spoke "publicly about the Subpoena"); DE16:16 (same). The court perceived a risk of chill from election workers' fears that their personal identifying information would be "disclosed to federal law enforcement," which would assertedly make it more difficult to recruit "poll workers and other election volunteers" in the future. DE37:25-27. But the only reason that election workers like the one quoted by the district court knew the grand jury sought to identify them was because the Board had publicly revealed the subpoena. Any chilling effect is therefore "self-inflicted," *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)), and insufficient to establish the kind of grave intrusion that could empower a court to conduct interest-balancing under Rule 17(c)(2). *See id.* (finding no live controversy in challenge to state's address-disclosure requirement where any chilling effect would be self-inflicted because candidates had ways to avoid the requirement going forward); *cf. City of S. Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) (organization cannot establish Article III "standing under a

diversion-of-resources theory … by inflicting harm on itself to address its members' fears of hypothetical future harm that is not certainly impending") (quotation marks omitted).

In the district court, the Board asserted that, as a grand-jury witness, it had the "right" to publicize the subpoena. DE16:7; DE7:9-10. It also suggested that sealing was unwarranted because search-warrant materials in the recent *Pitts* Rule 41(g) litigation had been publicly docketed and then-Deputy Attorney General Blanche had confirmed the existence of "'a grand jury investigation being run by the FBI'" in an interview. DE7:3-4. Neither the search-warrant materials nor Mr. Blanche's cited comments, however, revealed the fact that the district court found to create a chilling effect—namely, that the grand jury was seeking the identifying information of election workers from the 2020 General Election. *See* DE7:4 n.3 (citing report of CNN interview where then-Deputy Attorney General Blanche stated that "we can't talk about specifics of any grand jury investigation" and described the nature of investigation as "tightly held, as it must be under the law").[8] Moreover, the fact that the Board's disclosure was

[8] The Board's motion cited to the following online article featuring a video and transcript of Blanche's comments: Tim Hains, *Deputy AG Todd Blanche: FBI Had A Warrant From Federal Grand Jury To Investigate 2020 Georgia Election Fraud Allegations, RealClear Politics* (Feb. 1, 2026), https://www.realclearpolitics.com/video/2026/02/01/deputy_ag_todd_blanche_fbi_had_a_200bwa

permitted by law does not alter the conclusion that the asserted chill was attributable to that voluntary disclosure. The district court was wrong to let the Board bootstrap searching judicial review of the subpoena from an asserted chilling effect that the Board itself created.

Second, and relatedly, the district court erred by giving no evident weight to the strict secrecy protections that govern grand-jury subpoenas under Federal Rule of Criminal Procedure 6(e)(6). *See* DE16:69-70, 74-75 (advancing arguments under Rule 6(e) at motion hearing). As explained, the court credited a declaration from a member of the Georgia State Election Board that linked the chill to the possibility that disclosing personal identifying information to federal law enforcement would lead to harassment on social media. DE37:25-26. Such a chill necessarily depends on the notion that information provided to the grand jury will make its way into the public sphere. But federal law bars, on pain of criminal contempt, prosecutors and law enforcement personnel privy to subpoenaed records from disclosing them. Fed. R. Crim. P. 6(e)(2)(B)(vi) and (vii), (e)(7). And the Supreme Court has repeatedly relied on these secrecy protections in refusing to excuse particular individuals or groups from complying with grand-jury subpoenas.

---

rrant_from_federal_grand_jury_to_investigate_2020_voter_georgia_fraud_allegations.html.

In *Trump v. Vance*, 591 U.S. 786 (2020), for example, the Court held that the President was not absolutely immune from complying with "state criminal subpoenas." *Id.* at 800. The Court rejected concerns based on, among other things, "the stigma of being subpoenaed," *id.* at 803, reasoning that "longstanding rules of grand jury secrecy aim to prevent the very stigma the President anticipates." *Id.* at 804. The Court acknowledged that "disclosure restrictions are not perfect" but found them sufficiently protective where, as here, the prospect of criminal penalties means that "those who make unauthorized disclosures do so at their peril." *Id.* (citing state law making unlawful grand jury disclosure a felony); *see also Branzburg*, 408 U.S. at 700 (relying, in rejecting a reporters' privilege, on "the characteristic secrecy of grand jury proceedings [a]s a further protection against the undue invasion of [First Amendment] rights"). Given the presumption of regularity afforded grand jury proceedings, *see R. Enterprises*, 498 U.S. at 300-01, the district court should have presumed that these secrecy restrictions would be honored—not found a "severe" burden predicated on the possibility that they would be breached.

Third, the district court's analysis overlooked provisions of Georgia law that undermine any expectation that the identifying information of election workers employed by the county would be free from grand-jury scrutiny. *See* DE9:10-11 & n.4 (government cites relevant provisions); DE33:23-24 (Board's

response). Georgia's Open Records Act provides that, although the personal contact information of public employees may not be disclosed in response to a public records request, Ga. Code Ann. § 50-18-72(a)(21), it may be "requested in writing by a state or federal grand jury … in conjunction with an ongoing administrative, criminal, or tax investigation," in which case "[t]he lawful custodian shall provide copies of such records to the requesting agency unless such records are privileged or disclosure to such agencies is specifically restricted by law." Ga. Code Ann. § 50-18-77. The Georgia legislature, in other words, has already weighed the relevant privacy interests and determined that employee records can be disclosed to grand juries, both state and federal, without any heightened showing of need. That legislative judgment undermines the district court's finding of a "severe" burden, DE37:25, and confirms that the subpoena does not intrude gravely on the Board's interests.

### B. The District Court's Premature Reliance On The Statute Of Limitations Erroneously Understated The Government Interests In Obtaining The Subpoenaed Information

The district court balanced the purportedly severe burden on the Board against the government's need for the subpoenaed information. The court assessed that need to be "low" largely because, in the court's telling, "[t]he statute of limitations for any possible crime arising from the 2020 Election has long expired." DE37: 4, 19. The court was mistaken on multiple levels. A future

*defendant's* (waivable) statute-of-limitations defense is not a valid basis to quash a subpoena served on a grand-jury *witness*. It is therefore unsurprising that the district court cited no appellate precedent approving the wholesale quashing of a grand-jury subpoena on that ground. And even if it were appropriate to consider the possible expiration of the limitations period at the grand-jury stage, the court erred in its analysis of the pertinent timeliness principles here.

#### *1. The possible expiration of the statute of limitations for certain offenses does not render compliance with a subpoena unreasonable or oppressive under Rule 17(c)(2).*

The district court recognized that "'[a] subpoena is not objectionable merely because it seeks documents beyond the period of the statute of limitations[.]'" DE37:17-18 (quoting 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 276 (4th ed. 2026)). The court nevertheless made the purported expiration of the limitations period for "any alleged crime related to the 2020 Election" the centerpiece of its decision to quash the subpoena. DE37:18. That was error because the statute of limitations is an affirmative defense to be raised following the return of an indictment, not the basis for a witness served with a subpoena to avoid compliance with it.

a. As explained above, the Supreme Court in *R. Enterprises* reaffirmed that a grand jury's "operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." 498 U.S. at 298

(quoting *Calandra*, 414 U.S. at 343); *see id.* ("This Court has emphasized on numerous occasions that many of the rules and restrictions that apply at a trial do not apply in grand jury proceedings."). The Court gave as examples "the rule against hearsay" and "the Fourth Amendment exclusionary rule." *Id.* The statute of limitations is another such rule particular to the trial stage of criminal proceedings and inapplicable at the grand-jury stage.

As the district court observed (DE37:3), grand juries return "indictments of individuals" (or entities) "alleged to have committed prosecutable crimes." But the statute of limitations is not part of any indictment a grand jury may return. Commission of the crime within the limitations period is not an element of the offense under federal law. *See Musacchio v. United States*, 577 U.S. 237, 247 (2016). Nor does the government "need [to] allege the time of the offense in the indictment." *Smith v. United States*, 568 U.S. 106, 112 (2013). And even following indictment, the statute of limitations is an affirmative defense that is subject to principles of waiver and forfeiture and that becomes part of a federal criminal case only if timely raised by a particular defendant. *See Musacchio*, 577 U.S. at 248 & n.3; *United States v. Najjar*, 283 F.3d 1306, 1208-09 (11th Cir. 2002). The statute of limitations' status as a defense personal to a defendant and unique to the trial stage makes it an unsuitable ground for objecting to a grand-jury subpoena served on a mere witness such as the Board here.

b. The nature of a statute-of-limitations defense confirms that conclusion. As this Court has explained, "whether a valid statute of limitations defense exists is not a cut and dry matter." *Pickens v. Hollowell*, 59 F.3d 1203, 1208 (11th Cir. 1995); *accord Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007) ("The application of the limitations period is not a clear cut matter in criminal prosecutions."). And the answer to that question can change based on facts uncovered during the grand jury's investigation. To take one example, although the limitations period for ordinary wire- and mail-fraud offenses is five years under 18 U.S.C. § 3282, that period extends to 10 years "if the offense affects a financial institution," 18 U.S.C. § 3293. The key fact triggering an extended limitations period—a scheme's effect on a financial institution—is the very type of information that might come to light during an investigation.

The viability of a limitations defense can also depend on information or events outside the grand jury's purview. For instance, the limitations period can be tolled based on the defendant's fugitive status, 18 U.S.C. § 3290; a prosecutor's pre-indictment request for records from a foreign country, *see* 18 U.S.C. § 3292; *Fraser v. United States*, 834 F.2d 911, 914 n.4 (11th Cir. 1987); or a tolling agreement between prosecutors and a defendant under investigation, *e.g., United States v. Smukler*, 991 F.3d 472, 489 & n.12 (3d Cir. 2021). These

circumstances, any of which could arise during the course of an investigation, may make viable charges that once appeared time barred.

In addition, a subpoena recipient may not be in position to know whether any of the foregoing circumstances exists in a given case. *Cf. Pickens*, 59 F.3d at 1208 (recognizing that police officers executing arrest warrants are not in a position to determine whether, for example, charges are timely because of statutory tolling); *Sands*, 502 F.3d at 269 (same). As a result, any challenge to the subpoena made by such a recipient would implicate the very concerns that the Supreme Court described in *R. Enterprises*, 498 U.S. at 298-300—*i.e.*, requiring the government to proffer sensitive facts about the investigation to the district court in opposing a motion to quash, potentially through the type of *in camera*, *ex parte* procedures that the Board opposed in this case. DE34. The delays ensuing from proceedings of that character would, ironically enough, raise the very staleness concerns that the district court understood as animating the statute-of-limitations defense. DE37:17, 19.

c. In light of these considerations, it is unsurprising that neither the Board nor the district court cited any appellate authority approving the quashing of a grand-jury subpoena based on the asserted expiration of the limitations period. Case law is uniformly to the contrary.

As one leading treatise puts it, "federal courts have refused to recognize

witness challenges alleging that the grand jury inquiry concerned offenses as to which prosecution would be barred by the statute of limitations." 2 Wayne R. LaFave, *et al.*, *Criminal Procedure* § 8.8(a) (Nov. 2025 update); *see* Sara Sun Beale, *et al.*, *Grand Jury Law and Practice* § 9:25 (2d ed.) (a grand jury "witness cannot refuse to answer questions about offenses that appear to be barred by the statute of limitations"). The relevant decisions start from the premise that "the grand jury's scope of inquiry is not limited to events which may themselves result in criminal prosecution, but is properly concerned with any evidence which may afford valuable leads for investigation of suspected criminal activity during the limitations period." *Trump v. Vance*, 977 F.3d 198, 212 (2d Cir. 2020) (quotation marks omitted); *see United States v. Nickels*, 502 F.2d 1173, 1176 (7th Cir. 1974) (noting that a challenge to grand-jury questioning about events prior to the five-year statute of limitations "is without merit because the grand jury's scope of inquiry is not limited to events which may result in criminal prosecution"). Courts have accordingly recognized that "[a] grand jury may ask questions about events outside of the statute of limitations" in the course of investigating other crimes, *United States v. Picketts*, 655 F.2d 837, 841 (7th Cir. 1981); *see Coson v. United States*, 533 F.2d 1119, 1120 (9th Cir. 1976), because "even if prosecution of the original offenses were barred by the statute of limitations or some other defense or exemption, the grand jury's inquiry might lead it to other offenses

which would still be subject to prosecution," Beale, *supra*, § 9:25.

The Ninth Circuit's decision in *Coson*, 533 F.2d 1119, is instructive. There, a subpoena recipient resisted production of corporate business records on the ground that "some of the subpoenaed records go back beyond the statute of limitations." *Id.* at 1120. The Ninth Circuit rejected that argument. Coson's objection, the court explained, "might bar some possible prosecutions, but it has nothing to do with the grand jury's right to inquire into crimes." *Id.* In so concluding, the court observed that "[t]ime-barred facts may be relevant on questions of intent." *Id.* That same logic shows why the district court erred in conducting a full-blown statute-of-limitations analysis as a basis for quashing the subpoena to the Board.

d. The district court, for its part, acknowledged some of the principles reflected in the above cases, including that the statute of limitations is an affirmative defense to be raised "*after* prosecution has already begun." DE37:22 (emphasis in original). The court nonetheless believed the limitations period pertinent to assessing the government's need for subpoenaed information at the grand-jury stage on the theory that any defendant would inevitably "bring up a statute of limitations bar" and that, "[i]ndeed, it would be malpractice and constitute ineffective assistance of counsel for such party's attorney not to raise [that] defense." *Id.* But the same could be said of the Fourth Amendment

exclusionary rule and the bar on hearsay, two "technical procedural and evidentiary rules governing the conduct of criminal trials" that the Supreme Court has held inapplicable to grand jury proceedings. *See R. Enterprises*, 498 U.S. at 298 (quotation marks omitted). It might be ineffective assistance, for example, for an indicted defendant's attorney to forgo a motion to suppress illegally obtained evidence, *see Kimmelman v. Morrison*, 477 U.S. 365 (1986), but that does not empower a district court to invoke the exclusionary rule in quashing a grand-jury subpoena under Rule 17(c).

Moreover, the district court gave no basis for its view that all defendants will necessarily (or "inescapabl[y]") raise a limitations defense that might be available. *See* Beale, *supra*, § 9:25 (noting that courts have declined to quash subpoenas on limitations grounds in part because "the defense might not be asserted"). A defendant might, for example, forgo a statute-of-limitations argument to facilitate a plea to a lesser charge; prefer vindicating his reputation through an acquittal at trial over dismissal on what might be perceived as a technicality; or simply think that securing pre-trial dismissal on a different ground better serves his legal or strategic goals. *See State v. Pearson*, 858 S.W.2d 879, 887 n.8 (Tenn. 1993); Comment, *Waiver of the Statute of Limitations in Criminal Prosecutions: United States v. Wild*, 90 Harv. L. Rev. 1550, 1554-55 (1977). Either way, the court's unsupported supposition that criminal charges

would inevitably be dismissed on statute-of-limitations grounds provides no basis for transforming a waivable trial defense personal to the defendant into a ground for quashing a grand jury's subpoena to a witness.

Finally, the district court's focus on whether the subpoenaed information would lead to prosecutable offenses overlooks a grand jury's authority to prepare a report in the event all offenses within the scope of the investigation turned out to be time-barred. Although this Court's predecessor noted "variation in views concerning the limits of grand jury power to issue reports," *United States v. Briggs*, 514 F.2d 794, 802 (5th Cir. 1975), federal courts have continued to recognize that "[f]actual situations do exist where a federal grand jury may properly issue a report." *In re Grand Jury Sitting in Cedar Rapids, Iowa*, 734 F. Supp. 875, 876 (N.D. Iowa 1990). And there is no doubt that a special grand jury convened under 18 U.S.C. § 3331 would have the authority to issue a report in certain situations, *see* 18 U.S.C. § 3333(a), or that information obtained pursuant to this subpoena could be provided to such a body. *See* Fed. R. Crim. P. 6(e)(3)(C) (authorizing "[a]n attorney for the government [to] disclose any grand-jury matter to another federal grand jury"). The possibility of a grand-jury report, in short, further demonstrates that the district court was mistaken in its singular focus on whether the subpoenaed information would lead to prosecutable offenses within the limitations period.

*2. The district court's limitations analysis was mistaken in any event.*

To the extent an analysis of potentially applicable statutes of limitations is relevant to assessing the reasonableness of the subpoena, the district court erred in conducting that analysis. The court did not dispute (DE37:4, 27) that the subpoena could serve one of the valid purposes recognized in the cases cited above—*i.e.*, providing investigative leads, corroborating evidence, or determining whether offenses commenced outside of the limitations period continued during that period. The court deemed the government's need for the information to be minimal, however, by focusing solely on whether the subpoena sought information likely to result in a "prosecutable" offense. DE27:18, 19, 22. The court abused its discretion in so concluding.

a. As an initial matter, the district court's analysis contravened the principles governing judicial review of grand-jury proceedings and prosecutorial charging decisions. The court declared that a grand jury's "ultimate purpose" is "to help the prosecutor indict valid criminal charges," DE37:17, and then set out to determine whether that ultimate purpose was being served here. The court listed seven criminal statutes that it determined were the "potential crimes" that evidence from the subpoena might uncover. DE37:18. The court then determined that criminal charges under any of those seven statutes would be barred by the statute of limitations. *Id.* Faulting the government for not making

"a showing that the subpoenaed information will result in a prosecutable crime," DE37:19, the court ultimately concluded that "DOJ's need for the subpoenaed information" was "questionable, at best." *Id.*

That analysis was improper under *R. Enterprises*. By requiring the government to make a "showing that the subpoenaed information will result in a prosecutable crime," DE37:19, the district court disregarded the Supreme Court's holding that the recipient of a grand jury subpoena, not the proponent, bears the burden of persuasion and must make a "strong showing" that compliance would be unreasonable or oppressive in order to overcome the presumption of regularity. *R. Enterprises*, 498 U.S. at 300. The government, however, is under no obligation to defend a subpoena by predicting what eventual criminal charges might result from it, if any. "The identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning," and thus "the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." *Id*. at 297 (brackets and quotation marks omitted). Indeed, far from requiring the government to make a showing that its investigation would lead to a "prosecutable crime," the Supreme Court has

acknowledged that a grand jury's investigation might be merely into "whether a crime has been committed," *Dionisio*, 410 U.S at 15, and that a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *R. Enterprises*, 498 U.S. at 297.

The district court's rationale also disregarded settled principles allocating charging responsibilities to prosecutors, not courts. No less than deciding "[w]hether to prosecute," the decision of "what charge to file or bring before a grand jury generally rest[s] in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 (1979). Here, however, the district court marched through a set of seven offenses that it (and the Board) identified as possible charges, deemed those to comprise the entire universe of crimes that might potentially warrant investigation, and then concluded that the statute of limitations had run on all of them. DE37:18-19.[9] That analysis was erroneous.

b. In any event, the district court was wrong even under its own prosecutable-offense focus because the court identified at least one crime that is *not* necessarily time-barred. Specifically, the court recognized that the

---

[9] To highlight one example of the district court's erroneous approach, the court identified false statements (18 U.S.C. § 1001) and witness tampering (18 U.S.C. § 1512) as two potential offenses yet apparently did not consider other offenses involving concealment or obstruction, such as document destruction in violation of 18 U.S.C. § 1519 or even misprision of a felony (18 U.S.C. § 4).

government's investigation encompasses "an alleged failure on the part of Fulton County to preserve its ballot images from 2020 for the time required by law," and that "[s]uch alleged failure to preserve records arguably would not be barred by the statute of limitations." DE37:5. The court was correct in that regard: 52 U.S.C. § 20701 mandates that certain records be maintained for a period of 22 months after a presidential election and provides criminal penalties for willfully failing to comply with that requirement. A neighboring section, in turn, punishes "[a]ny person who willfully steals, destroys, conceals, mutilates, or alters any record or paper [that § 20701 requires] to be retained and preserved." 52 U.S.C. § 20702. Because the 22-month retention period ended in September 2022 for records pertaining to the 2020 General Election, the five-year limitations period for violating these statutes runs into September 2027.

The record before the district court made clear that violations of these statutes were well within the scope of the grand jury's investigation. Indeed, the search warrant challenged in the *Pitts* litigation had issued based on a magistrate judge's finding of probable cause to believe that evidence of a § 20701 violation would be found in the Board's records. DE9-1:21-22. Moreover, in its post-hearing brief below, the government identified—by reference to the search-warrant affidavit addressed in *Pitts*—evidence that some ballot image files from 2020 may have been altered as recently as January 2024 and others may have

been overwritten when tabulator tapes were reused during the 2022 election. DE19:3. That explanation sufficed to show that the grand jury has an interest in (and need for) information that could help determine whether a prosecutable violation of (at least) § 20701 occurred within the applicable limitations period.

The district court's reasons for resisting that conclusion are unsound. The court's apparent view that any record alterations in 2024 would not violate § 20701 or cognate statutes (DE37:24) contravenes the settled principle that "the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause." *R. Enterprises*, 498 U.S. at 297; *see In re Grand Jury Proceedings No. 92-4*, 42 F.3d 876 (4th Cir. 1994) ("The grand jury is under no obligation at the investigative stage to prove its case to a court of law."). The court also intimated that even a potentially timely § 20701 charge would not establish a legitimate government need for the subpoenaed information because that offense is punished as a misdemeanor. DE37:24. But the court identified nothing improper about a grand jury investigating a misdemeanor given that federal law expressly permits charging misdemeanors by indictment. *See* Fed. R. Crim. P. 58(b)(1); *United States v. Ayala-Bello*, 995 F.3d 710, 713 (9th Cir. 2021).

The district court separately expressed skepticism that election workers from the November 2020 General Election could shed light on any alteration

allegations from subsequent years. DE37:24-25 & n.19. Understanding whether and to what extent irregularities occurred in November 2020, however, could inform the grand jury's assessment of whether subsequent record alterations or retention failures are more likely attributable to intentional misconduct or have an innocent explanation. Put another way, identifying election workers with pertinent knowledge would help answer the question of *why* someone might intentionally alter or dispose of records years later. As explained above, it is within the grand-jury's purview to seek information shedding light on such motives or intent even if the facts at issue occurred outside the statute of limitations. *See Coson*, 533 F.2d 1119. And information about motive and intent would be especially valuable here, where the potential offenses analyzed by the district court would (if charged) require proof of heightened mental states, including willfulness in § 20701. DE37:18; *see United States v. Campa*, 529 F.3d 980, 999 (11th Cir. 2008) (describing laws requiring proof of willfulness, or knowledge and willfulness, as "requir[ing] a heightened mens rea").

c. The Supreme Court's decision in *Grunewald v. United States*, 353 U.S. 391 (1957), is not to the contrary. *Grunewald* held that the statute of limitations for a conspiracy offense begins to run once "the central criminal purposes of [the] conspiracy have been attained," and that later "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy," do not

extend the life of the conspiracy for limitations purposes. *Id.* at 401-02. The district court thought *Grunewald* important because, in opposing the motion to quash, the government stated that any criminal acts "subsequent" to the November 2020 election, "or acts in furtherance of a criminal conspiracy, would restart the limitations period." DE9:16. But *Grunewald* speaks at most to the category of conspiracies hatched prior to the November 2020 General Election that had as their sole objective affecting the election results; it does not address the possibility that the grand jury's investigation would yield evidence of, for example, a multi-object conspiracy, only one facet of which was an agreement to commit a statutory offense within the limitations period. *See, e.g.*, *United States v. Arlt*, 252 F.3d 1032, 1038 (9th Cir. 2001) (en banc) ("the specific substantive offense that the defendant is alleged to have conspired to commit" is an element of the general conspiracy statute, 18 U.S.C. § 371).

Nor does *Grunewald* address the other category on which the government relied—namely, discrete acts of obstruction or concealment occurring "subsequent" to the November 2020 General Election that violate other statutes carrying their own five-year limitations period. *See* DE9:16. The district court itself recognized that prosecutions based on these acts might not be time-barred. DE37:4. And, as explained above, a grand jury investigating any such acts could permissibly look back to the time period of the November 2020 General Election

in assessing (at least) proof of the mental state needed to support the pertinent charges. *See, e.g.*, *Coson*, 533 F.2d at 1120 ("Time-barred facts may be relevant on questions of intent.").

### C. Any Overbreadth Concerns Can Be Addressed By Modifying, Rather Than Quashing, The Subpoena

Although the district court did not reach the Board's claim that the subpoena is "overbroad," DE27:13 n.10, the court elsewhere alluded to concerns over the subpoena's "breadth." *Id.* at 1. Any such concerns, however, would not justify quashing the subpoena in its entirety. Rule 17 authorizes courts to "quash *or* modify [a] subpoena," Fed. R. Crim. P. 17(c)(2) (emphasis added), and courts generally prefer "modification of a subpoena … to quashing it outright." *Wiwa v. Royal Dutch Petroleum, Co.*, 392 F.3d 812, 818 (5th Cir. 2004). As the government explained at the motions hearing, no departure from that general practice is warranted here, where the district court retains the ability on remand "to tailor [the subpoena] or narrow it down." DE16:84.

## CONCLUSION

The order quashing the grand jury subpoena should be reversed.

Respectfully submitted,

/s/ Dan Bishop
J. DANIEL BISHOP
Special Attorney to the Attorney General and United States Attorney for the Middle District of Norh Carolina
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
(336) 332-6333
Dan.Bishop@usdoj.gov

OCTOBER 5, 2026

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Appellate Procedure 25(d), the undersigned counsel of record certifies that the foregoing Opening Brief for the United States was this day served on counsel for petitioner-appellee by notice of electronic filing with the Eleventh Circuit CM/ECF system.

DATED: OCTOBER 5, 2026

/s/ Dan Bishop
J. DANIEL BISHOP

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,718 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

DATED: OCTOBER 5, 2026

/s/ Dan Bishop
J. DANIEL BISHOP