No. 26-12769-AA

# In the United States Court of Appeals for the Eleventh Circuit

FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS,
Petitioner–Appellee,

v.

UNITED STATES OF AMERICA,
Respondent–Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NO. 1:26-CV-02777 (Hon. William R. Ray, II)

**APPELLANT APPENDIX**

J. DANIEL BISHOP
Special Attorney to the Attorney General and United States Attorney for the Middle District of Norh Carolina
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
(336) 332-6333
Dan.Bishop@usdoj.gov

# INDEX OF APPENDIX[1]


Docket Sheet .......... A

Motion to Quash Grand Jury Subpoena by Fulton County Board of Registration and Elections with Exhibits .......... 1

Order Staying Any Enforcement of the Referenced Subpoena .......... 3

Motion to Unseal Docket by Fulton County Board of Registration and Elections .......... 7

Response in Opposition to Quash Grand Jury Subpoena and Cross-Motion to Enforce Grand Jury Subpoena filed by United States with Exhibits .......... 9

Motion to Intervene and for Access to Court Record by Advance Publications, Inc., et al. .......... 11

Minute Entry for Proceedings Held before Judge William M. Ray, II: Motion Hearing held on 5/19/2026 .......... 14

Order Directing Respondent to File a Supplemental Brief .......... 15

Transcript of Proceedings Held on 5/19/2026, Before Judge William M. Ray .......... 16

Posthearing Brief of United States of America on Petitioner's Motion to Quash and Cross-Motion to Enforce Grand Jury Subpoena .......... 19

Motion for In Camera Review With Brief In Support by United States .......... 32

Fulton County Board of Registration and Elections's Supplemental Brief in Support of its Motion to Quash .......... 33


[1] Petitioner's exhibits offered at the May 19, 2026 hearing are part of the record under seal at DE17. The United States does not have access to the file-stamped copies of these documents and so did not include them in a separate sealed appendix per 11th Cir. R. 25-3(h).

Response in Opposition Re Motion for In Camera Review........................... 34

Order Granting Motion to Unseal and Terminating as Moot........................ 36

Order Granting Fulton County's Motion to Quash with Exhibits[2]................ 37

Notice of Appeal.......................................................................... 38

Motion to Supplement Transmission of Notice of Appeal ............................ 44

[2] The United States' brief referred to DE137 on page 27 and DE27 on page 43. Both references should have been to DE37.

# A

APPEAL,CLOSED,EXH,WMRLC2

# U.S. District Court
# Northern District of Georgia (Atlanta)
# CIVIL DOCKET FOR CASE #: 1:26-cv-02777-WMR

In re: Grand Jury Subpoena
Assigned to: Judge William M. Ray, II
Case in other court: USCA- 11th Circuit, 26-12769-A
Cause: FRCP 45(b) Motion to quash or modify subpoena

Date Filed: 05/15/2026
Date Terminated: 07/07/2026
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Petitioner**

**Fulton County Board of Registration and Elections**

represented by

**Abbe David Lowell**
Lowell & Associates, PLLC
1250 H St NW, Ste 250
Washington, DC 20005
202-508-4450
Fax: 202-964-6116
Email: alowellpublicoutreach@lowellandassociates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack Bolen**
Lowell & Associates, PLLC
1250 H Street NW
Washington, DC 20005
301-651-5610
Email: jbolen@lowellandassociates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
Chaiken Ghali LLP
One Atlantic Center
1201 West Peachtree Street, NW
Suite 2300
Atlanta, GA 30309
404-795-5005
Email: kghali@chaikenghali.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Allan Josephson**
Chaiken Ghali LLP
One Atlantic Center

1201 W. Peachtree Street
Suite 2300
Atlanta, GA 30309
706-296-8066
Email: mjosephson@chaikenghali.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Duffey**
Chaiken Ghali LLP
1201 W. Peachtree Street
Suite 2300
Atlanta, GA 30309
404-795-5005
Email: mduffey@chaikenghali.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Norman Larry Eisen**
Democracy Defenders Fund
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
202-594-9958
Email: norman@democracydefenders.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Allen Jonas**
Democracy Defenders Fund
600 Pennsylvania Ave SE
Suite 15180
Washington, DC 20003
781-898-8351
Email: steve@democracydefenders.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Y. Soo Jo**
Office of the Fulton County Attorney
141 Pryor Street, SW
Suite 4038
Atlanta, GA 30303
404-612-0235
Email: soo.jo@fultoncountyga.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

| | | |
|---|---|---|
| **United States of America** | represented by | **James Daniel Bishop**<br>DOJ-USAO<br>101 S Edgeworth St<br>4th Floor<br>Greensboro, NC 27401<br>336-332-6333<br>Email: dan.bishop@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Advance Publications, Inc.** | represented by | **Jacquelyn Nicole Schell**<br>Ballard Spahr LLP<br>999 Peachtree Street NE<br>Suite 1600<br>Atlanta, GA 30309<br>646-346-8048<br>Fax: 212-223-1942<br>Email: SchellJ@BallardSpahr.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>Ballard Spahr LLP - NY<br>1675 Broadway, 19th Floor<br>New York, NY 10019<br>440-647-7129<br>Email: fehlank@ballardspahr.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Bloomberg L.P.**<br>*the publisher of Bloomberg News* | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Cable News Network, Inc.** | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **The E.W. Scripps Company** | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **Movant** | | |
| **Gray Local Media, Inc.**<br>*doing business as*<br>WANF | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **Movant** | | |
| **NBCUniversal Media, LLC**<br>*doing business as*<br>NBCUniversal News Group | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **Movant** | | |
| **The New York Times Company** | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **Movant** | | |
| **Pro Publica, Inc.** | represented by | **Jacquelyn Nicole Schell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kirsten Fehlan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

**Reuters News & Media Inc.** represented by **Jacquelyn Nicole Schell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Fehlan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**WP Company LLC**
*doing business as*
The Washington Post

represented by **Jacquelyn Nicole Schell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Fehlan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/04/2026 | 1 | MOTION to Quash Grand Jury Subpoena by Fulton County Board of Registration and Elections. (Attachments: # 1 Exhibit A- Subpoena, # 2 Civil Cover Sheet)(dgr) (Main Document 1 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Attachment 2 replaced on 5/27/2026) (jpa). (Main Document 1 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Attachment 2 replaced on 5/27/2026) (jpa). (Main Document 1 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Attachment 2 replaced on 5/27/2026) (jpa). (Entered: 05/05/2026) |
| 05/05/2026 | | Filing Fee Paid: $52.00, receipt number 100026805 (dgr) (Entered: 05/05/2026) |
| 05/05/2026 | | ***Attorney Information Notification re: Attorney in database-PHV Motion Required for Abbe David Lowell, John Bolen, Stephen Jonas, and Norman Eisen representing Fulton County Board of Registration and Elections. Updated information can be found in Document 1 . (dgr) Modified on 5/6/2026 letter sent (mh). (Entered: 05/05/2026) |
| 05/05/2026 | 3 | ORDER staying any enforcement of the referenced subpoena which is the subject of the Motion of the Fulton County Board of Registration and Elections to Quash Grand Jury Subpoena (Motion) until such time as the United States Department of Justice (DOJ) has had an opportunity to respond in writing to said Motion and until the time that the Court has issued a ruling on said Motion. Once the DOJ has responded to the Motion, the Court will schedule a hearing on this matter. The Petitioner, Fulton County Board of Registration and Elections, is directed to send a copy of this Order to the DOJ. Signed by Judge William M. Ray, II on 5/5/26. (served by crd)(jpa) (Main Document 3 replaced on 5/27/2026) (jpa). (Entered: 05/06/2026) |
| 05/06/2026 | 2 | Letter from Clerk re: LR 83.1 Pro Hac Vice requirements sent to Abbe David Lowell. Clerk to follow-up by 5/18/2026. (mh) (Main Document 2 replaced on 5/27/2026) (jpa). (Entered: 05/06/2026) |
| 05/13/2026 | 4 | CERTIFICATE OF SERVICE re 1 MOTION to Quash Grand Jury Subpoena filed by Fulton County Board of Registration and Elections (rlh) (Main Document 4 replaced on |

| | | |
|---|---|---|
| | | 5/27/2026) (jpa). (Entered: 05/14/2026) |
| 05/13/2026 | 5 | NOTICE of Filing Civil Cover Sheet by Fulton County Board of Registration and Elections (Attachments: # 1 Civil Cover Sheet)(rlh) (Main Document 5 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Entered: 05/14/2026) |
| 05/14/2026 | 6 | NOTICE of Hearing on Motion re: 1 MOTION to Quash Grand Jury Subpoena Motion Hearing set for 5/19/2026 at 01:30 AM in ROME Courtroom 300 before Judge William M. Ray II. Each side shall submit prior to the start of the hearing, a proposed order which includes findings of fact and conclusions of law for each motion being heard. Orders should be submitted by email to: sherri_lundy@gand.uscourts.gov. (cnw) (Main Document 6 replaced on 5/27/2026) (jpa). (Entered: 05/14/2026) |
| 05/14/2026 | | Clerk's Certificate of Mailing re 6 Notice of Hearing on Motion, mailed to all counsel. (cnw) (Entered: 05/14/2026) |
| 05/14/2026 | 7 | MOTION to Unseal Docket by Fulton County Board of Registration and Elections. (bgt) (Main Document 7 replaced on 5/27/2026) (jpa). Modified on 6/24/2026 (cnw). (Entered: 05/14/2026) |
| 05/14/2026 | 8 | ORDER resetting Hearing on 1 MOTION to Quash Grand Jury Subpoena for 5/19/2026 at 01:30 PM in ROME Courtroom 300 before Judge William M. Ray II. Signed by Judge William M. Ray, II on 5/14/26. (Served by CRD)(jpa) (Main Document 8 replaced on 5/27/2026) (jpa). (Entered: 05/15/2026) |
| 05/15/2026 | 9 | RESPONSE in Opposition re 1 MOTION to Quash Grand Jury Subpoena filed by United States of America. (Attachments: # 1 Exhibit 1 - 108 Order Denying Motion and Closing Case)(bgt) (Main Document 9 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Entered: 05/15/2026) |
| 05/15/2026 | 10 | CROSS-MOTION to Enforce Grand Jury Subpoena by United States of America. (Cross-Motion found in 9 Response.) (Attachments: # 1 Exhibit 1 - 108 Order Denying Motion and Closing Case)(bgt) (Main Document 10 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Entered: 05/15/2026) |
| 05/15/2026 | 11 | MOTION to Intervene and for Access to Court Records by Advance Publications, Inc., Bloomberg L.P., Cable News Network, Inc., Gray Local Media, Inc., NBCUniversal Media, LLC, Pro Publica, Inc., Reuters News & Media Inc., The E.W. Scripps Company, The New York Times Company, WP Company LLC. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - Grand Jury Subpoena, # 3 Exhibit B - Fulton County Motion to Quash)(bgt) (Main Document 11 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Attachment 2 replaced on 5/27/2026) (jpa). (Attachment 3 replaced on 5/27/2026) (jpa). (Entered: 05/15/2026) |
| 05/15/2026 | 12 | Certificate of Interested Persons and Corporate Disclosure Statement by Advance Publications, Inc., Bloomberg L.P., Cable News Network, Inc., Gray Local Media, Inc., NBCUniversal Media, LLC, Pro Publica, Inc., Reuters News & Media Inc., The E.W. Scripps Company, The New York Times Company, WP Company LLC identifying Corporate Parent Nash Holdings LLC for WP Company LLC; Corporate Parent Gray Media, Inc. for Gray Local Media, Inc.; Corporate Parent Warner Bros. Discovery, Inc. for Cable News Network, Inc.; Corporate Parent Thomson Reuters Corporation, Corporate Parent Thomson Reuters U.S. LLC for Reuters News & Media Inc.; Corporate Parent Bloomberg Inc. for Bloomberg L.P.; Corporate Parent Comcast Corporation for NBCUniversal Media, LLC. (bgt) (Main Document 12 replaced on 5/27/2026) (jpa). (Entered: 05/15/2026) |
| 05/15/2026 | | Case reported statistically. Matter transferred from 1:26-mi-88-WMR. (jpa) (Entered: 05/18/2026) |

| | | |
|---|---|---|
| 05/19/2026 | 13 | NOTICE of Appearance by Kirsten Fehlan on behalf of Advance Publications, Inc., Bloomberg L.P., Cable News Network, Inc., Gray Local Media, Inc., NBCUniversal Media, LLC, Pro Publica, Inc., Reuters News & Media Inc., The E.W. Scripps Company, The New York Times Company, WP Company LLC (cnw) (Main Document 13 replaced on 5/27/2026) (jpa). (Entered: 05/19/2026) |
| 05/19/2026 | 14 | Minute Entry for proceedings held before Judge William M. Ray, II: Motion Hearing held on 5/19/2026 re 7 MOTION to Unseal Case filed by Fulton County Board of Registration and Elections. Court heard argument on the Motion to Unseal. By Minute Order, the Court GRANTS the Motion to Unseal; however, a written Order will follow as to the Motion to Unseal and all other pending motions. The Court allows each side 14 days to file any supplemental briefing of not more than 25 pages on pending issues, and 14 days for any parties to respond to any supplemental briefing. The Court will issue a more detailed order as to the information to be more further briefed. Hearing Concluded. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Geraldine Glover)(cnw) (Main Document 14 replaced on 5/27/2026) (jpa). (Entered: 05/20/2026) |
| 05/21/2026 | 17 | PETITIONER'S EXHIBITS (SEALED) admitted and retained at the 14 Motion Hearing, have been received from the Law Clerk and placed in the custody of the Records Clerks. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3A (Redacted), # 4 Exhibit 3B, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11) (fbj) (Entered: 05/28/2026) |
| 05/22/2026 | 15 | ORDER DIRECTING Respondent to file a supplemental brief addressing the additional authority and evidence referenced by Petitioner during the hearing within FOURTEEN (14) DAYS of the date of the hearing. Petitioner may file a response briefing within FOURTEEN (14) DAYS after Respondent files its supplemental brief. Respondent shall also file a separate brief addressing any arguments concerning any potential theory of wrongdoing that it contends supports the subpoena at issue within FOURTEEN (14) DAYS of the date of this Order. The Court recognizes that the information relevant to this issue may involve confidential investigative material and, therefore, directs the brief to be filed separately so that Respondent may seek leave to file it under seal. Signed by Judge William M. Ray, II on 5/22/2026. (cnw) (Main Document 15 replaced on 5/27/2026) (jpa). (Entered: 05/22/2026) |
| 05/22/2026 | | Clerk's Certificate of Mailing re 15 Order, to all counsel. (cnw) (Entered: 05/22/2026) |
| 05/26/2026 | 16 | TRANSCRIPT of Proceedings held on 5/19/2026, before Judge William M. Ray II. Court Reporter/Transcriber Geraldine Glover. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court-reporter-directory. (Attachments: # 1 NFT) (jpa) (Main Document 16 replaced on 5/27/2026) (jpa). (Attachment 1 replaced on 5/27/2026) (jpa). (Entered: 05/26/2026) |
| 05/27/2026 | | Submission of 1 MOTION to Quash Grand Jury Subpoena, to District Judge William M. Ray II. (sll) (Entered: 05/27/2026) |
| 05/28/2026 | 18 | NOTICE TO COUNSEL OF RECORD for Fulton County Board of Registration and Elections regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS pursuant to Local Rule 79.1D. Re: 17 Exhibits. (fbj) (Entered: 05/28/2026) |
| 05/28/2026 | 19 | REPLY BRIEF re 10 MOTION, 1 MOTION to Quash Grand Jury Subpoena *(Posthearing Brief as Ordered)* filed by United States of America. (Bishop, James) (Entered: 05/28/2026) |
| 05/28/2026 | | Submission of 2 Letter re:83.1 (attorney Abbe David Lowell has not applied for admission), to District Judge William M. Ray II. (bgt) (Entered: 05/28/2026) |

| | | |
|---|---|---|
| 05/28/2026 | 20 | APPLICATION for Admission of Abbe David Lowell Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273816).by Fulton County Board of Registration and Elections. (Duffey, Michael) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/28/2026) |
| 05/28/2026 | 21 | APPLICATION for Admission of John Bolen Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273818).by Fulton County Board of Registration and Elections. (Duffey, Michael) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/28/2026) |
| 05/28/2026 | 22 | APPLICATION for Admission of Norman L. Eisen Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273820).by Fulton County Board of Registration and Elections. (Duffey, Michael) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/28/2026) |
| 05/28/2026 | 23 | APPLICATION for Admission of Stephen Jonas Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273821).by Fulton County Board of Registration and Elections. (Duffey, Michael) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/28/2026) |
| 05/29/2026 | | RETURN of 20 APPLICATION for Admission of Abbe David Lowell Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273816)., 21 APPLICATION for Admission of John Bolen Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273818)., 22 APPLICATION for Admission of Norman L. Eisen Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273820)., 23 APPLICATION for Admission of Stephen Jonas Pro Hac Vice (Application fee $ 100, receipt number AGANDC-15273821) to attorney for correction. Reason for Return: Designated local counsel must electronically file the applications. Please correct and resubmit. (esr) (Entered: 05/29/2026) |
| 05/29/2026 | 24 | APPLICATION for Admission of Abbe David Lowell Pro Hac Vice.by Fulton County Board of Registration and Elections. (Ghali, Kamal) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/29/2026) |
| 05/29/2026 | 25 | APPLICATION for Admission of John Bolen Pro Hac Vice.by Fulton County Board of Registration and Elections. (Ghali, Kamal) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/29/2026) |
| 05/29/2026 | 26 | APPLICATION for Admission of Norman L. Eisen Pro Hac Vice.by Fulton County Board of Registration and Elections. (Ghali, Kamal) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/29/2026) |
| 05/29/2026 | 27 | APPLICATION for Admission of Stephen Jonas Pro Hac Vice.by Fulton County Board of Registration and Elections. (Ghali, Kamal) Documents for this entry are not available for viewing outside the courthouse. (Entered: 05/29/2026) |
| 06/01/2026 | | APPROVAL by Clerks Office re: 24 APPLICATION for Admission of Abbe David Lowell Pro Hac Vice., 25 APPLICATION for Admission of John Bolen Pro Hac Vice., 26 APPLICATION for Admission of Norman L. Eisen Pro Hac Vice., 27 APPLICATION for Admission of Stephen Jonas Pro Hac Vice. Attorney Abbe David Lowell, John P. Bolen, Stephen Allen Jonas, Norman Larry Eisen added appearing on behalf of Fulton County Board of Registration and Elections. E-filing access may be requested after an order granting the application is entered. (esr) (Entered: 06/01/2026) |
| 06/02/2026 | 28 | ORDER GRANTING 24 Application for Admission Pro Hac Vice as to Abbe David Lowell. Signed by Judge William M. Ray, II on 6/2/2026. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at |

USCA11 Case: 26-12769 Document: 18 Date Filed: 10/13/2026 Page: 13 of 416

| | | |
|---|---|---|
| | | http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(cnw) (Entered: 06/02/2026) |
| 06/02/2026 | 29 | ORDER GRANTING 25 Application for Admission Pro Hac Vice as to John P. Bolen. Signed by Judge William M. Ray, II on 6/2/2026. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(cnw) (Entered: 06/02/2026) |
| 06/02/2026 | 30 | ORDER GRANTING 26 Application for Admission Pro Hac Vice as to Norman L. Eisen. Signed by Judge William M. Ray, II on 6/2/2026. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(cnw) (Entered: 06/02/2026) |
| 06/02/2026 | 31 | ORDER GRANTING 27 Application for Admission Pro Hac Vice as to Stephen Jonas. Signed by Judge William M. Ray, II on 6/2/2026. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(cnw) (Entered: 06/02/2026) |
| 06/02/2026 | | Clerk's Certificate of Mailing re 31 Order on Application for Admission PHV, 28 Order on Application for Admission PHV, 30 Order on Application for Admission PHV, 29 Order on Application for Admission PHV, mailed to Stephen Jonas and Norman L. Eisen at Democracy Defenders Fund, 600 Pennsylvania Ave SE, Suite 15180, Washington, DC 20003 and to John P. Bolen and Abbe David Lowell at Lowell & Associates, PLLC, 1250 H St NW, Ste 250, Washington, DC 20005. (cnw) (Entered: 06/02/2026) |
| 06/05/2026 | 32 | MOTION for In Camera Review with Brief In Support by United States of America. (Attachments: # 1 Text of Proposed Order)(Bishop, James) (Entered: 06/05/2026) |
| 06/10/2026 | | Submission of 10 MOTION, 11 MOTION to Intervene, to District Judge William M. Ray II. (sll) (Entered: 06/10/2026) |
| 06/11/2026 | 33 | RESPONSE re 19 Reply Brief *PETITIONER'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO QUASH* filed by Fulton County Board of Registration and Elections. (Ghali, Kamal) (Entered: 06/11/2026) |
| 06/19/2026 | 34 | RESPONSE in Opposition re 32 MOTION for In Camera Review filed by Fulton County Board of Registration and Elections. (Duffey, Michael) (Entered: 06/19/2026) |
| 06/24/2026 | 35 | REPLY to Response to Motion re 32 MOTION for In Camera Review filed by United States of America. (Bishop, James) (Entered: 06/24/2026) |
| 06/24/2026 | 36 | ORDER GRANTING 7 Motion to Unseal and TERMINATING AS MOOT the Media Intervenors' 11 Motion to Intervene. Signed by Judge William M. Ray, II on 6/24/2026. (cnw) (Entered: 06/24/2026) |
| 06/29/2026 | | Submission of 32 MOTION for In Camera Review , to District Judge William M. Ray II. (sll) (Entered: 06/29/2026) |
| 07/07/2026 | 37 | ORDER GRANTING Fulton County's 1 Motion to Quash and DENYING the United States of America's 10 Cross-Motion to enforce grand jury subpoena. The Subpoena No. 2026R00350-1 is QUASHED and Fulton County is under no obligation to comply. Fulton County's 34 Request for access to materials in the 32 Motion is TERMINATED AS MOOT. The Clerk is DIRECTED TO TERMINATE this case. Signed by Judge William M. Ray, II on 7/7/26. (jpa) (Entered: 07/07/2026) |
| 07/07/2026 | | Civil Case Terminated. (jpa) (Entered: 07/07/2026) |

| | | |
|---|---|---|
| 08/06/2026 | 38 | NOTICE OF APPEAL as to 37 Order on Motion to Quash,, Order on Motion for In Camera Review,, Order on Motion for Miscellaneous Relief, by United States of America. Case Appealed to USCA - 11th Circuit. Transcript Order Form due on 8/20/2026 (Bishop, James) (Entered: 08/06/2026) |
| 08/06/2026 | 39 | Transmission of Certified Copy of Notice of Appeal, Order, and Docket Sheet to USCA-11th Circuit re: 38 Notice of Appeal. Appeal fees have been WAIVED. The court reporter is Geraldine Glover. The District Judge is William M. Ray, II. (pjm) (Entered: 08/06/2026) |
| 08/07/2026 | 40 | USCA Acknowledgment of 38 Notice of Appeal, filed by United States of America. Case Appealed to USCA- 11th Circuit. Case Number 26-12769-A. (pjm) (Entered: 08/07/2026) |
| 08/20/2026 | 41 | TRANSCRIPT Order Form (All necessary transcript(s) already on file) re: 38 Notice of Appeal. (Bishop, James) Modified on 8/20/2026 to update text (pjm). (Entered: 08/20/2026) |
| 08/20/2026 | 42 | Notification of Transcript Filed in District Court re: 41 Transcript Order Form filed by United States of America. All transcripts for this request are now on file. (pjm) (Entered: 08/20/2026) |
| 09/10/2026 | 43 | SEALED FILING (rlh) (rlh). (Entered: 09/10/2026) |
| 09/25/2026 | 44 | MOTION to Supplement 39 Transmission of Notice of Appeal and Docket Sheet to USCA by United States of America. (Bishop, James) (Entered: 09/25/2026) |
| 10/07/2026 | | Pursuant to F.R.A.P.11(c), the Clerk certifies that the record is complete for purposes of this appeal, 38 Notice of Appeal. Case Appealed to USCA- 11th Circuit, Case Number 26-12769-AA. The entire record on appeal is available electronically. (pjm) (Entered: 10/07/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/12/2026 09:42:30 | | | |
| **PACER Login:** | JMHundscheid123 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-02777-WMR |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA NO. 2026R00350-01 | Case No. 26-MI-_____ |

**MOTION OF THE FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS TO QUASH GRAND JURY SUBPOENA**

This is a motion to quash a grand jury subpoena arising out of the U.S. Department of Justice's (DOJ) latest effort to target and harass the President's perceived political enemies—this time election officials, poll workers, and volunteers in Fulton County whom Donald Trump continues to disparage as he perpetuates his false claim that they "stole" the 2020 election.

On April 17, 2026, a federal prosecutor in the U.S. Attorney's Office for the Middle District of North Carolina—working at the direction of U.S. Attorney Dan Bishop[1]—issued an unprecedented and harassing grand jury subpoena to the Fulton County Board of Registration and Elections (FBRE) seeking the disclosure of sensitive personal information of thousands of Fulton County election workers and volunteers who served in the 2020 general election in Fulton County. *See* Exhibit A,

[1] *See, e.g.*, Kaelan Deese, *Bondi taps US attorney who voted against Biden 2020 certification for election integrity role,* Washington Examiner (Mar. 31, 2026), https://www.washingtonexaminer.com/news/justice/4511150/bondi-taps-us-attorney-who-voted-against-biden-2020-certification-for-election-integrity-role/.

Subpoena No. 2026R00350-01 (the "Subpoena"). Although the Subpoena purports to be issued by a grand jury sitting in the Northern District of Georgia, it directs the FBRE to send the personal information of thousands of volunteers and county employees to the email accounts of an out-of-district AUSA and an FBI agent.

As explained below, there are many reasons that this Court should quash the Subpoena. Its purpose is to target, harass, and punish the President's perceived political opponents; it is grossly overbroad and untethered to any reasonable need; it cannot yield any evidence that could result in a criminal prosecution (because, among other things, the statutes of limitations have expired for any purported 2020 election crimes); it burdens the First Amendment rights of election workers and will chill their participation in elections; and it unreasonably interferes with Georgia's sovereign authority to administer elections. By any measure, the Subpoena is improper and must be quashed.

**A. The Court Has the Power and Duty to Quash the Grand Jury Subpoena.**

"Although the grand jury operates with great independence, 'the powers of the grand jury are not unlimited and are subject to the supervision of a judge.'" *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 584–85 (4th Cir. 2007) (hereinafter, "*John Doe*") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972)). That supervisory authority exists, in part, because "[g]rand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation

out of malice or an intent to harass." *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991); *see also Trump v. Vance*, 591 U.S. 786, 805 (2020). As the former Fifth Circuit noted, "[w]hen the grand jury goes on a fishing expedition in forbidden waters, the courts are not powerless to act." *Ealy v. Littlejohn*, 569 F.2d 219, 227 (5th Cir. 1978). The judiciary's supervisory role "is especially important because of the risks for abuse that inhere in proceedings over which trial and appellate courts rarely have insight." *United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023).

Notably, courts have the power to quash a subpoena when "compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2); *R. Enters.*, 498 U.S. at 299 (citation omitted). A subpoena may be "unreasonable or oppressive" if it is "irrelevant, abusive or harassing, overly vague, or excessively broad." *John Doe*, 478 F.3d at 585 (internal citations omitted).[2] While the subpoena power formally belongs to the grand jury, "in modern federal practice, prosecutors often issue grand jury subpoenas with little or no involvement of the grand jurors themselves." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, 814 F. Supp. 3d 284, 298–99 (N.D.N.Y. 2026). "Rule 17 therefore functions as a key mechanism to ensure that the grand jury is not 'misused' by the Department of Justice." *Id.* at 299 (citation

[2] "The factors the district court must consider under Rule 17(c)(2) . . . cannot sensibly be converted into a mechanical rule enabling an escape from case-by-case judgment." *United States v. Bergeson*, 425 F.3d 1221, 1225 (9th Cir. 2005). Put differently, "what is reasonable depends on the context." *R. Enters.*, 498 U.S. at 299.

omitted); *see also Calk*, 87 F.4th at 186 ("[C]ourts may not ignore possible abuse of the grand jury process, as the grand jury is not meant to be the private tool of a prosecutor.") (internal quotation marks and citation omitted).

In recent months, abuses by the U.S. Department of Justice have compelled multiple courts to quash grand jury subpoenas issued for improper political purposes. *See, e.g.*, *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *5–10 (D.D.C. Mar. 13, 2026) (hereinafter, "*In re Federal Reserve Grand Jury Subpoena*") (granting motion to quash subpoena issued to the Chairman of the Federal Reserve Jerome Powell because it was motivated by the President's political agenda of lowering interest rates); *In re Grand Jury Subpoenas to Off. of New York State Att'y Gen.*, 814 F. Supp. 3d at 299–300 (granting motion to quash subpoena issued to the office of New York's Attorney General, where federal prosecutor acted outside scope of his appointment and subpoena was issued to a state law-enforcement office that the President has publicly cast as a political adversary).[3]

Ten federal courts of appeals, including the Eleventh Circuit, have weighed in on the question, and they have uniformly held that a court can quash a subpoena on the basis that it was issued for an "improper" purpose. *In re Federal Reserve*

[3] Because the FBRE has not yet had an opportunity to inspect the documents purporting to vest an out-of-district U.S. Attorney with the authority to direct the issuance of grand jury subpoenas in the Northern District of Georgia, the FBRE expressly reserves any argument or objection relating to the authority to do so.

*Grand Jury Subpoena*, 2026 WL 710202, at *5 (collecting cases); *see also United States v. US Infrastructure*, 576 F.3d 1195, 1214 (11th Cir. 2009) (grand jury cannot be used "solely or even primarily" for an improper purpose). The sheer fact that there is some conceivable proper purpose is not dispositive; a subpoena must be quashed if its "'sole or dominant' purpose is improper." *See In re Federal Reserve Grand Jury Subpoena*, 2026 WL 710202, at *5 (citations omitted).

**B. The Subpoena Purports to Require the FBRE to Produce Reams of Personal Identifying Information to the DOJ, Rather than a Grand Jury.**

On April 20, 2026, an FBI agent served the Subpoena on the Fulton County Director of Elections. The Subpoena directs the FBRE to provide "any/all records/documentation" that show the "name, position/function, residential and email addresses, and personal telephone number(s)" for ten categories of Fulton County 2020 election workers. There are thousands of such individuals, ranging from county employees who assisted on election day, to bus drivers who operated a mobile voting location, to volunteers and temporary poll workers. Ex. A, at 3. Specifically, the Subpoena seeks:

1. Rosters of Election Staff Members who served in the November 2020 General Election, sufficient to identify name, position/function, residential and email addresses, and personal telephone number(s), including for the following persons, without limitation:
    a. Individuals assigned to review Mail-In Ballots
    b. Individuals assigned to the Voter Review Panel/Board
    c. Individuals assigned to Mobile Voting Locations
    d. Individuals assigned to transfer results to or from media or to transport ballots, ballot stock, or media

e. Individuals employed or contracted by the Fulton County Board of Registration and Elections
f. Individuals who worked or volunteered on Election Day who were assigned to review or tabulate ballots
g. Individuals who worked or volunteered for the Risk Limiting Audit
h. Individuals who worked or volunteered for the Recount
i. Individuals who served as precinct managers and assistant managers

Notably, the Subpoena does not require that the FBRE provide the records to the grand jury; instead, it directs that the records be routed out of this district to a U.S. Attorney appointed to "pursue election-related probes across the country"[4] on behalf of DOJ. So by its terms, the Subpoena does not suggest that the grand jury is conducting an investigation of its own (for which it intends to receive the records), but rather, that DOJ is simply conducting its own investigation.[5] Notably, "[f]ederal prosecutors have no authority to issue grand jury subpoenas independent of the grand jury." *Lopez v. Dep't of Just.*, 393 F.3d 1345, 1349 (D.C. Cir. 2005).[6] Yet here, there

[4] Vera Bergengruen *et al.*, *The Unlikely Ensemble Leading Trump's Hunt for 2020 Election Fraud*, Wall Street Journal (Mar. 30, 2026), https://www.wsj.com/politics/the-unlikely-ensemble-leading-trumps-hunt-for-2020-election-fraud-6f69ae66.

[5] *See* Ex. A at 3 ("Send the subpoenaed records, a copy of the subpoena, and any request for reimbursement to the AUSA identified on the subpoena or its attachment(s) and/or to Special Agent Hugh Evans at [redacted]@fbi.gov and Assistant United States Attorney at [redacted]@usdoj.gov.").

[6] While some courts have held that "[g]overnment attorneys engaged in grand jury investigations properly may have subpoenas issued without the grand jury's authorization or awareness to compel attendance of witnesses before the grand jury," those courts have also noted that prosecutors "may not use the grand jury subpoena power to gather information without the intended participation of the grand jury." *United States v. Santucci*, 674 F.2d 624, 627 (7th Cir. 1982) (emphasis added); *In re Melvin*, 546 F.2d 1, 5 (1st Cir. 1976) ("The United States Attorney may obtain

is no indication from the face of the Subpoena that the grand jury is even aware of this investigation, that the records will be returned to the grand jury, or that the grand jury would knowingly participate in a politicized abuse of its subpoena process given, among other things, that the statute of limitations has lapsed on any purported 2020 election "crime."

**C. The President's Public Comments, Including Social Media Posts, Confirm that the Subpoena Is Designed to Punish, Intimidate, and Harass His Perceived Political Opponents.**

For the past five and a half years, the President has obsessively propagated the debunked conspiracy theory that Fulton County "stole" the 2020 election from him.[7] And he has made it clear that he seeks retribution against those who refuse to

---

subpoenas issued in blank by the court, fill in the blanks, and have the witnesses served without consulting the grand jury. Still, he may not use his subpoena powers under Rule 17 to gather evidence without the participation of the grand jury.") (citations omitted and emphasis added); *Durbin v. United States*, 221 F.2d 520, 522 (D.C. Cir. 1954) ("The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. . . . They do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office.") (internal quotation marks and citation omitted).

[7] Notably, multiple investigations and lawsuits have confirmed that there is no reasonable basis for the theory that the 2020 election was "stolen." *See, e.g.*, House Report 117-663, Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol (Dec. 22, 2022), available at https://www.congress.gov/committee-report/117th-congress/house-report/663/1, §§ 1.6 (detailing multiple witness accounts of the President being told that there was no substantial fraud in the 2020 election), 1.7 (collecting court cases rejecting claims of fraud in the 2020 election).

indulge his baseless claims. The most disturbing manifestation of the President's retaliation is his targeting of Fulton County poll workers, including individuals like Ruby Freeman, who were falsely vilified by the President and his political allies over false allegations that they cheated him out of a 2020 win. Here is just a sample of the President's social media posts, which leave no question that the Subpoena's purpose is to intimidate and harass poll workers, including innocent people like Ms. Freeman:

- October 23, 2023: Reposting an image of two black women with papers and masks, including the following text, "START ARRESTING THE POLL WORKERS AND WATCH HOW FAST THEY TELL YOU WHO TOLD THEM TO CHEAT."[8]
- August 14, 2023: "THOSE WHO RIGGED & STOLE THE ELECTION WERE THE ONES DOING THE TAMPERING, & THEY ARE THE SLIME THAT SHOULD BE PROSECUTED."[9]
- August 17, 2023: Posting a link to an article titled, "How Should The GOP Respond to Fulton County? Indict the Left."[10] The article concludes: "'Investigate first, define the crimes later' should be the

---

[8] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 23, 2023, at 2:57 p.m.), https://truthsocial.com/@realDonaldTrump/posts/111285859945538575 (reposted from Ash Coleman, @AshColeman) (also available at https://trumpstruth.org/statuses/9173).
[9] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 14, 2023, at 8:23 a.m.), https://truthsocial.com/@realDonaldTrump/posts/110887946861072507.
[10] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 17, 2023, at 4:21 p.m.), https://truthsocial.com/@realDonaldTrump/posts/110906813000476495.

order of the day. And for even the most minor of offenses, the rule should be: no charity, no goodwill, no mercy."[11]

And the relentless campaign to harass and intimidate election workers only escalated after Donald Trump was elected for a second term:

- November 1, 2025: Reposting a video with the caption: "MR. PRESIDENT, BY THE WAY, YOU WON GEORGIA THREE TIMES."[12]

- November 26, 2025: "THE 2020 ELECTION WAS RIGGED AND STOLEN."[13]

- December 23, 2025: Reposting, "BREAKING: Ruby Freeman should have to pay Rudy back reparations and every single penny that she got off of him based on a BIG LIE AND A FALSE PRETENSE. And her, Raffensperger, Kemp and every single one of their fellow election riggers must be arrested and prosecuted to the fullest extent of the law. This was the POLITICAL CRIME OF THE CENTURY and they should never be allowed to show their faces in public again without being shouted down by we the people for stealing our vote and our President from us . . . When President Trump was talking about the enemy from within, he was talking about people like them." Commenting with repost, "Thank you Joshua. Total Crooks!!!"[14]

- December 25, 2025: Reposting, "Fulton County certified a contested election, and it took them only 5 yrs to admit it[.] They . . . started

---

[11] Charlie Kirk, *How Should The GOP Respond to Fulton County? Indict the Left*, The Federalist (Aug. 15, 2023), https://thefederalist.com/2023/08/15/how-should-republicans-respond-to-fulton-county-indict-the-left/ (emphasis added).

[12] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 1, 2025, at 10:36 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115474943152358383 (reposted from Real America's Voice (RAV), @RealAmVoice).

[13] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 26, 2025, at 2:31 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115617658912008194.

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 23, 2025, at 6:15 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115771425061663851 (reposted from Joshua Hall, @JoshHall2024).

pulling suitcases out from under tables and started stuffing ballots into machines . . . Trump won Georgia, by a lot … and everyone knows it."[15]

- December 25, 2025: Reposting, "Ruby Freeman needs to be held accountable! She was caught on camera putting the same ballots through the machine several times in Fulton County! Time to payback @RudyGuiliani He Was Right!"[16]
- January 29, 2026: Reposting, "President Trump's legal team exposing the 2020 Election Fraud at the Georgia State Farm Arena pulling suitcases full of alleged fraudulent ballots from under tables . . . stealing the election from President Trump. This is exactly why the FBI raided the election center today in Fulton County, Atlanta, Georgia. This is only the beginning. Prosecutions are coming."[17]

To be clear, the President's tactics to punish and harass his perceived enemies have caused immense harm. For example, President Trump and his followers repeatedly (and falsely) accused Ms. Freeman of tampering with the results of the 2020 election. On May 31, 2022, Ms. Freeman gave an interview with the House Select Committee to Investigate the January 6th Attack on the United States

[15] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2025, at 12:42 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115778605564637366 (reposted from Chicago1Ray, @Chicago1Ray).
[16] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2025, at 1:03 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115778691872777547 (reposted from JamierR Army Girl, @Jamierodr14).
[17] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 29, 2026, at 6:01 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115978045822911393 (reposted from The SCIF, @TheSCIF).

Capitol.[18] She explained in compelling detail how the personal attacks from the President and his aides have detrimentally changed every aspect of her life, her home, her family, her work, her sense of safety, and her mental health. In pertinent part, she stated:

- "I've lost my name. I've lost my reputation. I've lost my sense of security – all because a group of people, starting with Number 45 [President Trump] and his ally Rudy Giuliani, decided to scapegoat me and my daughter, Shaye, to push their own lies about how the Presidential election was stolen."[19]

- "What is true is that I signed up as an election worker because I believe in our democracy. I signed up to support my daughter, Shaye, whose entire professional career has been devoted to making sure that Fulton County Elections are fair and that every vote is counted."[20]

- "But because some people didn't like the outcome of the fair and accurate election in Fulton County, they decided to attack Shaye and me by name and by picture. I received hundreds of racist, threatening, horrible calls and messages that I do not even feel comfortable describing here."[21]

- "Do you know how it feels to have the President of the United States . . . target you? . . . [H]e targeted me . . . a small-business owner, a mother, a proud American citizen who stood up to help Fulton County run an election in the middle of the pandemic."[22]

---

[18] Interview of Ruby Freeman Before the House Select Committee to Investigate the January 6th Attack on the United States Capitol (May 31, 2022), available at https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000086315/pdf/GPO-J6-TRANSCRIPT-CTRL0000086315.pdf.
[19] *Id.* at 6:21–24.
[20] *Id.* at 7:6–9.
[21] *Id.* at 7:22–25.
[22] *Id.* at 8:8–13.

- "I am just one name, one reputation, one life devastated by disinformation, but here are so many more, and there will be more if things don't change." [23]

None of this deterred the President. As shown in the above-quoted social media posts, he and his followers continue to circulate the same harmful lies about Ms. Freeman and other election workers.

The Subpoena is a chilling escalation in the campaign to terrorize Fulton County election workers, but harassment and political retribution are in no way permissible purposes for a grand jury subpoena. The Court should quash the Subpoena to protect thousands of election workers from potentially devastating consequences.

**D. The Fact That the Statute of Limitations Has Run on Any Conceivable 2020 Election Crime Confirms that the Subpoena Is Improper.**

The Subpoena should be quashed for the additional reason that known facts foreclose any conceivably proper purpose. The purpose of any grand jury proceeding is "to determine whether a crime has been committed and whether criminal proceedings should be instituted . . . ." *United States v. Calandra*, 414 U.S. 338, 343–44 (1974); *see also United States v. (Under Seal)*, 714 F.2d 347, 349 (4th Cir. 1983) ("[P]ractices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden. This includes use of the grand jury by the prosecutor to harass witnesses or as a means of civil or criminal discovery.")

[23] *Id.* at 9:4–6.

(footnotes omitted). But here, the statute of limitations for any federal crime that could conceivably have occurred in relation to the 2020 election has already passed. *See, e.g.*, 52 U.S.C. § 20511 (willful effort to interfere with fair and impartial election process, subject to five-year statute of limitations); 52 U.S.C. § 20701 (willful failure to preserve election records, same). In particular, the general five-year statute of limitations for noncapital offenses, *see* 18 U.S.C. § 3282, would apply to offenses under Section 20511 or Section 20701, as well as all of the following: 18 U.S.C. § 371 (conspiracy to defraud the federal government); 18 U.S.C. §§ 594, 610 (voter intimidation); 18 U.S.C. § 1001 (false representations to federal government); 18 U.S.C. § 1512 (obstruction of official proceedings). That deadline has long since passed for any conduct related to the 2020 election.

Perhaps DOJ will argue that grand juries may properly request records outside of the statute of limitations in order "to determine whether there were illegal activities which were begun before the statutory period and continued within it." *Trump v. Vance*, 480 F. Supp. 3d 460, 496–97 (S.D.N.Y.), *aff'd*, 977 F.3d 198 (2d Cir. 2020) (internal quotation marks and citation omitted); *see also United States v. Doe*, 457 F.2d 895, 901 (2d Cir. 1972) ("[T]he grand jury's scope of inquiry is not limited to events which may themselves result in criminal prosecution, but is properly concerned with any evidence which may afford valuable leads for

investigation of suspected criminal activity during the limitations period.") (internal quotation marks and citations omitted).

In this case, however, there is no indication that DOJ is investigating any illegal activity that took place within the statute of limitations. Instead, the Subpoena seeks name and contact information only for people who worked on the Fulton County general election in 2020, five and a half years ago. *See generally* Ex. A. But grand juries do not exist to conduct roving inquiries untethered to a prosecutable criminal case.[24] Similarly, DOJ cannot rely on the mere possibility of a subsequent obstruction charge as the basis for the Subpoena. Because there is no reason to believe that the records sought by the Subpoena can support a prosecutable criminal case within any applicable statute of limitations, DOJ cannot identify any reasonable interest in such information.

**E. The Subpoena Is Overbroad.**

The Subpoena should be quashed for the additional, independent reason that it is egregiously overbroad and oppressive. Without any effort to target by precinct,

[24] *Cf. Costello v. United States*, 350 U.S. 359, 362 (1956) ("There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes."); *In re Grand Jury Subpoenas, Apr., 1978, at Baltimore*, 581 F.2d 1103, 1108 (4th Cir. 1978) ("If the powers of the grand jury, including the power to subpoena documents, are used, not for the purpose of criminal investigation but rather to gather evidence for civil enforcement, there exists an abuse of the grand jury process.").

function, or suspected irregularity, the Subpoena demands the sensitive, personal information of thousands of individuals who participated in the administration of the 2020 election in *any* capacity. No legitimate investigative theory could justify that breadth or such an open-ended fishing expedition into the private and personally identifying information of so many individuals, with no regard for whether the information will conceivably support a criminal investigation.

Subpoenas so sweeping cannot "be regarded as reasonable." *Hale v. Henkel*, 201 U.S. 43, 76 (1906) ("[T]he *subpoena duces tecum* is far too sweeping in its terms to be regarded as reasonable. It does not require the production of a single contract, or of contracts with a particular corporation, or a limited number of documents, but all understandings, contracts, or correspondence[.]"), *overruled on other grounds by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964); *In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993*, 846 F. Supp. 11, 13–14 (S.D.N.Y. 1994) ("[B]ecause the subpoena at issue unnecessarily demands documents that are irrelevant to the grand jury inquiry, it is unreasonably broad under Federal Rule of Criminal Procedure 17(c)."); *United States v. Vilar*, 2007 WL 1075041, at *46 (S.D.N.Y. Apr. 4, 2007) (excising certain document requests from subpoena because they are "too broad" and "beyond the scope of the investigation"); *see also In re Grand Jury Proceedings*, 593 F. Supp. 92, 94 (S.D. Fla. 1984) ("The Fourth Amendment provides protection against a grand jury subpoena *duces tecum*

too sweeping in terms 'to be regarded as reasonable'") (quoting *United States v. Dionisio*, 410 U.S. 1, 11–12 (1973)); *id.* at 95 (granting motion to quash subpoena on other grounds).

On its face, the Subpoena compels the production of personal information including for people who had nothing to do with ballot tabulation and could not possibly have impacted the 2020 election count or results. For example, the Subpoena seeks the names and personal information of bus drivers for mobile voting stations (subpoena request 1.c); "Risk Limiting Audit" participants who, by definition, do not certify whether a particular candidate won an election (subpoena request 1.g); and all "Election Staff Members," regardless of their specific job duties (subpoena request 1).[25] At best, DOJ's theory appears to be that it can subpoena the sensitive, personal information of thousands of people because, maybe, one of them was a witness to an undefined, un-prosecutable, time-barred "crime," for which there is zero credible evidence. But it is hard to imagine a clearer example of an

[25] Notably, many of the individuals who filled those roles volunteered, at substantial risk to themselves, to help Fulton County citizens vote while the COVID-19 pandemic was still raging through the county. *See* Claire Simms, *Inside the Vote: Being a poll worker in Georgia*, Fox5 Atlanta (Sept. 30, 2020), available at https://www.fox5atlanta.com/news/inside-the-vote-being-a-poll-worker-in-georgia ("Election officials say recruiting poll workers is always tough, but this year proved exceptionally difficult with the coronavirus pandemic.").

impermissible "fishing expedition." *See United States v. Nixon*, 418 U.S. 683, 700 (1974).

As reflected in Census data, Fulton County, Georgia is the state's most populous county, with an estimated 2020 population of approximately 1,066,710 residents. It covers a land area of about 526 square miles, and holds the highest population density in Georgia, with over 2,000 people per square mile.[26] To serve Georgia's most populous county, thousands of election workers, including volunteers and temporary employees, play a critical role in administering elections. No legal precedent authorizes a federal grand jury to compel the disclosure of such a broad swath of information based on the speculation about non-prosecutable crimes, let alone for the purpose of "investigating" debunked conspiracy theories that the President has obsessively posted and reposted on social media.

What is more, the timing of the Subpoena casts further doubt on its legitimacy. The FBRE and the Department of Elections are currently preparing for the 2026 elections. Given the President's express statements that he wants to "nationalize" elections and have Republican officials "take over" voting procedures in places like

---

[26] *See* United States Census Bureau, Data Profile of Fulton County, Georgia, https://data.census.gov/profile/Fulton_County,_Georgia?g=050XX00US13121#populations-and-people.

Fulton County,[27] it is impossible to ignore the possibility that this overbroad, time-consuming subpoena was issued for the additional purpose of interfering with Fulton County's ability to administer its own elections in 2026. Considering the breadth of the Subpoena, Fulton County's governmental duties, and DOJ's lack of any legitimate interest in conducting a time-barred investigation, the Court should quash the Subpoena and relieve the FBRE from the burden of compliance. *See Vilar*, 2007 WL 1075041, at *48 ("A subpoena [] may be quashed or modified" pursuant to Rule 17(c)(2) of the Federal Rules of Criminal Procedure "if compliance therewith would be overly burdensome.") (citing *In re Horowitz*, 482 F.2d 72, 77 (2d Cir. 1973)).

### F. The Grand Jury Subpoena Burdens the First Amendment Rights of Election Workers and Will Chill Participation in Elections.

The Subpoena's compelled disclosure of the identities and contact information of thousands of election workers—including private volunteers—burdens their First Amendment rights and will foreseeably chill their participation in local elections and their association with Fulton County. *See In re Grand Jury Proceeding,* 842 F.2d 1229, 1233 (11th Cir. 1988) ("[I]t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly

---

[27] *See, e.g.*, Nick Corasaniti & Richard Fausset, *Trump Wants to 'Take Over' Elections. These States Are Prime Targets.*, N.Y. Times (Mar. 8, 2026), https://www.nytimes.com/2026/03/08/us/politics/trump-elections-fulton-county-ballots.html.

show a substantial relation between the information sought and a subject of overriding and compelling state interest.") (quoting *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963)); *see also NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (compelled disclosure of associational identities of NAACP members constituted a restraint on freedom of association).[28]

Here, the Subpoena seeks to <u>compel the disclosure of election workers' identities and other personal information</u>—so long as they worked on the 2020 election in Fulton County—in a political environment in which election workers fear for their physical safety.[29] Notably, prior to this Administration, the U.S. Department of Justice created an "Election Threats Task Force," which was expressly designed "to address threats of violence against election workers, and to ensure that all election workers – whether elected, appointed, or volunteer – are able to do their

---

[28] Even a public employee's "right of free association [is] a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *Shelton v. Tucker*, 364 U.S. 479, 486 (1960); *First Choice Women's Res. Centers, Inc. v. Davenport*, No. 24-781, 2026 WL 1153029, at *5 (U.S. Apr. 29, 2026) ("The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely. Each of these rights, this Court has long understood, necessarily carries with it a corresponding right to associate with others.") (internal quotation marks and citations omitted).

[29] *See, e.g.*, U.S. Department of Justice Press Release, *Justice Department's Election Threats Task Force Secures Ninth Conviction* (Aug. 31, 2023), available at https://www.justice.gov/archives/opa/pr/justice-departments-election-threats-task-force-secures-ninth-conviction ("During and following the 2020 election cycle, the election community reported a sharp increase in hostile and threatening communications received from members of the public.").

jobs free from threats and intimidation." *See* FACT SHEET: Justice Department's Election Threats Task Force (August 31, 2023), available at https://www.justice.gov/archives/opa/file/1313366/dl?inline (identifying thirteen criminal prosecutions related to threats against election workers). Unfortunately, data suggests that these types of stresses, including the likelihood of being scapegoated by public officials, are driving election workers to leave the field in unprecedented numbers.[30]

Ultimately, the grand jury subpoena demands a dossier designed to out thousands of individuals, including their names, personal email addresses, personal phone numbers, and physical home addresses, all for people who, in the President's telling, "stole" the 2020 election from him. Such compelled disclosure will inevitably chill the associational rights of these individuals. It is well-established that

---

[30] Ruby Edlin & Lawrence Norden, *Analysis, Survey Finds Election Officials Remain Concerned About Safety, Lack of Government Support*, Brennan Center for Justice (Apr. 13, 2025), https://www.brennancenter.org/our-work/analysis-opinion/survey-finds-election-officials-remain-concerned-about-safety-lack ("Since at least 2020, scores of local election officials have been scapegoated by political leaders and others unhappy with election results, resulting in unprecedented attacks. Their concerns about safety remain high. In total, 32 percent of officials said they had been threatened, harassed, or abused, compared to 38 percent in 2025. Of the 14 percent who reported being threatened, 65 percent had been threatened in person, most commonly at their offices. Nearly 1 in 4 officials said they are concerned about being assaulted at home or at work. Fifty-two percent reported concern about the safety of their colleagues and staff. And more than half worried that threats, harassment, and intimidation would make it more difficult to retain or recruit election workers in the future.").

governmental efforts to compel the disclosure of identities can "chill association," even where the identifying information is not otherwise disclosed to the public at large. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021). Accordingly, the Supreme Court has confirmed that such "compelled disclosure requirements are reviewed under exacting scrutiny," regardless of the nature of the association at issue. *Id.* at 608 (citing *NAACP*, 357 U.S. at 460–61)).[31] Put differently, the sheer fact that the U.S. Department of Justice promises not to disclose the list of Fulton County 2020 election workers is of no moment—the compelled disclosure in and of itself causes First Amendment harm all the same. *See, e.g.*, *First Choice Women's Res. Centers, Inc.*, 2026 WL 1153029, at *12 ("Just ask yourself, would it have been an answer in *NAACP v. Alabama* if the State's Attorney General promised to keep the NAACP's membership rolls to himself?").

Here, the Subpoena cannot meet the high bar of exacting scrutiny, or any other level of scrutiny, given the absence of any legitimate need for the names and personal contact information of thousands of election workers, in a criminal investigation where no criminal charges can be brought. Even if there were a properly predicated, good faith, and regular criminal investigation, such an investigation does not require

[31] "'[I]t is immaterial' to the level of scrutiny 'whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters.' Regardless of the type of association, compelled disclosure requirements are reviewed under <u>exacting scrutiny</u>." *Bonta,* 594 U.S. at 608 (quoting *NAACP*, 357 U.S. at 460–61) (emphasis added).

disclosure of the names of every individual who worked on the election, nor a disclosure of each and every person's (1) phone number, (2) physical address, and (3) email address.

**G. The Grand Jury Subpoena Needlessly Intrudes on Georgia's Sovereign Role in Administering Elections.**

The Subpoena, which seeks records related to the Fulton County 2020 General Election, also raises profound constitutional questions about the allocation of power between the federal government and the states. The Constitution's Electors Clause, Art. II, § 1, cl. 2, "authorize[s] States to conduct and regulate . . . Presidential elections." *Trump v. Anderson*, 601 U.S. 100, 112 (2024). Notably, Georgia has implemented this constitutional right to oversee elections through a comprehensive statutory scheme that vests custody and retention of election records in state and county officials. *See, e.g.*, O.C.G.A. §§ 21-2-70, 21-2-73, 21-2-500. Georgia has also enacted specific provisions governing investigation of fraud or any irregularities with respect to elections. *Id.* §§ 21-2-73, 21-2-390.

Here, DOJ, purporting to act in the name of the grand jury, seeks to infringe on county officials' authority by compelling them to provide records regarding a core state constitutional function. *Cf. Printz v. United States*, 521 U.S. 898, 919–20 (1997) ("[T]he Framers rejected the concept of a central government that would act upon . . . the States, and instead designed a system in which the State and Federal

Governments would exercise concurrent authority over the people.") (emphasis added).

As Judge Rosenbaum recently noted, 52 U.S.C. § 20701 and similar provisions authorizing the federal government to obtain certain election-related records "focus on civil-rights violations," not "purported voter fraud," and there is otherwise no statutory authority that gives "the President or DOJ power to intervene in Georgia's elections." *Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). The Justice Manual recognizes this limitation:

> The Department [of Justice] has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts. The Department [of Justice] has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification.

*Id.* (quoting U.S. Dep't of Just., Just. Manual § 9-85.300 (2022)). Here, the Subpoena infringes upon Petitioner's sovereign interests in conducting elections and reassuring poll workers that their private information will not be disseminated, misused, or used to harass. It is, by any measure, unreasonable and subject to quashal for this additional reason.

### H. A Grand Jury Subpoena Cannot Authorize the Indefinite Retention of the Personal Identifying Information of Thousands of Poll Workers.

To the extent that the Subpoena seeks to allow DOJ to indefinitely retain the sensitive data of nearly 3,000 election workers and volunteers, it should be quashed.

After all, "a subpoena is not a search warrant. With the exception of exemplars and other limited classes of physical evidence, a grand jury subpoena *duces tecum*—without more—cannot be used to simply seize a witness's property." *In re Grand Jury No. 09-1*, No. 6:10MC38ORL31DAB, 2010 WL 2330273, at *9 (M.D. Fla. June 10, 2010) (citations omitted). It is well settled that "[d]ocuments, records and tangible evidence remain the exclusive property of the person required to produce them before the grand jury and, absent a court order or stipulation between the witness and the government, the witness has the right to remove his evidence at the end of each day of the grand jury's proceedings and at the end of the grand jury's session." *Id.* (citing *Application of Mesta Machine Company*, 184 F.2d 375, 375–76 (3d Cir. 1950); *Application of Bendix Aviation Corp.*, 58 F. Supp. 953, 954 (S.D.N.Y. 1945)).

Here, the DOJ has not obtained any stipulation from the FBRE regarding the sensitive records at issue here; nor has DOJ sought any impounding order from the Court to retain the records. Yet the Subpoena still purports to require the FBRE to provide digital copies of the records directly to DOJ. *See* Subpoena at 3. In short, nothing authorizes the grand jury, let alone DOJ, to indefinitely retain those records without a stipulation or court order. *See, e.g.*, *In re Grand Jury No. 09-1*, 2010 WL 2330273, at *9–10 (citing U.S. Department of Justice, Antitrust Division, *Grand Jury Manual* and finding that DOJ "failed to demonstrate that it has a legitimate

reason to retain [the subpoenaed] property"). Given the sensitivity of the data at issue, and the lack of any legitimate reason for DOJ to indefinitely retain such data, the Court should quash the Subpoena, or in the alternative, decline to enter any order authorizing either DOJ or the grand jury to retain the requested sensitive data.

## I. Conclusion

For the foregoing reasons, this Court should quash the Subpoena.

Respectfully submitted, this 4th day of May, 2026.

[SIGNATURES ON FOLLOWING PAGE]

*/s/ Y. Soo Jo*
Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON
COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30309
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

*/s/ Kamal Ghali*
Kamal Ghali
Georgia Bar No. 805055
Matthew A. Josephson
Georgia Bar No. 367216
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

*/s/ Abbe David Lowell*
Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202)-964-6110
jbolen@lowellandassociates.com
alowellpublicoutreach@
lowellandassociates.com

*/s/ Stephen Jonas*
Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 1580
Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Fulton County Board of Registration and Elections*

**Application for admission pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.

This 4th day of May, 2026.

*/s/ Michael C. Duffey*
Michael C. Duffey

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

for the

Northern District of Georgia

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: Fulton County Board of Registration and Elections
5600 Campbellton Fairburn Road
Union City, GA 30213
Clerk of Records, Custodian of Records or Designee

X **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | Date and Time: |
|---|---|
| GJ# 1-26<br>United States Courthouse<br>75 Ted Turner Dr. SW, Room 240, Atlanta, GA 30303 | 9:00 AM<br>May 5, 2026 |

X You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Please see attachment. If you have any questions, please contact Special Agent Hugh Evans at 770-[redacted]. Please email responsive documents to Special Agent Evans at [redacted]@fbi.gov and Assistant United States Attorney at [redacted]@usdoj.gov. Please also include a copy of this subpoena with your response.

Although the law does not prohibit disclosure, it is requested that you do not disclose the existence of this subpoena. Any such disclosure could impede the investigation being conducted.

Date: April 17, 2026

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Terry Meinecke
United States Attorney's Office for the Middle District of North Carolina
101 S Edgeworth Street, Fourth Floor Greensboro, NC 27401
[redacted]@usdoj.gov

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)* Fulton County Board of Registration and Elections
was received by me on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________

______________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________

______________ .

I declare under penalty of perjury that this information is true.

Date: ______________

______________
*Server's signature*

______________
*Printed name and title*

______________
*Server's address*

Additional information regarding attempted service, etc:

SUBPOENA ATTACHMENT

To: Fulton County Board of Registration and Elections
Clerk of Records, Custodian of Records or Designee
5600 Campbellton Fairburn Road Union City, GA 30213

INSTRUCTIONS RE COMPLYING WITH SUBPOENA

- Please provide this information, if available, as data files on CD-ROM or other electronic media, or by making the information available for the government to download.
- In lieu of personal appearance, please execute the waiver of appearance form included with this subpoena.
- Execute the attached business records certification for all records produced.
- Send the subpoenaed records, a copy of the subpoena, and any request for reimbursement to the AUSA identified on the subpoena or its attachment(s) and/or to Special Agent Hugh Evans at [redacted]@fbi.gov and Assistant United States Attorney at [redacted]@usdoj.gov.
- If you have any questions, please contact Special Agent Evans at 770-[redacted].

Provide any/all records/documentation related to the following:

1. Rosters of Election Staff Members who served in the November 2020 General Election, sufficient to identify name, position/function, residential and email addresses, and personal telephone number(s), including for the following persons, without limitation:

a. Individuals assigned to review Mail-In Ballots
b. Individuals assigned to the Voter Review Panel/Board
c. Individuals assigned to Mobile Voting Locations
d. Individuals assigned to transfer results to or from media or to transport ballots, ballot stock, or media
e. Individuals employed or contracted by the Fulton County Board of Registration and Elections
f. Individuals who worked or volunteered on Election Day who were assigned to review or tabulate ballots
g. Individuals who worked or volunteered for the Risk Limiting Audit
h. Individuals who worked or volunteered for the Recount
i. Individuals who served as precinct managers and assistant managers

**U.S. Department of Justice**
United States Attorney
Northern District of Georgia

*Richard Russell Federal Building*
*75 Ted Turner Dr. S.W., Suite 600*
*Atlanta, Georgia 30303*

*Telephone: (404) 581-6000*
*Fax: (404) 581-6181*

Custodian of Records

Re: Certification of Authenticity of Business Records

Dear Sir or Madam:

The attached federal grand jury subpoena directs your business to produce certain business records and/or information for use in a federal investigation. At some point in the future, it may be necessary to offer some or all of the documents as evidence in a federal trial in the United States District Court for the Northern District of Georgia. In the past, unless both parties stipulated to the admissibility of business records, it was necessary for a witness from the business to physically appear at trial and testify that the records were authentic, within the meaning of Rule 902 of the Federal Rules of Evidence, and that they were business records, within the meaning of Rule 803(6) of the Federal Rules of Evidence.

Federal Rules of Evidence Rules 803(6) and 902 permit the foundation requirements of Rule 803(6) and the authenticity requirements of Rule 902 to be satisfied under certain circumstances without the expense and inconvenience of producing witnesses. I have attached a Business Record Certification form for a qualified representative of your business to sign. Please review the Certification to determine whether it is an accurate statement with regard to the referenced business records. If the Certification is accurate, please sign and return the original Certification along with the subpoenaed records to the grand jury clerk as directed by the subpoena. There is no guarantee that your business' custodian of records will not have to appear at trial to authenticate the business' records and lay the proper business record foundation. However, when appropriate, the United States Attorney's office will make every effort to use the Business Record Certification attached instead of the testimony of your custodian of records.

If you have any questions, please do not hesitate to contact me at (336) [redacted]

Sincerely,

J. DANIEL BISHOP
SPECIAL ATTORNEY TO THE AG AND
UNITED STATES ATTORNEY

/s/ TERRY MEINECKE
ASSISTANT U.S. ATTORNEY

Enclosures

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, ______________________________, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, attest that the information contained in this certification is true and correct. I am employed by _________________________ ("Company"), and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Company. The attached records consist generally of __________________________________________. I further state that:

1. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Company, and they were made by Company as a regular practice; and

2. To the extent the records were generated by an electronic process or system, such records were generated by Company's electronic process or system that produces an accurate result, to wit:

    a. The records were copied from electronic device/s, storage medium/s, or file/s in the custody of Company in a manner to ensure that they are true duplicates of the original records; and

    b. The process or system is regularly verified by Company, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Federal Rules of Evidence 902(11) and 902(13).

________________________ ______________________________________

Date Signature

**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| GRAND JURY PROCEEDINGS | GRAND JURY NO. 1-26 |

WAIVER OF APPEARANCE
AND
DOCUMENT RECEIPT

I, ______________________________, of ____________________________________,

have custody and control of the documents requested in the attached subpoena. I would prefer that:

( ) I will mail the requested documents via USPS mail or FedEx to:
Attn: Grand Jury, U.S. Attorney's Office, Suite 600, 75 Ted Turner Drive SW, Atlanta, Georgia 30303

( ) I will email the requested documents to Assistant United States Attorney

( ) I will email the requested documents to the Grand Jury Clerk at USAGAN.GrandJury@usdoj.gov.

in lieu of actual appearance by myself. Submission of the requested documents is fully complied with, this _______ day of ____________, 20___.

______________________________________________
SIGNATURE OF PERSON SUBMITTING DOCUMENTS

______________ ______________________________________________
DATE SIGNATURE OF PERSON RECEIVING DOCUMENTS

______________ ______________________________________________
DATE SIGNATURE OF GRAND JURY FOREPERSON

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff ____________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ____________
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Fulton County Board of Registration and Elections<br>(Petitioner)<br>v<br>United States of America<br>(Respondent) | Case No. 26-MI-88 |

**ORDER**

Acting under the Court's inherent authority under Rule 17(c)(2) of the Federal Rules of Criminal Procedure, this Court hereby stays any enforcement of the referenced subpoena which is the subject of the Motion of the Fulton County Board of Registration and Elections to Quash Grand Jury Subpoena ("Motion") until such time as the United States Department of Justice ("DOJ") has had an opportunity to respond in writing to said Motion and until the time that the Court has issued a ruling on said Motion. Once the DOJ has responded to the Motion, the Court will schedule a hearing on this matter. The Petitioner, Fulton County Board of Registration and Elections, is directed to send a copy of this Order to the DOJ.

So ORDERED this 5th day of May, 2026.

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA NO. 2026R00350-01 | Case No. 26-MI-0088 |

**MOTION OF THE FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS TO UNSEAL DOCKET**

The Fulton County Board of Registration and Elections ("FBRE" or "Petitioner") respectfully requests this Court to unseal the docket in the above-referenced matter, including FBRE's Motion to Quash Grand Jury Subpoena (the "Motion"). As detailed in FBRE's Motion, the grand jury subpoena is the latest example of the U.S. Department of Justice ("DOJ") issuing an improper subpoena that is subject to quashal.[1] But, as explained below, nothing requires that the entire docket in this matter be sealed.

---

[1] Similarly improper subpoenas have now been quashed in multiple other districts. *See, e.g.*, *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202 (D.D.C. Mar. 13, 2026) (hereinafter, "*In re Federal Reserve Grand Jury Subpoena*") (granting motion to quash subpoena issued to the Chairman of the Federal Reserve because it was motivated by the President's political agenda of lowering interest rates); *In re Grand Jury Subpoenas to Off. of New York State Att'y Gen.*, 814 F. Supp. 3d 284 (S.D.N.Y. 2026) (granting motion to quash subpoena issued to the office of New York's Attorney General, where federal prosecutor acted outside scope of his appointment).

As a threshold matter, neither party requested that the entire docket be sealed. To the extent that there is any specific information on the docket that should be sealed, Petitioner respectfully requests that the sealing of such specific information be handled in due course, as opposed to the wholesale sealing of the docket.

Second, as the face of the grand jury subpoena acknowledges, "the law does not prohibit disclosure" of the subpoena itself. Given the limited number of substantive records in the docket (the motion to quash, the subpoena, and the Court's order), there is no material that requires sealing.

Third, there is no appropriate basis for continued sealing of the docket because: (1) unsealing the docket would not reveal any "matter occurring before the grand jury" contemplated by Rule 6 of the Federal Rules of Criminal Procedure; (2) a subpoenaed party such as FBRE is not prohibited from publicly disclosing any of the information in the filings to date; (3) FBRE's Motion does not contain information that is not already public;[2] and (4) the Motion implicates substantial public interest in the baseless federal investigation into Fulton County's administration of the 2020 election.

---

[2] Out of an abundance of caution, FBRE redacted the email addresses and phone numbers of DOJ employees in the Motion and its exhibit. FBRE has no objection to filing unredacted copies of those documents at the Court's direction, either under seal or on the public docket.

In short, the Motion was automatically placed on a sealed docket by the Clerk of Court—not because of any request by a party—and the continued sealing of the docket is not required or justified. Accordingly, FBRE hereby files the present motion requesting that the docket in this matter, including FBRE's Motion and any related pleadings or orders, be unsealed.

**A. Background**

On April 17, 2026, the DOJ issued a grand jury subpoena to the FBRE. *See* Grand Jury Subpoena 2026R00350-01 (the "Subpoena"), attached as Exhibit A to FBRE's Motion. That subpoena purports to require the FBRE to disclose the sensitive, personal information of thousands of Fulton County election workers and volunteers who served in the 2020 general election. *See id.* And rather than having the FBRE provide that information to a grand jury in this district, the Subpoena directs the FBRE to send that personal information to an out-of-district federal prosecutor and an FBI agent. *Id.* at 1.

Notably, DOJ did not take any steps to prevent disclosure of the Subpoena or any related grand jury investigation. On its face, the Subpoena itself notes that "the law does not prohibit disclosure." *Id.* And over three months ago, Todd Blanche, then-Deputy Attorney General and now the Acting Attorney General, stated on CNN that there was "a grand jury investigation being run by the FBI" involving Fulton

County's role in the 2020 election.[3] Indeed, those comments were made in the context of DOJ's execution of a search warrant at Fulton County's election hub in January 2026. Notably, DOJ filed the search warrant affidavit on a public docket and did not object to unsealing the affidavit. *See* Search Warrant Affidavit, *Pitts v. United States*, No. 26-cv-00809 (N.D. Ga. filed Feb. 10, 2026) (Doc. 22-2). On May 4, 2026, the FBRE filed its Motion, which identifies the numerous ways in which the Subpoena is improper and explains why the Court should quash the Subpoena.

**B. Legal Standard**

"Courts have discretion to determine which portions of the record, if any, should be placed under seal," but that discretion "is guided by the presumption of public access to judicial documents." *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1235 (11th Cir. 2013). And "[w]here the trial court conceals the record of an entire case, making no distinction between those documents that are sensitive or privileged and those that are not, it must be shown that 'the denial [of access] is necessitated by a compelling governmental interest, and is narrowly tailored to that interest.'" *Chicago Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) (quoting *Wilson v. Am. Motors Corp.*, 759 F.2d 1568, 1571 (11th

[3] Tim Hains, *Deputy AG Todd Blanche: FBI Had A Warrant From Federal Grand Jury To Investigate 2020 Georgia Election Fraud Allegations*, RealClear Politics (Feb. 1, 2026), https://www.realclearpolitics.com/video/2026/02/01/deputy_ag_todd_blanche_fbi_had_a_warrant_from_federal_grand_jury_to_investigate_2020_voter_georgia_fraud_allegations.html.

Cir. 1985)); *cf. United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1029–30 (11th Cir. 2005) (reminding the district court of its prior finding that certain "secret docketing procedures" were unconstitutional); *United States v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993) ("[W]e hold that the Middle District's maintenance of a dual-docketing system is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings."). As to any material relating to grand juries specifically, the Supreme Court has "repeatedly stressed that wide discretion must be afforded to district court judges in evaluating whether disclosure is appropriate." *United States v. John Doe, Inc. I*, 481 U.S. 102, 116 (1987) (listing cases).

The Eleventh Circuit also applies the common law "balance of interests" test to decide whether access to judicial records should be granted. "The test for whether a judicial record can be withheld from the public is a balancing test that weighs 'the competing interests of the parties' to determine whether there is good cause to deny the public the right to access the document." *FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013) (quoting *Chicago Trib. Co.*, 263 F.3d at 1312). Among the factors to be considered are "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents

of the records." *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983). Other factors include "whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007).

### C. Argument

As explained below, there are several compelling reasons for this Court to unseal the docket in this matter, and there is no valid interest in keeping FBRE's motion and related filings under seal.

#### 1. The Docket Should Be Unsealed Because This Action Is an Ancillary Proceeding that Does Not Reveal Any Matter Before the Grand Jury.

As a threshold matter, the Subpoena on its face raises questions about whether DOJ took proper steps to ensure the "participation of the grand jury" in this matter. *See United States v. Santucci*, 674 F.2d 624, 627 (7th Cir. 1982) (explaining that prosecutors "may not use the grand jury subpoena power to gather information without the intended participation of the grand jury."). But as detailed in FBRE's Motion, the Subpoena instructs FBRE to "[s]end the subpoenaed records" to an out-of-district AUSA and an FBI special agent. Subpoena at 3; Mot. at 6–7. "Unless information reveals something about the grand jury proceedings, secrecy is

unnecessary." *United States v. Stanford*, 589 F.2d 285, 291 (7th Cir. 1978). Given the apparent lack of the grand jury's involvement in the Subpoena, neither the Subpoena nor FBRE's Motion would implicate any interest in secrecy that applies to a "matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2), (6).

Second, even if a grand jury were properly involved, resolution of a motion to quash is an *ancillary proceeding* before the Court, not part of the matter before the grand jury. *See In re Federal Reserve Grand Jury Subpoena*, 2026 WL 710202, at *11 ("Whereas grand-jury proceedings are conducted in secret before the grand jury with no judge presiding . . . ancillary proceedings are litigated through motions filed on a docket and decided by a judge outside the grand jury's presence.") (citing *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 498 (D.C. Cir. 1998)). And as the Eleventh Circuit has explained, judicial records generally include motions and supporting materials "presented to the court to invoke its powers or affect its decisions." *Romero*, 480 F.3d at 1246 (internal quotation marks and citations omitted); *see also Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1361–63 (11th Cir. 2021) (explaining that "[w]hat matters" is whether a party used a document "to support an argument before the court").

Although the records in ancillary proceedings may be sealed under Rule 6(e)(6); *see, e.g.*, *In re Federal Reserve Grand Jury Subpoena*, 2026 WL 710202, at *11; that Rule is inapposite here. Specifically, Rule 6(e)(6) provides for records

relating to grand-jury proceedings to be "kept under seal to the extent and as long as necessary to prevent the unauthorized *disclosure of a matter occurring before the grand jury*." Fed. R. Crim. P. 6(e)(6) (emphasis added). But "only documents that reveal some secret aspect of the grand jury investigation should be subject to the restrictions of rule 6(e)." *United States v. Phillips*, 843 F.2d 438, 441 (11th Cir. 1988). The filings in this case "in no way indicate[] the pattern of the grand jury investigation or the deliberations of the grand jury;" therefore, they are "not 'matters occurring before a grand jury' and are not subject to the secrecy provisions of rule 6(e)" *Id.* (quoting Fed. R. Crim. P. 6(e)).

Put simply, the filings on the docket in this ancillary proceeding are judicial records, which are "presumptively accessible to the public." *In re Federal Reserve Grand Jury Subpoena*, 2026 WL 710202, at *11 (citations omitted); *cf. Chi. Trib. Co.*, 263 F.3d at 1310–11 (discussing the general public's constitutional and common-law rights to access judicial records); *AbbVie Prods. LLC*, 713 F.3d at 63 (noting the presumptive right of public access to "materials that invoke judicial resolution of the merits") (internal quotation marks and citation omitted). Moreover, there is no indication in the record of the "extraordinary circumstances" required to maintain the entire docket under seal in this matter. *See Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992) ("Absent a showing of extraordinary circumstances set forth by the district court in the record . . . the court file must

remain accessible to the public."). Given the presumptive right of access to judicial records and the absence of extraordinary circumstances compelling secrecy, this Court should unseal the docket and pleadings in this matter.

**2. Keeping This Proceeding Under Seal Would Improperly Bind FBRE, the Subpoenaed Witness, to Rule 6(e)'s Secrecy Provisions.**

This Court should unseal the docket in this matter for the additional reason that FBRE, the party seeking to unseal the docket, is the recipient of the Subpoena. As the subpoena's recipient, FBRE is permitted to disclose the contents of the Subpoena or any related grand jury testimony at will. This is because Rule 6(e) expressly provides that "[n]o obligation of secrecy may be imposed on any person" except for seven categories of persons, who "must not disclose a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2).[4] The FBRE does not fall into any of those categories,[5] so the restrictions of Rule 6(e) do not apply to it. *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983) ("Witnesses are not under [Rule 6(e)(2)'s] prohibition unless they also happen to fit into one of the enumerated classes."); *In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir. 1980) ("Rule

[4] FBRE maintains that unsealing the docket would not reveal any matter before the grand jury, but in all events, FBRE's willingness to disclose the information would moot any otherwise-applicable restrictions under Rule 6(e).

[5] The following persons are bound by Rule 6(e)'s prohibition on disclosures: "(i) a grand juror; (ii) an interpreter; (iii) a court reporter; (iv) an operator of a recording device; (v) a person who transcribes recorded testimony; (vi) an attorney for the government; or (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)." Fed. R. Crim. P. 6(e)(2)(B).

6(e) does not prevent disclosures by a witness who testifies before the grand jury."). Indeed, the Subpoena itself notes that "the law does not prohibit disclosure." Subpoena at 1. Although DOJ could have sought a court order restricting disclosure, it declined to do so.

Moreover, one of the primary bases for the grand jury secrecy rule is to protect targets or witnesses from public embarrassment or harassment. *See Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979) (noting that without the secrecy rule, "witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements"); *id.* ("[B]y preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule."). But here, FBRE is the witness of whom documents are requested, and its willingness to unseal the record renders those interests irrelevant, even if unsealing the docket did require disclosing some matter before the grand jury. Accordingly, this Court should unseal the docket in this case for the additional reason that FBRE, the subpoenaed witness, seeks its disclosure.

### 3. Unsealing the Docket Is Appropriate Because the Information in the Sealed Filings Is Publicly Known.

The Court should also grant FBRE's request to unseal the docket because doing so would not reveal any information not already known to the public. In particular, FBRE's Motion does not disclose any non-public information, other than

the existence of the Subpoena itself. To the contrary, the Administration and DOJ officials have repeatedly made public statements about the purported investigation into the 2020 election in Fulton County. For example, the President continues to claim that his political opponents in Fulton County "cheated like dogs,"[6] and earlier this year, he posted the following on social media: "This is exactly why the FBI raided the election center today in Fulton County, Atlanta, Georgia. This is only the beginning. *Prosecutions are coming*.") (emphasis added).[7] The FBI Director has similarly stated, "'[W]e are going to be making arrests, and it's coming.'"[8] And as stated above, the now Acting Attorney General has confirmed in at least one television interview that there is "a grand jury investigation being run by the FBI."[9]

[6] Sarah Kallis, *Trump visits Georgia, a target of his election falsehoods, as Republicans look for midterm boost*, Associated Press (Feb. 20, 2026), https://www.gpb.org/news/2026/02/20/trump-visits-georgia-target-of-his-election-falsehoods-republicans-look-for-midterm.

[7] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 29, 2026, at 6:01 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115978045822911393 (reposted from The SCIF, @TheSCIF).

[8] Brentin Mock, *FBI Director says arrests 'coming soon' on 2020 rigged election conspiracy*, Democracy Docket (Apr. 19, 2026), https://www.democracydocket.com/news-alerts/fbi-director-says-arrests-coming-soon-on-2020-rigged-election-conspiracy/ (quoting FBI Director Kash Patel).

[9] Tim Hains, *Deputy AG Todd Blanche: FBI Had A Warrant From Federal Grand Jury To Investigate 2020 Georgia Election Fraud Allegations*, RealClear Politics (Feb. 1, 2026), https://www.realclearpolitics.com/video/2026/02/01/deputy_ag_todd_blanche_fbi_had_a_warrant_from_federal_grand_jury_to_investigate_2020_voter_georgia_fraud_allegations.html.

Such public disclosures moot any purported need for secrecy because "if everyone already knows about a matter occurring before the grand jury, then sealing is no longer 'necessary to prevent [its] disclosure.'" *In re Federal Reserve Grand Jury Subpoena*, 2026 WL 710202, at *11 (quoting Fed. R. Crim. P. 6(e)(6)); *see also In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007) ("[G]rand jury secrecy is not unyielding when there is no secrecy left to protect.") (internal quotation marks and citation omitted); *In re Petition of Craig*, 131 F.3d 99, 107 (2d Cir. 1997) (noting that the extent to which grand jury material has been made public should be considered in the disclosure context because "even partial previous disclosure often undercuts many of the reasons for secrecy"); *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) ("The purpose in Rule 6(e) is to preserve secrecy. Information widely known is not secret."); *In re Charlotte Observer (A Div. of Knight Pub. Co. & Herald Pub. Co.)*, 921 F.2d 47, 50 (4th Cir. 1990) (reversing district court order not to disclose name of grand jury investigation's target where after the target was identified in open court, "the cat [was] out of the bag.").

And even on its face, the Subpoena does not disclose any confidential information. Rather, as explained in FBRE's Motion, the Subpoena is staggeringly overbroad and requests personal information for *thousands* of election workers and volunteers. *See* Mot. at 14–18. While this defect renders the Subpoena defective and merits quashal, it also leaves any reader unable to discern confidential information

such as "the pattern of the grand jury investigation or the deliberations of the grand jury." *Phillips*, 843 F.2d at 441. Nor does the Subpoena provide enough information to extrapolate as to "the identity of persons who will be called to testify" or "when the grand jury will return an indictment." *In re Grand Jury Investigation*, 610 F.2d at 217. Because unsealing the docket in this ancillary proceeding will not result in a disclosure of any non-public information, this Court should grant the motion to unseal.

**4. There Is a Compelling Public Interest in Unsealing the Docket in This Matter.**

The significant public interest in this matter constitutes additional grounds for unsealing the docket. "[T]he common-law right of access to judicial proceedings" is a "right grounded in the democratic process, as '[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Chi. Trib. Co.*, 263 F.3d at 1309 (quoting *Landmark Comm. v. Virginia*, 435 U.S. 829, 839 (1978)); *see also Newman*, 696 F.2d at 803 ("This right [of public access] is important if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system.").

In this matter, DOJ is seeking the sensitive, personal information of thousands of election workers and volunteers from the 2020 election, despite the fact that the statute of limitations has lapsed on any purported crimes involving the administration of that election. *See* Mot. at 12–14. The public has a compelling

interest in DOJ's efforts to collect such personal information on a broad swath of election workers and volunteers. And given the lack of any potentially prosecutable offense, there is no sufficiently strong interest in keeping this matter under seal. *Cf. Ochoa-Vasquez*, 428 F.3d at 1030 (party seeking to overcome presumption of access must show "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest") (internal quotation marks and citation omitted); *In re Four Search Warrants*, 945 F. Supp. 1563, 1568–69 (N.D. Ga. 1996) ("ongoing investigation would not be compromised" by release of information "widely available to the public," particularly given public interests such as "the public's right to understand the legal process, the preservation of the integrity of the fact-finding process, and the furtherance of the appearance of fairness").

In addition, even if the filings in this matter did reveal any matter before the grand jury, several courts have found that substantial public interest in a case may still justify unsealing records. *See, e.g.*, *In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence*, 678 F. Supp. 3d 135, 145 (D.D.C. 2023) (releasing portions of grand jury transcripts involving former Vice President Mike Pence, in part because the court was resolving a "novel constitutional dispute" and because Mr. Pence's "invocation of the Speech or Debate Clause and this Court's resolution of the ensuing

controversy carry far-reaching public implications"); *In re North*, 16 F.3d at 1245 (unsealing final report on Iran Contra investigation, despite its inclusion of grand jury materials, and noting that "it is in the public interest that this matter of extended national controversy be afforded as full a conclusion as possible"); *Special Feb. 1971 Grand Jury v. Conlisk*, 490 F.2d 894, 898 (7th Cir. 1973) ("Because the maintenance of police integrity and credibility is essential to public confidence, the disclosure of testimony by policemen to a police board in order to discipline those abusing public offices is a sufficient public interest to override the policy of shielding the grand jury from public scrutiny."). Because the public interest is similarly substantial in this matter, the Court should unseal the docket.

**D. Conclusion**

For the foregoing reasons, this Court should unseal the docket and the filings in this action.

Respectfully submitted, this 14th day of May, 2026.

[SIGNATURES ON FOLLOWING PAGE]

*/s/ Y. Soo Jo*
Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON
COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30309
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

*/s/ Kamal Ghali*
Kamal Ghali
Georgia Bar No. 805055
Matthew A. Josephson
Georgia Bar No. 367216
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

*/s/ Abbe David Lowell*
Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202)-964-6110
jbolen@lowellandassociates.com
alowellpublicoutreach@
lowellandassociates.com

*/s/ Stephen Jonas*
Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 1580
Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Fulton County Board of Registration and Elections*

**Application for admission pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court via email. I further certify that I have this day served Counsel for Respondent with a copy of the same document via email.

This 14th day of May, 2026.

*/s/ Michael C. Duffey*
Michael C. Duffey

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **IN RE GRAND JURY SUBPOENA NO. 2026R00350-01,** | **Case No. 1:26-mi-00088-WMR (filing no. 1729)** |

# UNITED STATES OF AMERICA'S RESPONSE TO PETITIONER'S MOTION TO QUASH AND CROSS-MOTION TO ENFORCE GRAND JURY SUBPOENA

## INTRODUCTION

Fresh off its defeat in a Rule 41(g) motion to compel the return of ballots seized under a search warrant issued by a magistrate judge of this Court upon a finding of probable cause, Petitioner now seeks to obstruct the next step in the normal investigative process by moving to quash a grand jury subpoena limited to records identifying persons with relevant knowledge. Petitioner's speculative and politicized diatribe falls woefully short of the established standard and appears to be a dilatory tactic. The motion should be denied, and the government cross-moves for enforcement of the subpoena without further delay.

## Table of Contents

Table of Authorities ........ iii

PROCEDURAL HISTORY ........ 1

FACTS ........ 2

ARGUMENT ........ 3

I. THE SUBPOENA SEEKS RELEVANT DOCUMENTS........ 7

II. THE SUBPOENA IS NOT OVERBROAD. ........ 7

III. NO FIRST AMENDMENT INTERESTS ARE JEOPARDIZED BECAUSE, INTER ALIA, ELECTION WORKERS' IDENTITIES ARE PUBLIC RECORD. ........ 9

IV. PETITIONER HAS NOT SHOWN ANY IMPROPER PURPOSE, AND PRIOR PROBABLE CAUSE AND RULE 41(G) DETERMINATIONS SHOW THE OPPOSITE. ........ 12

A. The President's Tweets Do Not Establish an Improper Purpose. ........ 13

B. Rehashed Statute of Limitations and Sovereignty Arguments Do Not Establish Improper Purpose. ........ 15

II. THE FORM AND ISSUANCE OF THE SUBPOENA WERE PROPER. ........ 17

CONCLUSION ........ 20

CERTIFICATE OF COMPLIANCE ........ 21

# Table of Authorities

## Cases

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) .................... 10
*Biddinger v. Comm'r of Police of City of New York*, 245 U.S. 128 (1917) ....... 15
*Georgia v. Clark*, 119 F.4th 1304 (11th Cir. 2024)......................................... 17
*Goddard v. City of Albany*, 684 S.E.2d 635 (Ga. 2009) .................................. 11
*In re Grand Jury Proceeding*, 842 F.2d 1229 (11th Cir. 1988)........ 9, 10, 11, 12
*In re Grand Jury Proceedings*, 616 F.3d 1186 (10th Cir. 2010) ........................ 8
*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202 (D.D.C. Mar. 13, 2026)............................... 14, 15
*In re Grand Jury Subpoenas to Off. of New York State Att'y Gen.*, 814 F. Supp. 3d 284 (N.D.N.Y. 2026) ................................................................ 19
*Musacchio v. United States*, 577 U.S. 237 (2016)............................................ 16
*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) .............................. 9
*Nieves v. Bartlett*, 587 U.S. 391 (2019) ............................................................ 15
*People v. Trump Organization, Inc.*, Case No. 451685/2020, 2022 WL 489625 (N.Y. Sup. Ct. Feb. 17, 2022) .......................................................... 14
*Pickens v. Hollowell*, 59 F.3d 1203 (11th Cir. 1995) ....................................... 16
*Prospero v. Sullivan*, 153 F.4th 1171 (11th Cir. 2025) .................................. 15
*Robert L. "Robb" Pitts, et al. v. United States*, Civil Action No. 1:26-CV-00809-JPB (N.D. Ga. May 6, 2026) ........................................................ 1, 16
*Trump v. Vance*, 977 F.3d 198 (2d Cir. 2020).................................................... 7
*United States v. Nixon*, 418 U.S. 683 (1974) .................................................... 4
*United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) .......................passim
*United States v. US Infrastructure, Inc.*, 576 F.3d 1195 (11th Cir. 2009)........ 5
*United States v. Wilson*, 262 F.3d 305 (4th Cir. 2001).................................... 13

## Statutes

52 U.S.C. § 20511(2)(B) (2026) ......................................................................... 1
52 U.S.C. § 20701 (2026) .................................................................................... 1
O.C.G.A. § 50-18-70 (2025) ............................................................................... 11
O.C.G.A. § 50-18-72 (2025) ............................................................................... 11
O.C.G.A. § 50-18-74(a) (2025)............................................................................ 11
O.C.G.A. § 50-18-77 (2025) ............................................................................... 11

## PROCEDURAL HISTORY

Petitioner filed this motion on May 4, 2026. Two days later, Judge Boulee denied Petitioner's Rule 41(g) motion filed February 5, 2026 seeking the return of ballots seized by the FBI on January 28, 2026 under a search warrant issued upon a finding of probable cause by Magistrate Judge Salinas that violations of 52 U.S.C. §§ 20701 (2026) and 20511(2)(B) occurred. Judge Boulee held that Petitioner failed on each of the four prongs of its assigned burden to prevail on the Rule 41(g) motion: (1) that the government displayed "callous disregard" for Petitioner's constitutional rights; (2) that the Petitioner had an individual interest in and need for the seized documents; (3) that the Petitioner would be irreparably injured by denial of the return of the documents; and (4) that Petitioner lacked an adequate remedy at law. *Robert L. "Robb" Pitts, et al. v. United States*, Civil Action No. 1:26-CV-00809-JPB (N.D. Ga. May 6, 2026) (Docket # 108, attached as Exhibit 1 hereto).[1]

Proceedings on the Rule 41(g) motion consumed three months. Three weeks after the March 27 evidentiary hearing, the government initiated the

[1] The government requests the Court to take judicial notice of the record in the Rule 41(g) proceeding. Fed. R. Evid. 201(c)(2); *see Paez v. Secretary*, 947 F.3d 649, 651-52 (11th Cir. 2020) (court can take judicial notice of court dockets and filings).

extant grand jury subpoena on Friday, April 17. The FBI case agent served the subpoena the following Monday, April 20.

Petitioner did not seek to negotiate the scope of the subpoena or communicate any objection. On April 29, six days before the grand jury return date of May 5, Petitioner's counsel emailed a request for "a 14-day extension of time to object, respond, or file an appropriate motion" and stated, "we are still assessing whether the subpoena has an appropriate legal basis." The government responded that it would extend the deadline for production but not for objections or motions. Three business days later, Petitioner filed this motion arguing that the subpoena is "unprecedented and harassing," is purposed to "target, harass, and punish the President's perceived political opponents," is "grossly overbroad and untethered to any reasonable need," is invalid because "statutes of limitations have expired for any purported 2020 election crimes," "burdens the First Amendment rights of election workers," and "unreasonably interferes with Georgia's sovereign authority to administer elections." Doc. #1729 (hereinafter "Mot.") at 2.

## FACTS

The sole factual record submitted by Petitioner is a copy of the grand jury subpoena. Petitioner's lurid characterizations notwithstanding, the subpoena seeks only one thing: records identifying persons reasonably likely

to be able to shed light on the irregularities in the Fulton County 2020 election under investigation. Although unnecessary to the resolution of the motion and without burden to do so, the government proffers an in camera showing of findings from its analysis of the seized ballots, the revelation of which to Petitioner or the public would impair the prospects of the ongoing investigation. In camera review would clarify the need for identification of potential witnesses across Petitioner's in-person voting operations as well as couriers and central elections administration staff. But the need is already sufficiently clear from the probable cause affidavit under the standard that governs.

## ARGUMENT

The grand jury is an "investigatory body charged with the responsibility of determining whether or not a crime has been committed." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991). Its powers are broad. It "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* (internal quotations and citations omitted). A grand jury "ascertain[s] whether probable cause exists" by "inquir[ing] into all information that *might possibly bear* on its investigation until it has identified an offense or has satisfied itself that none has occurred."

*Id* (emphasis added). Thus, "[a]s a necessary consequence of its investigatory function, the grand jury paints with a broad brush." *Id.*

Petitioner's motion ignores these fundamental principles of the grand jury. It references *R. Enterprises*, the controlling authority, but completely disregards (and omits to state) its principal holding. According to Petitioner, *R. Enterprises* stands for the propositions that "grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass" and that Rule 17(c)(2) empowers the court to quash a subpoena when compliance would be unreasonable or oppressive. Mot. at 2-3 (brackets omitted). Relatedly, Petitioner cites *United States v. Nixon*, 418 U.S. 683, 700 (1974), for the proposition that the instant subpoena reflects an "impermissible 'fishing expedition.'" Mot. at 16-17.

The central holding of *R. Enterprises*, however, was that "the *Nixon* standard" — requiring the government to show "relevancy, admissibility, and specificity" in order to enforce a trial subpoena — "does *not* apply in the context of grand jury proceedings" and that the Court of Appeals "committed error" by plac[ing] an initial burden on the Government" to demonstrate a grand jury subpoena's reasonableness. 498 U.S. at 296, 300 (emphasis added). A "grand jury subpoena issued through normal channels is presumed to be reasonable," the Court said, "and the burden of showing unreasonableness must be on the

recipient who seeks to avoid compliance." *Id.* at 301; *see also United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1214 (11th Cir. 2009) ("The law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority.") (internal quotes and brackets omitted).

The case language quoted by Petitioner — that the grand jury's investigatory powers are "not unlimited" and not a "license[ ] to engage in arbitrary fishing expeditions" — introduced the Court's undertaking to "define" the "unreasonable or oppressive" threshold for court supervision under Rule 17(c) in the context of a grand jury subpoena. *R. Enterprises*, 498 U.S. at 299-300. Considering the needs to "not impair the strong governmental interests in affording grand juries wide latitude, avoid[ ] minitrials on peripheral matters, and preserv[e] a necessary level of secrecy," *id.* at 300, the Court concluded: "[W]here, as here, a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the government seeks will produce information relevant to the general subject of the grand jury's investigation." *Id.* at 301. That is the controlling standard for the present motion.

The Court also observed that a "blanket denial" from the subpoenaed party is insufficient to establish "no reasonable possibility": "A grand jury need

not accept on faith the self-serving assertions of those who may have committed criminal acts. Rather, it is entitled to determine for itself whether a crime has been committed." *Id.* at 303. Thus, Petitioner's categorical assertions and speculation about "debunked conspiracy theories," Mot. at 17, and that "known facts foreclose any conceivably proper purpose," Mot. at 12, do not meet their burden.

Petitioner's approach threatens to undermine the grand jury's very purpose. It "invite[s] procedural delays and detours while courts evaluate the relevancy and admissibility of documents sought by a particular subpoena," where such delays and detours would "impede [the grand jury's] investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enterprises, Inc.*, 498 U.S. at 292. It also endangers the confidentiality of grand jury proceedings, which are protected by federal law. Requiring the government to "explain in too much detail the particular reasons underlying a subpoena threatens to compromise the indispensable secrecy of grand jury proceedings." *Id.* at 292–293. "Broad disclosure also affords the targets of investigation far more information about the grand jury's internal workings than the *Federal Rules of Criminal Procedure* appear to contemplate." *Id.* at 293.

## I. THE SUBPOENA SEEKS RELEVANT DOCUMENTS.

It is indisputable that the subpoena seeks documents that meet the *R. Enterprises* standard. A subpoena for a list of employees and workers involved in the 2020 Fulton County election cannot conceivably hold "no reasonable possibility" of producing information bearing on an investigation of that election. Such a subpoena is completely orthodox, and its relevance is obvious.

## II. THE SUBPOENA IS NOT OVERBROAD.

The *R. Enterprises* standard also controls Petitioner's overbreadth challenge. (*See* Mot. at 14-18.) *Trump v. Vance*, 977 F.3d 198, 206 (2d Cir. 2020)[2] ("To prevail on an overbreadth challenge in practice [ ], the moving party must show that a particular category of documents can have no conceivable relevance to any legitimate object of investigation by the grand jury.") (internal quotes omitted; citing *R. Enterprises*). "Whether [a] subpoena is overbroad is measured against 'the general subject of the grand jury's investigation.'" *Id.* at 208 (quoting *R. Enterprises*). "It is neither uncommon nor unlawful for grand jury subpoenas to seek categories of documents that may include some documents that ultimately prove to be unhelpful to the grand jury's investigation." *Id.* at 213. After all, the standard references not the

[2] Although the Second Circuit evaluated a state grand jury subpoena for documents, it noted that "the standards governing challenges to grand jury subpoenas on the grounds of overbreadth and bad faith are substantively identical under New York and federal law." *Id.* at 206 n. 5.

"materials" but "the category of materials the Government seeks." *R. Enterprises*, 498 U.S. at 301. This "contemplates that the district court will assess relevancy based on the broad types of material sought by the Government" and "forecloses [a] document-by-document or line-by-line approach to assessing relevancy." *In re Grand Jury Proceedings*, 616 F.3d 1186, 1202 (10th Cir. 2010).

> A non-categorical approach … unduly disrupt[s] the grand jury's broad investigatory powers and its unique function to inquire into all information that might possibly bear on its investigations. … The Government often is not in a position to establish the relevancy with respect to specific documents, much less specific lines, because (a) it may not know the precise content of the requested documents or particular lines and (b) it may not know precisely what information is or is not relevant at the grand jury investigative stage. In fact, it is for this reason that subpoenas *duces tecum* are often drawn broadly, sweeping up both documents that may prove decisive and documents that turn out not to be. Such a process necessarily involves a fishing expedition by the grand jury, but such fishing is permissible so long as it is not an *arbitrary* fishing expedition and satisfies the *R. Enterprises* relevancy standard. *See R. Enterprises,* 498 U.S. at 299 … (noting that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions").

*Id.* at 1203 (emphasis by court; some internal citations and quotes omitted).

Petitioner's incorrect reliance upon *Nixon's* inapt "fishing expedition" language, omission to disclose that *R. Enterprises* rejected the *Nixon* standard in the grand jury subpoena context, and apparent failure to comprehend the Tenth Circuit's distinction between "fishing" necessary to the grand jury investigative process and an arbitrary fishing expedition disconnected from the

investigative subject matter are all fatal to Petitioner's latest attempt to disrupt this investigation. This is not a *Nixon* fishing expedition. After all, a magistrate judge of this Court has found probable cause to believe violations of federal law occurred. The *category* of documents identifying witnesses to these possible crimes is plainly relevant. Under the *R. Enterprises* standard, that forecloses arguments about whether every one of the persons whose identities are revealed to the grand jury will turn out to be the correct ones.

## III. NO FIRST AMENDMENT INTERESTS ARE JEOPARDIZED BECAUSE, INTER ALIA, ELECTION WORKERS' IDENTITIES ARE PUBLIC RECORD.

The utter frivolousness of Petitioner's attack on the subpoena becomes even clearer upon examining its argument that First Amendment interests are at stake. (Mot. at 18-22.) Petitioner attempts to assert a claim of associational privacy on behalf of election workers sought to be identified via the subpoena, citing *In re Grand Jury Proceeding*, 842 F.2d 1229 (11th Cir. 1988). As explained by that court, the First Amendment freedom of association "necessarily entail[s] the right to privacy in [group] association, for inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 1232 (internal quotes omitted; citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). In such cases, disclosure of group member identities can be compelled only where the

government "convincingly show[s] a substantial relation between the information sought and a subject of overriding and compelling state interest." *Id.* at 1232–33.

This protection applies in cases of "expressive association" — that is among "organizations and individuals whose 'association' furthers … expressive activity" and not in its absence. *Id.* at 1234 (citing "escort services" and "vendor of sno-cones to schoolchildren" as examples of associational activity outside the protection).[3] Petitioner asserts that the grand jury subpoena in issue "will inevitably chill the associational rights of" the election workers it seeks to identify, but cites no authority that working for a public election authority constitutes a private expressive association. That proposition does not bear examination.

Election authorities are the antithesis of an advocacy group. Their assigned role is neutrality, not advocacy. More generally, public employment and contracting is simply not private associational activity. Indeed, Georgia

---

[3] Petitioner's motion states that protection of identities is afforded "regardless of the nature of the association at issue," quoting out of context *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021). But its footnote 31 expands the quote to reflect that the doctrine applies "whether the beliefs sought to be advanced by association pertaining to political, economic, religious or cultural matters" — that is, regardless of the type of *expressive* association. Nothing in Bonta suggests expansion of expressive association privacy rights beyond expressive associations.

municipalities' employees' and contractors' identities are public record through personnel files made generally public in the Georgia Open Records Act, O.C.G.A. §§ 50-18-70 & -72 (2025). *Goddard v. City of Albany*, 684 S.E.2d 635, 640 (Ga. 2009).[4] And "knowingly and willingly frustrating or attempting to frustrate the access to records by intentionally making records difficult to obtain or review" is a criminal misdemeanor. O.C.G.A. § 50-18-74(a). Petitioner's argument that the First Amendment requires quashing a subpoena for records it is under a statutory command to provide is untenable.

Even assuming election workers have expressive association rights in their relationship with Petitioner, the government has a compelling interest in the information it seeks through the subpoena. The case Petitioner cites held that where such rights exist and are properly asserted, circumstances paralleling those at hand "established a justification for th[e] infringement." 842 F.2d at 1236. "The right to associate for expressive purposes is not absolute. There are governmental interests sufficiently important to outweigh the possibility of infringement." *Id.* (internal quotations and citations omitted).

---

[4] Personal details like "home address, home telephone number, personal mobile or wireless telephone number" are exempted from disclosure to the general public, O.C.G.A. § 50-18-72(a)(21), but readily available to "a state or federal grand jury … or prosecuting attorney in conjunction with an ongoing administrative, criminal, or tax investigation" upon written request, *id.* § 50-18-77.

Where the government was conducting a good-faith criminal investigation into "possible criminal violations of the tax laws," the court had "no doubt that this case implicates a compelling governmental interest." *Id.* And by examining records under seal, the court further concluded that the government had shown a "substantial relation" between the information sought and the compelling interest. *Id.* at 1236-37.

Here, with probable cause demonstrated to the satisfaction of a magistrate judge and the challenge to the seizure of documents under warrant rejected by a district judge, the government is conducting a good-faith criminal investigation into possible violations of election laws, which are of like importance to tax laws. The "substantial relation" between identities of the persons who conduct of the election and the subject of the investigation speaks for itself. No further showing should be needed. If, however, the Court wishes to inquire into the range of personnel requested to be identified, the government is prepared to make that showing in camera.

## IV. PETITIONER HAS NOT SHOWN ANY IMPROPER PURPOSE, AND PRIOR PROBABLE CAUSE AND RULE 41(G) DETERMINATIONS SHOW THE OPPOSITE.

Petitioner's remaining substantive arguments, across many pages and subheadings, appear to fall under the rubric of improper purpose. Petitioner asserts that the subpoena's "purpose is to target, harass, and punish the President's perceived political opponents." Mot. at 2. Pages later, Petitioner

cites cases for the proposition that "a court can quash a subpoena … issued for an 'improper' purpose." *Id.* at 4-5. Yet no improper purpose is shown.

A. The President's Tweets Do Not Establish an Improper Purpose.

Petitioner reverts to the theme that "the President has obsessively propagated the debunked conspiracy theory that Fulton County 'stole" the 2020 election from him" and "made it clear that he seeks retribution." *Id.* at 7. Petitioner simply ignores that the search warrant affidavit makes clear that the investigation concerns *any* violation of the relevant federal election laws (which would constitute a serious federal offense), whether or not outcome determinative. Instead, Petitioner relies on a litany of accusations and purported quotes of social media posts and re-posts and tales of insults suffered, none of which is properly of record.

But even if it were, the President's tweets and offenses taken have no capacity to prove an improper purpose for a grand jury investigation he does not direct. Petitioner itself states that the subpoena was procured by Bishop, not the President. Petitioner furnishes no evidence that the President directed Bishop to initiate the subpoena (or underlying criminal investigation) and cites no authority for the proposition that animus "was somehow transferred" from one to the other. That supposition is entirely speculative. *Cf. United States v. Wilson*, 262 F.3d 305, 316 (4th Cir. 2001) (in vindictive prosecution analysis, an explicit request to prosecute by a vindictive U.S. attorney was "no evidence"

that the animus was transferred to a different, prosecuting U.S. attorney). Petitioner's own cited authority declares that the presumption of regularity accorded to normally issued subpoenas "cannot be rebutted by mere speculation or conjecture." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *7 (D.D.C. Mar. 13, 2026).

Moreover, even where a prosecutor's comments reflect personal animus — especially through comments in the political sphere — a showing of merit supporting the underlying investigation rebuts any indication of improper purpose in issuance of a grand jury subpoena. For example, although the New York Attorney General made "dozens of public statements" indicating intent to investigate Trump (including, "Oh we're definitely going to sue him. We're going to be a real pain in his ass. He's going to know my name personally."), where a showing was made of "a sufficient basis for continuing [the] investigation," the court declined to quash a grand jury subpoena issued to Trump by her office. *People v. Trump Organization, Inc.*, Case No. 451685/2020, 2022 WL 489625, at *4 (N.Y. Sup. Ct. Feb. 17, 2022) ("As has often been said, that a prosecutor dislikes someone does not prevent the prosecution."). Even Petitioner's cited authority is to like effect:

> [T]he separate rule that subpoenas may be quashed if their dominant purpose is improper requires weighing the evidence of improper purpose against the strength of the Government's

> reasons for issuing the subpoena. In the rare case when the evidence of improper purpose is overwhelming, that might require the Government to show something akin to probable cause.

*Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *7. Here, Petitioner offers no evidence of improper purpose, and probable cause has already been shown and adjudicated. So, Petitioner is not entitled to quashing of the subpoena. *Cf. Prospero v. Sullivan*, 153 F.4th 1171, 1183 (11th Cir. 2025) ("the presence of probable cause should generally defeat a First Amendment retaliatory arrest claim") (quoting *Nieves v. Bartlett*, 587 U.S. 391 (2019); internal quotes and brackets omitted).

B. Rehashed Statute of Limitations and Sovereignty Arguments Do Not Establish Improper Purpose.

Petitioner's final arguments on this issue resurrect contentions rejected by Judge Boulee in the Rule 41(g) proceeding — that the government's criminal investigation (and here, the issuance of the subpoena) is improper because the statute of limitations has run and it intrudes on Georgia's sovereignty. Mot. at 12-13, 22-23. As before, Petitioner cites no authority so holding. And, as before, the answers remain the same.

The statute of limitations is an affirmative defense "that must be asserted on the trial by the defendant in criminal cases." *Biddinger v. Comm'r of Police of City of New York*, 245 U.S. 128, 135 (1917). "[A] statute-of-limitations defense becomes part of a case only if the defendant puts the

defense in issue." *Musacchio v. United States*, 577 U.S. 237, 248 (2016). "The existence of a statute of limitations bar is a legal question that is appropriately evaluated by the district attorney or by a court after a prosecution [has] begun, not by police officers executing an arrest warrant." *Pickens v. Hollowell*, 59 F.3d 1203, 1207–08 (11th Cir. 1995). At this stage, there is not even a defendant to raise statute of limitations arguments.

Regardless, how applicable limitations periods will be calculated given conduct that may have occurred during various inquiries and investigations following the November 2020 election (as detailed in the affidavit) remains to be seen. *See Pickens*, 59 F.3d at 1208 ("[W]hether a valid statute of limitations defense exists is not a cut and dry matter."). Any subsequent criminal acts, or acts in furtherance of a criminal conspiracy, would restart the limitations period. Notably, Judge Boulee determined that the Court could not "ignore that a witness told [an FBI Special Agent] that some of the ballot images may have been modified as recently as January 11, 2024—which is well within the statutory period." *Pitts, et al.*, at 51-52. Regardless, the statute-of-limitations calculations will be fact-specific — which underscores why courts examine limitations defenses raised in concrete prosecutions, not when subpoenas are issued. The possibility of such a defense does not defeat probable cause and does not undermine the basis for the subpoena.

Nor is there any conflict between the government's investigation or the present subpoena and Petitioner's "sovereign interests in safeguarding election integrity." Petitioner's sole citation on this point is to a concurrence that includes the remark that "no statutory [ ] authority gives 'the President or DOJ power to intervene in Georgia's elections'" and that the federal election statutes in Chapters 205 and 207 of Title 52 — including those addressed by the probable cause affidavit — "focus on civil-rights violations, not purported voter fraud." Mot. p. 23 (citing *Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). For one thing, a grand jury subpoena concerning an election that took place nearly six years ago does not constitute intervention in an election. For another, the concurrence is not law, and it says nothing to invalidate a federal criminal investigation of possible violations of two of those (broadly worded) statutes, 52 U.S.C. §§ 20511 and 20701. Section 20511(2)(B) expressly encompasses "the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent." Because the investigation is valid, the subpoena is valid.

## II. THE FORM AND ISSUANCE OF THE SUBPOENA WERE PROPER.

Finally, Petitioner scatters procedural sniping throughout its motion but never makes clear whether it contends these issues justify quashing the subpoena. They do not.

Petitioner acknowledges that "in modern federal practice, prosecutors often issue grand jury subpoenas with little or no involvement of the grand jurors themselves," Mot. at 3, and "without the grand jury's authorization or awareness" <u>and that the practice is proper</u>, *id.* at 6 n.6. It further notes that the U.S. Attorney "may obtain subpoenas issued in blank by the court, fill in the blanks, and have the witness served without consulting the grand jury." *Id.* But Petitioner's footnote includes repeated quotes that prosecutors cannot use grand jury subpoenas "without the intended participation of the grand jury" and states in the accompanying text that "there is no indication from the face of the Subpoena that the grand jury is even aware of this investigation [or] that the records will be returned to the grand jury." *Id.* at 6 n.6 & 7. Petitioner's point is unclear, but the government agrees that the issuance of the subpoena was proper and orthodox.

Petitioner asserts that an AUSA from the Middle District of North Carolina "working at the direction of U.S. Attorney Dan Bishop" "issued" the subpoena, *id.* at 1, but the subpoena is captioned for this Court and signed by its clerk, Mot. Ex. A. The face of the subpoena states that the North Carolina AUSA "requested" the subpoena. The accompanying correspondence bearing letterhead of the United States Attorney's Office for the Northern District of Georgia appears over the typewritten signature of Bishop as "Special Attorney to the AG and United States Attorney," subsigned by the same AUSA. *Id.*

Petitioner offers no challenge to the authority of Bishop and, to the contrary, cites two news articles reporting his appointment as special attorney by the Attorney General "to pursue election-related probes across the country."[5] *Id.* at 1 n.1, 6 n.4. This alone distinguishes *In re Grand Jury Subpoenas to Off. of New York State Att'y Gen.*, 814 F. Supp. 3d 284, 298–99 (N.D.N.Y. 2026), which quashed a subpoena based on defects in the issuing official's authority. The point of Petitioner citing it is unclear.

Petitioner asserts that the subpoena "directs the FBRE to send … to the email accounts of an out of district AUSA and an FBI agent." *Id.* at 2; *see also id.* at 6 ("the Subpoena does not require that the FBRE provide the records to the grand jury; instead, it directs that the records be routed out of this district …"). In fact, the face of the subpoena "commands" Petitioner to appear at GJ# 1-26 in the United States Courthouse in Atlanta at 9:00 AM on May 5, 2026 and to bring responsive documents.[6] *Id.* Ex. A. It does not "direct" the sending of documents out of the district but offers the option to supply records in lieu of appearance by sending them to the requesting AUSA "and/or" the FBI case

---

[5] In a footnote Petitioner claims to reserve objection to Bishop's authority for later assertion. *Id.* at 4 n.3.

[6] This speaks incidentally to Petitioner's musings whether the government is attempting to use grand jury subpoenas independent of the grand jury. If Petitioner complied with the subpoena by appearing before the grand jury, the grand jury would be aware.

agent assigned to the Atlanta Field Office. It also invites questions by telephone to the case agent. In this way, the subpoena issued is like grand jury subpoena issued in federal investigations across the country. It is not unique or irregular.

This meandering, self-contradictory, and inaccurate critique of procedural details appears to be pointless. The form of the subpoena is proper, the prosecuting Special Attorney is unchallenged, and the commanded grand jury return refutes any suggestion of usage independent of the grand jury. This final argument also fails.

## CONCLUSION

For these reasons, the Court should deny Petitioner's motion to quash and should correspondingly grant the government's cross-motion to enforce.

/s/ DAN BISHOP
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina
N.C. State Bar Number 17333
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
Telephone: (336) 332-6333
E-mail: Dan.Bishop@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to LR 5.1(C) and 7.1(D), that I prepared the foregoing brief using Century Schoolbook, 13 point font.

/s/ DAN BISHOP
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina

## CERTIFICATE OF SERVICE

I certify that, given this filing on a sealed docket via email transmittal to criminal_sealed@gand.uscourts.gov, I have today served a copy of the filing on counsel of record via email with their express consent pursuant to Fed. R. Civ. P. 5(b)(2)(E).

This 15th day of May, 2026.

/s/ DAN BISHOP
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ROBERT L. "ROBB" PITTS, et al.,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CIVIL ACTION NO.<br>1:26-CV-00809-JPB |

**ORDER**

This matter is before the Court on Petitioners'[1] Amended Motion for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g) [Doc. 30]. The United States of America ("Respondent") opposes the motion. This Court finds as follows:

## PROCEDURAL HISTORY

On January 28, 2026, after obtaining a search warrant signed by a United States Magistrate Judge (hereinafter, the "Magistrate Judge"), the Federal Bureau of Investigation ("FBI") seized over 600 boxes of Fulton County's 2020 election records. Soon after, on February 5, 2026, Petitioners filed an Emergency Motion

[1] Petitioners are Robert L. "Robb" Pitts, who is the Chairman of the Fulton County Board of Commissioners; the Fulton County Board of Registration and Elections; Fulton County, Georgia; and Che Alexander, the Clerk of Court for Fulton County.

for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g). [Doc. 1]. Petitioners amended their motion on February 17, 2026. [Doc. 30]. After briefing closed and the parties attempted to mediate their dispute, the Court held an evidentiary hearing on March 27, 2026. Thereafter, Petitioners filed a Post-Hearing Motion for Additional Evidence. [Doc. 71]. Although the Court denied Petitioners' motion, which sought to compel Respondent to answer certain questions and separately requested documents for an *in camera* review, the Court determined that if Petitioners obtained additional evidence, they could submit it to the Court no later than April 27, 2026. [Doc. 88, p. 4]. Petitioners timely submitted additional evidence. [Doc. 98].

In addition to submitting additional evidence, Petitioners filed a Motion to Compel, which this Court granted in part. [Doc. 89]; [Doc. 100]. The parties filed supplemental briefing on May 5, 2026. [Doc. 105]; [Doc. 106]. With evidence now closed and briefing complete, Petitioners' Amended Motion for Return of Property is now ripe for review.

**FACTS**

After considering the parties' submissions and the entirety of the evidence, the Court sets forth the following facts, which relate to: (A) the 2020 election in Fulton County; (B) current litigation involving the 2020 election records; (C) the

FBI's seizure of the election records; and (D) pertinent testimony from the evidentiary hearing.

### A. The 2020 Election in Fulton County

#### *i. Voting*

In 2020, Fulton County voters could vote either absentee or in person. Given the COVID-19 pandemic that was still affecting the country at the time, many Fulton County voters chose to vote absentee. To vote absentee, a person had to request an absentee ballot prior to the election. The Secretary of State then sent the voter a blank absentee ballot and two return envelopes. [Doc. 22-2, p. 16]. Once the voter filled out the ballot and placed it in the provided envelopes, the voter would return the ballot either by leaving it in a designated drop box or by mailing it. Id. Because absentee ballots were placed in envelopes, they were typically folded.

Voters who did not vote absentee could vote in-person during the early-voting period or on Election Day. These voters cast their ballots on voting machines. After a voter made his or her selections using the machine's electronic interface, the machine would print a filled-in paper ballot with a QR code indicating the voter's selections. Id. at 12.

Completed ballots—whether cast in-person or absentee—were electronically counted and recorded using tabulator machines. Relevant here, tabulator machines capture two types of digital records when scanning ballots. See [Doc. 76, p. 108]. The first record is a "cast vote record," which is the actual recording of a voter's selections that is ultimately used to tabulate the results for the election. Id. The second is a picture of the front and back of the ballot known as a "ballot image." Id. Ballot images are not ballots and are not used to tabulate the results of the election, but they are often retained as a form of receipt. [Doc. 22-2, p. 11].

In addition to capturing the digital records, tabulator machines contain a memory card that stores information about the scanned ballots, including the total number of votes cast for each candidate on that particular machine. Id. at 13; [Doc. 76, p. 125]. The tabulator machines also have a protective counter, which logs the total number of ballots recorded on an individual tabulator machine during the machine's lifetime—similar to how an odometer keeps track of the total number of miles driven on a car. [Doc. 22-2, p. 15]. At the end of the voting period, poll workers generate tabulator tapes from the tabulator machines. Ga. Comp. R. & Regs. § 183-1-12-.12(a)(1). A tabulator tape documents the number on a tabulator machine's protective counter (as explained above, the total number of ballots scanned by that tabulator machine during its lifetime) and the number of

votes cast on that machine for each individual candidate. Tabulator tapes serve as a "paper back-up to the memory cards that store the ballot tabulation and are not part of the process by which official results are reported by counties to the Secretary of State." [Doc. 85-5, p. 9]. Under Georgia law, the tabulator tapes must be signed by the poll manager and two poll-officer witnesses. [Doc. 22-2, p. 14]; Ga. Comp. R. & Regs. § 183-1-12-.12(a)(1).

***ii. Counting the Votes***

After the polls closed on Election Day, Fulton County began counting the ballots. In 2020, as summarized in Figure 1 below, three separate counts occurred before the results were certified. [Doc. 22-2, p. 7 n.1]. The first count (the "Original Count") began immediately after the polls closed and was completed the following day. Id. Fulton County used tabulator machines during the Original Count to keep track of the votes electronically. [Doc. 76, p. 116].

After the Original Count, Fulton County conducted a second count (the "Risk Limiting Audit"). [Doc. 22-2, p. 7 n.1]. "[V]oters and members of the public" performed the Risk Limiting Audit by hand-counting the ballots. [Doc. 76, p. 116]. The purpose of the Risk Limiting Audit was to "detect or determine whether or not there [was] sufficient evidence that the outcome [of the Original

Count was] incorrect." Id.[2] Because the purpose of the Risk Limiting Audit was to determine whether there was confidence in the Original Count, the results of the Risk Limiting Audit were not certified, nor were they a precise count. Id. at 116–17; [Doc. 85-3, p. 4].

In early December 2020, a third count (the "Recount") of the ballots occurred. Like the Original Count, the Recount utilized tabulator machines to electronically scan the ballots. [Doc. 22-2, p. 15]. Ultimately, the results produced in the Recount were certified as the official election results for the 2020 Fulton County general election. [Doc. 76, p. 117]; O.C.G.A. § 21-2-495.

| **November 2020 Election — Fulton County Ballot Counts** | | |
|---|---|---|
| **Name** | **Method** | **Dates** |
| Original Count | Tabulator machines (electronic) | November 3–4, 2020 |
| Risk Limiting Audit | Hand count | Mid-November 2020 |
| Recount | Tabulator machines (electronic) | December 2020 |

*Figure 1: Election Counts*

[2] Though a standard risk limiting audit would only include a hand count of a "small sample of ballots" to verify election results, all the ballots were counted during the 2020 Risk Limiting Audit "due to the closeness of the race." [Doc. 22-2, p. 16].

### *iii. Investigations and Reports Concerning the 2020 Election*

Given the closeness of the 2020 election and concerns by some that it was not conducted in a fair manner, there were multiple investigations into Fulton County's election processes. Following these investigations, Seven Hills Strategies, LLC, the Fulton County Performance Review Board and the Secretary of State issued reports. The reports are discussed below.

The Georgia State Election Board ("SEB") contracted with Seven Hills Strategies to serve as an independent, non-partisan monitor for the 2020 election in Fulton County. [Doc. 22-2, p. 20]. In its report, Seven Hills Strategies identified several problems with the election, like the "extremely sloppy" absentee ballot counting process. [Doc. 85-7, p. 2]. While the report acknowledged that the election was not perfect, the report noted that there were no indications of "dishonesty, fraud, or intentional malfeasance" by any Fulton County election officials. Id. at 1.

In 2023, the Fulton County Performance Review Board[3] issued a report concerning elections in Fulton County. In its report, the Performance Review

[3] At the request of the Georgia General Assembly, the SEB appointed the Performance Review Board in August of 2021. [Doc. 22-2, p. 21]. The Performance Review Board was tasked with "mak[ing] a thorough and complete investigation . . . regarding the technical competency in the maintenance and operation of election equipment, proper

Board summarized previous investigations into the 2020 election and agreed with the Seven Hills Strategies report that there were no indications of fraud, dishonesty or intentional malfeasance by election officials. [Doc. 85-6, pp. 8–10]. The report also stated that elections conducted in 2021 and 2022, which are not an issue here, ran smoother than the one that occurred in 2020. Id. at 11–20.

The Secretary of State issued reports in 2022, 2023 and 2024. These reports addressed specific complaints about the 2020 election. The first report, released in 2022, discussed the Risk Limiting Audit. [Doc. 85-3]. The report recognized that irregularities occurred with the Risk Limiting Audit and determined that they were caused by human error and issues with Fulton County's data reporting. Id. at 15–19. The 2023 report addressed allegations of mishandled ballots and found that there were no violations of the law. [Doc. 85-4, pp. 15, 17]. The final report pertained to alleged problems with ballot images and tabulator tapes. [Doc. 85-5]. As to these problems, the report found that there were possible violations of SEB rules relating to the counting process. Id. at 11–13.

administration and oversight of registration and elections, and compliance with state law and regulations." O.C.G.A. § 21-2-106(b).

**B. Current Litigation Involving the 2020 Election Records**

The 2020 election led to multiple civil lawsuits. At least two of those suits are still pending, and Petitioners claim that they are relevant here. The suits are Allen v. State of Georgia, filed in the Superior Court of Fulton County ("the Superior Court Action"), and United States v. Alexander, filed in the United States District Court for the Northern District of Georgia ("the Federal Court Action"). Both actions were stayed after the FBI seized the election records. The Court discusses the Superior Court Action first.

The Fulton County Board of Registration and Elections ("BRE") filed the Superior Court Action in November 2024 seeking to quash two subpoenas issued by the SEB for the 2020 election materials. Allen, Civ. A. No. 24CV014632 (Ga. Super. Ct.). On October 6, 2025, the SEB issued a new subpoena, which the BRE also sought to quash, for "all used and void ballots, stubs of all ballots, signature envelopes, and corresponding envelope digital files from the 2020 General Election in Fulton County." [Doc. 1-1, p. 8]. The Superior Court denied the motion to quash on December 22, 2025, and ordered the BRE to provide the materials to the SEB upon payment of production costs. [Doc. 71-4].

The Attorney General of the United States filed the Federal Court Action on December 11, 2025. In the Federal Court Action, the Attorney General sued Che

Alexander (the "Clerk") seeking the same materials that the SEB requested in its October 6, 2025 subpoena. Alexander, 1:25-CV-07084 (N.D. Ga.), Doc. 1. The Attorney General sought access to the records via a federal statute that requires custodians of election records to, upon written demand, make their records available for inspection. See 52 U.S.C. § 20703. On January 5, 2026, the Clerk filed a motion to dismiss. Alexander, Doc. 18.

**C. The FBI's Seizure of the Election Records**

The criminal investigation in this case originated with a referral from Kurt Olsen, the presidentially appointed Director of Election Security and Integrity. [Doc. 76, p. 215]. Specifically, no later than 9:03 AM on January 5, 2026, Olsen formally referred the investigation to the FBI. [Doc. 101, p. 2]. Thomas C. Albus, the United States Attorney for the Eastern District of Missouri and Special Attorney to the Attorney General, received the referral on January 5, 2026. Id. The next day, the FBI opened an "assessment." Id. Shortly thereafter, on January 12, 2026, Special Agent Hugh Raymond Evans ("SA Evans")—an FBI agent assigned to the Public Corruption and Civil Rights Squad—requested that the matter be opened as a full investigation, and his request was approved on January 14, 2026. Id. On January 19, 2026, SA Evans began drafting his investigative

summary based on witness interviews, which he converted to the format of a search warrant affidavit on January 22, 2026. Id. at 2–3.

On January 27, 2026, Albus submitted a search warrant application to the Magistrate Judge seeking permission to seize Fulton County's 2020 election records. [Doc. 82-3]. The Court first discusses the search warrant application before turning to the execution of the search warrant.

***i. The Search Warrant Application***

As part of the search warrant application, SA Evans provided an affidavit for the purpose of establishing probable cause (hereinafter, "the Affidavit"). [Doc. 22-2, pp. 5–23]. The Affidavit stated that the FBI was investigating irregularities in the 2020 election in Fulton County. The Affidavit specifically focused on missing ballot images, "duplicate ballots," tabulator tapes, "pristine ballots" and issues with the Risk Limiting Audit. Id. at 7, 13–16.[4]

[4] In the Affidavit, SA Evans also noted a problem with the reported Recount numbers. [Doc. 22-2, p. 7]. Specifically, SA Evans stated that: "[o]n the day of the deadline to report the Recount results, Fulton County reported a recount totaling 511,343 ballots, 17,434 ballots fewer than original[ly] counted. The following day, Fulton County then reported a total of 527,925 ballots counted." Id. The Affidavit never again mentioned any problem with the number of ballots tallied in the Recount. While the Affidavit only mentioned this issue in passing, the Court does have concerns that the statement was misleading. See infra p. 36.

*a. Missing Ballot Images*

SA Evans stated in his Affidavit that the FBI was investigating missing ballot images. As noted previously, a ballot image is a digital scan of a voter's completed ballot and is automatically created when a ballot is fed into a tabulator machine. In the Affidavit, SA Evans reported that there were almost 18,000 missing ballot images from the Recount. Id. at 8. According to SA Evans, the Director of Elections for the Georgia Secretary of State told him that "a discrepancy like that would be problematic." Id. at 11. SA Evans also provided information that some of the ballot images appeared to have been modified or manipulated as recently as January 11, 2024. Id. at 10. Although SA Evans did not fully explain the importance of ballot images or the significance of missing ballot images, he did acknowledge that the "images are just duplicates" and that it was only the actual ballots that were counted to determine the winner of a given race. Id. at 11 ("The concern is less about the images and more about the ballots and voter count" and "[w]hen the Secretary of State conducted the recount, they did not focus on the images taken by the scanners. They took the actual ballots that were cast and counted them one by one to come up with the total."). SA Evans further acknowledged that "a possible explanation for missing images was

that they were stored on a memory card and it was not uploaded correctly or became corrupt." Id.

*b. Duplicate Ballots*

In the Affidavit, SA Evans indicated that the FBI was investigating duplicate ballots, which were detected by "stray marks or other unique markings on a ballot that would allow it to be uniquely identified." Id. at 12. SA Evans explained that a witness told him that he discovered duplicate ballots in both the Original Count and the Recount. Id. In addition to the duplicate ballots, the witness also informed SA Evans that he found new ballots and test ballots in the Recount that did not appear in the Original Count. Id. In the witness's opinion, the addition of these duplicate or new ballots did not change the outcome of the election[5] but could have been an intentional act to make the Recount match the Original Count. Id. at 12–13. SA Evans noted that, if deliberate, this type of ballot manipulation would be an intentional tabulation of ballots in a false manner in violation of the law. Id. at 13. After detailing these potential concerns regarding duplicate ballots, SA Evans disclosed that the Secretary of State investigated the issue and closed its

[5] Indeed, the duplicate ballots appeared to favor Donald Trump. [Doc. 22-2, p. 13] ("[The witness] concluded that what he observed could be intentional but was not partisan" because "by adding the duplicate ballots, Donald Trump received approximately 10% more than his average in Fulton County (40% instead of 30%).").

investigation after learning that the duplicate ballots favored Donald Trump. Id. SA Evans further explained that the Fulton County Director of Registration and Elections "admitted that duplication of ballots 'may have occurred,' but indicated that, if it did occur, it happened due to human error." Id.

*c. Tabulator Tapes*

SA Evans also included a discussion of tabulator tapes in the Affidavit. As previously explained, tabulator machines print tabulator tapes after the polls close at the end of the voting period. Tabulator tapes reflect the number of total ballots scanned on a given tabulator machine as well as the number of votes cast for each individual candidate on that machine. Id. SA Evans explained that he spoke with a witness who reported that some tabulator tapes from the 2020 election were not properly signed as required under Georgia law and that this deficiency "impacts the accountability process."[6] Id. at 13–14. The Affidavit also referenced a December 9, 2025 SEB meeting during which Fulton County stated that tabulator tapes accounting for 315,000 ballots were not properly signed. Id. at 16. According to the Affidavit, Secretary of State Brad Raffensberger told the media that he considered this error to be an administrative oversight. Id.

[6] That same witness also told SA Evans that the tabulator tapes should match the number of physical ballots scanned by that machine and described tabulator tapes as the "holy grail" for the final count. [Doc. 22-2, p. 14].

With regard to tabulator tapes, SA Evans included several observations from Clay Parikh, a cyber security specialist with experience running security and performance checks on voting equipment and a current Special Government Employee appointed to work for the Executive Branch. Id. at 14. After reviewing tabulator tapes that he obtained through an open records request, Parikh suspected that memory cards were removed from some tabulator machines and inserted into other tabulator machines, meaning that certain tabulator machines were used to generate final tabulator tapes reflecting voting data gathered from several different tabulator machines. Id. Parikh arrived at this conclusion after determining that closing tabulator tapes from some machines were missing and, of the 138 tabulator tapes reviewed, it appeared that 16 tabulator machines were utilized to produce the tapes for approximately 315,000 ballots. Id. For instance, Parikh identified one tabulator machine that was used to generate tabulator tapes for ballots scanned on sixteen total tabulator machines across twelve different locations. Id. Presumably, this occurred by taking the memory cards from fifteen different machines and feeding them all into one separate tabulator machine that generated a tabulator tape reflecting data at the end of polling from both that machine and the fifteen other machines. Id. Based on the proximity of the times reflected across several tabulator tapes, Parikh further reported that he believed that someone had

manipulated the poll-closing and report-printed times on several tabulator tapes. Id.

Parikh also reviewed the protective counter data reflected on the tabulator tapes. Id. at 15. Again, protective counters depict the total number of ballots scanned by a given tabulator machine during the machine's lifetime. Id. Parikh determined that the protective counter numbers on five separate tabulator tapes from the same tabulator machine were identical and that, for some tapes, the ballots-scanned number exceeded the protective counter number. Id. In Parikh's view, this indicated that no ballots were ever actually scanned on these tabulator machines, but rather, the tabulator tapes were printed on the machines by inserting a memory card from a different tabulator machine and printing a tape based on the foreign memory card's data. Id. The Affidavit concluded that "[t]his would have allowed an opportunity for the tabulation to be tampered with." Id.

After his discussion of Parikh's findings and conclusions, SA Evans included in the Affidavit statements from a different witness asserting that the tabulator tapes were not used to determine the final vote. Id. In fact, this witness reported that tabulator tapes from the Original Count were not needed during the Recount because the ballots were re-scanned using a different tabulator machine. Id. According to the witness, the ballots were what mattered. Id.

*d. Pristine Ballots*

The Affidavit provided that the FBI was investigating "pristine ballots," which SA Evans described as absentee ballots that have "no indications" that they have been "folded and mailed as a typical absentee ballot would." Id. at 16. At the outset, SA Evans explained that an SEB member told him that "there is no reason to have a pristine absentee ballot with no folds." Id. The Affidavit then described claims about pristine ballots made by a 2020 poll manager. Id. at 16–17. This witness stated that, during the Risk Limiting Audit, she saw ballot boxes with broken seals, unfolded ballots and some stacks of ballots that were located outside the view of security cameras. Id. at 17. She described one box in particular that included 110 absentee ballots. Id. According to her, these ballots lacked folds and were "too clean" to be absentee ballots. Id. Additionally, she said that 107 of these pristine ballots were identical—voting for the same candidates in every race. Id. Finally, she thought that these ballots had a different texture from typical ballots. Id.

The Affidavit also mentioned that another witness who assisted with the Risk Limiting Audit likewise remembered the 107 ballots and said that the selections looked like they "had been made with a stamp." Id. This same witness reported that she saw two individuals re-voting ballots printed on a different kind

of paper and was told by the then-Director of Elections for the BRE that these individuals were re-voting the ballots because the originals were not accepted by the machine. Id. at 17–18. SA Evans noted in the Affidavit that, under Georgia law, any duplicated ballots of damaged or unscannable original ballots had to be clearly identified as duplicates. Id. at 18.

Additionally, the Affidavit discussed statements from a current Fulton County Commissioner who was a poll worker during the November 2020 election. Id. at 19. This witness was assigned to test ballots on tabulator machines to make sure that the machines were working accurately. Id. While performing these tests, the witness said that she observed stacks of "unsecured" test ballots, "unattended" ballots that had already been cast by voters at early voting locations and the printing of random ballots, even though all the necessary test ballots had already been printed. Id. at 19–20.

While SA Evans detailed the concerns that these witnesses had with pristine ballots, SA Evans explained that the Secretary of State's Election Director did not think that it would be feasible for someone to tamper with absentee ballots due to how many people are in the room and that it would be "barely possible" to do anything on a large scale. Id. at 18. SA Evans also noted that the Election Director told him that "there would be pristine absentee ballots in every election"

because the Vote Review Panel would generate a pristine ballot after adjudicating the results of a damaged ballot. Id. at 19. SA Evans further reported that the Election Director stated that, if fraudulent absentee ballots were introduced during the reconciliation process without removing real ballots, it would be caught by comparing the total number of ballots to the total number of votes. Id. at 18. The Election Director also said that he was not aware of any discrepancies between the voter count and the ballot count.[7] Id. Even though the Election Director opined that it would not be feasible to introduce fictitious ballots on a large scale, he did note that there was no way to determine whether someone substituted fictitious ballots for real ballots during the reconciliation process if the voter total and ballot total matched. Id. SA Evans further included a statement from an Investigator with the Secretary of State's Office indicating that he did not know how a person could inject fraudulent absentee ballots into the count and, indeed, that a post-election ballot count performed by the Georgia Secretary of State's Office and the Recount performed by Fulton County matched. Id. at 20.

[7] The Affidavit also included statements to the same effect from another witness. [Doc. 22-2, p. 19]. This witness, an Investigator with the Secretary of State's Office, explained that the provisional ballots available on Election Day were all accounted for. Id.

*e. The Risk Limiting Audit*

The Affidavit also raised issues with the Risk Limiting Audit conducted by Fulton County. As already discussed, the Risk Limiting Audit was not an official recount, but was a tool to verify election results. SA Evans stated in the Affidavit that a witness identified thirty-six errors within the batch tallies and that these errors included "duplicated or misidentified batch entries and incorrect batch entries reflecting 100% vote for one candidate."[8] Id. at 8 n.4. In contrast, SA Evans also included in the Affidavit the statements of one witness who believed that the ballots were all accounted for during the Risk Limiting Audit. Id. at 15.

SA Evans explained in the Affidavit that reports from Seven Hills Strategies and the Performance Review Board confirmed that there were problems with the Risk Limiting Audit. Specifically, the Seven Hills Strategies Report stated that "there were chain of custody issues, ballots left unattended, unsealed bags being used, and auditors not recording seal numbers on ballot bags." Id. at 20. The Performance Review Board likewise found that there were inaccurate batch tallies. Id. at 7. SA Evans disclosed in his Affidavit that both reports concluded that there was "no evidence of fraud, dishonesty, or intentional misconduct" with regard to

[8] Neither the Affidavit nor the parties explain what batch tallies or batch entries are.

the November 2020 election in Fulton County, but rather "persistent disorganization." Id. at 21.

*f. Other Observations in the Affidavit*

In SA Evans's view, the above irregularities, if intentionally caused, demonstrate violations of 52 U.S.C. § 20701 and 52 U.S.C. § 20511(2)(B).[9] Id. at 22. Section 20701, which is a records-retention statute, provides that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President . . . are voted for, all records and papers." Put more simply, the statute requires election officers to retain election records for twenty-two months. Section 20511(2)(B) states that it is a felony to

> knowingly and willfully deprive[] . . . the residents of a State of a fair and impartially conducted election process, by . . . the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held.

Essentially, SA Evans stated in his Affidavit that the seizure of the election records could show that some of them were intentionally destroyed or that the "tabulation

[9] SA Evans explained that "[i]f these deficiencies were the result of intentional action, it would be a violation of federal law regardless of whether the failure to retain records or the deprivation of a fair tabulation of a vote was outcome determinative for any particular election or race." [Doc. 22-2, p. 8].

of votes included materially false votes, either through duplicated scanning of specific ballots" or through the "interjection of pristine ballots." [Doc. 22-2, p. 22].

### *ii. Execution of the Search Warrant*

The Magistrate Judge considered the search warrant application on January 28, 2026, and determined that there was probable cause. Consequently, the Magistrate Judge signed the warrant authorizing the seizure of the election records.[10] Id. at 1. After the warrant was signed, FBI agents executed the warrant and seized over 600 boxes of election records. Following the seizure, both the Superior Court Action[11] and the Federal Court Action were stayed because at least some of the items at issue in those cases were no longer in the Clerk's possession.

[10] The Magistrate Judge actually signed two warrants. The Magistrate Judge first authorized the search of the Fulton County Election Hub. [Doc. 22-1, p. 2]. After Respondent discovered that the election records were housed within the Election Hub, but in "an access-limited portion of the warehouse controlled by the Clerk of Court," it requested a second warrant. [Doc. 22-2, p. 22]. The Magistrate Judge then signed a new warrant to specifically authorize the search of "the Clerk of Court's portion of the warehouse." Id. at 2, 22.

[11] Although the judge in the Superior Court Action denied the motion to quash and ordered the Clerk to turn over the records to the SEB, the election records had not yet been produced to the SEB because a cost determination needed to be made.

### D. Pertinent Testimony from the Evidentiary Hearing

The Court conducted an evidentiary hearing on Petitioners' Amended Motion for Return of Property on March 27, 2026.[12] At the hearing, Petitioners' evidence primarily focused on what they perceived to be shortcomings with SA Evans's Affidavit. Specifically, Petitioners argued that SA Evans omitted material facts from the Affidavit that—had they been revealed to the Magistrate Judge—would have caused her to deny the warrant application.

Petitioners called an expert witness, Ryan Macias, to testify regarding the Affidavit's alleged deficiencies.[13] Macias opined that the Affidavit omitted various innocent explanations for the facts it alleged. For instance, he asserted that "pristine" absentee ballots that do not have folds are normal in elections, especially from military and overseas voters. [Doc. 76, pp. 113, 118]. As to one witness's description of ballot image files that were modified after the date of the election, Macias explained that the Secretary of State's Office might have renamed the

---

[12] The hearing was originally scheduled for the end of February. [Doc. 26]. After Respondent filed a motion to both vacate the hearing and to quash a subpoena for SA Evans's testimony, however, the Court ordered the parties to mediate and continued the hearing. [Doc. 49]. Mediation did not result in a complete agreement between the parties, although Respondent did agree during the mediation to give Petitioners a copy of the seized documents.

[13] Macias's written declaration was admitted into evidence at the hearing. [Doc. 85-1]. It was also attached to Petitioners' Amended Motion. [Doc. 30-1]. Macias's declaration provides that he is "an election technology and security expert." Id. at 1.

ballot image files, which would result in a later modification date. Id. at 112. Macias further testified that multiple legitimate reasons could exist for scanning a ballot more than once. Id. at 114.

In addressing the Affidavit's discussion on tabulator tapes, Macias confirmed that memory cards were taken from some machines and then, after Election Day, input into different tabulator machines to determine the final vote count. Id. at 125–26. Macias explained that this was done specifically with tabulator machines used during early voting so that election officials did not have to send personnel back to each early voting location after the close of voting to retrieve the votes from those machines. Id. at 125. Macias stated that the memory cards were stored "securely" until Election Day and were then used to generate tabulator tapes reflecting each memory card's results after the close of voting. Id. at 125–26. Macias explained that this was done because it is impermissible to begin calculating election results until all votes have been cast and that nothing in this process indicates misconduct. Id. at 126.

Macias also discussed other aspects of the Affidavit. He testified that ballot images and tabulator tapes have no bearing on the election outcome because only ballots are counted in determining the winner of a given race. Id. at 107, 122. He

further testified that the sort of issues identified in the Affidavit occur in virtually every election. Id. at 105–06.

The facts detailed above provide the context for the issue before the Court—whether Petitioners are entitled to the return of the election records under Federal Rule of Criminal Procedure 41(g). The Court now turns to the applicable legal standards and analysis.

**DISCUSSION**

Petitioners assert that under Federal Rule of Criminal Procedure 41(g), the Court should order the immediate return of the seized property.[14] Rule 41(g) permits "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return." Where, as here, a party invokes Rule 41(g) before the initiation of any civil or criminal proceedings, the motion for return of property is treated as a civil action in equity. Richey v. Smith, 515 F.2d 1239, 1245 (5th Cir. 1975).[15] Notably, the Eleventh Circuit Court

[14] Not only do Petitioners want the return of the election records—they also want Respondent to return any copies, which would effectively enjoin any further criminal investigation. [Doc. 30, p. 35].

[15] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit . . . handed down by that court prior to the close of business on [September 30, 1981], shall be binding as precedent in the Eleventh Circuit." Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

of Appeals has held that a district court should invoke its equitable jurisdiction only under the "narrowest" circumstances and that "[e]xercises of equitable jurisdiction . . . should be exceptional and anomalous." Trump v. United States, 54 F.4th 689, 694, 697 (11th Cir. 2022) (citation modified). In other words, a district court should show "caution and restraint" before exercising its equitable jurisdiction. Vasarely v. United States, No. 23-MC-00256, 2025 WL 2624156, at *7 (D.P.R. Sep. 11, 2025) (quoting 3A Wright & Miller's Federal Practice & Procedure § 690 (4th ed. 2008)). The burden of establishing this "exceptional and anomalous" jurisdiction "rests upon the party asserting jurisdiction." Trump, 54 F.4th at 694, 697 (citation modified).

Courts are required to apply "an exacting test" when deciding whether to exercise equitable jurisdiction over suits flowing from the seizure of property. Id. at 697. Under this test, courts must consider the four factors set forth in Richey: (1) "whether the government displayed a 'callous disregard' for the plaintiff's constitutional rights"; (2) "whether the plaintiff has an individual interest in and need for the material whose return [it] seeks"; (3) "whether the plaintiff would be irreparably injured by denial of the return of the property"; and (4) "whether the plaintiff has an adequate remedy at law for the redress of [its] grievance." Id. (citation modified). The purpose of this exacting test is to prevent "unnecessary

[judicial] interference with the executive branch's criminal enforcement authority—while also offering relief in rare instances where a gross constitutional violation would otherwise leave the subject of a search without recourse." Id.

**A. Callous Disregard for Constitutional Rights**

As stated above, courts should first consider whether there has been a callous disregard of a movant's constitutional rights. This factor is the most important of the factors. Id. at 698 (stating that the callous disregard factor should be "the 'foremost consideration' for a court when deciding whether it may exercise its equitable jurisdiction" (quoting United States v. Chapman, 559 F.2d 402, 406 (5th Cir. 1977)). Indeed, if the callous disregard factor is not satisfied, "courts will not intervene in an ongoing investigation—and rightly so." Id. Importantly, to "ensure[] that equitable jurisdiction remains extraordinary" and to prevent a "flood of disruptive civil litigation," the callous disregard standard presents a formidable burden to movants. Id. (citation modified); see also Lindell v. United States, 82 F.4th 614, 619 (8th Cir. 2023) (describing callous disregard as an "extraordinarily high hurdle").

Although callous disregard is the most important factor, the Eleventh Circuit has not explicitly defined it.[16] Helpful guideposts have been established, however.

[16] The parties have not offered definitions for the term either.

For example, the Richey court suggested that a movant generally cannot establish callous disregard where the government's seizure of the property was pursuant to a search warrant—even when the warrant is "subsequently challenged as invalid." 515 F.2d at 1243 n.8. Given this guidance, the Eleventh Circuit has recognized that "the vast majority of subjects of a search warrant have not experienced a 'callous disregard' of their constitutional rights." Trump, 54 F.4th at 698. Importantly, the court has not said that a movant's constitutional rights can *never* be callously disregarded when there is a warrant. Indeed, it would be error to find that no callous disregard exists merely because there is a warrant. Harbor Healthcare Sys., L.P. v. United States, 5 F.4th 593, 599 (5th Cir. 2021) (stating that the district court erred by concluding that the government did not callously disregard the plaintiff's rights simply because the government obtained a search warrant). Although the Richey court suggested that a movant ordinarily does not meet its burden where the government's seizure of property was pursuant to a search warrant, that court did indicate that a movant may be able to establish callous disregard where government agents employ "fraudulent or deceitful methods in order to gain access to a citizen's private papers." 515 F.2d at 1243 n.8. With these guideposts in mind, the Court analyzes Petitioners' arguments.

Petitioners advance two arguments in support of their contention that callous disregard exists here. First, Petitioners assert that the Affidavit (a) lacked probable cause and (b) omitted material facts. Second, Petitioners contend that the manner of the execution of the warrant was unreasonable because it interfered with both state sovereignty and ongoing legal proceedings and was premised upon criminal violations where the statute of limitations had already lapsed. The Court addresses the arguments below.[17]

***i. Petitioners' Argument that the Affidavit Lacked Probable Cause and Omitted Material Facts***

*a. Lack of Probable Cause*

The Affidavit used to support the search in this case was eighteen pages long and identified various alleged election deficiencies that the FBI was investigating. As stated previously, the Affidavit provided that "[i]f" the election deficiencies "were the result of intentional action, it would be a violation of federal law." [Doc. 22-2, p. 8]. In Petitioners' view, the Affidavit failed to sufficiently allege intent. Specifically, Petitioners claim that the Affidavit's "hypothetical" does not establish

[17] Respondent argues, among other things, that there is no callous disregard because Petitioners—as government entities and individuals suing on behalf of government entities—lack cognizable Fourth Amendment rights. [Doc. 32, pp. 16–17]. For purposes of adjudicating the instant motion, the Court assumes without deciding that Petitioners can assert constitutional claims.

probable cause and that the Magistrate Judge made a "mistake of law" in finding otherwise. [Doc. 30, p. 9]; [Doc. 76, p. 203]. Petitioners argue that "the Affidavit does not identify a single piece of evidence from the FBI's investigation establishing probable cause to believe that anyone intentionally, let alone willfully, violated" the law. [Doc. 30, p. 8] (emphasis omitted). Ultimately, Petitioners assert that "[i]t is woefully deficient for an affiant to say if I develop additional evidence at some later point in time, the seized property would potentially be evidence of a crime." Id. at 10 (emphasis omitted). In response, Respondent primarily asserts that the Affidavit does not need to contain evidence of each element of an offense, including intent, to establish probable cause.[18] [Doc. 32, pp. 20–22].

The Court disagrees with Petitioners' argument that the Affidavit is "woefully deficient" just because, in their view, allegations of intent are lacking.[19] Indeed, "an affidavit need not establish every element of a suspected

---

[18] Respondent also argues that there can be no callous disregard when an agent complies with the warrant requirement. [Doc. 32, pp. 17–18]. While callous disregard is often not found in cases where a warrant is obtained, the presence of a warrant does not categorically prevent a finding of callous disregard. See Harbor Healthcare Sys., 5 F.4th at 599 (finding callous disregard even where a warrant was obtained).

[19] The Court notes that the Affidavit did suggest some intentional action. For example, SA Evans stated that a witness told him that missing secure hash algorithm ("SHA") files were a "red flag . . . that someone had manipulated the data" and that the witness believed that "the removal of the SHA files was an intentional act by someone." [Doc. 22-2, p.

crime, it need only present a fair probability that evidence of criminal activity will be found in the place to be searched." United States v. Safahi, No. 23-10032, 2024 WL 863363, at *2 (9th Cir. Feb. 29, 2024) (citation modified). Moreover, even if the Affidavit did lack probable cause because of a failure to allege intent, Petitioners' argument hinges on the idea that a lack of probable cause equates to callous disregard. But Petitioners do not offer any authority for this proposition. And, in view of other cases' discussions of callous disregard, the Court declines to adopt such a rule here. See Richey, 515 F.2d at 1243 n.8 (implying that a warrant simply challenged as "invalid" is not enough to establish callous disregard, but "fraudulent or deceitful methods" in the warrant process might be); Burum v. United States, No. 11-01570, 2014 WL 12596719, at *4 (C.D. Cal. Apr. 2, 2014) (noting "that a callous disregard for [a movant's] constitutional rights is a higher threshold than a mere violation of [a movant's] constitutional rights" (emphasis omitted)). Simply put, Petitioners must do more to establish callous disregard.

---

10]. As to tabulator tapes, SA Evans reported that a witness thought that someone had "manipulated the times on the reports" because the poll-closing time and the report-printed times were too close together. Id. at 14.

*b. Omission of Material Facts*

Petitioners next argue that their rights were callously disregarded because the Affidavit omitted material facts. In Petitioners' view, these omissions misled the Magistrate Judge, whom they contend would not have issued the warrant if the omitted information had been included. Petitioners specifically focus on omitted facts related to pristine ballots, missing and duplicate ballot images, tabulator tapes and biases of the witnesses interviewed by SA Evans. The Court will summarize these alleged omissions in turn.

As discussed previously, the Affidavit stated that the discovery of pristine ballots during the Risk Limiting Audit showed that some type of wrongdoing may have occurred in the 2020 election. Petitioners argue that the Affidavit is incomplete and/or misleading because pristine ballots are a typical feature of elections and that they can occur because military members and other overseas voters cast ballots in a different manner than Georgians voting from within the state. [Doc. 30, pp. 21–22]. They further assert that the Affidavit is misleading because it omitted any reference to the Georgia Secretary of State's investigation which found that the same pristine-ballots claim was unsubstantiated. Id. at 22–23.

Petitioners go on to address the Affidavit's assertion that "[o]n the day of the deadline to report the Recount results, Fulton County reported a recount totaling

511,343 ballots, 17,434 ballots fewer than original[ly] counted. The following day, Fulton County then reported a total of 527,925 ballots counted." [Doc. 22-2, p. 7]; see [Doc. 30, pp. 23–24]. Petitioners contend that this statement was misleading because 511,343 was not "reported" by Fulton County—rather, the Recount had not yet finished, and 511,343 was merely an interim number used to keep track of votes already counted at that point in the process. [Doc. 30, pp. 23–24]. According to Petitioners, the 527,925 ballots counted the next day was the final number after counting had actually finished. Id.

As to ballot images and duplicate ballots, Petitioners argue that the Affidavit's statements were misleading. Specifically, Petitioners contend that the Affidavit omitted several basic facts, including that: in 2020, Georgia law did not require the preservation of ballot images; that saving ballot images was optional for aggregating election results; and that investigators found that scanning some ballots multiple times did not affect election results. Id. at 13–14; [Doc. 30-1, p. 12]. Additionally, Petitioners assert that ballot images cannot have been the basis for a violation of 52 U.S.C. § 20701 because they are not records related to an "act requisite to voting" as required by the statute. [Doc. 30, pp. 13–14]. Finally, they claim that the Affidavit omitted any innocent explanation for scanning duplicate ballots (such as mismanagement or paper jams) and similarly offered no

explanation for the witness's conclusion that missing ballot images meant that duplicate ballots were counted. [Doc. 30-1, p. 13].

Petitioners further assert that the Affidavit's statements concerning tabulator tapes were misleading. While the Affidavit quoted a witness who called these tapes the "holy grail" for calculating the final ballot count, [Doc. 22-2, p. 14], Petitioners argue that the Affidavit omitted findings from the Georgia Secretary of State's investigators that tabulator tapes were not part of determining official election results. [Doc. 30, p. 24]. According to Petitioners, the assumption that missing or incorrect tabulator tapes equals missing ballots is incorrect. Id.

Finally, Petitioners contend that the Affidavit omitted several facts about the biases of the witnesses. First, the Affidavit said that the criminal investigation began with a referral from Olsen. But Petitioners say the Affidavit left out the fact that Olsen had been sanctioned by numerous courts for making unsubstantiated claims about elections and had been disciplined by the State Bar of Arizona regarding the same conduct. Id. at 25–26. Second, Petitioners argue that the Affidavit failed to include information that one witness was referred to the FBI in 2023 for sending threatening messages to members of the SEB and to Georgia Secretary of State Raffensberger. Id. at 26. Third, Petitioners contend that the Affidavit "relie[d] on witnesses who, among other things, participated in Kari

Lake's failed efforts to contest the 2022 gubernatorial election in Arizona, and reportedly run a Telegram channel devoted to election conspiracies."[20] Id.

In sum, Petitioners ask the Court to examine the aggregate of these omissions and find that the Affidavit would have lacked probable cause if the information identified above had been included. They further contend that SA Evans was "reckless" in making the omissions and, as a result, disregarded their constitutional rights. Id. at 19.

This Court recognizes that Petitioners think the Affidavit should have contained additional information. However, some of the omissions that Petitioners take issue with are not truly omissions at all but rather appear in the Affidavit in a different form. For instance, Petitioners argue that the Affidavit omitted important context regarding duplicate ballot images, but SA Evans's description of the investigation did include a witness statement indicating that "the images are just duplicates" and that the "concern [was] less about the images and more about the ballots and voter count." [Doc. 22-2, p. 11]. Similarly, while Petitioners fault the Affidavit for purported omissions as to pristine ballots, the Affidavit contained statements from one witness explaining that "there would be pristine ballots in

[20] It is unclear from Petitioners' brief whether one or multiple witnesses are involved in each of these activities.

every election" and offered one explanation for the occurrence of such ballots. Id. at 19. Likewise, though Petitioners contend that the Affidavit made material omissions concerning tabulator tapes, the document did incorporate a witness's statement that "[t]he original tabulator tapes [were] not used during the recount because the ballots [were] scanned utilizing a different machine" and that "the ballots are what mattered." Id. at 15.

Although this Court does not entirely agree with Petitioners' characterization of all the alleged omissions in the Affidavit, the Court does recognize that the Affidavit was defective in some respects. For instance, the Affidavit stated that Fulton County reported 511,343 ballots "[o]n the day of the deadline to report the Recount results"—17,434 ballots short of the Original Count. Id. at 7. The Affidavit then asserted, without further explanation, that Fulton County reported a total of 527,925 ballots the following day. Id. As Petitioners pointed out in their briefing and during the evidentiary hearing, this statement was misleading given that there was a scanner programming error and Fulton County was unable to finish scanning the ballots on time. [Doc. 30, p. 23]. Thus, the 511,343 was "an internal report that was used to understand where the county was at" in the count as opposed to a final number. [Doc. 76, p. 121].

The Court also agrees with Petitioners that some of the Affidavit's statements regarding the importance of ballot images and tabulator tapes are troubling. For instance, while the Affidavit included one witness's statements expressing concern over modification dates on ballot image files long past the conclusion of the 2020 election, [Doc. 22-2, p. 10], it failed to explain that this modification date could have been caused by personnel from the Secretary of State's Office simply renaming the file, [Doc. 76, p. 112]. Likewise, the Affidavit's inclusion of one witness's description of tabulator tapes as the "holy grail" is confusing when read in conjunction with another witness's statement that the tapes were not even used during the Recount. [Doc. 22-2, pp. 14–15]. Again, the Court agrees with Petitioners that such features within the Affidavit are problematic. Nevertheless, the Court is cognizant that its task is to assess whether Respondent callously disregarded Petitioners' rights. As Respondent observed during the evidentiary hearing, "the Court may think [the Affidavit] is a B or B minus or some other grade, but that's not the issue." [Doc. 76, p. 210]. Rather, the issue is whether Petitioners have supplied sufficient evidence that their rights were callously disregarded.

In analyzing whether callous disregard exists here, the Court notes that the Affidavit in this case was eighteen pages long and included statements from more

than ten witnesses concerning the 2020 election in Fulton County. [Doc. 22-2]. While the Affidavit referenced witness statements critiquing the election, describing errors and discussing potential wrongdoing, it also included other witness statements suggesting that these perceived issues during the election did not go beyond benign human error. Id. Indeed, "[a]t least 20 times the [A]ffidavit included contrary information and perspectives."[21] [Doc. 76, p. 79]. It seems to the Court that SA Evans presented the Magistrate Judge with facts that both hurt and helped him. While the Affidavit was certainly far from perfect, this is not a situation where an officer left out all the facts that might undermine probable cause or where an officer intentionally lied.[22] Ultimately, when examining the totality of the Affidavit, including SA Evans's inclusion of contrary information and the supposed omissions, the Court cannot say that the Affidavit was so deficient that

---

[21] For example, in addition to the contrary information already discussed, the Affidavit provided that some ballot images may be missing if they "were stored on a memory card and it was not uploaded correctly or became corrupt." [Doc. 22-2, p. 11]. It also mentioned that the reports from Seven Hills Strategies and the Performance Review Board found no evidence of intentional misconduct. Id. at 21. The inclusion of this information indicates a lack of callous disregard.

[22] Petitioners never claim that SA Evans lied. Instead, they assert that he was reckless. The Court recognizes, though, that Petitioners' ability to ascertain SA Evans's state of mind was affected by Respondent's denial of a Touhy request for his testimony and this Court's subsequent order quashing the subpoena for his testimony. [Doc. 65]. The Court notes, however, that Petitioners were not prevented from calling other witnesses who could supply additional context supporting their assertions of recklessness.

its shortcomings rise to the "high[] threshold" of callous disregard.[23] Vasarely, 2025 WL 2624156, at *8.

### *ii. Petitioners' Argument that the Manner in which the Warrant Was Executed Constitutes Callous Disregard*

In addition to their arguments concerning the substance of the Affidavit, Petitioners contend that their rights were callously disregarded due to the manner in which the warrant was executed. Petitioners argue that the manner of the search was unreasonable because it interfered with state sovereignty and ongoing civil proceedings.[24] Petitioners also assert that the manner was unreasonable because the statute of limitations for the two potential offenses the Affidavit cites has expired.

---

[23] In making this determination, the Court does not suggest that an affidavit can never be so deficient as to constitute callous disregard. Rather, the Court merely finds that the standard is not met here. In doing so, the Court is mindful of the Eleventh Circuit's guidance that "the vast majority of subjects of a search warrant have not experienced a 'callous disregard' of their constitutional rights." Trump, 54 F.4th at 698. Indeed, the height of this standard is what ensures that "equitable jurisdiction remains extraordinary." Id.

[24] Petitioners seemingly conflate unreasonableness with callous disregard. In other words, Petitioners argue that if the search was unreasonable, their rights must have been callously disregarded. Callous disregard, however, is a different inquiry from reasonableness.

*a. Interference with State Sovereignty*

Petitioners argue that when Respondent seized the election records in this case, "it did so in callous disregard of Georgia's constitutional rights, powers and responsibilities under the Electors Clause and the Tenth Amendment as implemented through the State's election laws." [Doc. 30, pp. 31–32]. Petitioners contend that by seizing the records, the BRE is prevented "from carrying out its duties under Georgia law to guarantee the secrecy of the ballot and to ensure that ballots and other election records are held under seal by the Clerk." Id. at 32 (citation modified). In short, Petitioners claim that the "seizure of ballots infringes upon [their] sovereign interests in safeguarding election integrity, maintaining accurate records, and reassuring voters that their ballots will not be manipulated or misused." Id. at 33.

As stated above, Petitioners assert that the seizure interfered with their ability under the Electors Clause and the Tenth Amendment to administer elections. The Court disagrees. The records at issue in this case concern the November 2020 presidential election, and the seizure of those records occurred in January 2026. Thus, the seizure of the records did not interfere with Fulton

County's ability to carry out the 2020 election because it happened over five years after the election took place.[25]

Petitioners also argue that the seizure prevented the BRE from "carrying out its duties under Georgia law 'to guarantee the secrecy of the ballot' and to ensure that ballots and other election records are held under seal by the Clerk." Id. at 32. (citing O.C.G.A. §§ 21-2-70(13), 21-2-500(a)). Petitioners, however, have presented no evidence that the election materials were manipulated, misused or publicly disclosed after the seizure. In other words, Petitioners have not shown that the secrecy of the ballot has been compromised by the seizure. Moreover, this argument is weakened by the fact that, prior to the seizure, the BRE had already received an order in the Superior Court Action to provide copies of the materials to the SEB. [Doc. 30, p. 30]. Consequently, the BRE was poised to release copies of the records to the SEB already—undermining Petitioners' argument that the seizure inflicted callous disregard upon them by interfering with the "secrecy of the ballot" or the sealed nature of the records. Id. at 32.

---

[25] And Petitioners have made no argument that the 2020 election records are somehow integral to the State's ability to hold future elections. Indeed, such an argument would be unpersuasive given that, absent a court order, the relevant Georgia records retention statutes allow destruction of the materials after twenty-four months. O.C.G.A. §§ 21-2-73, 21-2-390, 21-2-500(a).

In sum, Petitioners have not demonstrated how the seizure of materials from an election that occurred five years ago "infringes upon [their] sovereign interests in safeguarding election integrity." Id. at 33. The Court finds this especially true in light of the fact that—in a hearing held on June 24, 2024—the Clerk requested permission to destroy the records. [Doc. 87-1, at 00:31]. Moreover, Petitioners did not present any evidence that voters are concerned that "their ballots will . . . be manipulated or misused," [Doc. 30, p. 33], and they did not explain whether these purported concerns relate to old ballots from the 2020 election or uncast ballots in a future election. Accordingly, the Court finds that Petitioners have not shown that Respondent's alleged interference with principles of state sovereignty demonstrates a callous disregard for their constitutional rights.[26]

[26] Respondent argues that, because Congress can define offenses related to federal elections, the United States retains the authority to investigate such offenses, including violations of 52 U.S.C. §§ 20701 and 20511. [Doc. 32, p. 36]. Addressing this argument, Petitioners contend that "the issue is not whether the federal government can criminalize certain election misconduct," but whether it can investigate misconduct in the manner it did here. [Doc. 39, pp. 25–26]. While the Court agrees with Petitioners that the federal government's investigative ability is not unfettered from Constitutional considerations, it does not find that Respondent's conduct here rises to the level of callous disregard for Petitioners' constitutional rights. Importantly, the seizure at issue in this case did not interfere with the State's ability to conduct the 2020 election or certify election results, nor have Petitioners shown that it will hinder the State's ability to conduct future elections.

*b. Interference with Ongoing Civil Proceedings*

As stated previously, there are two civil proceedings involving the 2020 election records—the Superior Court Action and the Federal Court Action—that were stayed after the search warrant was executed in this case. Petitioners contend that Respondent's seizure was unreasonable because the seizure was made "without regard to the consequences" to these existing proceedings. [Doc. 39, p. 26]. Petitioners further argue that the criminal investigation "was, in reality, a late-breaking pretext" for Respondent to get the documents after it suffered "setbacks" in these actions. [Doc. 105, p. 1]. Respondent, on the other hand, argues that no callous disregard exists here because "[t]he government can bring parallel actions and very frequently does pursue both civil and criminal proceedings." [Doc. 76, p. 68].

As an initial matter, the Court agrees with Respondent that the government can simultaneously pursue both civil and criminal proceedings involving the same subject matter. In other words, a constitutional violation does not exist simply because the government is pursuing remedies in both the civil and criminal spheres. See United States v. Goldstein, 989 F.3d 1178, 1202 (11th Cir. 2021) (acknowledging that "parallel government investigations" are "common and generally proper"); see also United States v. Stringer, 535 F.3d 929, 936 (9th Cir.

2008) (stating that "the government may conduct parallel civil and criminal investigations without violating" the Constitution). Consequently, this Court is not willing to make a finding of callous disregard simply because the civil actions relating to the 2020 election records were ongoing when the FBI executed its search warrant.

Although the general rule provides that the government may bring parallel actions and conduct simultaneous investigations, an exception exists. Indeed, a violation of the Constitution may occur where two arms of the government collude in bad faith "to deprive the defendant of his constitutional rights." Goldstein, 989 F.3d at 1202. "Such bad faith collusion generally involves affirmative misrepresentations or trickery or deceit by the investigating authority to get the defendant to voluntarily turn over documentary or physical evidence relevant to the criminal investigation." Id. (citation modified). By way of example, "the government may act in bad faith if it brings a civil action solely for the purpose of obtaining evidence in a criminal prosecution and does not advise the defendant of the planned use of evidence in a criminal proceeding." Stringer, 535 F.3d at 937.

Petitioners suggest that Respondent obtained the warrant in bad faith after encountering procedural hurdles in the Superior Court Action and the Federal

Court Action. Given this argument, it is important for the Court to detail the relevant timeline.

On November 5, 2024, the SEB issued two subpoenas to the BRE seeking election materials from the 2020 election.[27] [Doc. 71-4, p. 2]. On the date that the responses to the subpoenas were due—November 18, 2024—the BRE filed the Superior Court Action seeking to quash the subpoenas. Id. at 3. Over a year after the action was filed, the Superior Court held a hearing, and a ruling was issued on December 22, 2025. Id. at 6. In its order, the Superior Court determined that the BRE was required to comply with the subpoenas—in other words, produce the records to the SEB—but that the SEB should bear the cost of compliance, which the BRE estimated to be approximately $400,000.[28] Id. at 5. The parties were ordered to provide evidence regarding costs no later than January 14, 2026. Id. at 5–6.

On October 30, 2025, while the Superior Court Action was ongoing and before the Superior Court determined that the subpoenas would not be quashed,

[27] As explained earlier, the SEB is the Georgia State Election Board, and the BRE is the Fulton County Board of Registration and Elections.

[28] The Superior Court noted that the BRE's estimates could be "off by an order of magnitude." [Doc. 71-4, p. 5].

Harmeet K. Dhillon, an Assistant Attorney General with the Civil Rights Division, sent a letter to Sheri Allen, the Chairperson of the BRE, requesting access to Fulton County's election records. [Doc. 71-1]. Specifically, Dhillon asked Allen to present for inspection all used and void ballots, stubs of all ballots, signature envelopes and corresponding envelope digital files from the 2020 General Election in Fulton County. Id. In response to the request, the BRE stated that it could not comply because it was not in possession of the records and the records were being held by the Clerk under seal. [Doc. 71-2, p. 2]. On November 21, 2025, Dhillon made an identical request for inspection of the records to the Clerk and the judge in the Superior Court Action. [Doc. 71-3]. When the information was again not made available for inspection, on December 11, 2025, the Attorney General filed the Federal Court Action seeking a court order to allow access to the records. Alexander, Doc. 1. Eleven days later, on December 22, 2025, the Superior Court denied the BRE's motion to quash. [Doc. 71-4].

On the morning of January 5, 2026—after the Superior Court had already ordered the BRE to produce the election materials to the SEB—Albus received Olsen's criminal referral regarding the 2020 election in Fulton County. [Doc. 101, p. 2]. Later that day, at 8:36 PM, the Clerk filed a motion to dismiss the Federal Court Action. Alexander, Doc. 18. The day after Albus received the referral and

the motion to dismiss was filed, the FBI opened an "assessment." [Doc. 101, p. 2]. On January 14, 2026, two days after SA Evans put in a request to do so, the matter was opened as a full investigation. Id. SA Evans began drafting his investigative summary based on witness interviews on January 19, 2026, which he converted to the format of a search warrant affidavit on January 22, 2026. Id. at 3–4. SA Evans ultimately sought the warrant on January 27, 2026, and it was signed and executed the following day. [Doc. 82-3]; [Doc. 22-1]; [Doc. 22-2].

The timeline set forth above demonstrates that there has been ongoing activity involving the 2020 election records since at least November 2024—when the SEB first requested the records. Yet, the warrant was not sought until more than a year later. For the reasons explained below, the Court is not persuaded that Petitioners have shown that Respondent created an "ongoing criminal investigation" to sidestep procedural hurdles in the Superior Court Action or the Federal Court Action.

As to the Superior Court Action, Petitioners point to no evidence to support their theory that the order denying the BRE's motion to quash prompted the FBI's criminal investigation and seizure at issue in this case. Indeed, the Superior Court

largely ruled in favor of the SEB,[29] granting it the right to access the documents.[30] If Petitioners' theory is correct—that the warrant was obtained to avoid delays and the procedural hurdle of paying costs—the Court does not understand why the Superior Court Action was pending for more than a year without the FBI taking action. Indeed, action was only taken after the SEB prevailed. It seems to the Court that if the two governmental entities were truly acting in bad faith to sidestep the Superior Court Action and expedite access to the records, the FBI would have obtained a warrant much sooner.

[29] The only outstanding issue was costs. While Petitioners suggest that the requirement for the SEB to pay costs was a motivating factor for the FBI to obtain the warrant in this case, Petitioners did not submit any evidence that the SEB could not—or would not—pay the costs to obtain the records. Petitioners also argue that the FBI decided to get the warrant because the judge in the Superior Court Action indicated, in his December 22, 2025 order, "that he would supervise access to the records." [Doc. 105, p. 3]. The Court has reviewed the December 22, 2025 order, and it did not say anything about supervision. [Doc. 71-3]. The Superior Court did, however, mention supervision in its February 9, 2026 order staying the Superior Court Action. [Doc. 30, pp. 30–31, 35]. Notably, this order was issued after the seizure. Thus, Petitioners have pointed to no evidence that Respondent would have been worried about the Superior Court's oversight at the time the warrant was executed.

[30] Petitioners argue that the Respondent and the SEB were working together to obtain the documents. Assuming that this is accurate, it seems even less likely that Respondent would feel compelled to create a pretextual criminal investigation when the SEB had already prevailed in the Superior Court Action and was likely just weeks away from obtaining the documents.

Petitioners also assert that the warrant was in response to delay in the Federal Court Action. The only delay Petitioners identified in the Federal Court Action, however, was the Clerk's motion to dismiss.[31] Problematically for Petitioners, the evidence shows that the criminal referral to the FBI was made *before* the Clerk filed her motion.[32] The fact that Olsen referred the matter to the FBI before the motion to dismiss was filed cuts against the contention that the criminal investigation was a pretextual response to delay in that case. Without any other evidence on the point, the Court finds that these facts fall short of callous disregard.[33] In sum, the Court is not convinced that the criminal investigation was

---

[31] In their newest filing, Petitioners argue that the motion to dismiss was foreseeable and that Respondent knew about the reasons for dismissal since at least November 2025—before the FBI initiated its criminal investigation. However, if this were true and the Department of Justice's ("DOJ") Civil and Criminal Divisions were colluding to obtain the documents, it would have made more sense for Respondent to obtain a warrant in November, rather than filing the Federal Court Action.

[32] Petitioners are correct to point out that the FBI's initial assessment and the investigation post-dated the Clerk's motion to dismiss filed on the evening of January 5, 2026. The FBI's timing, however, makes sense given that Albus received the criminal referral on the morning of January 5, 2026. The FBI naturally began its investigation after, not before, receiving the referral.

[33] The Court recognizes that Petitioners moved to compel additional evidence beyond the date Olsen referred the criminal investigation to the FBI, the date the FBI opened the investigation and the date the DOJ first began drafting the Affidavit. Specifically, Petitioners sought evidence relating to "any meetings or communications . . . in which DOJ officials . . . discussed using a criminal search warrant in response to delays" in the Federal Court Action. [Doc. 89-1, p. 3]. Because the Court is constrained to follow applicable law regarding Touhy requests, Petitioners' request for these communications was denied. [Doc. 100].

created in response to procedural hurdles in either the Superior Court or Federal Court Action.[34]

*c. Statute of Limitations*

Finally, Petitioners argue that the manner of the seizure was unreasonable because the statute of limitations for the two offenses listed in the Affidavit—52 U.S.C. §§ 20701 and 20511—has expired. Notably, Petitioners admit that the potential expiration of the limitations period "does not necessarily negate probable cause." [Doc. 30, p. 27]; see also [Doc. 76, p. 40]. Yet Petitioners argue that the possible expiration of the statute of limitations caused the manner of the seizure to be unreasonable because "Respondent lacked any legitimate interest in executing a seizure." [Doc. 30, pp. 27–28]. In Petitioners' view,

[34] The Court acknowledges that, at the hearing, it stated that it would be a "good argument" in support of callous disregard if members of the DOJ's Criminal Division invented the criminal investigation out of whole cloth as a means of obtaining documents that members of the DOJ's Civil Division had yet to receive because of delays in the Federal Court Action. [Doc. 76, pp. 73–74]. Here, however, the record indicates that the referral from Olsen occurred prior to the Clerk filing the motion to dismiss in the Federal Court Action. [Doc. 101, p. 2]. Thus, there was a pre-existing basis for the criminal investigation that was not entirely tethered to the timing of proceedings in the Federal Court Action. Knowing this, the Court does not find it appropriate to now make judgments about when various stages of the FBI's criminal investigation occurred, nor do Petitioners present any authority supporting the proposition that the timing of an investigation can rise to the level of callous disregard. Indeed, the Eleventh Circuit has cautioned that the high standard of callous disregard is, in part, to prevent "needless judicial intrusion into the course of criminal investigations—a sphere of power committed to the executive branch." Trump, 54 F.4th at 698.

> the issue is not that a statute of limitations defect per se defeats probable cause; it is that Respondent does not have a legitimate, let alone significant, interest in a criminal investigation that cannot yield a criminal prosecution, especially when balanced against Petitioners' competing governmental interest in retention of their own records.

[Doc. 39, p. 24] (emphasis omitted). Petitioners ultimately assert that the Court should balance Petitioners' privacy interests in the election records with Respondent's need for the evidence.[35] Id.

The Court acknowledges that this case involves records from the 2020 election and that the limitations period for the statutes identified in the Affidavit is five years. The Court further recognizes that many parts of the Affidavit refer to activity or potential wrongdoing that occurred more than five years ago. While this may be true, the Court cannot ignore that a witness told SA Evans that some of

[35] To support the argument that the Court should weigh Petitioners' privacy interests against Respondent's need for the evidence in deciding whether Petitioners' rights were callously disregarded, Petitioners cite to Winston v. Lee, 470 U.S. 753 (1985). But that case is inapposite. In Winston, the Commonwealth of Virginia sought to compel a suspect accused of attempting to commit armed robbery to undergo a surgical procedure under a general anesthetic for removal of a bullet lodged in his chest. Id. at 755. In analyzing the "reasonableness of surgical intrusions beneath the skin," the Court focused on the extent of the intrusion on the suspect's privacy interest and on the Commonwealth's need for the evidence. Id. at 760, 763. Ultimately, the Court determined that "[a] compelled surgical intrusion into an individual's body for evidence . . . implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime." Id. at 759.

the ballot images may have been modified as recently as January 11, 2024—which is well within the statutory period.[36] [Doc. 22-2, p. 10].

The Eleventh Circuit has held that "whether a valid statute of limitations defense exists is not a cut and dry matter." See Pickens v. Hollowell, 59 F.3d 1203, 1208 (11th Cir. 1995). Given the complexities in determining whether a statute of limitations defense is viable, the limited amount of evidence in the record and SA Evans's assertion that at least part of the investigation involves activities that occurred during the limitations period, the Court is not convinced that Respondent has no legitimate interest in the election records. In short, while the Court understands that Petitioners believe that the statute of limitations has expired for all potential criminal activity and speculate that criminal charges will never be brought, this Court finds that the execution of the warrant under these circumstances does not give rise to a constitutional claim, let alone a showing of a callous disregard for constitutional rights. Id. at 1207–08 ("The existence of a statute of limitations bar is a legal question that is appropriately evaluated by the district attorney or by a court after a prosecution is begun, not by police officers

---

[36] Additionally, the Court notes that one of the criminal statutes cited in the warrant, 52 U.S.C. § 20701, requires a twenty-two-month retention period for certain election materials. If any misconduct occurred within this twenty-two-month period, it would trigger the statute of limitations at that time. In other words, conduct toward the middle and end of this period might still be timely for prosecution.

executing an arrest warrant."). Ultimately, the potential expiration of the statute of limitations does not demonstrate that Petitioners' constitutional rights were callously disregarded.

***

In summary, Petitioners have not shown that their rights were callously disregarded either through supposed defects in the warrant or through the manner in which the warrant was executed. The Court also finds that—when considering the cumulative weight of Petitioners' argument concerning defects in the warrant and their argument concerning the manner in which the search was executed—they have not demonstrated callous disregard. Therefore, this factor weighs against exercising equitable jurisdiction.[37] Although the Court could end its analysis here because a finding of "callous disregard for constitutional rights" is indispensable to

[37] Although not applicable here, the Court notes that a lengthy retention of the seized materials without charges "may well involve callous disregard for constitutional rights." Bennett v. United States, No. 12-61499-CIV, 2013 WL 3821625, at *13–14 (S.D. Fla. July 23, 2013) (recognizing that while a certain amount of time is necessary to review seized materials, draft an indictment and file criminal charges, that time is not unlimited). In this case, Respondent has only had the records in its possession for just over three months and, for at least some time while this case has been pending, voluntarily abstained from looking at the records. [Doc. 51, pp. 5–7]. If Respondent retains the records at issue here for a lengthy period, beyond what would be necessary for bringing criminal charges, Petitioners may well be able to establish callous disregard at that juncture.

invoking equitable jurisdiction, the Court will nevertheless address the remaining factors. Trump, 54 F.4th at 701.

**B. Other Factors**

Although Petitioners bear the burden of establishing that the Court should exercise equitable jurisdiction—which has been described as exceptional and anomalous—Petitioners did not address the three remaining Richey factors in detail.[38] This is significant because the Eleventh Circuit has emphasized "again and again that equitable jurisdiction exists only in response to the most callous disregard of constitutional rights, and even then only if other factors make it clear that judicial oversight is absolutely necessary." Id. at 698.

***i. Individual Interest and Need for the Material***

The second factor requires courts to consider whether the movant has an individual interest in and need for the return of the materials at issue. As an initial matter, the Court notes that an interest in the property is not enough. Indeed, "personal interest in or ownership of a seized document is not synonymous with the need for its return" because "[i]n most search warrants, the government seizes

[38] In Petitioners' Amended Motion for Return of Property, which is thirty-seven pages long, only two pages address these factors. [Doc. 30, pp. 34–35]. Petitioners' thirty-page Reply in Support of Amended Motion for Return of Property is a little more detailed in that almost four pages discuss these factors. [Doc. 39, pp. 27–30].

property that unambiguously belongs to the subject of a search." Id. at 699. Because a possessory interest alone is not enough to establish need, the Eleventh Circuit has held that a movant must do more than offer "vague allegations" of need; it must "identify[] 'specific' documents" and explain "the harm from their 'seizure and retention.'"[39] Id. (quoting Harbor Healthcare Sys., 5 F.4th at 600).

In their briefing, Petitioners argue that they need the election records so that they can: (1) rebut "unfounded attacks on the 2020 election with evidence"; (2) fulfill open records requests; and (3) comply with orders from the civil cases. [Doc. 39, pp. 3, 28]. Beginning with Petitioners' claim that the documents are needed to defend against allegations of election fraud, the Court notes that Petitioners have failed to identify which documents they need. Without any specificity, it is unclear whether Petitioners need all the documents to defend against the allegations or just some of them. Moreover, the Clerk once requested

[39] The Court notes that several times during the evidentiary hearing, Petitioners suggested that the Court should conduct a balancing test which measures Petitioners' need for the seized materials against Respondent's need. See [Doc. 76, p. 19] (counsel for Petitioners questioning whether Respondent could "possibly really have an articulable reason to keep what must be one million pieces of paper"). As explained by the Eleventh Circuit, Petitioners are "wrong to suggest that jurisdiction somehow depends on the balance of interests between the parties—the relevant inquiry is if [Petitioners need] the documents." Trump, 54 F.4th at 699. The Eleventh Circuit has specifically stated that the standard should not be reversed. Id. (rejecting the plaintiff's attempt to "reverse the standard" and clarifying that the plaintiff's task "was to show why *he* needed the documents, not why the government did not").

permission to destroy the records. [Doc. 87-1]. In the Court's view, if the records were necessary to combat allegations of fraud, the Clerk would not have sought to destroy them.[40] Even more tellingly, when the FBI seized the election records, the Fulton County Director of Registration and Elections stated that the FBI could "make paper airplanes" with the records for all she cared. [Doc. 87-2]. If Petitioners truly needed the records, this statement makes little sense.

In further considering Petitioners' argument that they need the documents to combat election misinformation, the Court cannot ignore the fact that Petitioners have copies of the documents. The evidence at the hearing established that Respondent has made copies of the seized election records and provided those copies to Petitioners. See also [Doc. 57, p. 4] ("[T]he United States is providing Petitioners a digital copy of the records scanned by the FBI . . . ."). Because Petitioners have the copies, this Court finds that Petitioners already have the ability to rebut attacks on the 2020 election and respond to any allegations of

[40] Petitioners contend that even though the Clerk sought permission to destroy the records, they have a new need for the records because President Trump continues to claim that people cheated in the 2020 election. The Court is not convinced that Petitioners have a new need because the election has been continually attacked since 2020. See [Doc. 76, p. 45] (Petitioners stating that "a week doesn't go by when somebody in the administration doesn't make an allegation of fraud for what happened six years ago.").

misconduct.[41] See Gulf Coast Pharms. Plus v. United States, No. 22-CV-263, 2023 WL 3099873, at *5 (S.D. Miss. Apr. 26, 2023) (determining that the need factor weighed against ordering the return of the property where the petitioner had "copies of all of the property seized and currently in the possession of the United States").

Petitioners also contend that they need the elections records to respond to open records requests. As an initial matter, Petitioners are not completely unable to fulfill open records requests because, again, they have copies of the documents. At a minimum, the copies allow Petitioners the ability to provide some information to the public if it is requested.[42] Setting aside the fact that Petitioners have copies, the argument that the records are needed to respond to open records requests is speculative. At the hearing, Petitioners admitted that no open records requests

---

[41] The Court recognizes that Petitioners claim that the copies are insufficient for their needs because some of the copies are unreadable. Petitioners can easily remedy this issue, however, by reaching out to Respondent for new copies of any unreadable documents.

[42] While Petitioners contend that they need the originals to comply with Georgia's open records laws, Georgia's Open Records Act does provide a way for an agency to partially respond to a request where records exist but are currently unavailable. Namely, the statute states that "[i]n any instance where records are unavailable within three business days of receipt of the request, and responsive records exist, the agency shall, within such time period, provide the requester with a description of such records and a timeline for when the records will be available for inspection or copying and provide the responsive records or access thereto as soon as practicable." O.C.G.A. § 50-18-71(b)(1)(A).

have been made since this case was filed and that none are currently pending. [Doc. 76, p. 95]. Moreover, Petitioners failed to present any evidence concerning the number of prior record requests, which documents were sought in those prior requests or when the most recent request was made. The Court thus has no way of determining whether Petitioners are likely to get open records requests while Respondent has the records. Without any evidence, the Court is not persuaded by Petitioners' argument that they need the documents to comply with these requests.[43]

Lastly, Petitioners assert that they need the documents so that they can comply with orders in other civil cases.[44] The Court finds this argument unavailing because Petitioners have failed to identify which documents are at issue in the other cases. For instance, instead of identifying the documents that are needed to

[43] Macias did testify that Petitioners may need the documents to respond to open records requests, but Macias provided no corroborating facts to show how often open records requests are made or what has been requested in the past. [Doc. 76, p. 150] (stating only that original records are valuable "to be able to provide to the public for public records requests").

[44] This argument is odd because, in both of those cases, Petititioners may have to turn the records over to another government entity, which they are trying to prevent here. Indeed, in the Federal Court Action, if the DOJ's request for the records is granted and an order is entered, Petitioners would simply need to do what has already been done through the FBI's seizure of the materials. In short, Petitioners are essentially asking for the records back so that, if an order is entered in the Federal Court Action, they can return those records to the DOJ.

comply with the subpoena in the Superior Court Action, Petitioners simply claim that they need *all* the documents back—more than a million pieces of paper.[45] The generality of this argument is especially problematic because, as noted above, a movant must go beyond "vague allegations" of need and "identify[] 'specific' documents" and explain "the harm from their 'seizure and retention.'" Trump, 54 F.4th at 699 (quoting Harbor Healthcare Sys., 5 F.4th at 600). Petitioners have simply failed to set forth a specific need in this case and instead have issued a general demand for the return of all documents seized.[46]

In summary, the Court finds that Petitioners' stated needs for the return of the documents fall short of what is demanded by Richey and its progeny. Accordingly, this factor weighs against exercising jurisdiction in this case.[47]

---

[45] It is the Court's understanding that the subpoena in the Superior Court Action was only for "all used and void ballots, stubs of all ballots, signature envelopes, and corresponding envelope digital files from the 2020 General Election in Fulton County." [Doc. 1-1, p. 8]. Thus, it is unclear to the Court why Petitioners need *all* the seized election materials back to comply with this particular court order.

[46] And, once again, to the extent that there is some level of need, the Court finds that it is largely ameliorated by the copies that have been provided to Petitioners.

[47] Petitioners also argued at the evidentiary hearing that they have a need for the seized materials because "as a sovereign," they need "to be able to assure voters [that they] are in charge." [Doc. 76, p. 44]. This argument is not discussed any further herein because Petitioners failed to present any evidence concerning the current mindset or fears of Fulton County voters. Without an evidentiary basis, the Court cannot find that this is a need that weighs in favor of exercising equitable jurisdiction.

### *ii. Irreparable Injury*

The third factor that courts must consider is irreparable injury. For irreparable injury, "courts focus on the harmful effects the loss of the property wreaks on the movant." Times Publ'g Co. v. United States, No. 23-MC-0014, 2023 WL 7411463, at *7 (M.D. Fla. Sep. 22, 2023) (citation modified); United States v. Search of L. Off., Residence, & Storage Unit Alan Brown, 341 F.3d 404, 415 (5th Cir. 2003).

In claiming that they will be irreparably harmed by the FBI's continued retention of the seized records, Petitioners repeat many of the same arguments that they made as to why they need the records. For instance, Petitioners argue that they will be irreparably harmed because they need to show Fulton County voters that they—not the federal government—are in charge of elections. [Doc. 76, p. 97]; [Doc. 39, pp. 28–29]. They also claim that they will be irreparably harmed because they must comply with open records requests and court orders. [Doc. 76, pp. 97–98]; [Doc. 30, p. 34]. Finally, they assert that they will be irreparably harmed because they need to be able to respond to "the constant barrage of criticisms" concerning the 2020 election. [Doc. 76, p. 98]; [Doc. 39, p. 28]. For the same reasons discussed in the preceding section, these arguments are unpersuasive and fail to show irreparable injury.

In addition to their repeated arguments, Petitioners also contend that they will suffer irreparable injury because (1) they will be unable to verify the chain of custody of the election returns[48] and (2) Respondent may disclose personal identifying information in the records. [Doc. 30, p. 35]; [Doc. 76, pp. 46–47]. In the Court's view, these arguments are vague and speculative. As to Petitioners' argument that they will not be able to verify the proper chain of custody, the Court cannot ignore that one of the reasons that the FBI seized the election records was to investigate various chain-of-custody issues that Petitioners now want to protect. Indeed, the Affidavit stated that a non-partisan report found that the "absentee processes were 'extremely sloppy and replete with chain of custody [i]ssues.'" [Doc. 22-2, p. 20]. The Court thus does not find that Petitioners will be irreparably harmed because they will not be able to address chain-of-custody issues. See Trump v. United States, No. 22-13005, 2022 WL 4366684, at *8 (11th Cir. Sep. 21, 2022) (disregarding the plaintiff's argument that he could be irreparably injured by the improper disclosure of sensitive information to the public because "a purpose of the United States's efforts in investigating the recovered classified

[48] This argument was made in one sentence. [Doc. 30, p. 35] ("Moreover, Respondent's continued seizure renders Petitioners unable to respond to verify the chain of custody of the election returns.").

documents [was] to *limit* unauthorized disclosure of the information they contain[ed]").

The Court is also not convinced that Petitioners will suffer irreparable injury due to the potential disclosure of personal identifying information. At the hearing, Petitioners complained that the copies that Respondent voluntarily provided to them contained personal identifying information, which, in their view, demonstrated that Respondent will not treat the election records with care. [Doc. 76, pp. 46–47]. The fact that Respondent copied materials that contained such information and provided those copies to Petitioners does not suggest that Respondent will disclose that same information to anyone unauthorized to have it.[49] See Trump, 2022 WL 4366684, at *8 ("But permitting the United States to retain the documents does not suggest that they will be released . . . ."). Moreover, Petitioners' fear that Respondent will publicly release sensitive personal information from the documents appears even more improbable given Respondent's assertion that it seized the documents pursuant to an ongoing

[49] Respondent's efforts to make copies for Petitioners actually weighs against a finding of irreparable injury and need. See Gulf Coast, 2023 WL 3099873, at *5–6 (determining that the irreparable injury factor weighed against the return of the property where the petitioner had "copies of all of the property seized" and stating that "[i]f the government agrees to return originals and/or copies of documents, it is difficult to envision that movants can comply with the irreparable injury standard" (quoting In re Search Warrant, 684 F. Supp. 1417, 1421 (N.D. Tex. 1988)).

criminal investigation, the substance of which Respondent has consistently argued is privileged.

Ultimately, after considering Petitioners' arguments as to why they will be irreparably injured, the Court finds that this factor weighs against exercising jurisdiction. In short, Petitioners simply have not shown that concerns about the chain of custody or the disclosure of private information demonstrate an irreparable injury that would warrant exercising equitable jurisdiction. Moreover, the Court finds that Petitioners' other stated harms—assuring Fulton County voters that they are in charge of elections, responding to open records requests and court orders and addressing criticisms of the 2020 election process—are unpersuasive for the reasons already discussed.

***iii. Adequate Remedy at Law***

Under the final factor, the Court must consider whether the movant has an adequate remedy at law for the redress of its grievance. Petitioners argue that they have no adequate remedy at law because they cannot file a suit for damages and are not currently subject to a prosecution such that suppression is available. [Doc. 39, p. 30]. According to Petitioners, their "only proper remedy is a return of property under 41(g)." Id. Relying on the Eleventh Circuit's decision in Trump, Respondent argues that this factor weighs against Petitioners because there is no

underlying harm to remedy. Specifically, Respondent contends that where there has been no constitutional violation, "there is no lawful basis for [Petitioners] to seek a return of the records at issue." [Doc. 32, p. 39].

The Court is not convinced that either party's arguments are entirely correct as to this factor. As mentioned directly above, Petitioners essentially argue that they have no adequate remedy at law because they have no other legal means for seeking the return of this property right now. Notably, the Eleventh Circuit has said that "[t]his is not a sufficient justification" for finding no adequate remedy at law. Trump, 54 F.4th at 700 (rejecting district court's reasoning that the plaintiff satisfied this factor based on the plaintiff having "no legal means of seeking the return of his property for the time being and no knowledge of when other relief might become available"). The court reasoned, at least in part, that it was unwilling to weigh this factor in favor of equitable jurisdiction because "any subject of a search warrant would like all of his property back before the government has a chance to use it." Id.; see also id. at 698 (rejecting arguments "that—if consistently applied—would allow any subject of a search warrant to invoke a federal court's equitable jurisdiction"). Ultimately, Trump seems to suggest that a plaintiff must argue something more than the mere inability to seek the return of the property for the time being.

As to Respondent's argument, this Court recognizes that, in Trump, the Eleventh Circuit said that the "real question" is "adequate remedy for what," and stated that "[i]f there has been no constitutional violation—much less a serious one—then there is no harm to be remediated in the first place." Id. at 701 (emphasis omitted). Relying on Trump, Respondent essentially contends that the adequate-remedy-at-law factor automatically weighs against equitable jurisdiction whenever there is no callous disregard. The Court is concerned, however, that Respondent reads this passage too broadly because in Trump, the plaintiff never asserted that his rights were violated, and the court's analysis proceeded on that premise. Here, by contrast, Petitioners expressly allege that their rights were callously disregarded. Accordingly, Respondent's wholesale reliance on Trump is at least somewhat misplaced.

The Court is sympathetic to Petitioners' argument that their only available option to pursue the election records, at least currently, is through Rule 41(g). It does not appear, however, that the adequate-remedy-at-law inquiry is limited solely to remedies available at the time the action is filed. Indeed, where it is likely that a proceeding could be available in the future in which a plaintiff can vindicate his rights, courts are authorized to find that a plaintiff has an adequate remedy at law. Hunsucker v. Phinney, 497 F.2d 29, 34 n.9 (5th Cir. 1974).

Conversely, "[w]here no future proceeding in which the plaintiff may vindicate his rights seems likely, it becomes more difficult to find an adequate remedy at law." Id.; see also Times Publ'g Co., 2023 WL 7411463, at *7 (stating that "[a]n adequate remedy at law may exist even if it cannot be asserted currently, but rather only at some future date" (quoting In re Stanford, 68 F. Supp. 2d 1352, 1356 (N.D. Ga. 1999)).

In this case, the FBI seized the election records on January 28, 2026, and Petitioners filed this action on February 5, 2026—only eight days later. It is the Court's understanding that for at least a portion of the time that this action has been pending, Respondent had not analyzed the documents to determine whether they contain evidence of criminal activity. Importantly, Petitioners have not presented any evidence that Respondent does not intend to ever bring criminal charges.[50] Ramsden v. United States, 2 F.3d 322, 326 (9th Cir. 1993) (concluding that the plaintiff did not have an adequate remedy at law because evidence existed that the government did not plan to prosecute the plaintiff). Given the recency of the seizure and the fact that Respondent paused its investigation when this action was filed, the Court is not willing to speculate, at least based on this record, that no

---

[50] Petitioners speculate that criminal charges will not be brought because the statute of limitations has expired. As discussed above, however, it seems possible that charges could be brought that are not barred by the statute of limitations. See supra n.36.

criminal action will ever be brought. Cf. Lin v. United States, No. 22-CV-00055, 2025 WL 2051103, at *10 (E.D. Tex. June 30, 2025) (finding no adequate remedy at law where it had been "more than three years since the government seized the property" and there was no indication that the government planned to invoke a forfeiture or grand-jury proceeding), R. & R. adopted as modified by, 2026 WL 819602 (E.D. Tex. Mar. 25, 2026). This is important because if criminal charges are initiated at some point in the future, Petitioners could vindicate their rights in that criminal proceeding. In short, in light of the early stage of the investigation and the absence of evidence regarding whether a future proceeding is likely, the Court finds that this factor weighs slightly against the exercise of equitable jurisdiction.

***

The seizure in this case was certainly not perfect. However, the Court has carefully considered the factors set forth in Richey and finds that each factor weighs against exercising equitable jurisdiction. More specifically, Petitioners did not establish that their rights were callously disregarded either through the lack of probable cause, omissions in the Affidavit or by the manner of the execution of the seizure. Petitioners also failed to show that they have a need for the documents or that they will be irreparably harmed without the documents, especially since they

have copies of them. Finally, Petitioners failed to demonstrate the absence of an adequate remedy at law. Ultimately, each of these factors weighs against Petitioners, and therefore the exercise of equitable jurisdiction in this case is not warranted.

## CONCLUSION

This Court acknowledges that the events leading up to this case are, in a variety of ways, unprecedented. But the "Richey test has been in place for nearly fifty years" and "its limits apply no matter who the government is investigating." Trump, 54 F.4th at 701. To apply the law differently here because of what this case is about, or whose records are at issue, would "defy our Nation's foundational principle that our law applies to all, without regard to numbers, wealth, or rank." Id. (citation modified). As explained in this Order, each of the factors, including the first and most important factor—callous disregard—weighs against this Court's exercise of jurisdiction. As such, Petitioners' Amended Motion for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g) [Doc. 30] is **DENIED**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 6th day of May, 2026.

**J. P. BOULEE**
United States District Judge

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

In Re: Grand Jury Subpoena No.
2026R00350-01

Case No.: 1:26-mi-88

---

**PROPOSED MEDIA INTERVENORS' MOTION
TO INTERVENE AND FOR ACCESS TO COURT RECORDS**

Proposed Media Intervenors Advance Publications, Inc.; Bloomberg L.P., the publisher of Bloomberg News; Cable News Network, Inc.; The E.W. Scripps Company; Gray Local Media, Inc., d/b/a WANF; NBCUniversal Media, LLC d/b/a NBCUniversal News Group; The New York Times Company; Pro Publica, Inc.; Reuters News & Media Inc.; and WP Company LLC d/b/a *The Washington Post* (together, the "Media Intervenors") respectfully move to intervene and unseal the docket, records, and future filings in this matter.

As explained more fully in the accompanying memorandum of law, the Media Intervenors seek to intervene in this matter for the limited purpose of seeking an order (1) unsealing and providing public access to the motion to quash ("Motion to Quash") filed by the Fulton County Board of Registrations and Elections ("Fulton County"), any exhibits thereto, including the underlying grand jury subpoena ("Subpoena"), and any other documents filed in this case; (2)

establishing public access to the docket; and (3) requiring that any additional documents in this litigation be filed publicly moving forward.

Although Federal Rule of Criminal Procedure 6(e) ordinarily restricts disclosure of matters "occurring before the grand jury," sealing of "[r]ecords, orders, and subpoenas relating to grand-jury proceedings" is required only as "necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." *See* Fed. R. Crim. P. 6(e)(6).

Here, the grand jury witness—Fulton County—has disclosed the existence of the Subpoena, publicized the fact that it moved to quash the Subpoena, and even filed the Motion to Quash on the public docket. Thus, any grand jury secrecy has been lost, and the subsequent sealing of the Motion to Quash, the Subpoena, and the docket is not necessary or appropriate under Rule 6(e)(6).

The undersigned counsel conferred with counsel for Fulton County and for the United States of America by email on May 15, 2026. Fulton County consents to the Media Intervenor's motion to intervene for the limited purpose of seeking access to records. The United States objects to the motion to intervene and to unsealing.

Respectfully submitted, this 15th day of May 2026,

BALLARD SPAHR LLP

*/s/ Jacquelyn N. Schell*

Jacquelyn N. Schell (Ga. Bar No. 111002)
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: 646.346.8048
Facsimile: 212.223.1942
schellj@ballardspahr.com

*Counsel for the Proposed Media Intervenors*

**CERTIFICATE OF COMPLIANCE WITH LR 7.1(D), N.D. Ga.**

Pursuant to LR 7.1(D), N.D. Ga., the undersigned counsel hereby certifies that this filing has been prepared with one of the font and point selections approved by the Court in LR 5.1(C), specifically, Times New Roman, 14 point font.

Respectfully submitted, this 15th day of May 2026,

*/s/ Jacquelyn N. Schell*
Jacquelyn N. Schell (Ga. Bar 111002)
*Counsel for the Proposed Media Intervenors*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2026, I filed the foregoing Proposed Media Intervenors' Motion to Intervene and for Access to Court Records with the Clerk of the Court via email at criminal_sealed@gand.uscourts.gov.

On the same date, I also served copies of the foregoing via email to the following individuals, who, to the best of my knowledge, are involved in or represent parties in this matter.

Terry M. Meinecke
Assistant United States Attorney
Middle District of North Carolina
terry.meinecke@usdoj.gov

Soo Jo
County Attorney for Fulton County
soo.jo@fultoncountyga.gov

Abbe David Lowell

John Bolen
LOWELL & ASSOCIATES, PLLC
jbolen@lowellandassociates.com
alowellpublicoutreach@
lowellandassociates.com

Kamal Ghali
Matthew A. Josephson
Michael C. Duffey
CHAIKEN GHALI LLP
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

Stephen Jonas
Norman Eisen
DEMOCRACY DEFENDERS FUND
steve@democracydefenders.org
norman@democracydefenders.org

Respectfully submitted, this 15th day of May 2026,

*/s/ Jacquelyn N. Schell*
Jacquelyn N. Schell (Ga. Bar 111002)
*Counsel for the Proposed Media Intervenors*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

In Re: Grand Jury Subpoena No.
2026R00350-01

Case No.: 1:26-mi-88

**MEMORANDUM OF LAW IN SUPPORT OF PROPOSED MEDIA INTERVENORS' MOTION TO INTERVENE AND FOR ACCESS TO COURT RECORDS**

This motion seeks greater transparency into an ongoing legal dispute that implicates the 2020 election, the rights of election workers in Georgia, and the electoral process throughout the United States.

On April 20, 2026, the Federal Bureau of Investigation ("FBI") served a grand jury subpoena on the Fulton County Board of Registrations and Elections ("Fulton County") seeking personal contact information for thousands of staff and volunteers in the November 2020 general election in Georgia. *See* Subpoena No. 2026R00350-01 (Ex. A) ("Subpoena") at 3. On May 4, 2026, Fulton County publicly filed a motion to quash that Subpoena, arguing that it was an unconstitutional and improper attempt to "harass … the President's perceived political opponents." *See* Mot. to Quash (Ex. B) ("Motion to Quash") at 1-2.

Multiple news outlets have reported on the Subpoena and Fulton County's Motion to Quash, which were initially filed on the public docket and then later

sealed.[1] Fulton County Commission Chairman Robb Pitts has spoken publicly about the Subpoena and issued public statements calling it "outrageous federal overreach designed to intimidate and chill participation in elections."[2] Lawmakers across Georgia, including both U.S. Senators, have voiced concerns about the privacy risks of a Subpoena they view as "deeply troubling."[3]

---

[1] *See, e.g.*, Kaanlta Iyer, *Fulton County asks court to stop DOJ subpoena of 2020 election workers' personal information*, CNN (May 5, 2026), https://www.cnn.com/2026/05/05/politics/fulton-county-doj-subpoena-2020-election; Gary Grumbach and Megan Lebowitz, *DOJ sends subpoena to Georgia officials for personal information about 2020 election workers*, NBC NEWS (May 5, 2026), https://www.nbcnews.com/politics/trump-administration/doj-asks-georgia-officials-personal-information-2020-election-workers-rcna343673; Ava-joye Burnett, *Georgia digs in to protect personal information of election workers from DOJ inquiry*, SCRIPPS NEWS (May 13, 2026), https://www.scrippsnews.com/politics/midterm-elections/georgia-digs-in-to-protect-personal-information-of-election-workers-from-doj-inquiry.

[2] Nick Corasaniti, Richard Fausset, and Alan Feuer, *Trump Administration Demands Names of 2020 Election Workers in Georgia*, THE NEW YORK TIMES (May 4, 2026), https://www.nytimes.com/2026/05/04/us/politics/trump-2020-georgia-election-workers.html; *Pitts calls federal subpoena voter intimidation*, FOX 5 NEWS (May 5, 2026), video at 0:55-1:29, https://www.fox5atlanta.com/video/fmc-imp8hovndin075b0.

[3] *Georgia lawmakers press DOJ for details on subpoena for Fulton County election worker information,* ATLANTA NEWS FIRST (May 12, 2026), https://www.atlantanewsfirst.com/2026/05/12/georgia-lawmakers-press-doj-details-subpoena-fulton-county-election-worker-information/; Ltr. from R. Warnock to T. Blanche (May 8, 2026), *available at* https://www.warnock.senate.gov/wp-content/uploads/2026/05/05.08.2026-Letter-to-Acting-AG-Blanche-re-Fulton-County-Subpoena.pdf.

Given the historic importance of and immense public interest in this case, 10 news organizations (together, the "Media Intervenors") now move to intervene in this matter for the limited purpose of seeking an order (1) unsealing and providing public access to Fulton County's Motion to Quash and the Subpoena (both of which were originally filed publicly), as well as any other documents filed in this case; (2) establishing public access to the docket; and (3) requiring that any additional documents in this litigation be filed publicly moving forward.

As representatives of the public, the Media Intervenors— Advance Publications, Inc.; Bloomberg L.P., the publisher of Bloomberg News; Cable News Network, Inc.; The E.W. Scripps Company; Gray Local Media, Inc., d/b/a WANF; NBCUniversal Media, LLC d/b/a NBCUniversal News Group; The New York Times Company; Pro Publica, Inc.; Reuters News & Media Inc.; and WP Company LLC d/b/a *The Washington Post* —have a powerful right of access to court records, and the immense public interest in this case outweighs any purported interest in keeping these records, and, indeed, entire proceedings, secret.

## BACKGROUND

On April 20, 2026, the FBI served the Subpoena on Fulton County, seeking to compel production of the names, home addresses, telephone numbers, and email addresses for all of the staff and volunteers who served in the November 2020 general election in Georgia. Ex. A at 3.

On May 4, 2026, Fulton County moved to quash the Subpoena on the grounds that it intrudes on the First Amendment rights of "thousands of Fulton County election workers and volunteers," violates Georgia's "sovereign authority to administer elections," and improperly attempts to "target, harass, and punish the President's perceived political opponents." Ex. B at 1-2. Fulton County filed its Motion to Quash on the public docket in Case No. 1:26-mi-99999-UNA.

Shortly thereafter, the Court sealed the Motion to Quash, the Subpoena, and the entire docket for this action, now assigned to Case No. 1:26-mi-88. As a result of this sealing, the public does not know how—or even if—the President, the acting Attorney General, or the federal prosecutors responsible for the Subpoena have responded to these allegations. Nor will the public have access to the Court's ruling on the Motion to Quash if this blanket sealing continues.

There has been extensive litigation and public debate over President Trump's claims of election fraud in 2020, particularly in Georgia.[4] Earlier this year, the Federal Government conducted an unprecedented search and seizure of

---

[4] *See, e.g.*, Michael Martina et al., *In recorded call, Trump pressures Georgia official to 'find' votes to overturn election*, REUTERS (Jan. 4, 2021), https://www.reuters.com/world/us/recorded-call-trump-pressures-georgia-official-change-election-results-media-2021-01-03; Amy Wang, *DOJ sues Georgia county as Trump pushes debunked 2020 election fraud claims*, WASHINGTON POST (Dec. 12, 2025), https://www.washingtonpost.com/politics/2025/12/12/justice-department-lawsuit-fulton-county-2020-election.

Fulton County's election records. That seizure garnered significant attention from Congress, the press, and the public[5] and led to an earlier litigation over Fulton County officials' motion for the return of the seized property. *See Pitts v. United States*, No. 1:26-cv-00809-JPB (N.D. Ga.).[6] That case, too, was originally filed under seal, until the Court ordered the docket and filings unsealed, "[g]iven the importance of the public's access to judicial proceedings." *Id.* (Dkt. 9).

Media Intervenors are among the news organizations that moved to unseal the docket and records in that litigation and that have reported extensively on the election fraud claims and ensuing litigations and investigations since 2020, in an ongoing effort to shed light on the Federal Government's actions and motivations.

---

[5] *See, e.g.*, Hannah Rabinowitz et al., *FBI searches Fulton County elections office as it investigates alleged voter fraud*, CNN (Jan. 28, 2026), https://www.cnn.com/2026/01/28/politics/fulton-county-election-office-fbi-warrant; Doug Bock Clark & Jen Fifield, *FBI's Search of Georgia Center Is "Dangerous," Experts Warn*, ProPublica (Jan. 29, 2026), https://www.propublica.org/article/fbi-fulton-county-voting-records-search-warrant.

[6] *See* Gregory Svirnovskiy, *Fulton County challenges FBI's seizure of its 2020 ballots in court*, Politico (Feb. 4, 2026), https://www.politico.com/news/2026/02/04/fulton-county-ballots-fbi-raid-lawsuit-00764350; Tim Darnell, *Fulton County files lawsuit seeking return of seized 2020 ballots*, Atlanta News First (Feb. 4, 2026), https://www.atlantanewsfirst.com/2026/02/04/fulton-county-files-lawsuit-seeking-return-seized-2020-ballots; Kate Brumback, *Georgia Fulton County seeks return of 2020 election documents seized by FBI*, ABC News (Feb. 4, 2026), https://abcnews.go.com/Politics/wireStory/georgias-fulton-county-seeks-return-2020-election-documents-129849119.

The Media Intervenors now seek to ensure the same transparency in this important proceeding.

## ARGUMENT

### I. The Media Intervenors Have Standing to Intervene

As the Eleventh Circuit has recognized, "[t]he press has standing to intervene in actions to which it is otherwise not a party in order to petition for access to court proceedings and records." *Comm'r, Ala. Dep't of Corr. v. Advance Local Media, LLC*, 918 F.3d 1161, 1170 (11th Cir. 2019); *see also Newman v. Graddick*, 696 F.2d 796, 800 (11th Cir. 1983); Fed. R. Civ. P. 24. The Media Intervenors are news organizations that have been covering the Motion to Quash, the Subpoena, and other ongoing claims and investigations regarding the 2020 election in Georgia, and they therefore have standing to intervene for the limited purpose of seeking access to requested records.

### II. The Court Should Make the Requested Records Public Because Grand Jury Secrecy Rules Do Not Require Their Continued Sealing

While Federal Rule of Criminal Procedure 6(e) ordinarily restricts disclosure of "a matter occurring before the grand jury," sealing of "[r]ecords, orders, and subpoenas relating to grand-jury proceedings" is required only as "necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." *Compare* Fed. R. Crim. P. 6(e)(2)-(3), *with* Fed. R. Crim. P. 6(e)(6). The public statements by Fulton County (the recipient of the Subpoena), the public discussion

of the Subpoena, and the original, public filing of the Motion to Quash all warrant the unsealing of this case.

As the District Court for the District of Columbia explained in a strikingly similar case, "judicial proceedings relating to, but at arm's length from" the grand jury, including proceedings "resolving a grand-jury witness's motion to quash a subpoena . . . are not themselves subject to grand-jury secrecy." *In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence* ("*In re Pence*"), 678 F. Supp. 3d 135, 140 (D.D.C. 2023) (citing *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 498 (D.C. Cir. 1998)); *see also United States v. Captive Alternatives, LLC*, No. 8:22-CV-406-TPB-CPT, 2023 WL 2885932, at *16 (M.D. Fla. Feb. 13, 2023) (rejecting request under Rule (6)(e)(6) to seal motion practice simply because it would reveal the existence of a grand jury investigation into a party), *R. & R. adopted as modified*, 2023 WL 2885660 (M.D. Fla. Mar. 8, 2023).

These ancillary proceedings are instead governed by Rule 6(e)(6), which "requires that 'records, orders, and subpoenas relating to grand-jury proceedings' remain sealed *only* 'to the extent and as long as necessary to prevent the unauthorized disclosure' of such matters." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007) (emphasis added). Put differently,

where the need for secrecy as to the identity of grand jury witnesses or their substantive testimony ends, the public's right to additional information begins.

Moreover, grand jury matters can lose their protection "if they are disclosed by a witness before the grand jury" or if "they become sufficiently widely known." *In re Cheney*, No. 23-5071, 2024 WL 1739096, at *3 (D.C. Cir. Apr. 23, 2024) (cleaned up); *see In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) ("There must come a time, however, when information is sufficiently widely known that it has lost its character as Rule 6(e) material."); *In re Charlotte Observer (A Div. of Knight Pub. Co. & Herald Pub. Co.)*, 921 F.2d 47, 50 (4th Cir. 1990) (reversing order enjoining dissemination of grand jury information because "the cat is out of the bag" and "[o]nce announced to the world, the information lost its secret characteristic"); *Captive Alternatives, LLC*, 2023 WL 2885932, at *16 ("[If] a sealed grand jury item becomes sufficiently widely known, it may lose its character as Rule 6(e) material." (cleaned up)).

Grand jury secrecy exists in part to protect those summoned before it from stigma, *see Trump v. Vance*, 591 U.S. 786, 804 (2020), but witnesses are not bound by grand jury secrecy rules, *see* Fed. R. Crim. P. 6(e)(2) (no obligation of secrecy imposed on subpoena recipient). Here, the grand jury witness—Fulton County—

chose to disclose the Subpoena and publicize the fact that it was moving to quash.[7] Chairman Pitts issued public statements and spoke openly to the press about the reasons for the Motion to Quash.[8] Lawmakers sent a letter to the Department of Justice expressing their concerns about the Subpoena.[9] Fulton County also filed its Motion to Quash, attaching the Subpoena, on the public docket at the outset of this proceeding. This information has been "announced to the world" and thus any "secret characteristic" has been lost. *See In re Charlotte Observer*, 921 F.2d at 50.

Because this District does not appear to have addressed the issue of publicly filed or disclosed ancillary proceedings, litigation in the U.S. District Court for the District of Columbia, also over the 2020 election, may be instructive. In one such case, former Vice President Pence had publicly disclosed his receipt of a grand jury subpoena and his reliance on the Speech and Debate Clause in his motion to quash that subpoena. *In re Pence*, 678 F.Supp.3d at 143. A press coalition (including several of the Media Intervenors) sought access to the ancillary proceeding over Pence's motion to quash. The Court granted the motion to unseal, as "[t]he heart of what the Press asks for here . . . is the legal discussion

---

[7] *See, e.g.*, Grumbach, *supra* n.1 (quoting Pitts, "This harassment should not be allowed, so we have asked the Court to act. I will always stand up for our elections workers and for the truth.").

[8] *See, e.g.*, FOX 5 NEWS, *supra* n.2.

[9] *See* Ltr. From Warnock to Blanche, *supra* n.3.

surrounding the dispute Pence has already revealed." *Id.* at 143. The Court also noted the importance of the legal claims at issue, regarding separation of powers, and allowed limited redactions as necessary to protect other, ongoing grand jury proceedings. *Id.* at 145-46.

Here, Fulton County chose to waive grand jury secrecy, publicize its receipt of the Subpoena and filing of the Motion to Quash, and file the Motion on the public docket. The current sealing is not necessary or appropriate under Rule 6(e)(6), as the Motion to Quash and the Subpoena have lost any grand jury character that they once had. Unsealing of the requested records, even with the narrow redaction of any Rule 6(e) information that would disclose still-secret details about grand-jury proceedings, would thus shed much needed light on the legal discussion of the dispute that Fulton County has already made public and the constitutional issues that it raises. *See id.*; *cf. Butterworth v. Smith*, 494 U.S. 624, 630 (1990) ("the invocation of grand jury interests is not some talisman that dissolves all constitutional protections") (internal marks omitted).[10] The Media Intervenors therefore respectfully request that the Court unseal the Motion to Quash, the Subpoena, and any other forthcoming filings in this case.

[10] In *Butterworth*, the Supreme Court held that a state law prohibiting grand jury witnesses from publicly disclosing their testimony violated the First Amendment, as the Court must balance "First Amendment rights against [the state's] interest in preserving the confidentiality of its grand jury proceedings." 494 U.S. at 630.

## III. The Court Should Establish a Public Docket.

The Court should also establish a public docket for this litigation, as court dockets are entitled to a presumption of public access. *See United States v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993) (holding that a "sealed docket" is "an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings").[11] The docket in this case is currently sealed in its entirety, and such a sealed docket is especially troubling because it "can effectively preclude the public and the press from seeking to exercise their constitutional right of access." *Id.*; *United States v. Fierer*, No. 96-cr-294, 1997 WL 445937, at *2 (N.D. Ga. July 25, 1997); *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1029 n.15 (11th Cir. 2005) ("The docket sheet forms an integral part of a criminal proceeding, acting as both an index and a publication.").

Even if the Motion to Quash or some subsequent filing were properly sealed to protect grand jury materials (and as shown above, they currently are not *properly* sealed), there is no basis to seal the docket itself, particularly where the existence and subject matter of this litigation are already public. So long as the docket remains sealed, the public and press cannot see even the type of records filed or what judicial actions have been taken in the case. Moreover, to the extent

[11] *See also, e.g.*, *Doe v. Pub. Citizen*, 749 F.3d 246, 268-69 (4th Cir. 2014); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 96, 102 (2d Cir. 2004).

parties seek to file documents under seal, they can and should be required to file a motion to do so, on a document-by-document basis, pursuant to this Court's sealing procedures and governing law, in order to ensure maximum transparency in this important and closely watched case.

## CONCLUSION

For the foregoing reasons, the Media Intervenors respectfully request that the Court grant their motion to intervene, establish a public docket in this matter, and unseal the Subpoena, Fulton County's Motion to Quash, and any other filings that have been or may be filed in this matter.

Respectfully submitted, this 15th day of May 2026,

BALLARD SPAHR LLP

*/s/ Jacquelyn N. Schell*
Jacquelyn N. Schell (Ga. Bar No. 111002)
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: 646.346.8048
Facsimile: 212.223.1942
schellj@ballardspahr.com

*Counsel for the Proposed Media Intervenors*

## CERTIFICATE OF COMPLIANCE WITH LR 7.1(D), N.D. Ga.

Pursuant to LR 7.1(D), N.D. Ga., the undersigned counsel hereby certifies that this filing has been prepared with one of the font and point selections approved by the Court in LR 5.1(C), specifically, Times New Roman, 14 point font.

Respectfully submitted, this 15th day of May 2026,

*/s/ Jacquelyn N. Schell*
Jacquelyn N. Schell (Ga. Bar 111002)
*Counsel for the Proposed Media Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, I filed the foregoing Memorandum of Law in Support of Proposed Media Intervenors' Motion to Intervene and for Access to Court Records with the Clerk of the Court via email at criminal_sealed@gand.uscourts.gov.

On the same date, I also served copies of the foregoing via email to the following individuals, who, to the best of my knowledge, are involved in or represent parties in this matter.

Terry M. Meinecke
Assistant United States Attorney
Middle District of North Carolina
terry.meinecke@usdoj.gov

Soo Jo
County Attorney for Fulton County
soo.jo@fultoncountyga.gov

Abbe David Lowell
John Bolen
LOWELL & ASSOCIATES, PLLC
jbolen@lowellandassociates.com
alowellpublicoutreach@
lowellandassociates.com

Kamal Ghali
Matthew A. Josephson
Michael C. Duffey
CHAIKEN GHALI LLP
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

Stephen Jonas
Norman Eisen
DEMOCRACY DEFENDERS FUND
steve@democracydefenders.org
norman@democracydefenders.org

Respectfully submitted, this 15th day of May 2026,

*/s/ Jacquelyn N. Schell*
Jacquelyn N. Schell (Ga. Bar 111002)
*Counsel for the Proposed Media Intervenors*

14

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**1:26-cv-02777-WMR *SEALED***
**In re: Grand Jury Subpoena**
**Honorable William M. Ray, II**

---

Minute Sheet for proceedings held In Open Court on 0**5/19/2026.**

TIME COURT COMMENCED: 2:30 P.M.
TIME COURT CONCLUDED: 5:30 P.M.
TIME IN COURT: 3:00
OFFICE LOCATION: **Rome**

COURT REPORTER: Geraldine Glover
DEPUTY CLERK: Sherri Lundy

ATTORNEY(S) PRESENT:

James Bishop representing United States of America
John Bolen representing Fulton County Board of Registration and Elections
Kirsten Fehlan representing Advance Publications, Inc., Bloomberg L.P., Cable News Network, Inc., Gray Local Media, Inc., NBCUniversal Media, LLC, Publica, Inc., Reuters News & Media Inc., The E.W. Scripps Company, The New York Times Company, WP Company LLC, , Advance Publications, Inc., Bloomberg L.P., Cable News Network, Inc.
Gray Local Media, Inc., NBCUniversal Media, LLC, Pro Publica, Inc., Reuters News & Media Inc., The E.W. Scripps Company, The New York Times Company, WP Company LLC

PROCEEDING CATEGORY: Motion Hearing(Motion Hearing Non-evidentiary);

MOTIONS RULED ON: [7]Motion to Unseal Case GRANTED

MINUTE TEXT: Court heard argument on the Motion to Unseal. By Minute Order, the Court Grants the Motion to Unseal; however, a written Order will follow as to the Motion to Unseal and all other pending motions. The Court allows each side 14 days to file any supplemental briefing of not more than 25 pages on pending issues, and 14 days for any parties to respond to any supplemental briefing. The Court will issue a more detailed order as to the information to be more further briefed.

HEARING STATUS: Hearing Concluded

EXHIBIT STATUS: Exhibits retained by the Court to be forwarded to the Clerks Office.

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CIVIL ACTION FILE NO:<br><br>1:26-cv-02777-WMR |

**ORDER**

This matter is before the Court following a hearing held on May 19, 2026. [Doc. 8]. During the hearing, it became apparent that additional briefing is necessary. Accordingly, the Court **ORDERS** as follows:

1. Respondent shall file a supplemental brief addressing the additional authority and evidence referenced by Petitioner during the hearing within **FOURTEEN (14) DAYS** of the date of the hearing. Petitioner may file a response briefing within **FOURTEEN (14) DAYS** after Respondent files its supplemental brief.
2. Respondent shall also file a separate brief addressing any arguments concerning any potential theory of wrongdoing that it contends supports

the subpoena at issue within **FOURTEEN (14) DAYS** of the date of this Order. The Court recognizes that the information relevant to this issue may involve confidential investigative material and, therefore, directs the brief to be filed separately so that Respondent may seek leave to file it under seal.

**IT IS SO ORDERED** this 22nd day of May, 2026.

William M. Ray II
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE: GRAND JURY SUBPOENA NO. 2026R00350-01 ) Case Number 1:26-cv-02777-WMR

Transcript of Motion to Quash
before the Honorable William M. Ray, II,
United States District Judge
May 19, 2026, 1:30 p.m.

Proceedings recorded by mechanical stenography, transcript produced by computer.

Geraldine S. Glover, RPR, CRR, RCR
Federal Official Court Reporter
75 Ted Turner Drive, SW, Suite 1714
Atlanta, Georgia 30303-3309

A P P E A R A N C E S:

On Behalf of the Petitioner:

Kamal Ghali
Matthew Allan Josephson
Michael Duffey
Chaiken Ghali, LLP

Y. Soo Jo
Office of the Fulton County Attorney

On Behalf of the Respondent:

William McComb
James Daniel Bishop
DOJ-USAO

On Behalf of the Movants:

Kirsten Fehlan
Ballard Spahr, LLP - NY

P R O C E E D I N G S

THE COURT: All right. Good afternoon. Y'all can have a seat, please.

All right. So this is a hearing in what is now known as Case Number 26-cv-2777. It was originally assigned a temporary number, which was 26-mi-88. So it's Fulton County Board of Registration and Elections v the United States. And then there's some intervenors that may have some people here soon that want to talk about their motion to intervene.

But who is going to be speaking on behalf of the plaintiff, Fulton County, today?

MR. GHALI: I am, Your Honor. Kamal Ghali with Chaiken Ghali, LLP.

THE COURT: Kamal Ghali? All right. Thank you.

MR. GHALI: Thank you, sir.

THE COURT: And on behalf of the United States?

MR. MCCOMB: Will McComb, Your Honor. I've been appointed as a Special Assistant United States Attorney.

THE COURT: Sorry. What's your last name, Will?

MR. MCCOMB: McComb M-C-C-O-M-B.

THE COURT: And you are from Alabama?

MR. MCCOMB: That's correct, Your Honor.

THE COURT: Okay. Thank you.

I had figured as much because I looked you up on LinkedIn and that was the only Will McComb I could find.

And are you Mr. Bishop?

MR. BISHOP: I am, Your Honor.

THE COURT: And you're the U.S. Attorney in the Middle District of North Carolina?

MR. BISHOP: Yes, Your Honor.

THE COURT: And I knew Mr. Bishop was from North Carolina, so I was thinking that you were probably from North Carolina or maybe from DOJ Central. But you're the only one I could find. Okay. That answers the question that I have.

All right. So I want to talk a minute or two about the motion that was filed to intervene. We received a call this morning. I'm not real versed on how the sealing process works. And it has changed in the courts in the last year or so because of the fear of data breaches.

And so I had anticipated that the orders that I had entered -- I guess it was really only one, but maybe a couple if you look at the scheduling orders -- were themselves sealed. But wasn't sure if the docket itself was available to the general public. It seems that it wasn't until the case was converted to a permanent number.

And then we received a called today from the lawyer that was the principal signatory on the motion to intervene from -- I can't remember her name.

Do you remember her name? It's Smalley or something. Do you remember, Casey?

MS. FEHLAN: It's Jacquelyn Schell.

THE COURT: Is that you?

MS. FEHLAN: No, it's not me. That's my colleague.

THE COURT: Jacquelyn Schell?

MS. FEHLAN: Yes. I am here --

THE COURT: Okay. And what is your name?

MS. FEHLAN: I am Kirsten Fehlan. And I believe Jacquelyn --

THE COURT: Kirsten Fehlan?

MS. FEHLAN: That's correct.

THE COURT: And what firm are you with?

MS. FEHLAN: I'm with Ballard Spahr, LLP.

THE COURT: Ballard? Okay.

All right. So I got an e-mail forwarded to me where the attorney in New York wanted us to make the hearing on Zoom. And I wasn't willing to do that for a variety of reasons. One is, this is not -- this isn't the place where I have the most resources. That's in Atlanta. And our IT office is all in Atlanta. And I was concerned about being able to make it work. And y'all have experienced a little bit of that this afternoon in trying to get the monitors to work.

Secondly, I'm not exactly sure what it would look like. And I didn't want to have an open Zoom call where others might jump in and disturb the proceedings, particularly in light of the subject matter.

In any event I was told that I guess Ms. Fehlan or someone would be here around 1:45. So I was -- 2:45. Excuse me. And so I was stalling a little bit, but then y'all had monitor problems and that took care of that.

So we've got this motion to intervene. I've read the motion. There hasn't been a response filed by either of the parties to the case, though the intervenors/movants have referenced that the plaintiff agrees to make the records public and that the Government disagrees with anything being public.

So I'm going to give all of you a chance. We're going to talk about that first, because if this isn't going to be public, then probably the hearing isn't either. So I just need to get your positions on it.

So, Mr. Ghali, do you want to tell me what your position is?

I'll give -- I'm going to give you, Ms. Fehlan, an opportunity to argue it last; okay?

But I need you always in front of a microphone, if you don't mind. A couple of reasons. One is, it helps me and the court reporter, but I also have some staff that aren't here that listen. And so it helps them when you're in front of the mic.

MR. GHALI: Thank you, Your Honor.

On behalf of the Fulton County Board of Registration

and Elections, we have a pending motion to unseal, so we are in agreement with the concept of unsealing.

We do not oppose intervenors intervening for the purpose of unsealing. Really three things. One is, the docket is sealed right now. So I think the Court is correct, that even I think the docket, to my knowledge, is not public. So our position would be that the docket should be public.

We also don't think there's a basis to seal the hearing itself. To the extent there's confidential grand jury information that the Government believes might need to be sealed, I think we can handle that in due course. But I think just under the Eleventh Circuit precedent, it wouldn't be that we would just blanketly seal.

And I'll say a third thing, which is, my client is the one that received the grand jury subpoena, the face of which says "the law does not require that you not disclose the subpoena." And so the Fulton County Board of Registration and Elections has disclosed the existence of the subpoena, which is their right to do so.

So without a separate motion to seal or a specific explanation as to what confidential information would be revealed during this hearing, we do not see any basis to seal the docket, the hearing, or any of the other materials filed in the matter so far.

THE COURT: Okay. Thank you.

MR. GHALI: Thank you.

THE COURT: Before I hear from you, Mr. McComb, I do want to explain -- not that it ultimately matters, I guess, but there may be some question about so how did I end up with the case. The reason I ended up with the case was -- this is an Atlanta case. I know I'm in Rome, but I was scheduled to be in Rome this week. For the month of May, I am the duty judge or the presiding judge for the court, so I handle this month all things that are urgent, arguably, at least -- because sometimes people say things are urgent when they're really not -- as well as, you know, sign all the stuff that administratively has to go across a judge's desk.

For example, DOJ, whenever Department of Justice allows non-attorneys to see stuff, grand jury stuff, for example, then there's a rule. I think it's Rule 6(e) that requires that it be disclosed to a superior court judge. I think I've got the right number. I'm not sure. Mr. McComb may know more than me. I think it's Rule 6(e), but I'm not positive. But there's a rule that requires that it be reported to a superior -- to a district court judge. And so during this month, I get those notices and sign off that I've seen it on behalf of the court.

Under our internal operating procedures, when a matter such as this is filed, it also becomes the responsibility of the judge who received the emergency filing

and thus is converted to that judge's caseload.

So I received the initial motion that was filed. I put out an order that stayed the enforcement of the subpoena, which maybe I didn't really need to do because I guess I'm the only one that can enforce a subpoena anyway. But just letting you know that I wasn't going to enforce the subpoena until we had a chance to decide the things in a more collaborative hearing or process. And then as soon as it was converted to an actual case number, then it was assigned to me anyway because that is our protocol.

All right. So, Mr. McComb, your position on behalf of the government relative to the motion to intervene --

MR. MCCOMB: Yes, Your Honor.

THE COURT: -- and/or the motion to unseal, I guess, filed by the plaintiff.

MR. MCCOMB: Yes, Your Honor.

Essentially, one, we are in the process of preparing a response to the petitioner's motion to unseal as well as presumably the motion to intervene.

That said, it is our stance right now that, one, we would like to keep the remaining procedure sealed simply because, to satisfy the investigative integrity and to -- there has been some allegations, particularly with petitioner's motion, regards to harassment or that sort of thing. And as long as the proceedings remain sealed, then

presumably there would be less harassment, less issues, with potential witnesses coming forward and being able to fully meet with and speak with FBI agents during the investigation, there will be less of the need to compel any of that sort of thing. And as long as it remains sealed from the point of view of the Government, that there would be less ability to harass or get to those individuals.

The more and more that this is in the media, the less likely witnesses will be wanting to come forward and present their -- what they know and their knowledge to any investigative body.

So that's our concern as far as it --

THE COURT: Well, that may be true, but I'm not sure that's a ground for me to seal something from the public that has a general right to know what's going on in the court.

But your statement about disclosure of sensitive grand jury related information, my assumption was that to the extent that I needed to hear some of that, is that you were likely to ask me to consider that in camera anyway.

MR. MCCOMB: That would be true. If there was a situation that arose today where there were any confidential investigative issues, we would request that you do that in camera.

THE COURT: Right. So I mean, that's alluded to as being a possibility in the case that probably we're going to

spend some time talking about today, United States v R. Enterprises, opinion written by Justice O'Connor in 1991. And she recognizes that there can be the need for the Court to hear about some of that stuff perhaps in camera -- well, in camera, and it may or may not then be something that a judge would have discretion to disclose to another party -- the other party really here, Fulton County Board of Registration and Elections.

And I'm not going to say all of that in the future. I'm just going to say Fulton County; okay? So when I say Fulton County, I'm talking about the plaintiff here not about the entity, which is Fulton County, but this particular subdivision, I guess. I guess it's an independent agency within the ambit of the Fulton County government.

So is there any reason that if we had this in camera -- if we implicated that -- or implemented an in camera process -- and I'm not saying that you should agree that information should be provided to Fulton County.

Now -- but if the Court were to do that at some point, is there any reason that standard protective orders that exist in civil litigation that requires the parties to maintain the confidentiality of that information that that wouldn't work in this context?

Because I have -- it seems like, for example -- I mean, this is a criminal investigation. It couldn't be a

civil investigation utilizing the grand jury because only a special grand jury does that, is my understanding. And that requires an appointment of that by the chief judge, probably with the -- probably with the consent of the en banc, but maybe not, but at least the chief judge is involved. And so we're talking about a criminal investigative process here.

And if -- I mean, maybe it's possible that Fulton County as an entity, as a government entity, can be subject of a criminal investigation, but highly unlikely for a government to be investigated that way, but maybe individuals, more likely individuals.

So I guess what I'm saying is, it seems that if I -- if you had to tell me stuff because I needed to hear it to make decisions relative to this motion to quash and I needed to convey that to the plaintiff so that the plaintiff could respond to the arguments, then I would think a protective order from the Court akin to what you do in civil litigation might be enough to protect that information.

Do you have any thoughts on that?

MR. MCCOMB: The only response I would have to that is, as the Fulton County, the Board of Registers and Electors [sic], as Fulton County, some of those individuals could very well -- and I have no idea what the investigation may turn out, but some of those individuals could become targets of the investigation. And so essentially as they are the

petitioners, a protective order would still be alerting the possible targets of the course of the United States investigation.

THE COURT: That may be true, but that doesn't mean that there might not have to be disclosure because there might need to be. In other words, the United States doesn't get to make all the decisions; right? It can't simply decide who gets to hear something. I mean, that's what judges do; right? And judges have judges too. You know, we have judges that judge us as well.

But even so, I mean protective orders -- I'm not sure if you do civil litigation at all. But you also have attorneys' eyes only designations. And I presume that lawyers that have a license to practice in front of a court are going to obey the court's rules. Maybe individuals wouldn't, you know.

MR. MCCOMB: Sure.

If we got to the point where you found it necessary to alert the petitioners as the counsel -- counsel for petitioners and issue a protective order in that regards, I don't think that you're going to have much argument, certainly not from the United States.

But when we're talking about counsel for the petitioners being able to alert their client, who are individuals that make up the Board, then I think there may be

some possible issues there.

THE COURT: There could be, but we're not -- it doesn't sound like we're there yet.

MR. MCCOMB: No, sir.

THE COURT: All right. Anything else you want to say about the motion to intervene?

MR. MCCOMB: No, sir.

THE COURT: All right. Thank you.

Ms. Fehlan -- is it Fallon like Jimmy Fallon kind of?

MS. FEHLAN: It's Fehlan.

THE COURT: Spelled F -- how do you spell it?

MS. FEHLAN: It's F as in Friday, E-H-L-A-N.

THE COURT: F-H-L --

MS. FEHLAN: F-E-H-L-A-N.

THE COURT: All right. Ms. Fehlan.

So you found out you were arguing this what, about two hours ago?

MS. FEHLAN: Less than that.

THE COURT: All right. Go ahead.

MS. FEHLAN: I'll do my best here.

THE COURT: Go ahead.

MS. FEHLAN: Your Honor, I'm Kirsten Fehlan from Ballard Spahr on behalf of the media intervenors. And the media interveners are suing to have standing to intervene to ask for access to the court proceedings and filings.

And as we heard from Fulton County, Fulton County filed a motion to unseal.

So I'm going to jump ahead to, the grand jury secrecy rules do not require continued sealing. That is especially true here where we have a witness to the grand jury proceedings specifically disclosing the fact of receiving the subpoena. It was why we talked about in the media. And here they consent to unsealing the docket and those papers.

And this case is an ancillary proceeding under Federal Rule of Criminal Procedure Rule 6(e)(6). And that -- under that rule, it says that the records, orders and subpoenas regarding grand jury proceedings, they remain sealed only to the extent and as long as necessary to prevent unauthorized disclosure of such matters.

And there's an on case point -- there's a case on point. And that is In Re Pence, 678 F.3d 135. And in that case, former Vice President Pence received a subpoena. He made the fact of receipt of that subpoena publicly known. He made his intent to file a motion to quash publicly known. And it was talked about in the media.

And the D.C. court found that those actions were -- just the fact of publicizing the subpoena and the motions to quash gave the media intervenors a right to access that information. And that's what they did. The press sought access to the motion to quash. The Court granted that motion

to intervene and to unseal those records.

And it's the same thing here. Through Fulton County's own actions, by making the receipt of that subpoena public, its intent to file a motion to quash public, and the fact of actually filing that motion to quash on the public docket -- because briefly before, it was initially publicly available, both the motion to quash and subpoena attached to it. So those actions sufficiently -- you know, those actions show that it was rightly known by the media. The right to secrecy -- the witness to the subpoena made it known.

And therefore, Your Honor, the media intervenors believe that this motion to quash and the subpoena and the docket and the other related papers filed in this action should be publicly available.

THE COURT: All right. Thank you, ma'am.

Anybody else want to speak in response to either the plaintiff or defendant, because you talked before Ms. Fehlan did?

Anything else, Mr. Ghali?

MR. GHALI: Your Honor, just to be clear about our position, we think it would be improper under the Eleventh Circuit rules to litigate any of this in secret. And what the Court has proposed is an absolutely reasonable vehicle to address it case by case if something confidential came up.

But for what's in the docket and what's in the

motions, there isn't anything we currently have that would require sealing of any kind.

THE COURT: All right. Mr. McComb, anything else for you, sir?

MR. MCCOMB: No, Your Honor.

THE COURT: Well, so maybe a point of information, how I found out about this case was through the media. Monday night two weeks ago, I was sitting in front of my television probably watching the Braves with my iPad, you know, looking at the news, because unfortunately our paper in Atlanta now is strictly online, which I'm not real happy about, but reading it online and a banner comes across the Atlanta paper in red alerting readers to the fact that this motion had been filed. And it wasn't just that the motion had been filed, but the entire motion was available through a link at that time.

Other things that I know about the general dispute, of course, because I've not been involved in any case until this one, has come from the media generally as well, just being a consumer of the news affecting my state and country.

I'm also privy to Judge Boulee's order in a somewhat similar case, the motion filed by Fulton County to obtain the original ballots that were taken pursuant to a search that occurred two or three months back. I guess in January it was.

I knew about the order, its impending filing, because while this case isn't strictly related to that case, though

similar in some respects on the subject matter to some degree, you know, we have an internal rule that when cases are related they go to the same judge. But the clerk's decision here was this case was similar but different and so it would not go to Judge Boulee.

But I reached out to Judge Boulee on Tuesday or Wednesday the week that this motion was filed. Part of it was, you know, colloquial considerations and comity between judges, wanting to make sure that he didn't feel like he should have the case. Even if I didn't have to transfer it to him as a matter of rule, we have an internal rule that allows judges to transfer cases between themselves if they both agree and the chief judge agrees as well.

Had Judge Boulee been interested in the case and felt like he needed to have it, I would have sent it to him. And I told him that. And I think Judge Boulee saw the light at the end of the tunnel for him and he had an impending order that was going to resolve his case, and maybe more out of altruism towards his staff he decided that he didn't want to take it, and so he declined my offer and told me that his order was coming out on Wednesday or Thursday. I think it came out on Thursday. I'm not sure if it was Wednesday or Thursday two weeks ago now.

But I read the order online. I didn't read the order in our internal docket. I mean, as soon as he filed the

order, again, there was a red banner that went across the ajc.com website and I saw the link and I went to it and I read it. And I read it in detail. Read it kind of in passing when I first read it. I read it in detail last night.

I didn't leave here until about 7 o'clock and then spent my night reading that order. As you can imagine, I maybe woke up a little cranky because, you know, no personal time yesterday.

But that's a long way of getting to this point, is that I'm not saying that there won't be some stuff that we talk about eventually that might have to be in camera or might have to be private because of the grand jury investigative process and integrity. I don't anticipate necessarily that there will be that happening today.

And there is an interest in my mind that the public has generally to knowing not just that this event is occurring but also as much as possible, you know, what the details are so long as it doesn't jeopardize legitimate government investigations.

I mean, let's just be frank. This has been in -- this topic has been in the news since November the 4th or 5th, 2000. And here we are, ironically, sitting here today on a major election day in Georgia for our primary where we're going to pick -- maybe not finally pick because there will be runoffs, but candidates for governor and the U.S. senator and

Congress. And we may very well have -- we have new Supreme Court justices that are picked in hotly contested partisan-ish races. We don't have partisan judges here, but we have partisan races, it appears.

So, you know, I do believe that there is a legitimate overriding reason to make our proceedings public. And I'm willing to consider whenever either party thinks that there needs to be a discussion of material that is not open to the public, I'm willing to consider that on a case-by-case basis. But otherwise, you know, what we put on the docket, if not designated to be under seal -- and I can certainly do that when I need to -- then I'm going to make it open.

And I will by minute order today grant the motion to intervene for purposes of opening the record. And it will follow with a written order, but not necessarily today, so it's going to be sometime in the future when that gets filed.

All right. So let me assure both sides that I have read your -- I've read the motion and I've read the response to the motion. I can't say that I'm an expert, as you might be, having lived with this case a lot longer, but I understand it generally.

I come into this job with a political history, past. I was a former elected official, not just as a state judge, but as a politician before that. And certainly understand the process of elections.

I had the opportunity when I was a chairman of a county party to appoint members to boards of election, as it was my responsibility.

Obviously was involved in a lot of elections as a candidate and as a political person before I ran, party person.

Coincidentally served on the first commission in Georgia appointed by then Secretary of State Cathy Cox that -- after the 2000 elections that led to the first voting machines in Georgia. Say first voting machines. Not really. I mean, people my age that lived in rural areas remember the big machines where we'd go in and pull the curtain behind us and we would vote on these mechanical machines. But the first computerized version, served on that commission.

Was a member of the General Assembly when the General Assembly adopted and funded the first voting machines in Georgia, which is different than the ones we have now; but, you know, revolutionary at the time trying to avoid the hanging chad issues that plagued Florida elections in the 2000 election.

So I'm not new to a lot of this. The details of counts and audits and recounts, I've learned that from reading the briefs that y'all have written.

I also want to say at the outset that though I have a political past, that was 23 years ago, and I left that behind

when I became a state trial judge, I'm not really impressed by hyperbolic partisan language from either side. That kind of stuff just kind of flows off my back because I've been around politics. I grew up in a politicians' family. I had an uncle who was a congressman. There was a state representative and mayor and county commissioners. And, you know, I've got a thick skin when it comes to stuff like that. That kind of stuff will not sway me.

I'm going to be focused on, you know, what Rule 17 says. I'm a textualist when it comes to interpreting rules and laws. And so is the Eleventh Circuit, for that matter. Maybe really everybody. Even justices that are viewed as more progressive on the Supreme Court talk in textualist tones these days. So, you know, I don't read much beyond what the words say.

I spent a good bit of time last night and this morning as well reading Justice O'Connor's opinion in the R. Enterprises case.

It seems to me that Fulton County can produce this information maybe relatively easily from a logistical standpoint to the extent that it has it. Of course, that's always an issue.

So I don't sense that this would be an undue burden from a logistical standpoint for the County to produce the information. The question is whether -- to me is whether the

request is reasonable or not.

As Justice O'Connor noted and maybe -- maybe it was Justice Blackmun or Stevens, Justice Stevens. And his concurring opinion, is, you know, it's really a case-by-case analysis, the devil's in the details.

The plaintiffs have to recognize that the language of the R. Enterprises case is very favorable to the Government. I mean, it is. You know, if we think about it from a civil litigation standpoint, the standard generally is, is the request that is made reasonably calculated to lead to the discovery of admissible evidence. That's in a case; right. This is before a case even starts.

And so, you know, the language basically -- and I'm paraphrasing here, but is -- you know is the request -- will it possibly lead to the discovery of information that will speak to the issue of whether crimes have occurred?

But there is this reasonable language. And that language means something. And it doesn't mean that the Government gets to simply decide it. You know, the Government says it's reasonable, thus, ergo it must be reasonable. I don't think that's what the rule says. If that's what the rule says, we don't need the rule; right? We just say, if the Government subpoenas information, then of course they've decided -- they're never going to admit it's not reasonable. I mean, nobody would. I wouldn't expect anyone to. And so it

must be reasonable.

So the rule is there for a purpose. But at the same time, you know, there's a lot of favorable preamble-like statements that Justice O'Connor made on behalf of the Supreme Court in the R. Enterprises case.

And let me just say, from the other perspective is, it will not be hard to convince me that on the other side of the ledger is this fact that election workers whose information that the Government seeks, many of them will have some concern about it. Now, they're not parties here. But let me just talk a minute about that.

Fulton County is a big county. It's the biggest county in Georgia when it comes to population. Just barely.

I live in Gwinnett County and have my whole career. I think it beats Gwinnett by 15,000 people or so. It's not much more than that.

It takes a lot of people to run elections. And the reason we're talking about Fulton County is because Fulton County provided, you know, the final votes that led to a final decision and who the winner in the 2020 election was. That means necessarily there are going to be a lot of people there who politically maybe don't agree with the current administration, who may have been workers, who are going to have some concern about their private information, their -- not just their name, but their home address, their phone

numbers, their e-mail addresses, being made public of sorts. I mean, being provided to the Government here.

So that's one thing.

And then another thing is that to the extent that there -- that this whole process, you know, giving the names and addresses and phone numbers and e-mails and such of these people that I'm talking about to the Government, leads to -- and certainly if it wasn't going to possibly lead to, there'd be no need to seek it to start with, but the Government contacting these people and trying to talk to these people, who might not agree with the Government's position generally about this or anything for some of them, and feel like they're then being harassed, it could also lead to problems that is in Fulton County's interest as it relates to having election workers.

I mean, as I mentioned, there's an election today. And it's taken a ton of people for the last three and a half weeks to conduct that election, because we had a long early voting period in Georgia and then the election days themselves are really massive affairs when we have a large turnout to vote.

So that is sort of on the other side -- all of that to me is on the other side of all this real favorable language that the Government, you know, has in its favor in the R. Enterprises case and maybe cases that have since come. I

haven't read other cases. I've read that case because that seems to be the seminal case that is going to be guiding me. And there may be another more specific one that y'all can alert me to.

All right. So that's where I come into all of this.

So I hope everybody has taken kind of note of my statement that I don't need a lot, I don't want a lot, of hyperbolic kind of stuff. I'm really focused on this reasonableness inquiry. And, you know, implicitly, at least, Fulton County is claiming that the Government's subpoena is not reasonable.

So, you know, I think we'll start out by -- I'm going to give you each, you know, 15 minutes to kind of make your presentation to me about where we are and where we're going in all of this. And then at the end of that, we'll kind of figure out together what we need to do next. Okay?

All right, Mr. Ghali.

MR. GHALI: Thank you, Your Honor.

Your Honor, I have a presentation with some slides. I know we also have some exhibits. I'm happy to hand these either to the court reporter --

THE COURT: Are they on the slides as well?

MR. GHALI: They are on slides.

And, Your Honor, I had planned to address -- and I appreciate the opening comment about how you framed

everything. And I want to really engage directly there. I likely had more than 15 minutes, but I'll take as long as the Court will give me.

THE COURT: How long do you need?

MR. GHALI: I think it would be no more than 30. And I hope to try to have it at 20, but I will --

THE COURT: Whatever -- I will just say, be as efficient as you can, but whatever amount of time you take, I'm going to give at least that amount of time to the respondent.

MR. GHALI: Thank you so much, Your Honor.

Well, let me just begin by saying that the Court should quash the grand jury subpoena. And I think what the Court described is exactly right.

This question is just this Court's power to quash this particular subpoena that requests the names of thousands of poll workers. So we'll walk through it, but the subpoena is overbroad, burdensome and drags thousands of poll workers into its orbit. That is an independent reason to quash it.

The second is our First Amendment arguments and practical argument that the subpoena will chill participation by election workers.

Third, the subpoena is an abuse of the grand jury because the statute of limitations bars any criminal charges based on the purported misconduct they've identified.

And then lastly -- the two are kind of related -- the subpoena has an improper purpose. We've laid that out in our brief. And I don't feel the need to belabor the purpose component. But on the other side of it, there's not appropriate factual predicate for this subpoena, for this subpoena, the information they're seeking.

And lastly, I know the Court has read the Pitts decision extensively. I just want to frame it in the context of this case to make clear why nothing in it can authorize the subpoena and doesn't let them lean into the language of R. Enterprises, which we'll talk about very specifically.

So first just looking at the face of the subpoena, again, this is a subpoena that asked Fulton County to appear. It directed them to bring with them following documents and to send them not only to the FBI but to an agent outside of the district. And this is the subpoena issued April 17th.

The subpoena has two components, the attachment that tells Fulton County how to address it. The top says: Give the information. You can bring a CD-ROM or make the information available for the Government to download, and then again directs that the subpoenas be sent to the agent and sent to the AUSA, rather than it be checked into the grand jury -- delivered directly to the grand jury.

So just flagging that language in the attachment.

THE COURT: Well, before you move on from that, what

is wrong with that?

MR. GHALI: I guess I'll say, one is, from the standpoint of R. Enterprises where you talk about the presumption of regularity with subpoenas issued through normal channels, what the cases talk about, the practice of prosecutors, go ahead and sign the subpoena, the grand jury might not know that's happening.

The cases also talk about the intended participation of the grand jury, and usually of language that requires that they be provided to the grand jury, it be checked into the grand jury.

And this attachment seemed anomalous. And when you're talking about a special assistant -- or a Special U.S. Attorney from another district that is using the grand jury function in the Northern District, it's atypical. And I think just from the standpoint of a presumption of regularity, the information sought --

THE COURT: All right. I hear you. But how do you know that it's atypical? How do you know that it's not typical that prosecutors issue grand jury subpoenas and have them returned exactly this way? I mean, not maybe involving the special prosecutor out of district type thing.

But I have anecdotal evidence through just conversations I've had over the years with judges that were AUSA's and such that may be more typical than you let on.

I guess what I'm saying is, you saying it is just a lawyer talking.

So what's the evidence that that is atypical?

MR. GHALI: I guess without belaboring the point, as a former AUSA, there are times where you see language where the agent or the prosecutor in the district gets the records. You see that. But there's also -- you see strong corrective forces where there's concern that the records aren't being checked into the grand jury, concern that these attachments have gone too far and aren't making clear that it is the grand jury's investigation.

So I can't sit here and say it happens X, Y, Z number of times, but it struck me that the face of this subpoena and the attachment did not require it. And I just -- in terms of the records, so the subpoena asks for the rosters of the election staff members who served in the November of 2020 election, four different pieces of personal information being requested without limitation, everyone who has been contracted, every employee, every volunteer, served on election day, who transferred results, the bus driver involved in a mobile voting location.

THE COURT: So I read that in your brief.

Which one of these things covers the bus driver?

MR. GHALI: The mobile voting locations -- so that's where that comes in.

And so I know the Court's reviewed this part of the subpoena. But again, it is comprehensive. It says without limitation it is designed to encompass virtually anyone who touched the election on the Fulton County side in 2020.

So for overbreadth and burden, I think there's a lot of ways the Court can look at this. One, it's overbroad as to sensitive personal data. It's overbroad as to roles and precincts. Geographically it's overbroad.

And when you talk about, you know, reasonableness, there really isn't a principled limit if we accept what the Government's take is here, which is, well, it's conceivable that the 2,000 poll workers, someone is going to know something that happened in 2020.

Well, what about saying, well, the General Assembly, they're the ones that certified the results, so all of the legislators and their staff or all voters? The notion that you can just say, well, I think these thousands of people, someone will know something, that is an awfully broad, very difficult principle to limit.

And it is the Government unilaterally saying, we want to do this, it's convenient, so we will. It's overbroad in time.

And this last point is, in the authority the Government cites, I'm not aware of a subpoena of this magnitude for this much personal information. I've certainly

never read one where you're talking about poll workers. And so we are talking about an unprecedented use of the grand jury.

You say what's -- you know, if you're thinking what's your evidence for that -- I've never heard of it. In the case law, I have not encountered it. And the Government certainly hasn't cited a case to say, this is typical, we asked for this type of information for poll workers or even other kinds of investigations.

So in terms of the authority that's before you, I'm not aware of precedence that would --

THE COURT: Before you -- go back, if you would.

Before you move on, the last -- the next to the last, the overbroad as to time, do you have more comments to make about that?

MR. GHALI: Yes, I do, Your Honor.

Again, today is voting day. And when you talk about burden and what's happening in Fulton County, I mean, you look at these polling precincts, I mean, these are churches, these are people that serve in their community. And in a very granular way, this is personal for folks that show up.

I've got a series of exhibits that are before the Court. And we've got -- in the first insert, there's a declaration that we'd offer into evidence for the Court's consideration. And it is from a member of the State Election

Board, Sara Tindall Ghazal, who says, you know, she was appointed by Governor Kemp, nominated by the Democratic Party to serve on the State Election Board. Talks about her role with the Carter Center.

THE COURT: Is this your actual document you want to file with the court?

MR. GHALI: This is the actual -- yes, Your Honor.

THE COURT: Okay. Thank you.

Let me do something before we go on.

I've got -- I need to write the case number on this document just to make sure it makes its way into the right file.

Go ahead. Thank you.

MR. GHALI: And again, without just reading the declaration to you, she lays out her experience overseas observing elections in, you know, places like Jamaica, Zimbabwe, Nigeria, Liberia.

In Georgia, she says: I'm asked to speak to civic and political groups about voting rights, election integrity. In these events, I offer suggestions for how individuals who care deeply about election integrity can become more involved and contribute.

THE COURT REPORTER: I'm sorry.

MR. GHALI: Slow down?

THE COURT: She's good, but not quite that good.

MR. GHALI: Sorry.

And there are two things that struck me here that I think hit at something the Court's concerned about. She said when she talks to people she recommends if you want to support democracy you serve as a poll worker. She said: I've found that many individuals who are reluctant to engage in overtly political speech find real meaning in serving as poll workers as an expression of their commitment to public service and democracy.

At SEB meetings, members of the public will often open their public comments with a statement of how many years the speaker has served as a poll worker as a demonstration of their commitment to the Democratic ideal.

And then on the second page, she talks about how ever since this -- you know, it's turned out that the Government is requesting this information, she has received calls from individuals who served as poll workers expressing deep concern over their potential exposure for simply having served as a poll worker, with one person even asking whether they should retain legal counsel.

She says, based on her personal and professional background she believes many potential volunteers balance their desire to support elections against any potential physical, legal or reputational risks they may face when serving as poll workers, and the risk of having nonpublic

personal information, including home address, mobile, e-mail, disclosed to federal law enforcement based on service as a volunteer or simple poll worker is highly likely to discourage individuals from participating in elections as poll workers.

And I think that's an intuitive thing that the cases talk about when you talk about chilling effect. And I think it's some of the concerns the Court had. But, you know, someone from the State Election Board is saying precisely that.

Now, I know the Court said that you expect the burden may be somewhat minimal. And I don't know all the ins and outs of Fulton's recordkeeping, but we still are talking about three different categories of information. So you have all these different folks, some of who are Fulton County employees, some that were involved with -- retained through temporary staffing agencies, some that are contracted directly on the day of election, and e-mail and address and phone number while they're doing the busy work of trying to put on an election.

And so when you talk about director of -- you know, the director of elections, people that are in that department, it is a burden. And the cases recognize that even subpoena compliance poses a burden that the Court can take into account. You're talking about records back from when the County surged during COVID trying to get everyone to handle

the original election, the hand count and the recount as well.

Now, in terms of where doctrinally you can fit this notion, hey, how -- okay, so this will chill election participation, what do I do with that, well, that's where the First Amendment case law gives this Court a clean independent legal basis to be able to say compel disclosure will have a future chilling affect on election workers, that that's a kind of civic participation and that there's expressive value to that association.

THE COURT: Okay. So, you know, I can't tell you that I've spent a lot of time thinking about this from a First Amendment perspective, because I haven't. But if we -- you're talking about the First Amendment rights of the individual poll workers; right?

MR. GHALI: Correct, Your Honor.

THE COURT: So I guess while I certainly have some collateral concern for the poll workers, you know, they're not before the Court. The County is before the Court.

And so, you know, you've just gone through and articulated the County's concern about poll workers not wanting to serve because they may feel harassed. Of course, that's -- and that's also in -- you know, the backdrop of that are the two women in Atlanta that were called out by Giuliani and ended up, you know, being harassed and sued him and won a judgment. I'm not sure if they ever got paid anything or not,

honestly.

But in any event, as it relates to the First Amendment consideration, you know, how does Fulton County have the standing to really to make this argument on behalf of the individuals?

MR. GHALI: All of the Supreme Court's cases that have dealt with these organizations where there's been compelled disclosure of information, that's one of the cleanest third-party standing doctrines where the organization can assert the rights of the folks whose liberty would be threatened chilled.

THE COURT: But most of the cases you're referring to are cases like where people have contributed money to organizations. There was just recently a case that the Supreme Court decided in that regard.

You know, one of the differences, though, this is -- and the Government points this out in their response. I mean, these are people that are providing a public function; right. And so generally there's not a right of privacy to the public when you're -- in other words, the Government doesn't get to hire -- I mean, maybe in the CIA context or something like that, but we don't get to hire people and keep their involvement in government secret; right? Most people don't, at least, you know.

So I don't think it's quite as a clean argument as

the people that give money to Planned Parenthood or give money to right to life organizations and then, you know, entities are trying to see who contributed the money. You know, we see some of that in Texas right now with regard to abortion and stuff where they're -- I think I'm right. It may not be Texas. But Texas is an easy one to point out, because Texas is really aggressive in that area where maybe the Attorney General tries to get at something indirectly that he can't get at directly.

But here we're talking about -- and like I said, the Government makes the argument -- is these are folks that are doing a public function. So is it the same thing really?

MR. GHALI: Well, Your Honor, I guess let me put some language in front of you, which is, when it comes to freedom of association, this is the Americans for Prosperity v Bonta, which is in the context of donations. That's often how this arises, the Court is right.

But what triggers the First Amendment scrutiny is whenever you have something that burdens an individual's ability to join with others to further shared goals. That's where the -- it's about the risk of chilling. It doesn't have to just be organizations. Otherwise, you'd be saying, if you're a public worker you lose First Amendment rights.

And we cite the Shelton Supreme Court case that says that's just not true, that you just -- that all First

Amendment liberties are suspended. And I think in the context --

THE COURT: Some are; right. When you're a public employee, you lose the ability to make statements about things that affect your area. I mean, I have those cases all the time.

The firefighters is a case I had in Atlanta. A firefighter calls a county commissioner to complain about the lack of resources in, you know, his particular fire assignment, particular precinct. And he got fired -- no pun intended. He got fired for insubordination, not following the chain of command. He argued, I had a First Amendment right as a citizen of Cobb County to articulate my concern that one of our local fire units was understaffed on a day, which caused community issues if we had fires.

And, you know, my decision, the decision of the Eleventh Circuit in that case, was, well, you don't have that here because you're speaking of -- you're not speaking about a matter of public concern, you're talking about, you know, something that was within your job here.

So I mean, I guess I'm bringing that up just to say, it's not an apples to apples kind of thing, right, it really depends on exactly what we're talking about.

MR. GHALI: I mean, absolutely the cases say that the facts matter. And First Amendment cases, they're inherently

fact specific.

But I would say this is a greater violation of the First Amendment. These are individuals that will simply stay home. They won't associate with people whose message to the community is, we want a free and fair election. And it's in the context of -- and this is what -- the Department of Justice had a memo in 2021 talking about threats on election workers where folks are being threatened for just trying to do the right thing, identify who won or lost. So showing up to the polls is an expressive act that is a function of --

THE COURT: So in this area, if you don't believe that the Government -- you believe what you believe relative to the motivations of why the DOJ is doing this. Okay. I'm not going to restate it.

But if the DOJ had a legitimate -- or has a legitimate purpose to investigate -- so let's say we're acting within the statute of limitations, because that's one of your arguments, and there was some reasonable basis to assume that there was irregularities at a certain poll at an election and that the poll workers there may have been witness to that.

Could you stand on the same argument? In other words, if the DOJ came in and said, okay, we want to know who all those poll workers are so we can go interview them, we've got this good evidence that there was something illegal there, we want to find out who did it, doesn't this argument then --

isn't it lessened to some degree?

And then it kind of takes us back to the whole reasonableness argument to start with.

I mean, I understand what you're saying. But if the subpoena itself is reasonable, then it really might not matter, if it was reasonable, that it might chill a specific poll worker or group of poll workers.

MR. GHALI: I think that the way the Court's phrased it I think is right in that the Eleventh Circuit authority requires you've got to look at the relationship -- what is the interest in the specific information versus the scrutiny you apply given the risk of chilling?

And so when you're talking about what is the compelling need for 3,000 names and e-mail and address and phone number and function versus the prospect of chilling election workers from participating in democracy -- and there's other things that you can add to the balancing of those analysis, but in the end there's -- it's about the level of scrutiny you apply.

And I think that's where the Court -- it's not black or white. It's not like there's some possibility of chilling and then it's an off switch. It's that the Government's interest in that information has to not only be compelling, but it has to survive a level of scrutiny commensurate with the risk of chilling participation in elections.

And I'll just note one other thing. This notion that, hey, you're supposed to be neutral, you know, you don't really advocate anything, you know, there's no authority that says neutrality -- neutrality is a kind of political expression saying things should be free, things should be fair, or even the statements from -- I think you mentioned -- Ruby Freeman and Shaye Moss where they say, it's important to us to stand up for our community and participate in elections. But again, a lot of that is -- you know, we cover that in our brief.

I want to address one argument with respect to the Open Records Act. I want to be really clear, information they're seeking is not publicly available. You cannot get under the Open Records Act the name and address and phone number and e-mail address for all of these folks compiled in one dossier, which who knows what the Government intends to do with that dossier the way it is. But just wanted to address that.

There is Open Records Act language that says that it doesn't apply to a grand jury subpoena unless contrary to law. And that's why we're here talking about 17(c) and the other restrictions on the Government's ability to get this information.

Okay. Now, I want to talk about the abuse of the grand jury subpoena as it relates to the statute of

limitations issue. This is from the Judge Boasberg opinion. We mention it in our brief. But the Department of Justice subpoenaed the head of the Federal Reserve Bank. And Judge Boasberg quashed that subpoena on the grounds that there was an improper purpose and kind of walked through the reasons that the Court can quash a subpoena. And it quotes that language. A court can quash a subpoena if compliance would be unreasonable or oppressive. The case law's teaching is an abusive purpose doesn't have to be identified from precedence, that they're as numerous and protean as the opportunities to misuse power.

So the Court under the way that the -- the authority on improper purpose can look at whether you're talking about the misuse of power in the way that the grand jury subpoena functions.

And then he goes on: It's clear, you can't reduce them to a fixed and exhaustive list. In none of the cases that -- where a Court said, hey, this just goes too far, this is improper, this isn't the way that you should use a grand jury subpoena, there wasn't a list beforehand. When new facts present new ways that prosecutors might be abusing their subpoena power, courts do not hesitate to declare those purposes improper.

Here there really isn't any dispute that the case law says for federal grand juries its sole function is whether to

bring criminal charges. That is the sole function.

And, you know, the cases say -- and I don't see the respondent really disagreeing with this prospect -- if you're just looking at a historical inquiry, you can't do it. You can't use the grand jury to say, I want to know what happened in the Nixon-Kennedy in 1960 or I want to revisit Bush v Gore or Iran-Contra. You'd be abusing authority of the grand jury.

So this notion that we should just throw the statute of limitations out the window, that's not supported by case law.

And even in their brief, they describe it. They say, the subpoena seeks one thing, they're just looking to shed light on the irregularities of the Fulton County 2020 election under investigation.

The grand jury's function isn't to just shed light on historical facts. There needs to be a criminal charge brought within the statute. There are only two statutes that the Government has identified, two statutes that might identify a crime. And they're both absolutely time barred.

The first is this felony election fraud statute. And you've got to willfully procure, cast or tabulate a false ballot. The charge is, during the election they're stuffing fake ballots in, they're trying to rig the election. it happens during the election. That is the only way to violate this statute.

And so there's no dispute that it has a five-year statute of limitations. On January 7th, 2021, the election was certified. So any procurement, casting or tabulation, it absolutely had to happen before January 7th, 2021.

The grand jury cannot return a valid indictment for any conduct before then.

And the Government doesn't really want to think about it. They say, well, who knows what we'll uncover. Maybe something -- extend the statute of limitations. But this is a categorical problem for them. And --

THE COURT: Well, I thought the most effective way they argued it -- and I'm not saying that I agree with them, because I haven't made any decision necessarily -- you know, they argue that, you know, there could be a conspiracy and that, you know, under conspiracy law that acts that predate, you know, an act that was within the statute of limitations, that you can go back and charge that act that may be outside the statute of limitations if there is a conspiracy. And that does seem to be correct in the general sense. But I certainly have questions for them about that.

So how does that --

MR. GHALI: I've got a Supreme Court case that basically says that doesn't work.

THE COURT: Okay. Well, tell me --

MR. GHALI: So it's U.S. v Grunewald. So I'm going

to go to the very end. But it basically says this -- oh, it did sort of short out. That's not good.

THE COURT: Did it short? Okay. We can get it back. I'm sorry. We may have to get our clerk's employee back in here.

MR. GHALI: But it is my last slide in case this came up. Now it seems like it's going to -- okay. Here we go.

But essentially the way the theory works is, if you've got a conspiracy, let's say, to steal the election, rig the election, procure false ballots, tabulate ballots improperly, once you have achieved the essential objective of the conspiracy to rig the election, the secrecy afterward does not extend the timeframe. Otherwise, it would wipe out the statute of limitations in any case.

And there's no clearer -- you can have different conspiracies that allege different things. An election conspiracy has got to be one of the clearest essential objective conspiracies that exists.

The conspiracy was to rig the 2020 election. Once you achieve that essential objective, post-conspiracy secrecy does not extend the statute of limitations.

And they don't cite a case for it. It's not true as a principle of law. But I think it's the way the Government has approached it, is, just don't think about it. We'll work it out. That's a personal affirmative defense that someone

can raise.

THE COURT: Well, that's the other argument they make, is there's an affirmative defense that it will be raised by defendants in the case. I'm not real impressed with that argument, I'll just tell you. Because to think -- let's say there was someone charged for something that happened in 2020. To suggest that their lawyer is not going to raise statute of limitations is ridiculous. I mean, it's really one of those kind of arguments you want to make when no one is listening, because it's not -- it's really stupid.

And if the lawyer didn't raise it, the lawyer, in a criminal case, is not only subject to being sued for malpractice, but also, you know, if there were a conviction, it would be likely set aside on ineffective assistance of counsel. I can't imagine an easier case to prove it if a lawyer doesn't raise a statute of limitations defense.

MR. GHALI: I couldn't agree more. But I'd also say, if you indict someone for the sole purpose of making them raise the statute of limitations defense, I can't think of anything more improper.

But the other side of it would be, Pickens, which is the case they cite, it's about executing an arrest warrant where like an officer is executing a warrant, but the statute of limitations passed. And the Eleventh Circuit didn't want cops in the field making judgment calls about the Eleventh

Circuit. That is different than lawyers that are conducting a grand jury investigation.

And so I would submit, Your Honor, this is one of these cases where the principle that, well, maybe something extends it, it -- this is a crucial issue. And it's one of the things that separates whether you can use the grand jury at all. Because the only other statute at issue is a misdemeanor. It's this recordkeeping statute.

And I know I've been talking. I'll try to wrap it up relatively quickly, Your Honor.

This is a -- it's just a recordkeeping misdemeanor. You don't even need the grand jury for a misdemeanor indictment. And again, that conduct would have had to take place during 2020. Now --

THE COURT: Is that also a five-year statute?

MR. GHALI: There is also a five-year statute on that, Your Honor.

Now, let me just -- I want to just quickly touch on the search warrant, because the Government seems to suggest, well, we have this probable cause affidavit, so you don't even need to think about whether there's an appropriate factual predicate here.

The one thing I'll say is that, this affidavit identified a number of issues that occur in elections, and then just says, if these are intentional, it would be a

violation of law. That's the language in the affidavit.

And there were -- there was evidence put forth in the Pitts hearing from election experts that said -- this is Ryan Macias. And so that's part of the record evidence. Again, these are exhibits we have so the Court has a full picture of what happened in Pitts, where election experts said: This stuff happens all the time, these allegations. And what you've described doesn't show intentional conduct.

So again, the -- and we'll talk about what Judge Boulee decided in Pitts, because I don't think that should constrain anything the Court does here or determine whether this grand jury subpoena is valid.

But the one thing I'll -- so again, there was testimony from Mr. Macias. Does the affidavit show any intentional misconduct? No.

Does this all -- for example, if there was an error in the hand recount -- this is an election expert that -- and again, without kind of belaboring it. But the respondent has suggested, well, you had a magistrate judge that already found that there was probable cause, end of story.

The one thing I'll note is, the Government submitted this e-mail from Judge Salinas to the agents before approving the warrant where she made really clear: Hey, can you edit the affidavit? Paragraph 84 reads as if it's a foregone conclusion there's an intentional violation of law. Can you

use this if-then formulation -- if this conduct was intentional, then it would be a violation of federal law?

And I only raise these points, Your Honor, to say, this isn't a case where you've got, look, there's a criminal investigation where we know that there's like definitive violations of law, there was a compelling governmental interest. We really just -- again, it's just an investigation that talks about the normal types of human errors in elections.

So without some judicial control on whether or not you can have subpoenas to poll workers that -- essentially there won't be limits in terms of how thin the factual predicate can be.

So I want to move to R. Enterprises quickly. But I note that in the improper purpose cases, the courts say, look at the improper purpose, but is there an adequate factual basis behind that improper purpose.

So I raise that to say, if they're going to rely on the affidavit, all you're talking about are hypotheticals of criminal violations, as opposed to some specific finding when the Court weighs whether the known facts in the investigation outweigh the improper purpose.

So moving to R. Enterprises, I just want to just note very -- why it doesn't actually govern your decision today.

First, R. Enterprises supports this notion that you

can't use the grand jury subpoena for an arbitrary fishing expedition and endorses the language in Rule 17(c) and purports to try and give it meaning. R. Enterprises applies whenever someone says: Hey, this information is irrelevant. It's irrelevant. You don't need it. We're doing a fraud case. The Government says give me your books and records. And we say, it just -- you don't really need it. It's irrelevant, so just look somewhere else.

It doesn't address an argument about, for example, a subpoena being too burdensome.

It doesn't purport to address overbreadth. It doesn't purport to address the First Amendment. It says the Court of Appeals didn't pass on the First Amendment issue, neither do we.

It doesn't address an improper purpose argument because of a statute of limitations.

It doesn't address improper purpose because of statements made by the President.

It is solely a relevance case -- if we were to say this is irrelevant, go somewhere else, you don't need it. And that's not the argument. The argument has been overbreadth, the burden that comes with that, the First Amendment chilling effect, and the improper purpose.

And then I'll note, Your Honor, that the Pitts decision doesn't authorize the grand jury subpoena.

I just want to be really clear. The only thing Judge Boulee decided was whether he could exercise his equitable jurisdiction to return ballots back to Fulton County. He talked about why the standard for doing so was exacting exceptional, that it is a formidable burden to movant.

It is -- it's hard under the law because you're essentially asking the Court, the way the Eleventh Circuit describes it, to supervise criminal investigation at the warrant execution stage.

But Judge Boulee never found probable cause. He never said this affidavit was good enough if there's probable cause here. He called the events leading up to the motion unprecedented.

And when the Court is thinking is this a normal grand jury subpoena subject to the presumption of regularity, the events were unprecedented, the allegations in the affidavit were defective, in some respects troubling, had features that were problematic. And he just declined to exercise jurisdiction over the case.

So to the extent they try to read it to say, that should somehow inform whether the Court enforces a grand jury subpoena for thousands of poll workers' information, it doesn't logically flow from anything that happened at Pitts.

And then lastly, I want to address this one issue that did come up in Pitts that the respondent cited, which is

this argument that, hey, something did happen in the statute of limitations period.

In 2024 -- this is from the search warrant affidavit -- someone from the State Election Board went to the Georgia Secretary of State's office to view ballot images, to view ballot images from the 2020 election. And when she did so, she found that it was missing the SHA File, a Secure Hash Algorithm file.

At the hearing that we had on March 27th, an election expert said that doesn't tell you anything. It's like if you were to say -- if you wanted to look at ballot images, the fact that an SHA file that -- wasn't there, doesn't mean that anyone tabulated ballots falsely. It doesn't mean anything other than you didn't get a file that you asked for.

But Judge Boulee's order called the allegations -- that 2024 allegation, he called it troubling because the affidavit did not explain that the modification date -- that there's a 2024 modification date. Could have been caused by someone at the Georgia Secretary of State's office.

So all of that, Your Honor, is just a way to say, if they'd come to you and said, look, something happened in 2024, don't even think about it in terms of the statute of limitations. This 2024 conduct of someone going to the Georgia Secretary of State's office and looking at ballot images that might have been manipulated, that has nothing to

do with 2- to 3,000 poll workers' personal information. It is so far removed and would only highlight how extremely overbroad the subpoena is if that's an allegation of misconduct.

And to be clear, the testimony from Mr. Macias was that that doesn't show anyone engaged in any misconduct. It showed someone at the State Election Board just saw that there was a modification date on the ballot images.

So I'm happy to move on from that. I just want to make sure that the Court doesn't have any questions about that part.

And then lastly in terms of improper purpose, I just want to highlight two things. And none of this -- I don't want to revisit anything that is in the brief in terms of statements made by the President.

But the respondent makes this argument that Mr. Bishop doesn't have an improper purpose just because the President had an improper purpose.

And the one thing I'd say is that, because Mr. Bishop had a career in public service, there are statements in the public domain that say I'm not going to certify the election in 2020 on behalf of Georgia. The burden of proof is on the Democrats in Georgia. And again, that's not to say -- it's only to say this line to say, hey, that's the President, this is me, it's completely different. I don't think that the

Department policy since 2025 supports that argument anymore.

Before this administration, the policy was, the Department is completely separate. And so you had a body of case law that talked about transferring animus in the vindictive prosecution context.

But the notion that, well, we need to break down the wall between the Department and the President means that there is more of a direct line, that there isn't the ability to say, a particular component of the Department of Justice is separated.

So to extent the Court considers the improper purpose arguments that we've identified in our brief, the sheer fact that there is a different prosecutor hired and could be fired by the President at any moment, it in no way sidesteps any of the improper purpose arguments in our brief.

THE COURT: Thank you.

Anything else?

MR. GHALI: Thank you, Your Honor.

THE COURT: Is that all?

MR. GHALI: Yes, Your Honor. we would just ask that the Court quash the grand jury subpoena. And we have a proposed order that identifies multiple avenues the Court can use to do that.

THE COURT: So any proposal you have, either side, just make sure you get the e-mail address for Ms. Wofford here

and send it to her for when we get around to working on it.

Why don't we -- because the Government's argument may take a little bit of time too, why don't we just take a quick recess, everybody go to the restroom. See you in ten minutes.

MR. GHALI: All right. Thank you.

THE COURT: Thank you.

(A recess was taken at 3:58 p.m.)

THE COURT: All right. Thank y'all.

Mr. McComb.

So, Mr. McComb, you're an AUSA with the Northern District of Alabama?

MR. MCCOMB: That's correct, Your Honor.

THE COURT: Are you -- what area are you based out of? Birmingham?

MR. MCCOMB: Birmingham.

THE COURT: Birmingham.

(brief pause)

THE COURT: All right. Yes, sir.

MR. MCCOMB: Your Honor, I just want to start out with just the basic law.

I think you indicated that you were a bit of a textualist when it comes to the basic law, so just to point out that --

THE COURT: You can't be a bit of one; right?

MR. MCCOMB: That's correct.

THE COURT: You either have to be or not; right?

MR. MCCOMB: That's right. That's exactly right.

This subpoena in this particular case is presumed to be a reasonable subpoena. It was properly done and properly served onto the petitioner's client and presumed to be reasonable. Under that presumption, it is the petitioner's burden to prove that it is somehow unreasonable and oppressive. And they have not done so today.

They have pointed out a variety of different reasons and methods, particularly involving the political controversy, but neither of those rise to the level of unreasonableness or oppressiveness in this particular case.

To start with the unreasonableness --

THE COURT: Are you talking about the reason they suggest that you want the documents for the political purpose?

MR. MCCOMB: That's right.

THE COURT: Okay.

MR. MCCOMB: And two -- let me start there. They continue to point out either through that process, through the text from the President of the United States or the text from Mr. Bishop --

THE COURT: I've got to say, I was impressed by that. Not what was said, but that they would do that kind of research to find out. I mean, that was -- it took me a second to kind of figure out what it was, you know. I did a

double-take looking at Mr. Bishop to make sure, is that who that photo is.

Mr. Bishop, when were you in Congress? How many years?

MR. BISHOP: 2019 to 2024.

THE COURT: So three terms I guess?

MR. BISHOP: Two and a half.

THE COURT: Based out of where?

MR. BISHOP: The Ninth and then Eighth District of North Carolina. So the district number changed in the process --

THE COURT: Love the Charlotte area.

My confirmation hearing was with Thomas Farr, who I suspect you know.

MR. BISHOP: I certainly do.

THE COURT: I heard -- did he die recently? I heard that.

Politics is a mean business these days. I was particularly affected by the fact that he got nominated twice and didn't get confirmed. And the last time was at the last minute. And that's just tough. You ask a lot of people to go through that process and then all of a sudden have it taken away.

I'm sorry, but -- go ahead, sir.

MR. MCCOMB: Yes. I was just going to point out that

a politician saying political things does not give rise to the animus that the petitioner would like for it to show in this particular case.

Mr. Bishop as a politician did make statements and I think wrote a memo in a sense of the voting outcomes of several different states. But just because a politician did not like the process or outcome and made political statements does not mean that an investigation into issues surrounding that would be considered improper.

In this particular situation, we have -- based on what's already been made public, we have information through the affidavit on the Pitts case that several irregularities were noted from the Fulton County Election Board -- and they've been laid out through that affidavit -- that really sort of bear a little more scrutiny as to what, if anything, criminal happened.

And the grand jury is a process that's perfectly able to do that. They have the ability to investigate and to satisfy themselves whether a crime occurred or did not occur.

THE COURT: Well, you're quoting Justice O'Connor there.

MR. MCCOMB: That's right.

THE COURT: I recognize that statement. But, you know, if we assume for a moment that there was something that was criminal or could be criminal that happened in 2020, you

know, there still is this statute of limitations argument.

And I read what you wrote, Mr. Bishop, or whoever, related to the conspiracy. I asked the plaintiffs about that. And they point to the Grunewald case.

Is that a case you're familiar with?

MR. MCCOMB: I was not familiar with it until they pointed it out.

THE COURT: It is kind of old. The question is, is it good law.

Basically, you know, Mr. -- I'm sorry. Ghali?

MR. GHALI: Ghali, Your Honor.

THE COURT: -- Mr. Ghali, he read it. But assuming it's good law, it says, a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, which presumably would extend the statute of limitations backwards --

MR. MCCOMB: That's correct.

THE COURT: -- and acts of concealment done after the central objectives have been obtained for purposes only of covering up after the crime.

We were talking about it in my office during the break. And, you know, I'm a movie person, so I kind of think in movies. And I'm seeing Matt Damon and Clooney, and they're in Ocean's Eleven or Seven, and they're making plans.

You know, if, for example, somebody -- if this case

applies still -- if somebody five years or outside of five years is buying the car for the getaway and buying the guns that are going to be used when they rob the casino and the dynamite that's going to be used to blow open the safe, then that might be -- under this case, sounds like that might be chargeable even if the crime doesn't -- the crime was just the robbing the casino doesn't happen for five plus years. But maybe what happens after the fact two or three years later when they ditch the car or get rid of the guns and the dynamite and stuff extra, whatever, might not be part of the actual conspiracy because the crime has already occurred.

That seems to be what the case says.

So after you leave here today, I'm just going to ask you to look at this case and then maybe supplement your briefing and tell me why this doesn't apply or -- either on its facts or why it's not good law or whatever.

MR. MCCOMB: Yes, Your Honor. I can definitely do that.

THE COURT: All right. Thank you.

MR. MCCOMB: While we're speaking about the statute of limitations, though, it is still -- as the Court has already pointed out during petitioner's address to the Court, the statute of limitations is still an affirmative defense that's raised post-indictment.

Okay. So this is a situation where there is no body

of case law that we have seen and there's certainly no statute or rule or regulation in the federal system that would suggest that the grand jury can no longer investigate matters that are outside a five-year statute of limitations. There is just not -- there's a derth of law out there on that.

THE COURT: Well, there's still the rule. And the rule is, it's got to be reasonable.

MR. MCCOMB: That's right.

THE COURT: And so I think the argument that the plaintiffs make at least is that it's not reasonable, particularly in light of the fact that you're asking for a lot of stuff on a lot of people and that, you know, whether it's a First Amendment right or not, that it conceivably could chill, you know, people's willingness to participate and assist government in a vital function, which is elections.

I always tell juries when I pick a jury is, there are a lot of, you know, very important boxes in government. The two most important is the ballot box and the jury box. I think the jury box is the most important because it doesn't matter what the elected officials decide if the jury doesn't enforce it. But if -- you know, going back to the ballot box, if we don't have people that are willing to help ensure that we have good elections, then we don't have those people that can make the laws that we need for us.

So I mean, do you just dismiss that if you're not --

if -- do you dismiss the prospect that if you're spending time investigating something for which charges can't legally be brought -- you know, I guess your argument is, well, it can be brought but they've got to raise the defense. As I said earlier, I'm not real impressed by that, honestly -- but that I should not consider then the possible chilling that occurs to people's willingness to be involved in the process?

MR. MCCOMB: I think you should consider that, but as it relates to the statute of limitations, no. And my point is not that something can be -- a charge can be brought and then dismissed later as a result of statute of limitations.

My point is, as we sit here now, we are not sure what charges can be brought. That's the whole point of the investigation. There may be something within our statute of limitations, namely, as the Court has already pointed out, the January 2024 issue with the changing of -- the modification of that particular -- that could lead to something beyond or something further in what we are investigating. We just do not know yet.

THE COURT: Right. But if the Government can operate when they can say I can always go beyond the statute of limitations for an endless period of time to look at things because we don't know if it will find something that then indicates acts in the future, if -- just because we want to, then there really is no limit ever on the Government. It's

not a question of reasonableness or not. It's just, we're doing it, you know.

And so that's why I'm looking -- you know, let me -- I'm not convinced that the DOJ has evidence that anything went awry in 2024, maybe because we're not really talking about it. We've been talking about 2020, but -- and certainly Judge Boulee didn't find that. And it was really beyond the pale of what the magistrate was doing anyway.

Let me also say: I'm not bound by either of them. Judge Boulee is not bound by what he wrote. He can change his mind, you know. I mean, district court judges don't bind anybody, except the parties in the case until they change their mind or the appellate court changes their mind for them.

But we know that there is some limit because the rule says reasonableness, so that implies that there can be some limit.

And Justice O'Connor even within her writing talks about fishing expeditions.

You know, an overbroad fishing expedition is bad and is not allowed. But one that's not overbroad is kind of okay. And the question is, how do we -- how does -- how do I as a judge decide when does it go too far? And that's why I've sort of focused on the statute of limitations.

And I did think it was a good argument that you made about the conspiracy. But if this case, this Grunewald case

is good law, then I'm not sure where I feel about it then. And that would take me back to -- if we're just investigating something that happened in 2020, I mean, we can say all day long, well, that's up to the defense lawyer to raise it later. But I have to decide now, is it reasonable to even be poking around in that area or not. I don't think I've got to wait until the indictment occurs because I'm charged with deciding is it reasonable today.

So anything else you can tell me to give me some comfort that the DOJ is reasonable today in asking about all these -- asking the names of the people that might lead to questions about the 2020 process?

MR. MCCOMB: I mean -- and I think it's difficult to answer that question, particularly now, simply because we don't know what they will tell us as far as what happened or what improprieties may or may not have happened in the 2020 election and whether that is a continuing situation in this current election cycle or in the next election cycles for the Fulton County Board of Registration and Elections. I don't know that we can definitely say.

And I think that's why grand juries are given such broad power. They are given -- in their investigative processes, they're given much more power than what's typically allowed obviously in a trial court, as far as evidentiary concerns that would be allowed in a trial court, much more

power and broad overview and overlook that is typically done in civil cases.

This is a situation where typically grand juries don't even have to move beyond much more than mere suspicion of something -- some irregularity, something for them to fully investigate or look at.

THE COURT: So I'm not sitting here with the premise that the grand jury has made any decisions in this case. I'm just telling you what I think.

I think if we were to go down that road and I were to require the Government to talk about it, I'm not sure that you're going to be able to tell me that the grand jury in the Northern District of Georgia has voted to do anything. I'm not saying they have to, because I don't think they have to.

But when you say grand jury, I'm thinking DOJ. Okay. That's what I'm thinking, because I believe that's the way it's worked. I have been around, you know, these processes for a long time. I've been the grand jury judge before, not in federal court, actually, but in state court many times.

And I'm certainly aware of the roles that prosecutors play, and there's discretion they're given and why they're given that discretion. They're the professionals whose job it is to investigate and charge people with crimes. Of course, the grand jury has got to agree that there's probable cause so that the case can go forward.

But grand juries normally -- I'm not saying they don't have the authority to sit there and indict somebody on their own, but they don't normally do that until the case is brought to them by the state or the federal government prosecutors.

Well, let me ask -- let me kind of stay on this topic, though, and ask it this way: You know, in an ex parte process whereby you provide me with information about things you might know that are not known to the general public, are not known to the plaintiff, is there more that you can tell me that would weigh in on my decision as to whether or not the subpoena that's been set is reasonable? If there is, then I want to take advantage of that process and give you the opportunity to do that.

MR. MCCOMB: May I have a moment, Your Honor?

THE COURT: Sure.

(brief pause)

MR. MCCOMB: Your Honor, we do have an affidavit from the investigative agent, the special agent here that wrote the affidavit for the search warrant. We do have an affidavit --

THE COURT: Are we talking about the same affidavit or a new one?

MR. MCCOMB: A new affidavit, not the search warrant affidavit. A new affidavit that we would like for you to take a look at in camera. So I don't know if you want me to just

hand it over to you --

THE COURT: Well, why don't we wait until you're finished, and then I'll -- and then I'll -- I don't want to look at it while you're talking -- and then I'll review it. I don't have any idea what it's about.

But I do want to say this, is, I'm not sure I agree with Judge Boulee about not making him subject to an interview in Judge Boulee's case. Nobody asked me because it's not my case. And it may very well be that I will require him -- if you're going to rely on a declaration, I'm going to require him to come and at least in an ex parte hearing testify so I can hear what he has to say and so that I can ask him questions about the factual predicate of things he's testifying to. And he'll have to do that under oath as well. So I'm just putting that out there.

I don't -- I always look for the -- for any witness that testifies the basis of what they're saying, rather than they're just saying it.

So I read pretty closely, you know, what happened in the Pitts case in that regard.

No, it's not your time. Not your time. He didn't interrupt you, so -- okay. All right. Go ahead.

MR. MCCOMB: I understand.

Before we leave the statute of limitations argument, I just want to point out to the Court -- and I understand the

Court's concern as to -- relative to what we know now and as to the statute of limitations have been -- I guess have run on the specific -- the crimes that we know now. But again, there's nothing in any case law, in any rule or any law, that suggests that the unreasonableness aspect of unreasonable and oppressive involves statute of limitations.

THE COURT: There's not, I guess. I mean, I haven't looked. But if there's not, unless it says the opposite too, then it just becomes an open question, which it sounds like I would have to weigh with everything else, you know, as to the issue of reasonableness.

MR. MCCOMB: Since the judge has already identified the amount of information that the subpoena is requesting as far as the individuals and their contact information essentially, I wanted to address that briefly as to whether it's reasonable or not.

And again, we are requesting this in the guise of a grand jury subpoena, so meaning the Government is bound by the rules of secrecy of 6(e). We can't share any of the information in the documents outside of our governmental prosecution team. Anybody that is then releasing anybody's name to the media or anything like that, obviously if it's a government attorney, that would be in violation of Rule 6(e). And there are other remedies attached to that that are quite possible.

The reason why -- and there was a question in the petitioner's slide as to why certain things were not requested under the Freedom of Information Act or just the Georgia Public Records Act. And I think that's probably it to -- one of these reasons is using the grand jury subpoena and attaching the Government to its secrecy mandate, I think would hopefully ensure to the individuals whose information we're looking for that: Hey, this is a -- this is an investigation. This is not done in terms to intimidate anyone. This is not done in terms of harassing anyone. This is simply in order to find possible information into some type of criminal wrongdoing.

This -- to go back, it is possible, I guess, we could have requested this through the Georgia, you know, Freedom of Information Act or the Public Records Act, but we didn't. We were doing this to add further protection to the individuals that the petitioners are most worried about.

THE COURT: I'm not really sure the difference, honestly. Because if you requested -- and you can get it. Plaintiff seems to argue that you couldn't have gotten some of this through the Open Records Act or through the -- I'm not sure. Does the Freedom of Information Act apply. It probably doesn't because that's a federal -- that applies to federal entities.

MR. MCCOMB: Yeah.

THE COURT: But assuming that you could have, I mean, I think their point really is more about the feelings that the workers would have that you know who they are and that you have their information.

And, you know, people generally -- unless you kind of work in this area, you don't know what you don't know; right? And I certainly have never -- since I started considering the facts of this case ever thought that there would be like intentional leaking or anything like that that would occur for the DOJ or for any individual actor, who most all of whom are lawyers I'm going to guess. I mean, even many FBI agents are lawyers and who are subject to Bar rules and things like that and want to protect their ability to -- and livelihood and what they went to school for.

But I've looked at it more from the perspective of what the individuals whose information is shared, what they think. And their thinking could be not necessarily -- they might not assume as much good faith as someone like me that has worked in the courts forever, for 30 years now -- not 30 years, 24 years or so.

And there is a lot of cynicism about government. You know, the right, you know, believes that the left is out to treat them incorrectly and wrongly and the left believes that the right's out to treat them wrongly.

And, you know, I certainly hope that Mr. Bishop

enjoyed his time in Congress and that that was great. Man, I'm not sure I would do it today, just because of the way that people communicate what we say about each other on the internet. I just think the realities of the world today has created so much distrust for anyone that's not like us, you know, whatever that might be.

And so from Fulton County's perspective, that's how I've kind of looked at this, is they have a fear that isn't de minimis, I don't think, that, you know, if this information is provided that it's going to affect their ability to get people to work in their system.

And here's what we know: We know that the press will report it and it's going to be another red line banner on the AJC. In fact, it's not going to be limited to that if you look at the parties that are part of the motion to intervene. I mean, it's major news outlets from the United States and around the world, in fact. So I don't know. That weighs on me --

MR. MCCOMB: And my question -- my response to that is, first of all, if the grand jury could be stymied simply because the press was reporting something that they perhaps may have a right to report, if the grand jury can be stymied by that in its search of records and witnesses, then I don't know where that would stop.

And also looking at it too, you know, fear has never

been a bar for a witness to be compelled to the grand jury.

THE COURT: You're right. And I don't disagree with you. But that's why it comes back to the question of reasonableness.

Just a quick story. I'm a big story teller.

When I was nine years old, ten years old, I went to a little private school in Middle Georgia. I saw what I thought was a drug deal happening in the parking lot where all the older students parked, because it was a school of three or four hundred people, K through 12. I rode to school with cousins and stuff.

And my mom went to talk to the police chief to tell them what I knew. And he assured me he'd keep it confidential. Guess how that worked out. About a week later, my mom gets a call that I'm down testifying in front of the grand jury about what I saw. I guarantee you, I would never have made that mistake again as a ten-year-old, you know, nine-year-old, whatever I was.

In any event, so I agree with you, it can't be like a determining factor in all cases. But it does sort of put in context just the decision about reasonableness. If you will, the more reasonable the request -- or put it this way: If you just reached the level of reasonableness, then it probably doesn't matter. But that's why it makes that decision about reasonableness a very important one because --

MR. MCCOMB: Sure.

THE COURT: And I'll say this: I mean, the kind of information you seek is information that companies -- not the names as much, but e-mails and phone numbers -- that companies have been sued for data breaches for.

I just recently dismissed a case like that where there wasn't a social security number and there wasn't a bank account number, but a class action lawsuit was brought where a company had names, e-mails and addresses and that's what was stolen. And there was a lawsuit filed.

And so, you know, it is an issue of, you know, fairly prominent discussion in the general public, because we all get those notices about data breaches. That doesn't mean that the Government would leak it indirectly or other -- directly, intentionally or that there would be a breach that was unintentional, like some bad actor coming in and getting into your system. But there is this reasonable fear that could exist for individuals that that could happen, you know.

MR. MCCOMB: Certainly, but we're also talking about information that they've already willingly handed over to another government entity or a different government entity into this case, the Fulton County Board of Registers and the State of Georgia.

THE COURT: Yeah. I mean, that's valid.

MR. MCCOMB: The grand jury investigation is not

fully carried out until every available clue has been run down and all witnesses examined in every proper way to find whether a crime has been committed or not. That's from Branzburg. And I just wanted to kind of say that as a capoff.

That's essentially all we're looking at here, is to determine all available witnesses. And again, we're just seeking information that they've already handed over to one government entity. And we're seeking information under the grand jury subpoena in order to bind us to secrecy.

Now, obviously each individual witness and the Georgia -- the Fulton County Board of Registers, you know, they are not bound by that. They are free, as we have already seen, to release certain things to the media.

But as far as any harassment coming from conduct from the Government, I just simply don't see that happening without some remedy on the back end for any government attorney that would violate Rule 6(e), so.

Sorry. I lost a little track.

The petitioner has indicated that this request is overbroad and that it would drag thousands of individuals, poll workers mainly, into this particular orbit. And again, to address that -- and I just feel like every time I say this, we're beating a dead horse. But we're only requesting information that they themselves have volunteered for one government entity. And we're requesting this information only

to ascertain if they are possible witnesses to any type of misconduct that could be criminal misconduct.

THE COURT: But the information wouldn't reveal that. You would have to go out and do more.

MR. MCCOMB: That's correct.

THE COURT: You would go talk to them; right?

MR. MCCOMB: Of course; that's correct.

The information by itself won't reveal that, but it is a key or a pathway to get to that destination; same as reviewing certain bank records in a government money or bank fraud case would reveal certain pathways as to who was benefiting and who may be the final criminal enterprise as to who ends up with the proceeds and that sort of thing.

This would simply be a pathway to determine and speak with and interview certain individuals who worked at the polls who may have seen, heard or done something in and of themselves.

And again, we discussed -- as far as the improper purpose, I believe their primary point is -- on the improper purpose is the whole political arena. And again, that is resolved by our confidentiality. You know, that is resolved --

THE COURT: Say that again now.

MR. MCCOMB: That is resolved by our confidentiality. There is no way for us to -- particularly the text message

from the President of the United States to harass individual poll workers naming them in a tweet or something, as they've alluded to in their motion. There's no way -- presumably because there is no way that the President of the United States would get his hands on this particular list.

THE COURT: How can you say that?

MR. MCCOMB: Well, Rule 6(e) is pretty clear as to who can access this information, particularly for a government.

THE COURT: Let me just look at the rule. So 16 -- do you know the subsection?

MR. MCCOMB: I'm sorry?

THE COURT: Is there a subsection of 16 you want to direct me to?

MR. MCCOMB: It is literally the -- I believe it's actually Subsection 2.

THE COURT: Subsection 2?

MR. MCCOMB: Yeah, but pretty sure --

THE COURT: Just give me a second, if you would.

(brief pause)

THE COURT: So Rule 16 is discovery and inspection. Is it Rule 6 or Rule 16?

MR. MCCOMB: 6(e).

THE COURT: Sorry. 6(e). I was hearing 16.

MR. MCCOMB: Oh, 6(e), yes. Six echo.

THE COURT: Okay. Hold on a second.

(brief pause)

THE COURT: We're looking at 6 little E; right?

MR. MCCOMB: That's correct, Your Honor.

(brief pause)

THE COURT: All right. So I see that subset rule that I was referring to earlier when I was talking about gettings notices of who has obtained some information from a grand jury, testimony usually.

Arguably you're right. But I'm -- you know, I'm not -- I'm not saying that this information, whatever it might be, might be provided to the Government or not -- I mean, provided to the President or not. And if it was provided to the President and it was improper to do so and he did disclose that information, I'm not really sure what I would do about it, what I could do about it.

I mean, courts don't have Armies. We've got marshals. I've got marshals in the room next door. They work for the President of the United States. They don't work for me. They just tend to do what I say.

When I was a superior court judge, there was a prospect one time where the sheriff of the county where I served was threatening maybe to do something contrary to what the Courts were saying. We really contemplated, well, what do we do about that. I mean, because who is it that works for us

as superior court judges? It's the sheriff of the county. And if we hold the sheriff in contempt of court for not doing something that we felt like was correct and proper to do, I'm not sure that we have a way to enforce it.

We get into a separation of powers, you know, situation, things that the courts want to avoid if at all possible. So I don't even really like to think about it, so --

MR. MCCOMB: And I certainly sympathize with that. But simply quashing a legitimate subpoena because there's some supposition or perception that something may happen down the road and bind an individual that the Court has no authority over, I don't think holds much weight or standing within the case law that I've seen as to the broad scope of that they're allowed to grand jury subpoenas.

THE COURT: Yes, sir.

So there was this -- there was all this noise in the plaintiff's brief about the involvement of Mr. Bishop in -- I guess vicariously the involvement by you or anyone like you in this case. That doesn't -- I mean, it's possibly because of the nature of this case. I understand it a little bit, about why they're raising an objection.

But isn't it pretty typical for like special agents from the DOJ to come in and prosecute cases, sometimes criminally, sometimes civilly, that have nothing to do with

the venue where the case is pending?

MR. MCCOMB: The case itself has everything to do with the venue. But you're talking about the individuals that come in have nothing to do with the venue.

THE COURT: Yeah. Like if I'm trying an FCC securities frauds case, you know, I've had Washington lawyers that are in there. There may be a local prosecutor assisting them, but they're the ones that are running the case.

MR. MCCOMB: Correct. And I think that's the general practice on most cases exactly like that dealing with securities fraud.

On many, many, many civil rights cases, the Department of Justice will send in or send down or send over attorneys that work in that particular department to handle grand jury, to handle the prosecution. Now, they may have assistance of local -- counsel from the local USAO or -- and they certainly have assistance of local investigators, whether it be special agents for the FBI or whatever particular department that they're using to investigate.

But they will also have individuals from the Department's main headquarters, particularly for the FBI they'll have people from the Hoover building in Washington come down, particularly in civil rights cases. So that is not -- that is not atypical. That happens quite often.

And again, in this particular situation, what we have

is a special prosecutor that has been selected to look into any possible criminal activity involving the 2020 election.

THE COURT: Are we talking about Mr. Bishop or are we talking about the gentleman from St. Louis?

MR. MCCOMB: We're talking about Mr. Bishop.

THE COURT: Okay. Because there's another -- there's somebody out in Missouri that -- I think it was Missouri, that was involved in Judge Boulee's matter, the Pitts matter.

MR. BISHOP: I beg your pardon, Your Honor. Perhaps I just sense that you were looking to me to perhaps answer that.

THE COURT: Yeah.

MR. BISHOP: So forgive me for stepping into the argument.

THE COURT: That's okay.

MR. BISHOP: But yes, that -- you're referring to Tom Albus, who's a United States Attorney in the Eastern District of Missouri. He has the same appointment that I do, so we both are appointed Special Attorney to the Attorney General for this purpose.

THE COURT: Thank you, Mr. Bishop.

MR. MCCOMB: And for the record, I've been appointed Special Assistant United States Attorney for the Northern District of Georgia just for.

THE COURT: And when that kind of stuff happens,

these are normally, I guess, DOJ centric appointments that occur through supervising level folks making a decision that someone else is needed for a particular purpose, and they sign internal documents that gives you the authority to investigate maybe an area that's different.

MR. MCCOMB: That's correct.

This is a situation, yeah, where I -- it's my understanding that the main Justice or the Department of Justice in Washington will reach out to various USAO's across the country and feasibly ask for individuals that may be useful, and then they appoint them as special, or certainly -- in another matter that I'm dealing with, completely wholly unrelated, is a recusal case out of the Southern District of Alabama where they've asked for, you know, a special prosecutor to go in and work that case. Again, nothing to do with this.

I know we've gone back and forth. I just kind of want to kind of close out a little bit in that, just pointing back to what the law is actually asking the Court to do with the grand jury subpoena, you know, the law does indicate that -- the broad-brush that grand jury subpoenas can operate with. And it's only if there's just a -- you know, just a small scintilla that there may be something that can come -- something relevant and reasonable that can come from this particular information that the grand jury seeks.

And this is what we have here; right. We are simply looking for -- and I know the Court has already asked us to later brief the special limitations. So I want to stay away from the special limitations argument, as we sort of dealt with that quite a bit now.

But, you know, removing that then from the judge's purview, you know, looking at this as to whether it's reasonable, you know, there is no other way for the United States to obtain the names and content information of possibly a necessary witness then through this subpoena, you know.

So as to -- as it relates to the question, you know, if there is a lesser way to do this, there really isn't. We're simply asking for the employees and volunteers who worked with or had access to the ballots and the ability to contact them and question them as witnesses. And there is no other way beyond a grand jury subpoena in which to do that.

THE COURT: So on a related point, the plaintiff says -- and I'm paraphrasing their argument, but you may be asking that, but you're asking for a lot more than that because you're asking essentially for any and all without limitation; and to the extent, for example, that it -- that one question includes bus drivers and mobile vote locations, that that's overbroad.

I'm assuming you don't really want bus driver information, but maybe you do. I don't know.

If it were overbroad and on the edges, you know, rather than some massive way, what do I do with that?

MR. MCCOMB: You know, based on the case law and what we've seen in Rule 17, you know, the Court has the ability to quash or modify the subpoena; right. So if the Court feels that certain areas are overbroad, it's within the Court's ability not to simply quash the subpoena and forget all about it but to narrow the scope if the Court feels that that would be easier and more palatable to swallow in terms of reasonableness.

And from that narrow scope, if we need further information based on the interviews and witnesses, then we can then request through another subpoena. But the Court has that ability, not to simply just quash the subpoena, but if necessary to tailor it or narrow it down.

Again, I'm not suggesting that this needs to happen in this particular -- for this particular subpoena, as we are only asking for the individuals that worked with the Fulton County electors and ballots for the 2020 election. We are not seeking every single ballot worker or poll worker in Georgia. We're not seeking every individual that works for the Fulton County government. We're not seeking the names of all the public services -- public service people from Fulton County. We have narrowly tailored it only to specifically those who have worked the polls and had access to the ballots during the

2020 election.

However, if the Court does feel that certain modifications need to be made, then it would seem under Rule 17 that that is a possibility that the Court can do rather than just grant petitioner's motion to quash.

Can I have a moment, Your Honor?

THE COURT: Yes, sir.

You're done?

MR. MCCOMB: No. Can I have a moment?

THE COURT: Oh, yeah, of course. Yes.

(brief pause)

MR. MCCOMB: Beyond what we have presented today, we obviously stand on our --

THE COURT: Thank you.

You had something you wanted to give me, though. I wanted to just remind you of that.

MR. MCCOMB: Yes.

THE COURT: So this is the affidavit of -- what's the gentleman's name?

MR. MCCOMB: Special Agent Evans.

THE COURT: Okay. And so what I will do with this is I will look at it, my law clerk, we'll look at it together. And I think I need to preserve it in the record under seal if I don't -- and I wouldn't disclose anything to anyone, including the plaintiff, without an opportunity to be heard on

it. But I would probably file it under seal in my -- in our docket to only be opened by me or by the appellate court, unless I decide to do something more. And if I did something more, I would talk about it before I would do that.

MR. BISHOP: Your Honor, if I might on that?

THE COURT: Yes, sir.

MR. BISHOP: We believe the full in camera showing would include an explanation of attendant circumstances that the affidavit relates to. We think you probably have to hear from us as well as part of the in camera showing.

THE COURT: Okay. So you need a hearing then with --

MR. BISHOP: I think it would be -- for you to get the full picture, you'd have to -- I think it may be enough on its face, but certainly I think to set forth why -- how it relates may be helpful to have an argument in camera along with the affidavit.

THE COURT: Okay. So I've just got to see what it is before. That raises the prospect that, you know -- without looking at it, it's hard to say, but that there may need to be some disclosure to opposing counsel with a protective order so that I can hear a different perspective so I'm not only hearing one perspective on that. But I'm not going to make any decision about that without having read it myself.

Let me also just say a little bit about timing. I mean, we're -- I'm not going to be making a decision this week

on this case. If possible -- it's possible that I could next week maybe, but I'm not sure, you know -- and if I -- from a timing perspective if I can.

There's also a couple of other scheduling issues. My law clerk is headed overseas in a few weeks to go to her brother's wedding, so that -- if I'm not able to make a decision by the end of next week, that could impact things a little bit too.

MR. BISHOP: May I make one more inquiry of the Court?

THE COURT: Yes, sir.

MR. BISHOP: We had a brief -- both sides opened with a motion that included a brief effectively. We responded. And then today there was a lot of additional authority cited in the -- for the first time in the PowerPoint presentation that was submitted. The Court has asked us for supplemental briefing on the Grunewald case in particular.

Would the Court also allow us in that supplemental briefing to cover the other authorities that were disclosed for the first time?

THE COURT: Sure. Absolutely. I mean, I don't think I'm going to be ruling right away, so yeah, there's time for that. But I would ask that -- let's just say within 14 days of today's date that you file any supplemental briefing --

MR. BISHOP: Thank you, Your Honor. I just want to

make sure we stay within whatever scope the Court intended.

THE COURT: Our briefing rule is 25 pages. It's usually for initial brief. But this is a pretty big issue, so I'll give you the full 25 pages.

MR. BISHOP: Thank you, Your Honor.

MR. MCCOMB: And I want to follow up. There was a prior ruling regarding the seal/unseal nature of this hearing.

Is there any reason that the Court would want us to go ahead and respond to, as planned, the petitioners' motion to unseal as well as --

THE COURT: I mean, if you think it will change my mind, yeah. But, I mean, I've already -- I've already made that ruling. And so stuff will be available until -- I mean, you had some basic arguments, but your arguments are pretty general, you know, and not specific. If there's something that's more specific you haven't said, you should probably tell me soon because there are going to be other things filed in this case. And so that's up to you.

MR. MCCOMB: Okay.

THE COURT: I don't anticipate reaching a different decision, but you might just be the best writer in the world and you may convince me that I was wrong. And if so, then I would revisit it.

All right. Thank you.

All right. Anything else from the plaintiff? You

had -- earlier you wanted to --

MR. GHALI: Your Honor --

THE COURT: Come to the microphone, please.

MR. GHALI: Yes. Just a few housekeeping matters, which is --

THE COURT: Oh, as far as housekeeping, let me say something.

So there's two sides to this coin, not just because people have different perspectives, but there's also the motion filed by the Government to enforce a subpoena. So the decision that I make is going to be one side or the other of both motions; right. So it will deal with both motions whenever I reach that decision.

MR. GHALI: So I guess in order of the Court raising -- so there's this cross-motion in the title. So I guess, could we set just a briefing schedule then, supplemental briefing, 14 days? Could we have an opportunity to reply?

THE COURT: Sure. I would like both sides to file anything you want to file within 14 days. And then if you want to respond to what the other person has said that's new -- I don't need somebody to say the same thing again, but then I'll give you another 14 days to do that. That's roughly going to be the timeframe we have with Ms. Wofford being out of town, my middle son is graduating from grad school in

California second week in June, and I'm going to be going to that for -- I'll be out of town for about a week myself. I mean, that would probably -- briefing schedule would probably accommodate all of that.

MR. GHALI: Thank you, Your Honor.

Secondly, in terms of the ex parte affidavit, I just want to make sure we're making our record that we -- the Court had proposed a world in which there's attorneys' eyes only, but we just -- we'd object to the ex parte consideration of the affidavit if there is an opportunity for something like an attorneys' eyes only review, especially to the extent that the Court considers in any way -- I know the Court has said that you want to look at it first and then you'll get back to the parties, but I just want the record -- I don't want the record to read like we've acquiesced in the ex parte process.

THE COURT: I understand. From a due process perspective, you want to be able to make your argument. I gotcha.

MR. GHALI: Absolutely, Your Honor. Thank you.

THE COURT: All right.

MR. GHALI: And then, third, I'd like to move in Exhibits 1 through 11, which are --

THE COURT: I've got 11.

MR. GHALI: That's in that binder. I've referenced them. I can walk through them if it's helpful. The rules of

evidence don't apply to this proceeding.

THE COURT: Well, let me just kind of go over it.

So document Number 1 was the grand jury subpoena.

Document Number 2 is the response to the order.

MR. GHALI: That never actually came up. It's just a filing the Government made in Pitts.

THE COURT: Okay. All right. I'm not sure I'm going to put that on our docket. I mean, I can take judicial notice of anything anyway.

MR. GHALI: That's fine.

THE COURT: And then A and B were -- what are those exhibits to?

MR. GHALI: That was the respondent's exhibit from Pitts, where it's Judge Salinas interfacing with Special Agent Evans about revising the affidavit to say, hey, add language that says if there was a crime, then it would be -- if there was intentionality, then it would be a crime.

THE COURT: So I'll look at it and figure out what we're going to do with that.

Number 4 is an affidavit for the search -- that's the original search warrant?

MR. GHALI: Yes.

THE COURT: Okay.

MR. GHALI: Exhibit 5 is an excerpt of the testimony from the Pitts hearing involving the election expert Ryan

Macias.

THE COURT: Okay.

MR. GHALI: Exhibit 6 is the declaration that was submitted in Pitts attached to the amended motion.

7 was just a reference to the polling locations. It just was a demonstrative.

THE COURT: Was -- so you showed on the screen one page, but this is more than that. It's five or six pages of -- and these are referenced to be all the -- represented to be all the polling locations from 2020 for Fulton County?

MR. GHALI: No. This is just actually today. This is just the May 19th, 2026. It's just an example to the Court of churches, schools, et cetera.

THE COURT: Current --

MR. GHALI: Current.

THE COURT: Okay. So I guess the point on that was the sensitive nature of these locations and --

MR. GHALI: Yes.

THE COURT: -- maybe the similar interests that workers there might have.

Number 8.

MR. GHALI: 8, Department of Justice memo by the former Deputy Attorney General identifying threats to election workers as a threat to democracy and the need to ensure that election workers and volunteers feel protected.

THE COURT: Do you want to tell me the name of this Deputy Attorney General? Because it's not referenced otherwise. Obviously they must recycle the letterhead because it's --

MR. GHALI: Yeah. I believe it's Lisa Monaco.

THE COURT: Okay.

MR. GHALI: Exhibits 9 and 10 were the prior documents of Mr. Bishop.

THE COURT: Okay.

MR. GHALI: Which really, again, were for just demonstrative purpose to respond to this argument --

MR. BISHOP: If Your Honor is contemplating putting things in the record as evidence received, we would -- I guess we'd object to that, Your Honor. None of this was forecast. It was handed to us as we walked in here today. And the last two are --

THE COURT: What would be the objection exactly?

MR. BISHOP: Well, the objection to the last two are relevance, Your Honor. I mean, unless --

THE COURT: I mean --

MR. BISHOP: If you were in the General Assembly, if they were to get to floor debates to offer it in a proceeding, that would be --

THE COURT: I don't know about North Carolina, but they don't keep those kinds of records in General Assembly in

Georgia. They -- if you submit something in writing, they might. And I know that's the way the Congress is.

So it's -- I'm not saying their argument's right, but it supports their argument, so I'm going to receive it for that purpose. You know, it is what it is. And I have to decide whether it's important or not.

Y'all heard what I said at the beginning of the hearing, so I don't know that it matters what you said as a private citizen -- might have been a public official, but it wasn't in this role.

So I will tell you, I was appointed to the superior court bench in Georgia when I was a state senator by a Democratic governor. I was a Republican. Had formally been a Republican party chairman.

I thought when I went to my confirmation hearing that I would have a pretty easy go. And it was anything but, because it was all -- I had been a judge for at that time 16 years, 17 years maybe. That's not what the senators wanted to talk about. They wanted to talk about things I said when I was in politics.

So I get where you're coming from. Because it's just a different role, you know. They had no criticism for the most part about me being a judge. It was all about me being a Republican senator, which was not relevant to where we were. So I understand your point.

MR. BISHOP: Thank you, Your Honor.

THE COURT: All right. So I'll have my law clerk process these. We're going to pull them out of the folder, obviously, and we'll place them as exhibits to your argument today.

MR. GHALI: Thank you, Your Honor.

Can I have 60 seconds to just make two points?

THE COURT: Sure.

MR. GHALI: One is, just going back to the Court's focus on textualism and the phrase "unreasonable and oppressive", I think one way the Court can think about this is, to comply with the subpoena is very costly for Fulton County in two ways. And one is, the cost on poll workers themselves in terms of the effect on them; and secondly, their ability to recruit election workers. And that's just one way to think about that text, this specific problem, and narrow way to quash this subpoena.

The second thing -- and I just also want to say this just on behalf of my client -- when you have poll workers that show up, I don't think they think of themselves as giving up their rights in the sense of people knowing where they live, their phone number, that e-mail address, et cetera. So in terms of just those are protections that are in the Open Records Act, that's a right you don't lose just because you volunteer in public, that that's going to be disseminated

broadly.

And then lastly, before the Court makes any decision, I just want the Court to know, I am a Bulldog by marriage and Mr. Josephson is a DoubleDawg. So I just want the record --

THE COURT: Who's a DoubleDawg?

MR. GHALI: Mr. Josephson.

MR. JOSEPHSON: Undergrad.

MR. GHALI: Undergrad. We have some Dog, we have Dogness spread out on this side.

Thank you very much for your patience and for hearing us. We really appreciate your time, Your Honor.

THE COURT: So I recused from all cases involving the University of Georgia because I could never rule against them. I'm just being honest.

But I did have a case when I was on the Georgia Court of Appeals where the ramblin' wreck, which is the Georgia Tech car, if you're -- you might not know about it in North Carolina, but people in Georgia certainly do -- where it fell off a flatbed truck when it was going to Savannah and had to be rebuilt. And Georgia Tech, the engineering school, you know -- Georgia now has one as well, but Georgia Tech is the preeminent engineering school in the South.

It outsourced some of the work. And they put handles on the ramblin' wreck for the cheerleaders to hold as the car is running out on the field.

Well, there's this club called the Ramblin' Wreck Club that takes care of the car. And one of the perks of doing that is you get to ride the ramblin' wreck around Midtown Atlanta around the campus of Georgia Tech on Fridays before football games.

And on one Friday before a football game, one of the ramblin' wreck guys who takes care of the car was hanging onto the car by the handle that was installed and it came loose, he fell and he was severely injured. And he sued Georgia Tech and the Board of Regents for a lot of money and won.

So the case was on appeal. I don't remember what the issues were on appeal. I did not recuse from that case. I wrote the opinion in that case.

So Georgia, yeah, I'll recuse.

MR. GHALI: How did you rule?

THE COURT: Oh, Georgia Tech wasn't happy. But it was really the University of Georgia system not Georgia Tech, anyway.

Yes, sir, Mr. McComb. Thank you.

If you'll just give it to Ms. Wofford.

Thank y'all for coming -- yes, sir.

MR. DUFFEY: Your Honor, Exhibit 3A is the e-mail exchange with the magistrate judge. And it is in the form that we got it from DOJ on the Pitts case. However, my recollection is that they redacted a little bit more

information before it got on the docket because it's an exchange and it has I think the AUSA and the agent's cell phone numbers --

THE COURT: So this version has that?

MR. DUFFEY: This version I think does not have that. I'm not positive. But before that got on the docket, I wanted a chance to confer with them and make sure that whatever gets on the docket matches those redactions. They were the ones that made the decision what to pull out, but I didn't want to kind of go beyond --

THE COURT: Whose cell phone number was it?

MR. DUFFEY: I think it's -- I know it's got the AUSA and the agent's numbers. I don't believe this version has magistrate Judge Salinas's number on it, but I just wanted to be mindful of that --

THE COURT: Well, that does raise a point, which isn't necessarily related to some of the issues in this case. Our clerk's office will reject documents for filing that have personal identifying information like phone numbers and addresses. They will not take it to be filed because of privacy issues. So I mean, that's sort of one of the things that we're talking about in this case.

But I'll charge Ms. Wofford with looking at it as well. If y'all will look at it just to make sure. And if you think there's something that shouldn't be there -- she'll take

it with her to Atlanta today -- tonight and then go over all the stuff before we file it in the clerk's office.

MR. DUFFEY: My recollection is that this is what was admitted, but on the docket was a little bit further redacted --

THE COURT: Okay. Sounds great.

I just want to say, thanks for coming to Rome. I'm sorry. It's a little bit harder flying into Atlanta to get to Rome, but this is just where I was.

Thank you.

(The proceedings concluded at 5:18 p.m.)

Reporter's Certification

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/Geraldine S. Glover, RPR, CRR, RCR
Official Court Reporter
United States District Court
Northern District of Georgia

Date: May 25, 2026

MR. BISHOP: [20] 4/2 4/5 58/5 58/7 58/9 58/15 81/9 81/13 81/16 86/5 86/7 86/12 87/9 87/12 87/25 88/5 93/12 93/18 93/21 95/1
MR. DUFFEY: [4] 97/22 98/5 98/12 99/3
MR. GHALI: [56] 3/12 3/15 6/24 8/1 16/20 26/18 26/23 27/5 27/11 29/2 30/4 30/24 32/16 33/7 33/14 33/24 34/1 36/15 37/6 38/13 39/24 41/8 45/22 45/25 46/6 47/17 48/16 55/18 55/20 56/5 60/11 89/2 89/4 89/14 90/5 90/19 90/21 90/24 91/5 91/10 91/13 91/22 91/24 92/3 92/11 92/15 92/18 92/22 93/5 93/7 93/10 95/6 95/9 96/6 96/8 97/15
MR. JOSEPHSON: [1] 96/7
MR. MCCOMB: [60] 3/17 3/20 3/22 9/13 9/16 10/20 12/20 13/17 14/4 14/7 17/5 56/12 56/15 56/19 56/25 57/2 57/16 57/18 58/25 59/22 60/6 60/17 61/17 61/20 62/8 63/8 65/13 67/15 67/18 67/23 68/23 69/12 70/25 72/19 74/1 74/19 74/25 76/5 76/7 76/24 77/7 77/12 77/15 77/18 77/23 77/25 78/4 79/9 80/2 80/9 81/5 81/22 82/6 84/3 85/9 85/12 85/17 85/20 88/6 88/19
MS. FEHLAN: [12] 5/1 5/3 5/5 5/7 5/10 5/12 14/10 14/12 14/14 14/18 14/20 14/22
THE COURT REPORTER: [1] 33/23
THE COURT: [153]

/

/S/Geraldine [1] 99/18

0

01 [1] 1/5

1

10 [1] 93/7
11 [2] 90/22 90/23
12 [1] 73/10
135 [1] 15/16
14 [4] 87/23 89/17 89/20 89/23
15 [2] 26/13 27/2
15,000 [1] 24/15
16 [6] 77/10 77/13 77/21 77/22 77/24 94/17
17 [6] 22/9 42/21 51/2 84/4 85/4 94/18
1714 [1] 1/24
17th [1] 28/16
19 [1] 1/11
1960 [1] 44/6
1991 [1] 11/2
19th [1] 92/12
1:26-cv-02777-WMR [1] 1/6
1:30 [1] 1/11
1:45 [1] 6/2

2

2,000 [1] 31/12
20 [1] 27/6
2000 [3] 19/22 21/9 21/19
2019 [1] 58/5
2020 [19] 24/20 30/16 31/4 31/13 44/13 46/19 47/6 48/14 53/6 54/22 59/25 64/6 65/3 65/12 65/16 81/2 84/19 85/1 92/10
2021 [3] 40/7 45/2 45/4
2024 [8] 53/3 53/16 53/18 53/21 53/23 58/5 63/16 64/5
2025 [1] 55/1
2026 [3] 1/11 92/12 99/21
2026R00350-01 [1] 1/5
23 [1] 21/25
24 [1] 71/20
25 [3] 88/2 88/4 99/21
26-mi-88 [1] 3/6
2777 [1] 3/5
27th [1] 53/9
2:45 [1] 6/2

3

3,000 [2] 41/14 54/1
30 [3] 27/5 71/19 71/19
30303-3309 [1] 1/24
3309 [1] 1/24
3:58 [1] 56/7
3A [1] 97/22

4

4th [1] 19/21

5

5:18 [1] 99/11
5th [1] 19/21

6

60 [1] 95/7
678 [1] 15/16

7

7 o'clock [1] 19/5
75 [1] 1/24
7th [2] 45/2 45/4

8

84 [1] 49/24
88 [1] 3/6

A

ability [13] 10/6 38/20 39/4 42/22 55/8 59/18 71/13 72/10 83/14 84/4 84/7 84/14 95/15
able [8] 5/20 10/2 13/24 36/6 59/17 66/12 87/6 90/17
abortion [1] 38/4
about [136]
above [1] 99/17
above-entitled [1] 99/17
absolutely [6] 16/23 39/24 44/19 45/4 87/21 90/19
abuse [2] 27/23 42/24
abusing [2] 43/21 44/7
abusive [1] 43/9
accept [1] 31/10
access [6] 14/25 15/23 15/25 77/8 83/14 84/25
accommodate [1] 90/4
account [2] 35/24 74/8
achieve [1] 46/20
achieved [1] 46/11
acquiesced [1] 90/15
across [4] 8/12 17/12 19/1 82/9
act [13] 40/10 42/12 42/14 42/19 45/16 45/17 70/3 70/4 70/15 70/15 70/21 70/22 95/24
act that [1] 40/10
acting [1] 40/16
action [2] 16/13 74/8
actions [4] 15/21 16/3 16/8 16/8
activity [1] 81/2
actor [2] 71/10 74/16
acts [4] 45/15 60/14 60/18 63/24
actual [4] 9/9 33/5 33/7 61/11
actually [7] 16/5 50/24 66/19 77/16 82/19 91/5 92/11
add [3] 41/17 70/16 91/15
additional [1] 87/14
address [22] 16/24 24/25 26/24 28/18 35/1 35/17 41/14 42/11 42/14 42/15 42/17 51/9 51/11 51/12 51/15 51/17 52/24 55/25 61/22 69/15 75/22 95/22
addresses [4] 25/1 25/6 74/9 98/20
adequate [1] 50/16
administration [2] 24/23 55/2
administratively [1] 8/12
admissible [1] 23/11
admit [1] 23/24
admitted [1] 99/4
adopted [1] 21/16
advantage [1] 67/13
advocate [1] 42/3
affairs [1] 25/20
affect [3] 36/7 39/5 72/10
affected [1] 58/19
affecting [1] 17/19
affidavit [26] 48/20 48/23 49/1 49/14 49/24 50/19 52/11 52/16 53/4 53/17 59/12 59/14 67/18 67/20 67/20 67/21 67/23 67/24 67/24 85/18 86/9 86/16 90/6 90/10 91/15 91/20
affirmative [3] 46/25 47/3 61/23
after [5] 21/9 60/18 60/20 61/8 61/13
afternoon [2] 3/2 5/21
afterward [1] 46/12
again [27] 19/1 28/13 28/21 31/2 32/17 33/14 42/9 48/13 49/4 49/9 49/13 49/18 50/7 54/23 69/3 69/17 73/17 75/6 75/21 76/18 76/20 76/23 80/25 82/15 84/16 89/22 93/10
against [2] 34/23 96/13
age [1] 21/11
agencies [1] 35/16
agency [1] 11/13
agent [7] 28/15 28/21 30/6 67/19 67/19 85/20 91/14
agent's [2] 98/2 98/13
agents [5] 10/3 49/22 71/11 79/23 80/18
aggressive [1] 38/7
ago [4] 14/17 17/8 18/23 21/25
agree [9] 11/17 18/12 24/22 25/11 45/12 47/17 66/24 68/6 73/19
agreement [1] 7/2
agrees [2] 6/8 18/13
ahead [8] 14/19 14/21 15/3 29/6 33/13 58/24 68/22 88/9
AJC [1] 72/14
ajc.com [1] 19/2
akin [1] 12/17
Alabama [3] 3/21 56/11 82/14
Albus [1] 81/17
alert [3] 13/19 13/24 26/4
alerting [2] 13/1 17/13
Algorithm [1] 53/8
all [76] 3/2 3/4 3/14 4/10 5/14 5/19 6/11 8/9 8/11 9/11 11/9 13/7 13/12 14/5 14/8 14/15 14/19 16/15 17/3 20/17 25/22 25/23 26/5 26/5 26/15 26/17 29/18 31/15 31/16 35/11 35/13 37/6 38/25 39/5 40/23 42/15 48/7 49/7 49/16 50/19 53/20 55/19 56/5 56/8 56/18 58/22 61/19 65/3 65/10 68/22 71/10 72/20 73/8 73/20 74/12 75/2 75/5 75/6 78/6 79/6 79/17 83/20 84/7 84/22 88/24 88/25 90/4 90/20 91/7 92/9 92/10 94/17 94/23 95/2 96/12 99/1
all First [1] 38/25
Allan [1] 2/5
allegation [2] 53/16 54/3
allegations [4] 9/23 49/7 52/16 53/15
allege [1] 46/16
allow [1] 87/18
allowed [4] 64/20 65/24 65/25 79/15
allows [2] 8/14 18/11
alluded [2] 10/24 77/3
along [1] 86/15
already [12] 49/19 59/11 61/11 61/22 63/15 69/12 74/20 75/7 75/12 83/2 88/12 88/12
also [25] 6/21 7/8 8/24 13/12 17/20 19/17 21/24 25/13 26/20 29/8 30/7 36/22 47/13 47/17 48/15 48/16 64/9 72/25 74/19 80/20 86/24 87/4 87/18 89/9 95/18
altruism [1] 18/18
always [5] 6/19 22/22 62/16 63/21 68/16
am [6] 3/12 4/2 5/5 5/7 8/7 96/3
ambit [1] 11/14
amended [1] 92/4
Amendment [15] 27/20 36/5 36/12 36/13 37/3 38/18 38/23 39/1 39/12 39/25 40/3 51/12 51/13 51/22 62/13
Americans [1] 38/15
amount [3] 27/8 27/9

A
amount... [1] 69/13
analysis [2] 23/5 41/18
ancillary [1] 15/9
anecdotal [1] 29/23
animus [2] 55/4 59/2
anomalous [1] 29/12
another [10] 11/6 25/4 26/3 29/14 72/13 74/21 81/6 82/12 84/13 89/23
answer [2] 65/14 81/10
answers [1] 4/9
anticipate [2] 19/13 88/20
anticipated [1] 4/15
any [45] 6/1 7/22 7/23 10/4 10/10 10/21 11/15 11/20 12/19 16/22 17/2 17/17 27/24 34/23 37/2 43/24 45/3 45/6 45/13 46/14 49/14 54/6 54/10 55/14 55/14 55/24 66/8 68/5 68/16 69/4 69/4 69/4 69/19 71/10 73/19 75/14 75/16 76/1 81/2 83/20 86/23 87/24 88/8 90/12 96/2
anybody [3] 16/16 64/12 69/21
anybody's [1] 69/21
anymore [1] 55/1
anyone [9] 23/25 31/3 53/13 54/6 70/9 70/10 72/5 79/19 85/24
anything [26] 6/9 14/5 16/19 17/1 17/3 25/12 36/25 42/3 47/20 49/11 52/23 53/10 53/13 54/14 55/17 59/15 64/4 65/9 66/13 69/22 71/9 85/24 88/25 89/20 91/9 94/16
anyway [6] 9/5 9/9 10/19 64/8 91/9 97/18
appeal [2] 97/11 97/12
Appeals [2] 51/13 96/16
appear [1] 28/13
appears [1] 20/4
appellate [2] 64/13 86/2
apples [2] 39/22 39/22
applies [3] 51/3 61/1 70/23
apply [6] 41/12 41/19 42/20 61/15 70/22 91/1
appoint [2] 21/2 82/11
appointed [6] 3/18 21/8 33/2 81/19 81/22 94/11
appointment [2] 12/3 81/18
appointments [1] 82/1
appreciate [2] 26/25 96/11
approached [1] 46/24
appropriate [2] 28/5 48/21
approving [1] 49/22
April [1] 28/16
April 17th [1] 28/16
arbitrary [1] 51/1
are [97] 3/21 4/1 5/11 7/1 8/9 8/10 9/17 12/25 13/14 13/24 14/24 18/2 19/17 19/22 20/2 22/12 24/21 24/23 25/20 26/14 26/22 26/23 28/1 30/5 32/2 32/19 32/20 32/22 34/2 34/6 35/12 35/14 35/16 35/21 36/23 37/13 37/18 37/18 38/3 38/11 38/11 39/1 39/3 40/3 40/8 40/23 44/17 48/1 48/25 49/5 50/19 54/20 56/13 56/13 57/14 61/3 62/3 62/16 62/22 63/12 63/18 65/21 65/22 67/9 67/9 67/21 69/17 69/24 69/24 70/17 71/3 71/10 71/11 71/12 72/15 75/12 75/12 76/1 80/7 80/8 81/3 81/3 81/19 82/1 83/1 84/6 84/17 84/19 88/14 88/17 90/22 91/11 92/9 93/16 93/18 95/23 95/23
area [8] 38/7 39/5 40/11 56/13 58/12 65/6 71/6 82/5
areas [2] 21/11 84/6
aren't [3] 6/21 30/8 30/10
arena [1] 76/20
arguably [2] 8/9 78/10
argue [3] 6/18 45/14 70/20
argued [2] 39/12 45/12
arguing [1] 14/16
argument [32] 13/21 27/21 37/4 37/25 38/11 40/21 40/25 41/3 42/11 47/2 47/5 51/9 51/15 51/21 51/21 53/1 54/16 55/1 56/2 60/1 62/9 63/3 64/24 68/24 81/14 83/4 83/18 86/15 90/17 93/11 94/4 95/4
argument's [1] 94/3
arguments [8] 12/16 27/20 40/18 47/9 55/12 55/15 88/14 88/14
arises [1] 38/17
Armies [1] 78/17
arose [1] 10/21
around [8] 6/2 22/3 56/1 65/6 66/17 72/17 97/3 97/4
arrest [1] 47/22
articulate [1] 39/13
articulated [1] 36/20
as [141]
ascertain [1] 76/1
aside [1] 47/14
ask [10] 10/19 14/25 55/20 58/21 61/13 67/6 67/7 68/12 82/10 87/23
asked [9] 28/13 32/7 33/18 53/14 60/3 68/8 82/14 83/2 87/16
asking [11] 34/19 52/7 62/11 65/10 65/11 82/19 83/13 83/19 83/19 83/20 84/18
asks [1] 30/15
aspect [1] 69/5
Assembly [5] 21/15 21/16 31/14 93/21 93/25
assert [1] 37/10
assigned [2] 3/5 9/9
assignment [1] 39/10
assist [1] 62/14
assistance [3] 47/14 80/16 80/17
assistant [3] 3/18 29/13 81/23
assisting [1] 80/7
associate [1] 40/4
association [2] 36/9 38/15
assume [3] 40/18 59/24 71/18
assuming [3] 60/12 71/1 83/24
assumption [1] 10/17
assure [1] 20/17
assured [1] 73/13
ATLANTA [12] 1/2 1/24 5/18 5/19 8/6 17/10 17/12 36/23 39/7 97/4 99/1 99/8
attached [3] 16/7 69/24 92/4
attaching [1] 70/6
attachment [4] 28/17 28/24 29/12 30/14
attachments [1] 30/9
attendant [1] 86/8
attorney [14] 2/8 3/18 4/3 5/15 29/14 38/7 69/23 75/16 81/17 81/19 81/19 81/23 92/23 93/2
attorneys [2] 8/14 80/14
attorneys' [3] 13/13 90/8 90/11
atypical [4] 29/15 29/19 30/3 80/24
audits [1] 21/22
AUSA [5] 28/22 30/5 56/10 98/2 98/12
AUSA's [1] 29/25
authorities [1] 87/19
authority [10] 31/23 32/10 41/9 42/3 43/12 44/7 67/2 79/12 82/4 87/14
authorize [2] 28/9 51/25
available [9] 4/18 16/7 16/14 17/15 28/20 42/13 75/1 75/6 88/13
avenues [1] 55/22
avoid [2] 21/18 79/6
aware [3] 31/24 32/11 66/20
away [3] 58/23 83/3 87/22
awfully [1] 31/18
awry [1] 64/5
B
back [18] 17/23 22/3 32/12 35/24 41/2 45/17 46/3 46/4 52/3 62/21 65/2 70/13 73/3 75/16 82/17 82/19 90/13 95/9
backdrop [1] 36/22
background [1] 34/22
backwards [1] 60/16
bad [2] 64/19 74/16
balance [1] 34/22
balancing [1] 41/17
Ballard [4] 2/15 5/12 5/13 14/23
ballot [9] 44/22 53/5 53/6 53/11 53/24 54/8 62/18 62/21 84/20
ballots [9] 17/22 44/23 46/10 46/10 52/3 53/13 83/14 84/19 84/25
banc [1] 12/4
bank [4] 43/3 74/7 76/10 76/10
banner [3] 17/12 19/1 72/13
bar [2] 71/12 73/1
barely [1] 24/13
barred [1] 44/19
bars [1] 27/24
based [8] 27/25 34/21 35/2 56/13 58/8 59/10 84/3 84/12
basic [3] 56/20 56/22 88/14
basically [4] 23/13 45/23 46/1 60/10
basis [7] 7/8 7/22 20/9 36/6 40/18 50/17 68/17
be [167]
bear [1] 59/15
beating [1] 75/23
beats [1] 24/15
became [1] 22/1
because [77] 3/24 4/14 6/12 8/10 9/4 9/10 9/22 11/24 12/1 12/13 13/5 16/6 16/17 17/10 17/17 17/24 19/7 19/12 19/24 22/3 24/18 25/18 26/1 27/24 36/12 36/21 38/6 39/18 40/17 45/13 47/5 47/10 48/7 48/19 49/10 51/16 51/17 52/6 53/16 54/17 54/19 56/2 59/6 61/11 62/19 63/23 63/24 64/5 64/14 65/7 65/14 66/14 66/16 68/8 70/19 70/23 72/2 72/21 73/9 73/25 74/12 77/4 78/25 79/10 79/20 81/6 83/20 88/17 89/8 93/2 93/3 94/17 94/21 95/24 96/13 98/1 98/20
become [2] 12/24 33/21
becomes [2] 8/24 69/9
been [35] 3/17 6/6 9/23 17/13 17/14 17/17 18/14 19/20 19/21 22/3 24/23 30/18 37/7 40/20 48/9 51/21 53/18 53/25 59/11 59/14 60/14 64/6 66/17 66/18 67/12 69/2 73/1 74/5 75/1 75/3 81/1 81/22 94/9 94/13 94/17
been in [1] 19/20
before [29] 1/10 8/2 16/6 16/17 20/24 21/5 23/12 28/25 32/10 32/12 32/13 32/22 33/9 36/18 36/18 45/4 45/6 49/22 55/2 66/18 68/24 86/4 86/18 96/2 97/5 97/6 98/1 98/6 99/2
beforehand [1] 43/20
beg [1] 81/9
begin [1] 27/12
beginning [1] 94/7
behalf [13] 2/4 2/10 2/14 3/10 3/16 6/25 8/22 9/11 14/23 24/4 37/4 54/22 95/19
behind [3] 21/12 21/25 50/17
being [19] 5/19 6/9 10/2 10/25 13/24 17/19 25/1 25/2 25/13 30/8 30/17 36/24 40/8 47/12 51/10 89/24 94/23 94/23 96/14
belabor [1] 28/3
belaboring [2] 30/4 49/18
believe [12] 5/7 16/12 20/5 40/11 40/12 40/12 66/16 76/19 77/15 86/7 93/5 98/13
believes [4] 7/10 34/22 71/22 71/23
bench [1] 94/12
benefiting [1] 76/12
best [2] 14/20 88/21
between [4] 18/8 18/12 55/7 60/14
beyond [8] 22/14 63/17

B
beyond... [6] 63/21 64/7 66/4 83/16 85/12 98/10
big [4] 21/11 24/12 73/5 88/3
biggest [1] 24/12
bind [3] 64/11 75/9 79/12
binder [1] 90/24
Birmingham [3] 56/14 56/15 56/16
Bishop [16] 2/11 4/1 4/6 54/17 54/19 57/21 58/1 58/3 59/4 60/2 71/25 79/18 81/3 81/5 81/21 93/8
bit [14] 5/20 6/3 22/16 56/3 56/21 56/24 79/21 82/18 83/5 86/24 87/8 97/25 99/4 99/8
black [1] 41/20
Blackmun [1] 23/3
blanketly [1] 7/13
blow [1] 61/4
Board [16] 3/7 6/25 7/17 11/7 12/21 13/25 33/1 33/3 35/8 53/4 54/7 59/13 65/19 74/22 75/11 97/10
boards [1] 21/2
Boasberg [2] 43/1 43/4
body [3] 10/11 55/3 61/25
Bonta [1] 38/15
books [1] 51/6
both [9] 16/7 18/12 20/17 44/19 81/19 87/12 89/12 89/12 89/19
Boulee [10] 18/5 18/6 18/14 18/16 49/10 52/2 52/10 64/7 64/10 68/7
Boulee's [4] 17/20 53/15 68/8 81/8
bound [4] 64/9 64/10 69/18 75/12
box [4] 62/18 62/18 62/19 62/21
boxes [1] 62/17
Branzburg [1] 75/3
Braves [1] 17/9
breach [1] 74/15
breaches [3] 4/14 74/5 74/13
break [2] 55/6 60/22
brief [19] 28/3 30/22 42/10 43/2 44/11 54/14 55/12 55/15 56/17 67/17 77/20 78/2 78/5 79/18 83/3 85/11 87/12 87/13 88/3
briefing [8] 61/15 87/17 87/19 87/24 88/2 89/16 89/17 90/3
briefly [2] 16/6 69/15
briefs [1] 21/23
bring [3] 28/14 28/19 44/1
bringing [1] 39/21
broad [5] 31/18 65/22 66/1 79/14 82/21
broad-brush [1] 82/21
broadly [1] 96/1
brother's [1] 87/6
brought [7] 44/16 63/3 63/4 63/10 63/13 67/4 74/8
brush [1] 82/21
building [1] 80/22
Bulldog [1] 96/3
burden [10] 22/23 31/5 32/18 35/10 35/22 35/23 51/22 52/5 54/22 57/7
burdens [1] 38/19
burdensome [2] 27/18 51/10
bus [4] 30/20 30/23 83/22 83/24
Bush [1] 44/6
business [1] 58/18
busy [1] 35/18
buying [2] 61/2 61/2

C
calculated [1] 23/10
California [1] 90/1
call [3] 4/11 5/23 73/15
called [6] 4/21 36/23 52/12 53/15 53/16 97/1
calls [3] 34/16 39/8 47/25
came [6] 16/24 18/21 40/22 46/6 91/5 97/8
camera [11] 10/19 10/23 11/4 11/5 11/16 11/16 19/11 67/25 86/7 86/10 86/15
campus [1] 97/4
can [69] 3/2 7/11 9/5 11/3 12/8 19/6 20/11 22/19 26/3 27/8 28/9 28/19 31/6 31/17 33/21 35/23 36/2 37/10 40/23 41/17 43/6 43/7 43/13 45/17 46/3 46/15 47/1 48/6 49/23 49/25 50/11 50/13 55/22 61/17 62/3 62/24 63/3 63/10 63/10 63/13 63/20 63/21 63/21 64/10 64/15 65/3 65/9 65/20 66/25 67/10 68/12 68/12 70/19 72/22 77/6 77/8 82/21 82/23 82/24 84/12 85/4 85/6 85/9 86/21 87/3 90/25 91/8 95/7 95/11
can't [16] 4/23 13/7 20/19 30/12 36/10 38/8 43/16 44/4 44/5 47/15 47/19 51/1 56/24 63/2 69/19 73/19
candidate [1] 21/5
candidates [1] 19/25
cannot [2] 42/13 45/5
capoff [1] 75/4
car [7] 61/2 61/9 96/17 96/24 97/2 97/7 97/8
care [4] 6/4 33/21 97/2 97/7
career [2] 24/14 54/20
Carolina [6] 4/4 4/7 4/8 58/10 93/24 96/18
carried [1] 75/1
Carter [1] 33/4
case [107]
caseload [1] 9/1
cases [25] 18/2 18/12 25/25 26/1 29/5 29/8 35/5 35/22 37/6 37/12 37/13 39/5 39/24 39/25 43/17 44/2 48/4 50/15 66/2 73/20 79/24 80/10 80/12 80/23 96/12
Casey [1] 4/25
casino [2] 61/3 61/7
cast [1] 44/21
casting [1] 45/3
categorical [1] 45/10
categories [1] 35/13
Cathy [1] 21/8
cause [5] 48/20 49/20 52/10 52/12 66/24
caused [2] 39/14 53/18
CD [1] 28/19
CD-ROM [1] 28/19
cell [2] 98/2 98/11
Center [1] 33/4
central [2] 4/8 60/19
centric [1] 82/1
certain [8] 40/19 70/2 75/13 76/10 76/11 76/15 84/6 85/2
certainly [20] 13/21 20/11 20/24 25/8 31/25 32/6 36/16 45/19 58/15 62/1 64/6 66/20 71/7 71/25 74/19 79/9 80/17 82/11 86/14 96/18
Certification [1] 99/15
certified [2] 31/15 45/3
certify [2] 54/21 99/16
cetera [2] 92/13 95/22
chad [1] 21/19
Chaiken [2] 2/6 3/13
chain [1] 39/12
chairman [2] 21/1 94/14
chance [3] 6/11 9/7 98/7
change [3] 64/10 64/12 88/11
changed [2] 4/13 58/10
changes [1] 64/13
changing [1] 63/16
channels [1] 29/5
charge [6] 44/16 44/22 45/17 63/10 66/23 98/23
chargeable [1] 61/6
charged [2] 47/6 65/7
charges [4] 27/24 44/1 63/2 63/13
Charlotte [1] 58/12
checked [3] 28/22 29/10 30/9
cheerleaders [1] 96/24
chief [4] 12/3 12/5 18/13 73/12
chill [4] 27/21 36/3 41/6 62/13
chilled [1] 37/11
chilling [9] 35/6 36/7 38/21 41/12 41/15 41/21 41/25 51/22 63/6
churches [2] 32/19 92/13
CIA [1] 37/21
Circuit [8] 7/12 16/22 22/11 39/17 41/9 47/24 48/1 52/7
circumstances [1] 86/8
cite [3] 38/24 46/22 47/22
cited [3] 32/7 52/25 87/14
cites [1] 31/24
citizen [2] 39/13 94/9
civic [2] 33/18 36/8
civil [8] 11/21 12/1 12/17 13/12 23/8 66/2 80/12 80/23
civilly [1] 79/25
claiming [1] 26/10
class [1] 74/8
clean [2] 36/5 37/25
cleanest [1] 37/9
clear [9] 16/20 28/9 30/10 42/12 43/16 49/23 52/1 54/5 77/7
clearer [1] 46/15
clearest [1] 46/17
clerk [3] 85/22 87/5 95/2
clerk's [4] 18/3 46/4 98/18 99/2
client [4] 7/14 13/24 57/5 95/19
Clooney [1] 60/23
close [1] 82/18
closely [1] 68/19
club [2] 97/1 97/2
clue [1] 75/1
Cobb [1] 39/13
coin [1] 89/8
Coincidentally [1] 21/7
collaborative [1] 9/7
collateral [1] 36/17
colleague [1] 5/3
colloquial [1] 18/8
come [14] 10/9 17/18 20/22 25/25 26/5 52/25 53/21 68/11 79/24 80/4 80/23 82/23 82/24 89/3
comes [9] 17/12 22/7 22/10 24/13 30/25 38/14 51/22 56/22 73/3
comfort [1] 65/10
coming [7] 10/2 18/21 74/16 75/14 94/21 97/21 99/7
comity [1] 18/8
command [1] 39/12
commensurate [1] 41/24
comment [1] 26/25
comments [2] 32/14 34/11
commission [2] 21/7 21/14
commissioner [1] 39/8
commissioners [1] 22/6
commitment [2] 34/8 34/13
committed [1] 75/3
communicate [1] 72/3
community [4] 32/20 39/15 40/5 42/8
companies [2] 74/3 74/4
company [1] 74/9
compel [2] 10/4 36/6
compelled [2] 37/8 73/1
compelling [3] 41/14 41/23 50/6
compiled [1] 42/15
complain [1] 39/8
completely [3] 54/25 55/3 82/12
compliance [2] 35/23 43/7
comply [1] 95/12
component [2] 28/4 55/9
components [1] 28/17
comprehensive [1] 31/2
computer [1] 1/15
computerized [1] 21/14
concealment [2] 60/14 60/18
conceivable [1] 31/11
conceivably [1] 62/13
concept [1] 7/2
concern [11] 10/12 24/10 24/24 30/8 30/9 34/17 36/17 36/20 39/13 39/19 69/1
concerned [2] 5/19 34/3
concerns [2] 35/7 65/25
concluded [1] 99/11
conclusion [1] 49/25
concurring [1] 23/4
conduct [7] 25/18 45/6 48/13 49/8 50/1 53/23

C
conduct... [1] 75/14
conducting [1] 48/1
confer [1] 98/7
confidential [5] 7/9 7/21 10/21 16/24 73/14
confidentiality [3] 11/22 76/21 76/24
confirmation [2] 58/13 94/15
confirmed [1] 58/20
Congress [4] 20/1 58/3 72/1 94/2
congressman [1] 22/5
consent [2] 12/4 15/8
consider [5] 10/19 20/7 20/9 63/6 63/8
consideration [3] 32/25 37/3 90/9
considerations [1] 18/8
considered [1] 59/9
considering [1] 71/7
considers [2] 55/11 90/12
conspiracies [2] 46/16 46/18
conspiracy [12] 45/14 45/15 45/18 46/9 46/12 46/17 46/19 46/20 60/3 60/15 61/11 64/25
constrain [1] 49/11
consumer [1] 17/19
contact [2] 69/14 83/15
contacting [1] 25/10
contemplated [1] 78/24
contemplating [1] 93/12
contempt [1] 79/2
content [1] 83/9
contested [1] 20/2
context [8] 11/23 28/8 37/21 38/16 39/2 40/6 55/5 73/21
continue [1] 57/19
continued [1] 15/4
continuing [1] 65/17
Contra [1] 44/7
contracted [2] 30/19 35/16
contrary [2] 42/20 78/23
contribute [1] 33/22
contributed [2] 37/13 38/3
control [1] 50/10
controversy [1] 57/10
convenient [1] 31/21
conversations [1] 29/24
converted [3] 4/20 9/1 9/8
convey [1] 12/15
conviction [1] 47/13
convince [2] 24/7 88/22
convinced [1] 64/4
cops [1] 47/25
correct [15] 3/22 5/10 7/5 36/15 45/19 56/12 56/25 60/17 76/5 76/7 78/4 79/3 80/9 82/6 99/16
corrective [1] 30/7
cost [1] 95/13
costly [1] 95/12
could [28] 3/25 4/9 12/15 12/22 12/24 14/2 25/13 40/21 45/14 52/2 53/18 55/13 59/25 62/13 63/17 70/13 71/1 71/17 72/20 74/17 74/18 76/2 78/16 87/1 87/7 89/16 89/17 96/13
couldn't [3] 11/25 47/17 70/20
counsel [7] 13/19 13/19 13/23 34/20 47/15 80/16 86/20
count [1] 36/1
country [2] 17/19 82/10
counts [1] 21/22
county [51] 2/8 3/6 3/11 6/25 7/17 11/7 11/10 11/11 11/12 11/14 11/18 12/8 12/21 12/22 15/1 15/1 17/21 21/2 22/6 22/19 22/24 24/12 24/12 24/13 24/14 24/18 24/19 26/10 28/13 28/18 31/4 32/18 35/14 35/25 36/18 37/3 39/8 39/13 44/13 52/3 59/13 65/19 74/22 75/11 78/22 79/1 84/19 84/22 84/23 92/10 95/13
County's [4] 16/3 25/14 36/20 72/7
couple [3] 4/16 6/20 87/4
course [9] 7/11 13/2 17/17 22/21 23/23 36/21 66/23 76/7 85/10
court [94] 1/1 1/23 6/21 7/5 8/8 8/16 8/20 8/22 10/15 11/3 11/19 12/17 13/14 14/25 15/21 15/25 16/23 20/2 22/13 24/5 26/21 27/3 27/12 27/14 28/7 31/6 32/23 33/6 35/7 35/10 35/23 36/5 36/18 36/18 37/15 38/17 38/24 41/20 43/6 43/7 43/12 43/18 45/22 49/5 49/11 50/21 51/13 52/7 52/14 52/21 54/10 55/11 55/21 55/22 61/21 61/22 63/15 64/11 64/13 65/24 65/25 66/19 66/19 68/25 78/21 79/1 79/2 79/12 82/19 83/2 84/4 84/5 84/8 84/13 85/2 85/4 86/2 87/10 87/16 87/18 88/1 88/8 89/14 90/7 90/12 90/12 92/12 94/12 95/11 96/2 96/3 96/15 99/19 99/19
Court has [1] 49/5
court's [10] 13/15 27/15 31/1 32/24 34/3 37/6 41/8 69/1 84/6 95/9
courts [7] 4/13 43/22 50/15 71/19 78/17 78/24 79/6
cousins [1] 73/11
cover [2] 42/9 87/19
covering [1] 60/20
covers [1] 30/23
COVID [1] 35/25
Cox [1] 21/8
cranky [1] 19/7
created [1] 72/5
crime [9] 44/19 59/19 60/20 61/6 61/6 61/11 75/3 91/16 91/17
crimes [3] 23/16 66/23 69/3
criminal [19] 11/25 12/6 12/9 15/10 27/24 44/1 44/16 47/12 50/4 50/20 52/8 59/16 59/25 59/25 60/15 70/11 76/2 76/12 81/2
criminally [1] 79/25
criticism [1] 94/22
cross [1] 89/15
cross-motion [1] 89/15
CRR [2] 1/23 99/18
crucial [1] 48/5
current [4] 24/22 65/18 92/14 92/15
currently [1] 17/1
curtain [1] 21/12
cv [2] 1/6 3/5
cycle [1] 65/18
cycles [1] 65/18
cynicism [1] 71/21
D
D.C [1] 15/21
Damon [1] 60/23
Daniel [1] 2/11
data [4] 4/14 31/7 74/5 74/13
date [5] 53/17 53/18 54/8 87/24 99/21
day [6] 19/23 30/20 32/17 35/17 39/14 65/3
days [7] 22/14 25/19 58/18 87/23 89/17 89/20 89/23
de [1] 72/8
dead [1] 75/23
deal [2] 73/8 89/12
dealing [2] 80/10 82/12
dealt [2] 37/7 83/4
debates [1] 93/22
decide [8] 9/7 13/7 23/19 62/20 64/22 65/5 86/3 94/6
decided [5] 18/19 23/24 37/15 49/10 52/2
deciding [1] 65/7
decision [20] 18/3 24/20 28/8 39/16 39/16 45/13 50/24 51/25 67/11 73/21 73/24 82/2 86/23 86/25 87/7 88/21 89/11 89/13 96/2 98/9
decisions [3] 12/14 13/7 66/8
declaration [4] 32/24 33/15 68/10 92/3
declare [1] 43/22
declined [2] 18/20 52/18
deep [1] 34/17
deeply [1] 33/21
defective [1] 52/17
defendant [1] 16/17
defendants [1] 47/4
defense [7] 46/25 47/3 47/16 47/19 61/23 63/4 65/4
definitely [2] 61/17 65/20
definitive [1] 50/5
degree [2] 18/1 41/1
delivered [1] 28/23
democracy [4] 34/5 34/9 41/16 92/24
Democratic [3] 33/2 34/13 94/13
Democrats [1] 54/23
demonstration [1] 34/12
demonstrative [2] 92/6 93/11
department [13] 8/13 35/21 40/6 43/2 55/1 55/3 55/7 55/9 80/13 80/14 80/19 82/8 92/22
Department's [1] 80/21
depends [1] 39/23
Deputy [2] 92/23 93/2
derth [1] 62/5
describe [1] 44/11
described [2] 27/14 49/8
describes [1] 52/8
designated [1] 20/11
designations [1] 13/13
designed [1] 31/3
desire [1] 34/23
desk [1] 8/12
destination [1] 76/9
detail [2] 19/3 19/4
details [3] 19/17 21/21 23/5
determine [3] 49/11 75/6 76/14
determining [1] 73/20
devil's [1] 23/5
did [22] 8/4 15/24 16/18 30/14 40/25 46/2 46/3 52/25 53/1 53/6 53/17 57/25 58/16 59/4 59/6 59/19 64/24 78/14 86/3 96/15 97/12 97/15
didn't [16] 5/23 9/4 18/9 18/10 18/19 18/24 19/5 47/11 47/24 51/13 53/14 58/20 64/7 68/21 70/15 98/9
die [1] 58/16
difference [1] 70/18
differences [1] 37/16
different [18] 18/4 21/17 30/17 35/13 35/14 46/15 46/16 48/1 54/25 55/13 57/9 59/6 74/21 82/5 86/21 88/20 89/9 94/22
difficult [2] 31/19 65/13
direct [2] 55/8 77/14
directed [1] 28/14
directly [5] 27/1 28/23 35/16 38/9 74/14
director [2] 35/20 35/21
directs [1] 28/21
disagree [1] 73/2
disagreeing [1] 44/3
disagrees [1] 6/9
disclose [4] 7/16 11/6 78/14 85/24
disclosed [4] 7/18 8/16 35/2 87/19
disclosing [1] 15/6
disclosure [6] 10/16 13/5 15/14 36/6 37/8 86/20
discourage [1] 35/3
discovery [3] 23/11 23/15 77/21
discretion [3] 11/6 66/21 66/22
discussed [1] 76/18
discussion [2] 20/8 74/12
dismiss [2] 62/25 63/1
dismissed [2] 63/11 74/6
dispute [3] 17/16 43/24 45/1
disseminated [1] 95/25
distinction [1] 60/13
district [20] 1/1 1/1 1/10 4/4 8/20 28/16 29/14 29/15 29/22 30/6 56/11 58/9 58/10 64/11 66/13 81/17 81/24 82/13 99/19 99/20
distrust [1] 72/5
disturb [1] 5/24
ditch [1] 61/9
DIVISION [1] 1/2
do [83] 4/24 4/25 5/16

D

do... [80] 6/15 7/3 7/19 7/22 8/2 9/4 10/22 11/19 12/17 12/19 13/8 13/12 14/11 14/20 15/4 20/5 20/11 26/16 27/4 29/18 29/19 31/21 32/14 32/16 33/9 36/4 36/4 40/8 42/16 43/22 44/4 51/14 54/1 55/23 57/23 58/15 59/18 61/17 62/25 63/1 63/18 64/21 64/21 66/13 67/3 67/14 67/18 67/20 68/6 68/14 72/2 76/4 77/11 78/14 78/15 78/16 78/20 78/23 78/24 78/25 79/3 79/25 80/2 80/4 81/18 82/15 82/19 83/12 83/16 83/25 84/2 84/2 85/4 85/21 86/3 86/4 89/23 91/19 93/1 96/18
docket [17] 4/18 7/5 7/6 7/7 7/23 15/8 16/6 16/13 16/25 18/25 20/10 86/2 91/8 98/1 98/6 98/8 99/4
doctrinally [1] 36/2
doctrines [1] 37/9
document [4] 33/5 33/11 91/3 91/4
documents [6] 28/14 57/15 69/20 82/4 93/8 98/18
does [20] 7/16 12/2 37/3 45/19 45/21 46/12 46/21 49/11 49/14 49/16 59/1 59/8 64/21 64/22 70/22 73/20 82/20 85/2 98/5 98/16
doesn't [38] 13/4 13/6 14/3 19/18 23/18 28/10 37/20 38/21 40/25 42/20 43/9 45/7 45/23 47/16 49/8 50/24 51/9 51/11 51/12 51/15 51/17 51/25 52/23 53/10 53/12 53/13 54/6 54/10 54/17 61/6 61/7 61/15 62/19 62/20 70/23 73/24 74/13 79/20
Dog [1] 96/8
Dogness [1] 96/9
doing [10] 35/18 38/12 40/13 51/5 52/4 64/2 64/8 70/16 79/2 97/3
DOJ [13] 2/12 4/8 8/13 40/13 40/15 40/22 64/4 65/10 66/15 71/10 79/24 82/1 97/24
DOJ-USAO [1] 2/12
domain [1] 54/21
don't [76] 6/20 7/8 13/21 19/13 20/3 22/14 22/23 23/21 23/22 24/22 26/7 26/7 28/3 35/11 37/22 37/23 37/25 39/17 40/11 42/2 44/2 46/22 46/24 48/12 48/20 49/10 51/5 51/7 51/20 53/22 54/13 54/25 56/2 56/3 62/22 62/23 63/23 64/11 65/6 65/15 65/19 66/4 66/14 67/2 67/3 67/25 68/2 68/3 68/5 68/16 71/6 71/6 72/9 72/17 72/23 73/2 75/15 78/17 78/19 79/7 79/13 83/24 83/25 85/24 87/21 88/20 89/22 90/14 91/1 93/24 93/25 94/8 95/20 95/24 97/11 98/13
donations [1] 38/16
done [9] 57/4 57/8 60/14 60/18 66/1 70/9 70/10 76/16 85/8
door [1] 78/18
dossier [2] 42/16 42/17
double [1] 58/1
double-take [1] 58/1
DoubleDawg [2] 96/4 96/5
down [9] 33/24 55/6 66/10 73/15 75/1 79/11 80/13 80/23 84/15
download [1] 28/20
drag [1] 75/20
drags [1] 27/18
Drive [1] 1/24
driver [3] 30/20 30/23 83/24
drivers [1] 83/22
drug [1] 73/8
due [2] 7/11 90/16
Duffey [1] 2/6
during [10] 7/22 8/21 10/3 35/25 44/22 44/24 48/14 60/21 61/22 84/25
duty [1] 8/7
dynamite [2] 61/4 61/10

E

e-mail [10] 5/14 25/1 35/1 35/17 41/14 42/15 49/22 55/25 95/22 97/22
e-mails [3] 25/6 74/4 74/9
each [3] 26/13 72/3 75/10
earlier [3] 63/5 78/7 89/1
early [1] 25/18
easier [2] 47/15 84/9
easily [1] 22/20
Eastern [1] 81/17
easy [2] 38/6 94/16
echo [1] 77/25
edges [1] 84/1
edit [1] 49/23
effect [3] 35/6 51/23 95/14
effective [1] 45/11
effectively [1] 87/13
efficient [1] 27/8
Eighth [1] 58/9
either [11] 6/6 6/13 16/16 20/7 22/2 26/21 55/24 57/1 57/19 61/15 64/9
elected [2] 20/23 62/20
election [58] 19/23 21/2 21/20 24/8 24/20 25/14 25/16 25/18 25/19 27/22 30/16 30/17 30/20 31/4 32/25 33/3 33/19 33/21 35/8 35/17 35/19 36/1 36/3 36/7 40/5 40/7 40/19 41/16 44/13 44/20 44/22 44/23 44/24 45/2 46/9 46/10 46/12 46/16 46/19 49/3 49/6 49/17 53/4 53/6 53/9 54/7 54/21 59/13 65/17 65/18 65/18 81/2 84/19 85/1 91/25 92/23 92/25 95/15
elections [20] 3/7 7/1 7/18 11/8 20/25 21/4 21/9 21/19 24/17 33/16 34/23 35/4 35/21 41/25 42/8 48/24 50/9 62/15 62/23 65/19
electors [2] 12/21 84/19
Eleven [1] 60/24
Eleventh [8] 7/12 16/21 22/11 39/17 41/9 47/24 47/25 52/7
else [11] 14/5 16/16 16/19 17/3 51/8 51/20 55/17 65/9 69/10 82/3 88/25
emergency [1] 8/25
employee [3] 30/19 39/4 46/4
employees [2] 35/15 83/13
en [1] 12/4
encompass [1] 31/3
encountered [1] 32/6
end [8] 8/4 18/17 26/15 41/18 46/1 49/20 75/16 87/7
ended [2] 8/5 36/24
endless [1] 63/22
endorses [1] 51/2
ends [1] 76/13
enforce [5] 9/5 9/6 62/21 79/4 89/10
enforcement [2] 9/3 35/2
enforces [1] 52/21
engage [2] 27/1 34/6
engaged [1] 54/6
engineering [2] 96/20 96/22
enjoyed [1] 72/1
enough [3] 12/18 52/11 86/13
ensure [3] 62/22 70/7 92/24
entered [1] 4/16
enterprise [1] 76/12
Enterprises [11] 11/2 22/18 23/7 24/5 25/25 28/11 29/3 50/14 50/23 50/25 51/3
entire [1] 17/15
entities [2] 38/2 70/24
entitled [1] 99/17
entity [7] 11/12 12/8 12/8 74/21 74/21 75/8 75/25
equitable [1] 52/2
ergo [1] 23/20
error [1] 49/16
errors [1] 50/8
especially [2] 15/4 90/11
essential [3] 46/11 46/17 46/20
essentially [8] 9/17 12/25 46/8 50/11 52/7 69/15 75/5 83/20
et [2] 92/13 95/22
Evans [2] 85/20 91/15
even [19] 7/6 13/11 18/10 22/12 23/12 32/8 34/19 35/22 42/6 44/11 48/12 48/20 53/22 61/6 64/17 65/5 66/4 71/11 79/7
event [4] 6/1 19/16 37/2 73/19
events [3] 33/20 52/12 52/16
eventually [1] 19/11
ever [4] 34/14 36/25 63/25 71/8
every [7] 30/19 30/19 75/1 75/2 75/22 84/20 84/21
everybody [3] 22/12 26/6 56/4
everyone [2] 30/18 35/25
everything [3] 27/1 69/10 80/2
evidence [11] 23/11 29/23 30/3 32/5 32/24 40/24 49/2 49/4 64/4 91/1 93/13
evidentiary [1] 65/24
ex [5] 67/7 68/11 90/6 90/9 90/15
exacting [1] 52/4
exactly [7] 5/22 27/14 29/21 39/23 57/2 80/10 93/17
examined [1] 75/2
example [8] 8/13 8/15 11/24 49/16 51/9 60/25 83/21 92/12
except [1] 64/12
exceptional [1] 52/5
excerpt [1] 91/24
exchange [2] 97/23 98/2
Excuse [1] 6/2
executing [2] 47/22 47/23
execution [1] 52/9
exercise [2] 52/2 52/18
exhaustive [1] 43/17
exhibit [4] 91/13 91/24 92/3 97/22
Exhibit 3A [1] 97/22
Exhibit 5 [1] 91/24
Exhibit 6 [1] 92/3
exhibits [7] 26/20 32/22 49/5 90/22 91/12 93/7 95/4
Exhibits 1 [1] 90/22
exist [2] 11/21 74/18
existence [1] 7/18
exists [1] 46/18
expect [2] 23/25 35/10
expedition [2] 51/2 64/19
expeditions [1] 64/18
experience [1] 33/15
experienced [1] 5/20
expert [4] 20/19 49/17 53/10 91/25
experts [2] 49/3 49/6
explain [2] 8/3 53/17
explanation [2] 7/21 86/8
exposure [1] 34/18
expressing [1] 34/17
expression [2] 34/8 42/5
expressive [2] 36/8 40/10
extend [4] 45/9 46/13 46/21 60/16
extends [1] 48/5
extensively [1] 28/8
extent [9] 7/9 10/18 15/13 22/21 25/4 52/20 55/11 83/21 90/11
extra [1] 61/10
extremely [1] 54/2
eyes [3] 13/13 90/8 90/11

F

F-H-L [1] 14/13
F.3d [1] 15/16
face [5] 7/15 28/12 30/13 34/24 86/14
fact [14] 15/6 15/18

F

fact... [12] 15/22 16/5 17/13 24/8 40/1 53/12 55/12 58/19 61/8 62/11 72/14 72/17
factor [1] 73/20
facts [6] 39/25 43/20 44/16 50/21 61/16 71/8
factual [5] 28/5 48/21 50/12 50/17 68/13
factual basis [1] 50/17
fair [2] 40/5 42/6
fairly [1] 74/11
faith [1] 71/18
fake [1] 44/23
Fallon [2] 14/9 14/9
false [2] 44/21 46/10
falsely [1] 53/13
familiar [2] 60/5 60/6
family [1] 22/4
far [12] 7/24 10/12 30/10 43/18 54/2 64/22 65/15 65/24 69/14 75/14 76/18 89/6
Farr [1] 58/13
favor [1] 25/24
favorable [3] 23/7 24/3 25/23
FBI [5] 10/3 28/15 71/11 80/18 80/21
FCC [1] 80/5
fear [4] 4/14 72/8 72/25 74/17
feasibly [1] 82/10
features [1] 52/17
federal [11] 1/23 15/10 35/2 43/3 43/25 50/2 62/2 66/19 67/4 70/23 70/23
feel [8] 18/9 25/12 28/3 36/21 65/1 75/22 85/2 92/25
feel the [1] 28/3
feelings [1] 71/2
feels [2] 84/5 84/8
Fehlan [10] 2/15 5/7 5/9 6/1 6/17 14/9 14/10 14/15 14/22 16/17
fell [2] 96/18 97/9
felony [1] 44/20
felt [2] 18/14 79/3
few [2] 87/5 89/4
field [2] 47/25 96/25
figure [3] 26/16 57/25 91/18
figured [1] 3/24
file [13] 15/19 16/4 33/6 33/12 53/7 53/8 53/12 53/14 86/1 87/24 89/19 89/20 99/2
file that [1] 53/12
filed [18] 4/11 6/6 7/23 8/24 9/2 9/15 15/2 16/13 17/13 17/14 17/21 18/7 18/25 20/16 74/10 88/17 89/10 98/20
filing [5] 8/25 16/5 17/24 91/6 98/18
filings [1] 14/25
final [3] 24/19 24/19 76/12
finally [1] 19/24
find [9] 3/25 4/9 34/7 40/25 57/24 63/23 64/7 70/11 75/2
finding [1] 50/20
fine [1] 91/10
finished [1] 68/3
fire [2] 39/9 39/14
fired [3] 39/10 39/11 55/13
firefighter [1] 39/8
firefighters [1] 39/7
fires [1] 39/15
firm [1] 5/11
first [30] 6/12 19/4 21/7 21/9 21/10 21/13 21/16 27/20 28/12 32/23 36/5 36/11 36/13 37/2 38/18 38/23 38/25 39/12 39/25 40/3 44/20 50/25 51/12 51/13 51/22 62/13 72/20 87/15 87/20 90/13
fishing [3] 51/1 64/18 64/19
fit [1] 36/2
five [8] 45/1 48/15 48/16 61/1 61/1 61/7 62/4 92/8
five-year [4] 45/1 48/15 48/16 62/4
fixed [1] 43/17
flagging [1] 28/24
flatbed [1] 96/19
floor [1] 93/22
Florida [1] 21/19
flow [1] 52/23
flows [1] 22/3
flying [1] 99/8
focus [1] 95/10
focused [3] 22/9 26/8 64/23
folder [1] 95/3
folks [7] 32/21 35/14 37/10 38/11 40/8 42/15 82/2
follow [2] 20/15 88/6
following [2] 28/14 39/11
football [2] 97/5 97/6
forces [1] 30/8
forecast [1] 93/14
foregoing [1] 99/16
foregone [1] 49/24
forever [1] 71/19
forget [1] 84/7
forgive [1] 81/13
form [1] 97/23
formally [1] 94/13
former [4] 15/17 20/23 30/5 92/23
formidable [1] 52/5
formulation [1] 50/1
forth [3] 49/2 82/17 86/14
forward [3] 10/2 10/9 66/25
forwarded [1] 5/14
found [8] 13/18 14/16 15/21 17/7 34/5 49/19 52/10 53/7
four [2] 30/17 73/10
frame [1] 28/8
framed [1] 26/25
frank [1] 19/20
fraud [4] 44/20 51/5 76/11 80/11
frauds [1] 80/6
free [3] 40/5 42/5 75/12
freedom [4] 38/14 70/3 70/14 70/22
Freeman [1] 42/7
Friday [2] 14/12 97/6
Fridays [1] 97/4
front [6] 6/19 6/22 13/14 17/8 38/14 73/15
full [4] 49/5 86/7 86/13 88/4
fully [3] 10/2 66/5 75/1
Fulton [42] 2/8 3/6 3/11 6/25 7/17 11/7 11/10 11/11 11/12 11/14 11/18 12/7 12/21 12/22 15/1 15/1 16/2 17/21 22/19 24/12 24/18 24/18 25/14 26/10 28/13 28/18 31/4 32/18 35/14 37/3 44/13 52/3 59/13 65/19 72/7 74/22 75/11 84/18 84/21 84/23 92/10 95/12
Fulton's [1] 35/12
function [9] 29/15 37/18 38/12 40/10 41/15 43/25 44/1 44/15 62/15
functions [1] 43/15
funded [1] 21/16
further [5] 38/20 63/18 70/16 84/11 99/4
furtherance [1] 60/14
future [4] 11/9 20/16 36/7 63/24

G

game [1] 97/6
games [1] 97/5
gave [1] 15/23
general [17] 4/19 10/15 17/16 21/15 21/15 31/14 38/8 45/19 67/9 74/12 80/9 81/19 88/15 92/23 93/2 93/21 93/25
generally [7] 17/18 19/16 20/21 23/9 25/11 37/19 71/5
gentleman [1] 81/4
gentleman's [1] 85/19
Geographically [1] 31/8
GEORGIA [38] 1/1 1/24 19/23 21/8 21/10 21/17 24/13 25/19 33/18 53/5 53/19 53/24 54/22 54/23 66/13 70/3 70/14 73/7 74/23 75/11 81/24 84/20 94/1 94/12 96/13 96/15 96/16 96/18 96/20 96/21 96/21 97/4 97/9 97/14 97/16 97/17 97/17 99/20
Geraldine [2] 1/23 99/18
get [31] 5/21 6/14 8/21 10/7 13/6 35/25 37/20 37/22 38/8 38/8 42/13 42/22 46/3 46/4 53/14 55/25 56/1 58/20 61/9 70/19 72/10 74/12 76/9 77/5 79/5 86/12 90/13 93/22 94/21 97/3 99/8
getaway [1] 61/2
gets [6] 13/8 20/16 23/19 30/6 73/15 98/7
getting [2] 19/9 74/16
gettings [1] 78/8
Ghali [11] 2/5 2/6 3/12 3/13 3/14 6/15 16/19 26/17 60/10 60/11 60/12
Ghazal [1] 33/1
Giuliani [1] 36/23
give [19] 6/11 6/17 6/17 26/13 27/3 27/9 28/18 38/1 38/1 51/3 51/6 59/1 65/9 67/13 77/19 85/15 88/4 89/23 97/20
given [6] 41/12 65/21 65/22 65/23 66/21 66/22
gives [2] 36/5 82/4
giving [2] 25/5 95/20
Glover [2] 1/23 99/18
go [33] 8/12 14/19 14/21 18/3 18/4 21/12 29/6 32/12 33/9 33/13 40/23 45/17 46/1 46/7 51/20 56/4 58/21 58/24 63/21 64/22 66/10 66/25 68/22 70/13 76/4 76/6 82/15 87/5 88/9 91/2 94/16 98/10 99/1
goals [1] 38/20
goes [2] 43/16 43/18
going [61] 3/10 6/11 6/12 6/12 6/17 9/6 10/15 10/25 11/9 11/10 13/14 13/21 15/3 18/18 19/24 20/12 20/16 22/9 23/24 24/21 24/23 25/8 26/2 26/12 26/14 27/9 31/12 40/14 45/25 46/7 47/7 50/18 53/23 54/21 58/25 61/3 61/4 61/13 62/21 66/12 68/10 68/10 71/11 72/10 72/13 72/14 86/22 86/25 87/22 88/17 89/11 89/24 90/1 90/1 91/7 91/19 94/4 95/3 95/9 95/25 96/19
gone [3] 30/10 36/19 82/17
good [14] 3/2 22/16 33/25 33/25 40/24 46/2 52/11 60/9 60/13 61/16 62/23 64/24 65/1 71/18
Gore [1] 44/6
got [32] 5/14 6/5 8/17 13/18 22/6 32/22 32/23 33/10 36/25 39/10 39/11 40/24 41/10 44/21 45/22 46/9 46/17 50/4 57/22 58/19 62/7 63/4 65/6 66/24 78/17 78/18 86/17 90/23 97/24 98/1 98/6 98/12
gotcha [1] 90/18
gotten [1] 70/20
govern [1] 50/24
government [57] 6/9 7/10 9/12 10/6 11/14 12/8 12/9 19/18 23/7 23/19 23/19 23/23 24/9 25/2 25/7 25/9 25/24 28/20 31/20 31/24 32/6 34/15 37/17 37/20 37/23 38/11 40/12 42/16 44/18 45/7 46/23 48/19 49/21 51/6 62/15 62/17 63/20 63/25 66/11 67/4 69/18 69/23 70/6 71/21 74/14 74/21 74/21 75/8 75/15 75/16 75/25 76/10 77/9 78/12 84/22 89/10 91/6
Government's [6] 25/11 26/10 31/11 41/22 42/22 56/2
governmental [2] 50/6 69/20
governor [3] 19/25 33/2 94/13
grad [1] 89/25
graduating [1] 89/25
grand [68] 1/4 7/9 7/15 8/14 10/17 12/1 12/2 15/3 15/5 15/12 19/12 27/13 27/23 28/22 28/23 29/6 29/9 29/10 29/11 29/14 29/20 30/9 30/10 32/2 42/20 42/25 43/14 43/19 43/25 44/5 44/7 44/15 45/5 48/2 48/6 48/12 49/12 51/1

G
grand... [30] 51/25 52/14 52/21 55/21 59/17 62/3 65/21 66/3 66/8 66/12 66/15 66/18 66/24 67/1 69/18 70/5 72/20 72/22 73/1 73/16 74/25 75/9 78/9 79/15 80/15 82/20 82/21 82/25 83/16 91/3
grant [2] 20/13 85/5
granted [1] 15/25
granular [1] 32/21
great [2] 72/1 99/6
greater [1] 40/2
grew [1] 22/4
ground [1] 10/14
grounds [1] 43/4
group [1] 41/7
groups [1] 33/19
Grunewald [4] 45/25 60/4 64/25 87/17
guarantee [1] 73/16
guess [28] 4/16 6/1 8/3 9/4 9/14 11/13 11/13 12/12 17/23 29/2 30/1 30/4 36/16 38/13 39/21 58/6 63/3 69/2 69/7 70/13 71/11 73/14 79/19 82/1 89/14 89/16 92/16 93/13
guiding [1] 26/2
guise [1] 69/17
guns [2] 61/2 61/9
guys [1] 97/7
Gwinnett [2] 24/14 24/15

H
had [44] 3/24 4/15 4/15 6/3 9/7 11/15 12/13 17/13 17/14 18/14 18/17 21/1 22/4 25/18 26/24 27/2 29/24 35/7 39/7 39/12 39/15 40/7 40/15 45/4 48/13 49/19 52/17 53/9 54/18 54/20 55/3 74/9 80/6 83/14 84/25 85/15 87/12 88/14 89/1 90/8 94/13 94/17 94/22 96/19
half [2] 25/17 58/7
hand [4] 26/20 36/1 49/17 68/1
handed [3] 74/20 75/7 93/15
handle [6] 7/11 8/8 35/25 80/14 80/15 97/8
handles [1] 96/23
hands [1] 77/5
hanging [2] 21/19 97/7
happen [6] 45/4 53/1 61/7 74/18 79/11 84/16
happened [12] 31/13 44/5 47/6 49/6 52/23 53/21 59/16 59/25 65/3 65/15 65/16 68/19
happening [5] 19/14 29/7 32/18 73/8 75/15
happens [6] 30/12 44/24 49/7 61/8 80/24 81/25
happy [4] 17/11 26/20 54/9 97/16
harass [2] 10/7 77/1
harassed [3] 25/13 36/21 36/24
harassing [1] 70/10
harassment [3] 9/24 10/1 75/14
hard [3] 24/7 52/6 86/19
harder [1] 99/8
has [60] 4/13 7/18 8/12 9/23 10/15 16/23 17/18 19/16 19/20 19/21 22/21 25/24 26/6 28/2 28/7 28/17 30/18 34/12 34/16 40/15 41/23 41/24 44/18 45/1 46/17 46/24 49/5 49/18 51/21 53/25 61/11 61/21 63/15 64/4 66/8 66/13 66/24 68/12 69/12 71/19 72/4 72/25 75/1 75/3 75/19 78/8 79/12 80/2 81/1 81/18 83/2 84/4 84/13 87/16 89/21 90/12 96/21 98/2 98/4 98/13
Hash [1] 53/7
hasn't [2] 6/6 32/7
have [155]
haven't [5] 26/1 36/12 45/13 69/7 88/16
having [5] 20/20 25/14 34/18 34/25 86/23
he [34] 15/17 15/18 18/9 18/9 18/15 18/17 18/19 18/19 18/20 18/25 38/8 39/10 39/11 39/12 43/16 52/2 52/3 52/10 52/12 52/18 53/16 58/16 58/19 60/12 64/10 64/10 68/12 68/21 73/13 78/14 81/18 97/8 97/9 97/9
he'd [1] 73/13
he'll [1] 68/14
he's [1] 68/13
head [1] 43/3
headed [1] 87/5
headquarters [1] 80/21
hear [9] 8/2 10/18 11/4 12/13 13/8 29/18 68/12 86/9 86/21
heard [7] 15/1 32/5 58/16 58/16 76/16 85/25 94/7
hearing [19] 3/4 5/15 6/13 7/9 7/22 7/23 9/8 49/3 53/9 58/13 68/11 77/24 86/11 86/22 88/7 91/25 94/8 94/15 96/10
help [1] 62/22
helpful [2] 86/15 90/25
helps [2] 6/20 6/22
her [9] 4/23 4/24 33/3 33/15 34/21 56/1 64/17 87/5 99/1
here [40] 3/8 5/5 6/2 6/22 11/7 11/11 12/6 14/20 15/5 15/7 16/2 18/3 19/5 19/22 19/22 20/3 23/14 24/10 25/2 30/12 31/11 34/2 38/10 39/18 39/20 42/21 43/24 46/5 46/7 48/22 49/11 52/12 55/25 61/13 63/12 66/7 67/19 75/5 83/1 93/15
here's [1] 72/12
hesitate [1] 43/22
hey [9] 36/3 42/2 43/18 49/23 51/4 53/1 54/24 70/8 91/15
highlight [2] 54/2 54/13
highly [2] 12/9 35/3
him [9] 18/11 18/15 18/16 18/17 36/24 68/7 68/9 68/11 68/12
hire [2] 37/21 37/22
hired [1] 55/13
his [10] 15/19 18/18 18/19 18/20 23/3 39/9 52/2 64/10 72/1 77/5
historical [2] 44/4 44/16
history [1] 20/22
hit [1] 34/3
hold [3] 78/1 79/2 96/24
holds [1] 79/13
home [3] 24/25 35/1 40/4
honest [1] 96/14
honestly [3] 37/1 63/5 70/19
Honor [50] 3/12 3/17 3/22 4/2 4/5 6/24 9/13 9/16 14/22 16/11 16/20 17/5 26/18 26/19 26/24 27/11 32/16 33/7 36/15 38/13 48/3 48/10 48/17 50/3 51/24 53/20 55/18 55/20 56/12 56/19 60/11 61/17 67/15 67/18 78/4 81/9 85/6 86/5 87/25 88/5 89/2 90/5 90/19 93/12 93/14 93/19 95/1 95/6 96/11 97/22
Honorable [1] 1/10
Hoover [1] 80/22
hope [3] 26/6 27/6 71/25
hopefully [1] 70/7
horse [1] 75/23
hotly [1] 20/2
hours [1] 14/17
housekeeping [2] 89/4 89/6
how [27] 4/12 8/4 14/11 17/7 26/25 27/4 28/18 29/18 29/19 33/20 34/11 34/14 36/3 37/3 38/16 45/21 50/12 54/2 58/3 64/21 64/21 64/21 72/7 73/14 77/6 86/14 97/15
However [2] 85/2 97/24
human [1] 50/8
hundred [1] 73/10
hyperbolic [2] 22/2 26/8
hypotheticals [1] 50/19

I
I'd [3] 47/17 54/19 90/21
I'll [23] 6/17 7/14 14/20 27/2 29/2 42/1 47/5 48/9 48/23 49/13 49/21 51/24 68/3 68/3 68/4 74/2 88/4 89/23 90/2 91/18 95/2 97/14 98/23
I'm [104]
I've [35] 3/17 6/5 8/17 8/21 17/17 20/18 20/18 21/22 22/3 22/6 26/1 29/24 31/25 32/5 32/22 33/10 34/5 36/11 45/22 48/9 57/22 64/22 65/6 66/18 71/15 72/8 78/18 79/14 80/6 81/22 86/17 88/12 88/12 90/23 90/24
idea [2] 12/23 68/5
ideal [1] 34/13
identified [6] 27/25 43/9 44/18 48/24 55/12 69/12
identifies [1] 55/22
identify [2] 40/9 44/18
identifying [2] 92/23 98/19
II [1] 1/10
illegal [1] 40/24
images [5] 53/5 53/6 53/11 53/25 54/8
imagine [2] 19/6 47/15
impact [1] 87/7
impending [2] 17/24 18/17
implemented [1] 11/16
implicated [1] 11/16
implicitly [1] 26/9
implies [1] 64/15
important [6] 42/7 62/17 62/18 62/19 73/25 94/6
impressed [4] 22/1 47/4 57/22 63/5
improper [23] 16/21 28/2 43/5 43/13 43/19 43/23 47/20 50/15 50/16 50/17 50/22 51/15 51/17 51/23 54/12 54/17 54/18 55/11 55/15 59/9 76/18 76/19 78/14
improperly [1] 46/11
improprieties [1] 65/16
include [1] 86/8
included [1] 87/13
includes [1] 83/22
including [2] 35/1 85/25
incorrectly [1] 71/23
independent [3] 11/13 27/19 36/5
indicate [1] 82/20
indicated [2] 56/21 75/19
indicates [1] 63/24
indict [2] 47/18 67/2
indictment [4] 45/5 48/13 61/24 65/7
indirectly [2] 38/8 74/14
individual [6] 36/13 71/10 75/10 77/1 79/12 84/21
individual's [1] 38/19
individuals [24] 10/7 12/10 12/11 12/22 12/24 13/15 13/25 33/20 34/6 34/17 35/4 37/5 40/3 69/14 70/7 70/16 71/16 74/18 75/20 76/15 80/3 80/20 82/10 84/18
ineffective [1] 47/14
inform [1] 52/21
information [64] 7/10 7/21 10/17 11/18 11/22 12/18 15/24 17/6 22/20 22/25 23/15 23/23 24/9 24/24 28/6 28/19 28/20 29/17 30/17 31/25 32/8 34/16 35/1 35/13 37/8 41/11 41/23 42/12 42/23 51/4 52/22 54/1 59/11 67/8 69/13 69/14 69/20 70/3 70/7 70/11 70/15 70/22 71/4 71/16 72/9 74/3 74/3 74/20 75/7 75/8 75/24 75/25 76/3 76/8 77/8 78/8 78/11 78/15 82/25 83/9 83/25 84/12 98/1 98/19
inherently [1] 39/25
initial [2] 9/2 88/3
initially [1] 16/6
injured [1] 97/9
inquiry [3] 26/9 44/4 87/9
ins [1] 35/11
insert [1] 32/23

I

inspection [1] 77/21
installed [1] 97/8
insubordination [1] 39/11
integrity [4] 9/22 19/13 33/19 33/21
intended [3] 29/8 39/11 88/1
intends [1] 42/16
intent [2] 15/19 16/4
intentional [6] 48/25 49/8 49/15 49/25 50/2 71/9
intentionality [1] 91/17
intentionally [1] 74/15
interest [5] 19/15 25/14 41/11 41/23 50/7
interested [1] 18/14
interests [1] 92/19
interfacing [1] 91/14
internal [5] 8/23 18/2 18/11 18/25 82/4
internet [1] 72/4
interpreting [1] 22/10
interrupt [1] 68/22
intervene [11] 3/9 4/11 4/22 6/5 9/12 9/19 14/6 14/24 16/1 20/14 72/15
interveners [1] 14/24
intervening [1] 7/3
intervenors [6] 3/8 6/7 7/3 14/23 15/23 16/11
intervenors/movants [1] 6/7
interview [3] 40/23 68/7 76/15
interviews [1] 84/12
intimidate [1] 70/9
intuitive [1] 35/5
investigate [7] 40/16 59/18 62/3 66/6 66/23 80/19 82/4
investigated [1] 12/10
investigating [3] 63/2 63/18 65/2
investigation [18] 10/3 11/25 12/1 12/9 12/23 12/25 13/3 30/11 44/14 48/2 50/5 50/7 50/21 52/8 59/8 63/14 70/8 74/25
investigations [2] 19/19 32/9
investigative [7] 9/22 10/11 10/22 12/6 19/12 65/22 67/19
investigators [1] 80/17
involved [8] 12/5 17/17 21/4 30/20 33/21 35/15 63/7 81/8
involvement [3] 37/23 79/18 79/19
involves [1] 69/6
involving [5] 29/21 57/10 81/2 91/25 96/12
iPad [1] 17/9
Iran [1] 44/7
Iran-Contra [1] 44/7
ironically [1] 19/22
irregularities [3] 40/19 44/13 59/12
irregularity [1] 66/5
irrelevant [4] 51/4 51/5 51/8 51/20
is [319]
ish [1] 20/2
isn't [16] 5/17 6/12 6/13 17/1 17/25 31/10 41/1 43/19 43/24 44/15 50/4 55/8 72/8 79/23 83/12 98/17
issue [13] 13/20 22/22 23/16 29/20 43/1 48/5 48/7 51/13 52/24 63/16 69/11 74/11 88/3
issued [2] 28/16 29/4
issues [11] 10/1 10/22 14/1 21/19 39/15 48/24 59/8 87/4 97/12 98/17 98/21
it [322]
it's [102]
its [10] 16/4 17/24 25/24 27/19 33/11 43/25 61/16 70/6 72/23 86/14
itself [5] 4/18 7/9 41/5 76/8 80/2

J

Jacquelyn [3] 5/1 5/4 5/8
Jamaica [1] 33/16
James [1] 2/11
January [4] 17/23 45/2 45/4 63/16
January 2024 [1] 63/16
January 7th [2] 45/2 45/4
jeopardize [1] 19/18
Jimmy [1] 14/9
Jo [1] 2/7
job [3] 20/22 39/20 66/22
join [1] 38/20
Josephson [3] 2/5 96/4 96/6
judge [41] 1/10 8/8 8/8 8/16 8/20 8/25 11/5 12/3 12/5 13/10 17/20 18/3 18/5 18/6 18/13 18/14 18/16 20/23 22/1 43/1 43/3 49/9 49/19 49/22 52/1 52/10 53/15 64/6 64/10 64/22 66/18 68/7 68/8 69/12 78/21 81/8 91/14 94/17 94/23 97/23 98/14
judge's [3] 8/12 9/1 83/6
judges [10] 13/8 13/9 13/9 13/9 18/9 18/12 20/3 29/24 64/11 79/1
judgment [2] 36/25 47/25
judicial [2] 50/10 91/8
jump [2] 5/24 15/3
June [1] 90/1
juries [5] 43/25 62/16 65/21 66/3 67/1
jurisdiction [2] 52/3 52/19
jury [66] 1/4 7/9 7/15 8/14 10/17 12/1 12/2 15/3 15/5 15/12 19/12 27/13 27/23 28/22 28/23 29/6 29/9 29/10 29/11 29/14 29/20 30/9 32/3 42/20 42/25 43/14 43/20 44/5 44/7 45/5 48/2 48/6 48/12 49/12 51/1 51/25 52/15 52/21 55/21 59/17 62/3 62/16 62/18 62/19 62/20 66/8 66/12 66/15 66/18 66/24 69/18 70/5 72/20 72/22 73/1 73/16 74/25 75/9 78/9 79/15 80/15 82/20 82/21 82/25 83/16 91/3
jury's [2] 30/11 44/15
just [145]
Justice [16] 8/13 11/2 22/17 23/2 23/3 23/3 24/4 40/7 43/2 55/9 59/20 64/17 80/13 82/8 82/9 92/22
justices [2] 20/2 22/12

K

Kamal [3] 2/5 3/12 3/14
keep [4] 9/21 37/22 73/13 93/25
Kemp [1] 33/2
Kennedy [1] 44/6
key [1] 76/9
kind [33] 14/9 17/2 19/3 22/2 22/3 22/7 26/6 26/8 26/13 26/15 28/1 36/7 39/22 41/2 42/4 43/5 47/9 49/18 57/23 57/25 60/8 60/22 64/20 67/6 71/5 72/8 74/2 75/4 81/25 82/17 82/18 91/2 98/10
kinds [2] 32/8 93/25
Kirsten [4] 2/15 5/7 5/9 14/22
knew [3] 4/6 17/24 73/13
know [157]
knowing [2] 19/16 95/21
knowledge [2] 7/6 10/10
known [8] 3/4 15/18 15/19 16/9 16/10 50/21 67/9 67/10
knows [2] 42/16 45/8

L

lack [1] 39/9
laid [2] 28/2 59/14
language [16] 22/2 23/6 23/13 23/17 23/18 25/23 28/10 28/24 29/9 30/5 38/14 42/19 43/7 49/1 51/2 91/15
large [1] 25/20
last [14] 3/19 4/13 6/18 19/4 22/16 25/17 31/23 32/13 32/13 46/6 58/20 58/20 93/15 93/18
lastly [5] 28/1 28/7 52/24 54/12 96/2
later [5] 61/8 63/11 65/4 73/14 83/3
law [32] 7/16 32/6 35/2 36/5 42/20 43/24 44/10 45/15 46/23 49/1 49/25 50/2 50/6 52/6 55/4 56/20 56/22 60/9 60/13 61/16 62/1 62/5 65/1 69/4 69/4 79/14 82/19 82/20 84/3 85/22 87/5 95/2
law's [1] 43/8
laws [2] 22/11 62/24
lawsuit [2] 74/8 74/10
lawyer [7] 4/21 30/2 47/7 47/11 47/11 47/16 65/4
lawyers [5] 13/13 48/1 71/11 71/12 80/6
lays [1] 33/15
lead [6] 23/10 23/15 25/8 25/13 63/17 65/11
leading [1] 52/12
leads [1] 25/7
leak [1] 74/14
leaking [1] 71/9
lean [1] 28/10
learned [1] 21/22
least [7] 8/9 12/5 26/9 27/9 37/24 62/10 68/11
leave [3] 19/5 61/13 68/24
led [2] 21/9 24/19
ledger [1] 24/8
left [3] 21/25 71/22 71/23
legal [3] 34/20 34/24 36/6
legally [1] 63/2
legislators [1] 31/16
legitimate [5] 19/18 20/5 40/15 40/16 79/10
less [6] 10/1 10/1 10/4 10/6 10/8 14/18
lessened [1] 41/1
lesser [1] 83/12
let [18] 20/17 24/6 24/11 27/12 28/10 29/25 33/9 38/13 48/18 57/18 64/3 64/9 67/6 67/6 77/10 86/24 89/6 91/2
let's [5] 19/20 40/16 46/9 47/5 87/23
letterhead [1] 93/3
letting [1] 9/5
level [5] 41/18 41/24 57/11 73/23 82/2
Liberia [1] 33/17
liberties [1] 39/1
liberty [1] 37/10
license [1] 13/14
life [1] 38/2
light [5] 5/25 18/16 44/13 44/15 62/11
like [45] 5/23 9/21 11/24 14/3 14/9 18/9 18/15 22/7 24/3 25/12 33/16 37/13 37/21 38/10 41/21 46/7 47/23 50/5 53/10 59/2 59/7 61/5 67/24 69/9 69/22 71/8 71/9 71/12 71/18 72/5 73/19 74/6 74/16 75/22 79/3 79/7 79/19 79/23 80/5 80/10 89/19 90/10 90/15 90/21 98/19
likely [6] 10/9 10/19 12/11 27/2 35/3 47/14
limit [5] 31/10 31/19 63/25 64/14 64/16
limitation [3] 30/18 31/3 83/21
limitations [32] 27/24 40/17 43/1 44/9 45/2 45/9 45/16 45/18 46/14 46/21 47/8 47/16 47/19 47/24 51/16 53/2 53/23 60/1 60/16 61/21 61/23 62/4 63/9 63/11 63/15 63/22 64/23 68/24 69/2 69/6 83/3 83/4
limited [1] 72/14
limits [1] 50/12
line [3] 54/24 55/8 72/13
link [2] 17/15 19/2
LinkedIn [1] 3/25
Lisa [1] 93/5
list [3] 43/17 43/20 77/5
listen [1] 6/22
listening [1] 47/9
literally [1] 77/15
litigate [1] 16/22
litigation [4] 11/21 12/17 13/12 23/9
little [15] 5/20 6/3 19/7 56/3 59/15 73/7 75/18 78/3 79/21 82/18 86/24 87/8 97/25 99/4 99/8

L
live [2] 24/14 95/21
lived [2] 20/20 21/11
livelihood [1] 71/13
LLP [4] 2/6 2/15 3/13 5/12
local [5] 39/14 80/7 80/16 80/16 80/17
location [1] 30/21
locations [5] 30/24 83/22 92/5 92/10 92/17
logically [1] 52/23
logistical [2] 22/20 22/24
long [10] 9/25 10/5 15/13 19/9 19/18 25/18 27/2 27/4 65/4 66/18
longer [2] 20/20 62/3
look [25] 4/17 5/22 31/6 32/18 41/10 43/13 50/4 50/15 51/8 53/11 53/21 61/14 63/22 66/6 67/25 68/4 68/16 72/15 77/10 81/1 85/22 85/22 90/13 91/18 98/24
looked [4] 3/24 69/8 71/15 72/8
looking [16] 17/9 28/12 44/4 44/12 53/24 58/1 64/3 70/8 72/25 75/5 78/3 81/10 83/2 83/7 86/19 98/23
loose [1] 97/8
lose [3] 38/23 39/4 95/24
lost [2] 40/9 75/18
lot [20] 20/20 21/4 21/21 24/3 24/17 24/21 26/7 26/7 31/5 36/11 42/9 58/21 62/11 62/12 62/17 71/21 73/8 83/19 87/14 97/10
Louis [1] 81/4
Love [1] 58/12
M
M-C-C-O-M-B [1] 3/20
ma'am [1] 16/15
machines [5] 21/9 21/10 21/12 21/13 21/16
Macias [4] 49/4 49/14 54/5 92/1
made [20] 15/18 15/19 16/10 23/10 24/4 25/1 45/13 49/23 51/18 54/15 59/7 59/11 60/13 64/24 66/8 73/17 85/3 88/12 91/6 98/9
magistrate [4] 49/19 64/8 97/23 98/14
magnitude [1] 31/25
mail [10] 5/14 25/1 35/1 35/17 41/14 42/15 49/22 55/25 95/22 97/22
mails [3] 25/6 74/4 74/9
main [3] 60/14 80/21 82/8
mainly [1] 75/21
maintain [1] 11/22
major [2] 19/23 72/16
make [34] 5/15 5/20 6/8 12/14 13/7 13/25 18/9 20/6 20/12 26/13 28/9 28/19 32/14 33/11 37/4 39/4 47/3 47/9 54/10 55/25 58/1 59/4 62/10 62/24 86/22 87/6 87/9 88/1 89/11 90/7 90/17 95/7 98/7 98/24
makes [5] 33/11 38/11 54/16 73/24 96/2
making [9] 16/3 30/10 47/18 47/25 60/24 68/7 82/2 86/25 90/7
malpractice [1] 47/13
Man [1] 72/1
mandate [1] 70/6
manipulated [1] 53/25
many [10] 24/9 34/6 34/11 34/22 58/3 66/19 71/11 80/12 80/12 80/12
March [1] 53/9
March 27th [1] 53/9
marriage [1] 96/3
marshals [2] 78/18 78/18
massive [2] 25/20 84/2
matches [1] 98/8
material [1] 20/8
materials [1] 7/23
Matt [1] 60/23
matter [15] 5/25 7/24 8/24 18/1 18/11 22/11 39/19 39/25 41/6 62/20 73/24 81/8 81/8 82/12 99/17
matters [5] 8/3 15/14 62/3 89/4 94/8
Matthew [1] 2/5
may [44] 1/11 3/8 8/4 8/7 8/18 10/13 11/5 11/5 12/23 13/4 13/25 20/1 24/23 26/3 29/25 34/24 35/11 36/21 38/5 40/20 45/17 46/4 56/2 63/14 65/16 65/16 67/15 68/9 72/22 76/12 76/16 79/11 80/7 80/15 82/10 82/23 83/18 86/13 86/15 86/19 87/9 88/22 92/12 99/21
may very [1] 20/1
maybe [31] 4/8 4/16 9/4 12/5 12/7 12/10 13/15 17/6 18/18 19/7 19/24 22/12 22/20 23/2 23/2 24/22 25/25 29/21 37/21 38/7 45/8 48/4 61/8 61/14 64/5 78/23 82/5 83/25 87/2 92/19 94/18
mayor [1] 22/6
McComb [11] 2/11 3/17 3/20 3/25 8/2 8/17 9/11 17/3 56/9 56/10 97/19
me [66] 5/3 5/14 6/3 6/15 6/20 8/18 9/9 10/14 10/19 12/13 18/20 20/17 22/8 22/19 22/25 24/6 24/7 24/11 25/23 26/2 26/4 26/14 27/3 27/12 30/13 33/9 34/2 38/13 45/24 48/18 51/6 54/25 57/18 57/24 61/15 64/3 64/9 65/2 65/9 65/9 66/12 67/6 67/6 67/8 67/10 67/25 68/8 71/18 72/18 73/13 77/10 77/14 77/19 78/20 81/10 81/13 85/15 86/2 86/24 88/17 88/22 89/6 91/2 93/1 94/23 94/23
mean [54] 10/24 11/25 12/7 13/4 13/8 13/11 18/25 19/20 21/10 23/8 23/18 23/25 25/2 25/16 29/21 32/18 32/19 37/17 37/21 39/5 39/21 39/24 41/4 47/8 53/12 53/13 57/24 58/18 59/8 62/25 64/11 65/3 65/13 69/7 71/1 71/11 72/16 74/2 74/13 74/24 78/12 78/17 78/25 79/20 86/25 87/21 88/11 88/12 88/13 90/3 91/8 93/19 93/20 98/21
meaning [3] 34/7 51/3 69/18
means [3] 23/18 24/21 55/7
mechanical [2] 1/15 21/13
mechanical machines [1] 21/13
media [12] 10/8 14/23 14/24 15/7 15/20 15/23 16/9 16/11 17/7 17/18 69/22 75/13
meet [1] 10/3
meetings [1] 34/10
member [2] 21/15 32/25
members [3] 21/2 30/16 34/10
memo [3] 40/7 59/5 92/22
mention [1] 43/2
mentioned [2] 25/16 42/6
mere [1] 66/4
message [2] 40/4 76/25
methods [1] 57/10
mi [1] 3/6
mic [1] 6/23
Michael [1] 2/6
microphone [2] 6/19 89/3
middle [3] 4/4 73/7 89/25
Midtown [1] 97/4
might [30] 5/24 7/10 12/18 13/5 13/5 19/11 19/11 20/19 25/11 29/7 41/5 41/6 43/21 44/18 53/25 61/5 61/5 61/10 65/11 67/9 71/18 72/6 78/11 78/12 86/5 88/21 92/20 94/2 94/9 96/17
mind [6] 6/20 19/15 64/11 64/13 64/13 88/12
mindful [1] 98/15
minimal [1] 35/11
minimis [1] 72/9
minute [4] 4/10 20/13 24/11 58/21
minutes [3] 26/13 27/2 56/4
misconduct [6] 27/25 49/15 54/4 54/6 76/2 76/2
misdemeanor [3] 48/8 48/11 48/12
missing [1] 53/7
Missouri [3] 81/7 81/7 81/18
mistake [1] 73/17
misuse [2] 43/11 43/14
mobile [4] 30/21 30/24 35/1 83/22
modification [4] 53/17 53/18 54/8 63/16
modifications [1] 85/3
modify [1] 84/5
mom [2] 73/12 73/15
moment [5] 55/14 59/24 67/15 85/6 85/9
Monaco [1] 93/5
Monday [1] 17/7
money [6] 37/13 38/1 38/1 38/3 76/10 97/10
monitor [1] 6/4
monitors [1] 5/21
month [3] 8/7 8/9 8/21
months [1] 17/23
more [34] 8/18 9/7 10/8 10/8 12/10 18/18 22/12 24/16 26/3 27/2 27/5 29/25 32/14 33/21 47/17 47/20 55/8 59/15 65/23 65/25 66/4 67/10 71/2 71/15 73/22 76/4 83/19 84/9 86/3 86/4 87/9 88/16 92/8 97/25
morning [2] 4/12 22/17
Moss [1] 42/7
most [10] 5/18 37/12 37/23 45/11 62/18 62/19 70/17 71/10 80/10 94/23
motion [41] 1/9 3/9 4/11 4/22 6/5 6/6 7/1 7/20 9/2 9/12 9/14 9/18 9/19 9/24 12/14 14/6 15/2 15/19 15/25 15/25 16/4 16/5 16/7 16/12 17/13 17/14 17/15 17/21 18/7 20/13 20/18 20/19 52/12 72/15 77/3 85/5 87/13 88/9 89/10 89/15 92/4
motions [4] 15/22 17/1 89/12 89/12
motivations [1] 40/13
movant [1] 52/5
movants [2] 2/14 6/7
move [6] 28/25 32/13 50/14 54/9 66/4 90/21
movie [1] 60/22
movies [1] 60/23
moving [1] 50/23
Mr [3] 60/10 96/4 96/6
Mr. [28] 4/1 4/6 6/15 8/2 8/17 9/11 16/19 17/3 26/17 49/14 54/5 54/17 54/19 56/9 56/10 57/21 58/1 58/3 59/4 60/2 60/12 71/25 79/18 81/3 81/5 81/21 93/8 97/19
Mr. Bishop [15] 4/1 4/6 54/17 54/19 57/21 58/1 58/3 59/4 60/2 71/25 79/18 81/3 81/5 81/21 93/8
Mr. Ghali [4] 6/15 16/19 26/17 60/12
Mr. Macias [2] 49/14 54/5
Mr. McComb [7] 8/2 8/17 9/11 17/3 56/9 56/10 97/19
Ms [3] 14/15 55/25 98/23
Ms. [6] 6/1 6/17 14/9 16/17 89/24 97/20
Ms. Fehlan [4] 6/1 6/17 14/9 16/17
Ms. Wofford [2] 89/24 97/20
much [15] 3/24 13/21 19/17 22/14 24/16 27/11 31/25 65/23 65/25 66/4 71/18 72/5 74/4 79/13 96/10
multiple [1] 55/22
must [4] 23/20 24/1 60/13 93/3
my [41] 5/3 7/6 7/14 10/17 12/2 14/20 17/8 17/9 17/19 18/20 19/6

M

my... [30] 19/15 21/3 21/11 22/3 24/14 26/6 39/13 39/16 46/6 58/13 60/21 63/9 63/12 67/11 68/8 72/19 72/19 73/12 73/15 82/7 85/22 86/1 87/4 88/11 89/25 94/15 95/2 95/19 97/24 99/3
myself [2] 86/23 90/2

N

name [9] 3/19 4/23 4/24 5/6 24/25 42/14 69/22 85/19 93/1
namely [1] 63/15
names [8] 25/5 27/16 41/14 65/11 74/4 74/9 83/9 84/22
naming [1] 77/2
narrow [4] 84/8 84/11 84/15 95/16
narrowly [1] 84/24
nature [3] 79/21 88/7 92/17
necessarily [6] 19/13 20/15 24/21 45/13 71/17 98/17
necessary [4] 13/18 15/13 83/10 84/15
need [30] 6/14 6/19 7/10 9/4 10/4 11/3 13/6 20/12 23/22 25/9 26/7 26/16 27/4 28/3 33/10 41/14 48/12 48/21 51/5 51/7 51/20 55/6 62/24 84/11 85/3 85/23 86/11 86/19 89/22 92/24
needed [5] 10/18 12/13 12/14 18/15 82/3
needs [3] 20/8 44/16 84/16
neither [2] 51/14 57/11
neutral [1] 42/2
neutrality [2] 42/4 42/4
never [10] 23/24 32/1 32/5 52/10 52/11 71/7 72/25 73/16 91/5 96/13
new [9] 5/15 20/1 21/21 43/20 43/21 67/22 67/23 67/24 89/22
news [4] 17/10 17/19 19/21 72/16
next [6] 26/16 32/13 65/18 78/18 87/1 87/7
Nigeria [1] 33/17
night [4] 17/8 19/4 19/6 22/16
nine [2] 73/6 73/18
nine-year-old [1] 73/18
Ninth [1] 58/9
Nixon [1] 44/6
Nixon-Kennedy in [1] 44/6
no [31] 1/4 5/3 12/23 14/4 14/7 17/5 19/7 25/9 27/5 39/10 42/3 45/1 46/15 47/9 49/15 55/14 61/25 62/1 62/3 63/9 63/25 68/21 76/25 77/3 77/4 79/12 83/8 83/15 85/9 92/11 94/22
no way [1] 77/3
nobody [2] 23/25 68/8
noise [1] 79/17
nominated [2] 33/2 58/19
non [1] 8/14
non-attorneys [1] 8/14
none [3] 43/17 54/13 93/14
nonpublic [1] 34/25
normal [3] 29/4 50/8 52/14
normally [3] 67/1 67/3 82/1
North [6] 4/4 4/6 4/7 58/10 93/24 96/17
NORTHERN [6] 1/1 29/15 56/10 66/13 81/23 99/20
not [185]
note [6] 26/6 42/1 49/21 50/15 50/23 51/24
noted [2] 23/2 59/13
nothing [6] 28/9 53/25 69/4 79/25 80/4 82/15
notice [1] 91/8
notices [3] 8/21 74/13 78/8
notion [6] 31/16 36/3 42/1 44/8 50/25 55/6
November [2] 19/21 30/16
November of [1] 30/16
now [26] 3/4 7/5 9/20 11/19 17/10 18/23 21/17 24/10 35/10 36/2 38/4 42/24 46/7 48/14 48/18 63/12 65/5 65/14 69/1 69/3 71/19 75/10 76/23 80/15 83/5 96/21
number [22] 1/6 3/5 3/6 4/20 8/17 9/9 30/12 33/10 35/18 41/15 42/15 48/24 58/10 74/7 74/8 91/3 91/4 91/20 92/21 95/22 98/11 98/14
Number 2 [1] 91/4
Number 26-cv-2777 [1] 3/5
Number 4 [1] 91/20
Number 8 [1] 92/21
numbers [6] 25/1 25/6 74/4 98/3 98/13 98/19
numerous [1] 43/10
NY [1] 2/15

O

o'clock [1] 19/5
O'Connor [5] 11/2 23/2 24/4 59/20 64/17
O'Connor's [1] 22/17
oath [1] 68/14
obey [1] 13/15
object [2] 90/9 93/14
objection [3] 79/22 93/17 93/18
objective [3] 46/11 46/18 46/20
objectives [2] 60/15 60/19
observing [1] 33/16
obtain [2] 17/21 83/9
obtained [2] 60/19 78/8
obviously [7] 21/4 65/24 69/22 75/10 85/13 93/3 95/4
occur [4] 48/24 59/19 71/9 82/2
occurred [4] 17/23 23/16 59/19 61/11
occurring [1] 19/16
occurs [2] 63/6 65/7
Ocean's [1] 60/24
off [4] 8/21 22/3 41/22 96/19
offer [4] 18/20 32/24 33/20 93/22
office [8] 2/8 5/19 53/5 53/19 53/24 60/21 98/18 99/2
officer [1] 47/23
official [4] 1/23 20/23 94/9 99/19
officials [1] 62/20
often [3] 34/10 38/16 80/24
oh [5] 46/1 77/25 85/10 89/6 97/16
okay [36] 3/23 4/9 5/6 5/13 6/18 7/25 11/10 26/16 33/8 36/3 36/10 40/13 40/22 42/24 45/24 46/3 46/7 57/17 61/25 64/20 66/15 68/22 78/1 81/6 81/15 85/21 86/11 86/17 88/19 91/7 91/23 92/2 92/16 93/6 93/9 99/6
old [5] 60/8 73/6 73/6 73/17 73/18
older [1] 73/9
once [2] 46/11 46/19
one [58] 4/8 4/16 5/17 6/20 7/4 7/15 9/5 9/17 9/20 17/18 25/3 26/3 29/2 30/23 31/6 32/1 34/19 37/8 37/16 38/6 39/13 40/17 42/1 42/11 42/16 44/12 46/17 47/8 47/9 48/3 48/5 48/23 49/13 49/21 52/24 54/19 56/24 64/20 67/22 70/4 73/25 75/7 75/24 78/22 83/22 86/22 87/9 89/11 92/7 95/9 95/11 95/13 95/15 96/21 97/2 97/6 97/6 98/21
ones [4] 21/17 31/15 80/8 98/8
online [3] 17/11 17/12 18/24
only [28] 3/25 4/8 4/16 9/5 12/1 12/20 13/13 15/13 28/15 41/23 44/17 44/24 47/12 48/7 50/3 52/1 54/2 54/24 60/19 75/23 75/25 82/22 84/18 84/24 86/2 86/21 90/8 90/11
open [11] 5/23 20/8 20/12 34/11 42/12 42/14 42/19 61/4 69/9 70/21 95/23
opened [2] 86/2 87/12
opening [2] 20/14 26/25
operate [2] 63/20 82/21
operating [1] 8/23
opinion [5] 11/2 22/17 23/4 43/1 97/13
opportunities [1] 43/10
opportunity [6] 6/18 21/1 67/14 85/25 89/17 90/10
oppose [1] 7/3
opposed [1] 50/20
opposing [1] 86/20
opposite [1] 69/8
oppressive [4] 43/8 57/8 69/6 95/11
oppressiveness [1] 57/12
orbit [2] 27/19 75/21
order [21] 9/3 12/17 13/1 13/20 17/20 17/24 18/17 18/20 18/24 18/24 19/1 19/6 20/13 20/15 53/15 55/22 70/10 75/9 86/20 89/14 91/4
orders [5] 4/15 4/17 11/20 13/11 15/11
organization [1] 37/9
organizations [4] 37/7 37/14 38/2 38/22
original [3] 17/22 36/1 91/21
originally [1] 3/5
other [31] 7/23 11/7 13/6 16/13 17/16 24/6 24/7 25/22 25/23 26/1 28/4 32/8 37/20 40/21 41/17 42/1 42/21 47/2 47/21 48/7 53/14 69/24 72/3 74/14 83/8 83/16 87/4 87/19 88/17 89/11 89/21
others [2] 5/24 38/20
otherwise [4] 20/10 38/22 46/13 93/3
our [30] 5/18 7/7 8/23 9/10 9/20 10/12 16/20 17/10 18/25 19/23 20/6 27/20 28/2 39/14 42/8 42/9 43/2 46/4 55/12 55/15 63/14 69/20 76/21 76/24 85/13 86/1 88/2 90/7 91/8 98/18
out [54] 9/3 12/24 14/16 17/7 18/6 18/18 18/21 18/21 26/12 26/16 28/2 29/22 33/15 34/15 36/23 37/17 38/6 40/25 44/9 46/2 46/13 46/25 56/13 56/19 56/23 57/9 57/19 57/24 57/25 58/8 58/25 59/14 60/7 61/22 62/5 63/15 68/15 68/25 71/22 71/24 73/14 75/1 76/4 81/7 82/9 82/13 82/18 89/24 90/2 91/18 95/3 96/9 96/25 98/9
outcome [1] 59/7
outcomes [1] 59/5
outlets [1] 72/16
outs [1] 35/12
outset [1] 21/24
outside [5] 28/15 45/17 61/1 62/4 69/20
outsourced [1] 96/23
outweigh [1] 50/22
over [10] 29/24 34/18 52/19 68/1 74/20 75/7 79/13 80/13 91/2 99/1
overbreadth [3] 31/5 51/11 51/21
overbroad [13] 27/18 31/6 31/7 31/8 31/21 32/14 54/3 64/19 64/20 75/20 83/23 84/1 84/6
overlook [1] 66/1
overriding [1] 20/6
overseas [2] 33/15 87/5
overtly [1] 34/6
overview [1] 66/1
own [2] 16/3 67/3

P

p.m [3] 1/11 56/7 99/11
page [2] 34/14 92/8
pages [3] 88/2 88/4 92/8
paid [1] 36/25
palatable [1] 84/9
pale [1] 64/7
paper [2] 17/10 17/12
papers [2] 15/8 16/13
Paragraph [1] 49/24
Paragraph 84 [1] 49/24

P

paraphrasing [2] 23/14 83/18
pardon [1] 81/9
Parenthood [1] 38/1
parked [1] 73/9
parking [1] 73/8
part [8] 18/7 31/1 49/4 54/11 61/10 72/15 86/10 94/23
parte [5] 67/7 68/11 90/6 90/9 90/15
participate [2] 42/8 62/14
participating [2] 35/4 41/16
participation [5] 27/21 29/8 36/4 36/8 41/25
particular [20] 11/12 27/16 39/9 39/10 55/9 57/3 57/12 59/3 59/10 63/17 75/21 77/5 80/14 80/18 80/25 82/3 82/25 84/17 84/17 87/17
particularly [10] 5/24 9/23 57/10 58/19 62/11 65/14 76/25 77/8 80/21 80/23
parties [6] 6/7 11/21 24/10 64/12 72/15 90/14
partisan [4] 20/2 20/3 20/4 22/2
partisan-ish [1] 20/2
party [8] 11/6 11/7 20/7 21/2 21/5 33/2 37/9 94/14
pass [1] 51/13
passed [1] 47/24
passing [1] 19/3
past [2] 20/22 21/25
pathway [2] 76/9 76/14
pathways [1] 76/11
patience [1] 96/10
pause [6] 56/17 67/17 77/20 78/2 78/5 85/11
Pence [2] 15/16 15/17
pending [2] 7/1 80/1
people [35] 3/8 8/10 21/11 24/15 24/17 24/21 25/7 25/10 25/10 25/17 31/17 32/20 34/4 35/21 37/13 37/18 37/22 37/23 38/1 40/4 58/21 62/12 62/22 62/23 65/11 66/23 71/5 72/3 72/10 73/10 80/22 84/23 89/9 95/21 96/18
people's [2] 62/14 63/7
perception [1] 79/11
perfectly [1] 59/17
perhaps [4] 11/4 72/21 81/9 81/10
period [3] 25/19 53/2 63/22
perks [1] 97/2
permanent [1] 4/20
person [5] 21/5 21/6 34/19 60/22 89/21
personal [10] 19/7 30/17 31/7 31/25 32/21 34/21 35/1 46/25 54/1 98/19
perspective [8] 24/6 36/12 71/15 72/7 86/21 86/22 87/3 90/17
perspectives [1] 89/9
petitioner [3] 2/4 59/2 75/19
petitioner's [7] 9/18 9/24 57/5 57/6 61/22 70/2 85/5
petitioners [5] 13/1 13/19 13/20 13/24 70/17
petitioners' [1] 88/9
phone [10] 24/25 25/6 35/17 41/15 42/14 74/4 95/22 98/3 98/11 98/19
photo [1] 58/2
phrase [1] 95/10
phrased [1] 41/8
physical [1] 34/24
pick [3] 19/24 19/24 62/16
picked [1] 20/2
Pickens [1] 47/21
picture [2] 49/5 86/13
pieces [1] 30/17
Pitts [15] 28/7 49/3 49/6 49/10 51/24 52/23 52/25 59/12 68/20 81/8 91/6 91/14 91/25 92/4 97/24
place [3] 5/17 48/14 95/4
places [1] 33/16
plagued [1] 21/19
plaintiff [12] 3/11 6/8 9/15 11/11 12/15 12/15 16/17 67/10 70/20 83/17 85/25 88/25
plaintiff's [1] 79/18
plaintiffs [3] 23/6 60/3 62/10
planned [3] 26/24 38/1 88/9
plans [1] 60/24
play [1] 66/21
please [2] 3/3 89/3
plus [1] 61/7
point [24] 10/5 11/20 13/18 15/15 15/16 17/6 19/9 30/4 31/23 38/6 56/22 57/19 58/25 60/4 63/9 63/12 63/13 68/25 71/2 76/19 83/17 92/16 94/25 98/16
point is [4] 31/23 63/9 63/12 76/19
point of [2] 17/6 63/13
point on [1] 92/16
point out [3] 38/6 57/19 58/25
point really [1] 71/2
point to [1] 60/4
point where [1] 13/18
pointed [4] 57/9 60/7 61/22 63/15
pointing [1] 82/18
points [3] 37/17 50/3 95/7
poking [1] 65/5
police [1] 73/12
policy [2] 55/1 55/2
political [11] 20/22 21/5 21/25 33/19 34/7 42/4 57/10 57/15 59/1 59/7 76/20
politically [1] 24/22
politician [4] 20/24 59/1 59/4 59/6
politicians' [1] 22/4
politics [3] 22/4 58/18 94/20
poll [29] 27/17 27/18 31/12 32/1 32/8 34/5 34/7 34/12 34/17 34/19 34/25 35/3 35/4 36/14 36/17 36/20 40/19 40/20 40/23 41/7 41/7 50/11 52/22 54/1 75/21 77/2 84/20 95/13 95/19
polling [3] 32/19 92/5 92/10
polls [3] 40/10 76/15 84/25
population [1] 24/13
poses [1] 35/23
position [5] 6/16 7/7 9/11 16/21 25/11
positions [1] 6/14
positive [2] 8/19 98/6
possibility [3] 10/25 41/21 85/4
possible [13] 12/7 13/2 14/1 19/17 63/6 69/25 70/11 70/13 76/1 79/7 81/2 87/1 87/1
possibly [4] 23/15 25/8 79/20 83/9
post [2] 46/20 61/24
post-conspiracy [1] 46/20
post-indictment [1] 61/24
potential [4] 10/2 34/18 34/22 34/23
power [7] 27/15 43/11 43/14 43/22 65/22 65/23 66/1
PowerPoint [1] 87/15
powers [1] 79/5
practical [1] 27/21
practice [3] 13/14 29/5 80/10
preamble [1] 24/3
preamble-like [1] 24/3
precedence [2] 32/11 43/9
precedent [1] 7/12
precinct [1] 39/10
precincts [2] 31/8 32/19
precisely [1] 35/8
predate [1] 45/15
predicate [4] 28/5 48/22 50/13 68/13
preeminent [1] 96/22
premise [1] 66/7
preparing [1] 9/17
present [2] 10/9 43/21
presentation [3] 26/14 26/19 87/15
presented [1] 85/12
preserve [1] 85/23
President [13] 15/17 51/18 54/15 54/18 54/24 55/7 55/14 57/20 77/1 77/4 78/13 78/14 78/19
presiding [1] 8/8
press [3] 15/24 72/12 72/21
presumably [4] 9/19 10/1 60/15 77/3
presume [1] 13/13
presumed [2] 57/3 57/5
presumption [4] 29/4 29/16 52/15 57/6
pretty [7] 68/19 77/7 77/18 79/23 88/3 88/14 94/16
prevent [1] 15/13
primary [2] 19/23 76/19
principal [1] 4/22
principle [3] 31/19 46/23 48/4
principled [1] 31/10
prior [2] 88/7 93/7
privacy [2] 37/19 98/21
private [4] 19/12 24/24 73/7 94/9
privy [1] 17/20
probable [5] 48/20 49/20 52/10 52/11 66/24
probably [14] 4/7 6/13 10/25 12/3 12/4 17/9 70/4 70/22 73/23 86/1 86/9 88/16 90/3 90/3
problem [2] 45/10 95/16
problematic [1] 52/18
problems [2] 6/4 25/13
procedure [2] 9/21 15/10
procedures [1] 8/23
proceeding [3] 15/9 91/1 93/22
proceedings [9] 1/15 5/24 9/25 14/25 15/6 15/12 20/6 99/11 99/17
proceeds [1] 76/13
process [20] 4/12 9/8 9/17 11/17 12/6 19/13 20/25 25/5 57/19 58/11 58/22 59/7 59/17 63/7 65/12 67/8 67/13 90/15 90/16 95/3
processes [2] 65/23 66/17
procure [2] 44/21 46/10
procurement [1] 45/3
produce [2] 22/19 22/24
produced [1] 1/15
professional [1] 34/21
professionals [1] 66/22
progressive [1] 22/13
prominent [1] 74/12
proof [1] 54/22
proof is [1] 54/22
proper [2] 75/2 79/3
properly [2] 57/4 57/4
proposal [1] 55/24
proposed [3] 16/23 55/22 90/8
prosecute [1] 79/24
prosecution [3] 55/5 69/21 80/15
prosecutor [6] 29/22 30/6 55/13 80/7 81/1 82/15
prosecutors [5] 29/6 29/20 43/21 66/20 67/5
prospect [5] 41/15 44/3 63/1 78/22 86/18
Prosperity [1] 38/15
protean [1] 43/10
protect [2] 12/18 71/13
protected [1] 92/25
protection [1] 70/16
protections [1] 95/23
protective [6] 11/20 12/16 13/1 13/11 13/20 86/20
protocol [1] 9/10
prove [2] 47/15 57/7
provide [1] 67/8
provided [8] 11/18 24/19 25/2 29/10 72/10 78/12 78/13 78/13
providing [1] 37/18
public [34] 4/19 6/9 6/10 6/13 7/6 7/7 10/14 16/4 16/4 16/5 19/15 20/6 20/9 25/1 34/8 34/10 34/11 37/18 37/19 38/12 38/23 39/3 39/19 54/20 54/21 59/11 67/9 70/4 70/15 74/12 84/23 84/23 94/9 95/25
publicizing [1] 15/22
publicly [5] 15/18 15/19 16/6 16/14 42/13
pull [3] 21/12 95/3 98/9

P
pun [1] 39/10
purport [2] 51/11 51/12
purported [1] 27/25
purports [1] 51/3
purpose [28] 7/4 24/2 28/2 28/3 40/16 43/5 43/9 43/13 47/18 50/15 50/16 50/17 50/22 51/15 51/17 51/23 54/12 54/17 54/18 55/11 55/15 57/15 76/19 76/20 81/20 82/3 93/11 94/5
purposes [3] 20/14 43/23 60/19
pursuant [1] 17/22
purview [1] 83/7
put [9] 9/3 20/10 35/18 38/13 49/2 73/20 73/22 91/8 96/23
putting [2] 68/15 93/12

Q
quash [20] 1/9 12/14 15/19 15/23 15/25 16/4 16/5 16/7 16/12 27/13 27/15 27/19 43/6 43/7 55/21 84/5 84/7 84/14 85/5 95/17
quashed [1] 43/4
quashing [1] 79/10
question [15] 4/9 8/4 22/25 27/15 60/8 64/1 64/21 65/14 69/9 70/1 72/19 73/3 83/11 83/15 83/22
questions [4] 45/20 54/10 65/12 68/13
quick [2] 56/3 73/5
quickly [3] 48/10 48/18 50/14
quite [5] 33/25 37/25 69/24 80/24 83/5
quotes [1] 43/6
quoting [1] 59/20

R
races [2] 20/3 20/4
raise [10] 47/1 47/7 47/11 47/16 47/19 50/3 50/18 63/4 65/4 98/16
raised [2] 47/3 61/24
raises [1] 86/18
raising [2] 79/22 89/15
ramblin' [5] 96/16 96/24 97/1 97/3 97/7
ran [1] 21/5
rather [4] 28/22 68/17 84/2 85/5
Ray [1] 1/10
RCR [2] 1/23 99/18
RE [2] 1/4 15/16
reach [2] 82/9 89/13
reached [2] 18/6 73/23
reaching [1] 88/20
read [23] 6/5 18/24 18/24 19/2 19/3 19/3 19/4 19/4 20/18 20/18 20/18 22/14 26/1 26/1 28/7 30/22 32/1 52/20 60/2 60/12 68/19 86/23 90/15
readers [1] 17/13
reading [5] 17/11 19/6 21/22 22/17 33/14
reads [1] 49/24
real [6] 4/12 17/11 25/23 34/7 47/4 63/5
realities [1] 72/4
really [43] 4/16 7/4 8/11 9/4 11/7 21/10 22/1 22/12 23/4 25/20 26/8 27/1 31/10 37/4 38/7 38/12 39/22 41/5 42/3 42/12 43/24 44/3 45/7 47/8 47/10 49/23 50/7 51/7 52/1 59/14 63/25 64/5 64/7 70/18 71/2 78/15 78/24 79/7 83/12 83/24 93/10 96/11 97/17
reason [9] 8/5 11/15 11/20 20/6 24/18 27/19 57/14 70/1 88/8
reasonable [24] 16/23 23/1 23/17 23/20 23/20 23/24 24/1 26/11 40/18 41/5 41/6 57/4 57/6 62/7 62/10 65/5 65/8 65/10 67/12 69/16 73/22 74/17 82/24 83/8
reasonableness [11] 26/9 31/9 41/3 64/1 64/15 69/11 73/4 73/21 73/23 73/25 84/10
reasonably [1] 23/10
reasons [5] 5/17 6/20 43/5 57/9 70/5
rebuilt [1] 96/20
receipt [2] 15/18 16/3
receive [1] 94/4
received [8] 4/11 4/21 7/15 8/25 9/2 15/17 34/16 93/13
receiving [1] 15/6
recently [3] 37/14 58/16 74/6
recess [2] 56/4 56/7
recognize [3] 23/6 35/22 59/23
recognizes [1] 11/3
recollection [2] 97/25 99/3
recommends [1] 34/4
record [10] 20/14 49/4 81/22 85/23 90/7 90/14 90/14 93/13 96/4 99/17
recorded [1] 1/15
recordkeeping [3] 35/12 48/8 48/11
records [18] 6/8 15/11 16/1 30/6 30/8 30/15 35/24 42/12 42/14 42/19 51/6 70/4 70/15 70/21 72/23 76/10 93/25 95/24
recount [2] 36/1 49/17
recounts [1] 21/22
recruit [1] 95/15
recusal [1] 82/13
recuse [2] 97/12 97/14
recused [1] 96/12
recycle [1] 93/3
red [3] 17/12 19/1 72/13
redacted [2] 97/25 99/5
redactions [1] 98/8
reduce [1] 43/16
reference [1] 92/5
referenced [4] 6/8 90/24 92/9 93/2
referring [3] 37/12 78/7 81/16
regard [3] 37/15 38/4 68/20
regarding [2] 15/12 88/7
regards [2] 9/24 13/20
Regents [1] 97/10
Registers [3] 12/21 74/22 75/11
Registration [5] 3/7 6/25 7/17 11/7 65/19
regularity [3] 29/4 29/16 52/15
regulation [1] 62/2
reject [1] 98/18
related [8] 10/17 16/13 17/25 18/2 28/1 60/3 83/17 98/17
relates [7] 25/14 37/2 42/25 63/9 83/11 86/9 86/15
relationship [1] 41/10
relative [4] 9/12 12/14 40/12 69/1
relatively [2] 22/20 48/10
release [1] 75/13
releasing [1] 69/21
relevance [2] 51/19 93/19
relevant [2] 82/24 94/24
reluctant [1] 34/6
rely [2] 50/18 68/10
remain [2] 9/25 15/12
remaining [1] 9/21
remains [1] 10/5
remedies [1] 69/24
remedy [1] 75/16
remember [5] 4/23 4/24 4/25 21/11 97/11
remind [1] 85/16
removed [1] 54/2
removing [1] 83/6
reply [1] 89/18
report [2] 72/13 72/22
reported [1] 8/20
reporter [4] 1/23 6/21 26/21 99/19
Reporter's [1] 99/15
reporting [1] 72/21
representative [1] 22/5
represented [1] 92/9
Republican [3] 94/13 94/14 94/24
reputational [1] 34/24
request [7] 10/22 23/1 23/10 23/14 73/22 75/19 84/13
requested [4] 30/18 70/2 70/14 70/19
requesting [5] 34/16 69/13 69/17 75/23 75/25
requests [1] 27/16
require [7] 7/16 15/4 17/2 30/14 66/11 68/9 68/10
requires [6] 8/16 8/19 11/21 12/3 29/9 41/10
research [1] 57/24
Reserve [1] 43/3
resolve [1] 18/18
resolved [3] 76/21 76/22 76/24
resources [2] 5/18 39/9
respect [1] 42/11
respects [2] 18/1 52/17
respond [4] 12/16 88/9 89/21 93/11
responded [1] 87/13
respondent [6] 2/10 27/10 44/3 49/18 52/25 54/16
respondent's [1] 91/13
response [8] 6/6 9/18 12/20 16/16 20/18 37/17 72/19 91/4
responsibility [2] 8/25 21/3
restate [1] 40/14
restrictions [1] 42/22
restroom [1] 56/4
result [1] 63/11
results [2] 30/20 31/15
retain [1] 34/20
retained [1] 35/15
return [2] 45/5 52/3
returned [1] 29/21
reveal [3] 76/3 76/8 76/11
revealed [1] 7/22
review [2] 68/4 90/11
reviewed [1] 31/1
reviewing [1] 76/10
revising [1] 91/15
revisit [3] 44/6 54/14 88/23
revolutionary [1] 21/18
rid [1] 61/9
ride [1] 97/3
ridiculous [1] 47/8
rig [4] 44/23 46/9 46/12 46/19
right [76] 3/2 3/4 3/14 4/10 5/14 7/5 7/19 8/17 9/11 9/20 10/15 10/24 13/7 13/8 14/5 14/8 14/15 14/19 15/23 16/9 16/15 17/3 20/17 23/11 23/22 26/5 26/17 27/14 29/18 33/11 36/14 37/18 37/19 37/23 38/2 38/4 38/5 38/17 39/3 39/12 39/22 40/9 41/9 56/5 56/8 56/18 56/24 57/1 57/2 57/2 57/16 59/22 61/19 62/8 62/13 63/20 68/22 71/6 71/22 72/22 73/2 76/6 78/3 78/6 78/10 83/1 84/5 87/22 88/24 88/25 89/12 90/20 91/7 94/3 95/2 95/24
right's [1] 71/24
rightly [1] 16/9
rights [7] 33/19 36/13 37/10 38/23 80/12 80/23 95/21
rise [2] 57/11 59/1
risk [4] 34/25 38/21 41/12 41/25
risks [1] 34/24
road [2] 66/10 79/12
rob [1] 61/3
robbing [1] 61/7
rode [1] 73/10
role [3] 33/3 94/10 94/22
roles [2] 31/7 66/20
ROM [1] 28/19
Rome [4] 8/6 8/7 99/7 99/9
room [1] 78/18
rosters [1] 30/15
roughly [1] 89/23
RPR [2] 1/23 99/18
Ruby [1] 42/7
rule [34] 8/15 8/15 8/18 8/19 15/10 15/10 15/11 18/2 18/11 18/11 22/9 23/21 23/22 23/22 24/2 51/2 62/2 62/6 62/7 64/14 69/4 69/23 75/17 77/7 77/10 77/21 77/22 77/22 78/6 84/4 85/4 88/2 96/13 97/15
Rule 17 [2] 51/2 85/4
rules [7] 13/15 15/4 16/22 22/10 69/19 71/12 90/25
ruling [3] 87/22 88/7 88/13
run [3] 24/17 69/2 75/1
running [2] 80/8 96/25
runoffs [1] 19/25

R
rural [1] 21/11
Ryan [2] 49/3 91/25

S
safe [1] 61/4
said [20] 9/20 34/3 34/5 35/10 38/10 40/22 43/18 49/3 49/6 52/11 53/10 53/21 57/23 63/4 88/16 89/21 90/12 94/7 94/8 94/19
Salinas [2] 49/22 91/14
Salinas's [1] 98/14
same [9] 16/2 18/3 24/2 38/12 40/21 67/21 76/9 81/18 89/22
Sara [1] 33/1
satisfy [2] 9/22 59/19
Savannah [1] 96/19
saw [5] 18/16 19/2 54/7 73/7 73/16
say [69] 7/14 8/10 11/9 11/10 11/10 14/5 20/19 21/10 21/24 22/15 23/22 24/6 27/7 29/2 30/12 31/17 32/4 32/7 36/6 39/21 39/24 40/2 40/16 42/7 44/2 44/5 44/11 45/8 46/9 47/5 47/17 48/23 50/3 50/15 50/18 51/7 51/19 52/20 53/11 53/20 54/19 54/21 54/23 54/24 54/24 55/8 57/22 63/21 64/9 65/3 65/20 66/15 68/6 68/12 72/3 74/2 75/4 75/22 76/23 77/6 78/20 86/19 86/24 87/23 89/6 89/22 91/15 95/18 99/7
saying [21] 11/17 12/12 19/10 27/12 30/1 30/1 31/14 31/20 35/8 38/22 41/4 42/5 45/12 59/1 66/14 67/1 68/17 68/18 78/11 78/24 94/3
says [27] 7/16 15/11 22/10 23/20 23/21 23/22 28/18 31/2 33/1 33/18 34/21 38/24 42/4 42/19 43/25 45/23 46/1 48/25 51/4 51/6 51/12 60/13 61/12 64/15 69/8 83/18 91/16
schedule [2] 89/16 90/3
scheduled [1] 8/6
scheduling [2] 4/17 87/4
Schell [2] 5/1 5/4
school [7] 71/14 73/7 73/9 73/10 89/25 96/20 96/22
schools [1] 92/13
scintilla [1] 82/23
scope [4] 79/14 84/8 84/11 88/1
screen [1] 92/7
scrutiny [5] 38/18 41/11 41/19 41/24 59/15
seal [9] 7/8 7/13 7/20 7/22 10/14 20/11 85/23 86/1 88/7
seal/unseal [1] 88/7
sealed [7] 4/18 7/5 7/11 9/21 9/25 10/5 15/12
sealing [3] 4/12 15/4 17/2
search [8] 17/22 48/19 53/3 67/20 67/23 72/23 91/20 91/21
seat [1] 3/3
SEB [1] 34/10
second [7] 27/20 34/14 57/24 77/19 78/1 90/1 95/18
secondly [3] 5/22 90/6 95/14
seconds [1] 95/7
secrecy [7] 15/3 16/10 46/12 46/20 69/19 70/6 75/9
secret [2] 16/22 37/23
Secretary [4] 21/8 53/5 53/19 53/24
Secure [1] 53/7
securities [2] 80/6 80/11
security [1] 74/7
see [12] 7/22 8/14 30/5 30/7 30/7 38/3 38/3 44/2 56/4 75/15 78/6 86/17
seeing [1] 60/23
seek [2] 25/9 74/3
seeking [7] 28/6 42/13 75/7 75/8 84/20 84/21 84/22
seeks [3] 24/9 44/12 82/25
seem [2] 45/19 85/3
seemed [1] 29/12
seems [9] 4/19 11/24 12/12 22/19 26/2 46/7 48/19 61/12 70/20
seen [6] 8/22 62/1 75/13 76/16 79/14 84/4
selected [1] 81/1
seminal [1] 26/2
senator [3] 19/25 94/12 94/24
senators [1] 94/18
send [5] 28/15 56/1 80/13 80/13 80/13
sense [5] 22/23 45/19 59/5 81/10 95/21
sensitive [3] 10/16 31/7 92/17
sent [3] 18/15 28/21 28/21
separate [2] 7/20 55/3
separated [1] 55/10
separates [1] 48/6
separation [1] 79/5
series [1] 32/22
serve [4] 32/20 33/3 34/5 36/21
served [9] 21/7 21/14 30/16 30/19 34/12 34/17 34/18 57/5 78/23
service [4] 34/8 35/2 54/20 84/23
services [1] 84/23
serving [2] 34/7 34/25
set [4] 47/14 67/12 86/14 89/16
Seven [1] 60/24
several [2] 59/6 59/12
severely [1] 97/9
SHA [2] 53/7 53/12
share [1] 69/19
shared [2] 38/20 71/16
Shaye [1] 42/7
she [15] 11/3 33/1 33/15 33/18 34/3 34/4 34/4 34/5 34/14 34/16 34/21 34/22 49/23 53/6 53/7
she'll [1] 98/25
She's [1] 33/25
shed [2] 44/12 44/15
sheer [1] 55/12
Shelton [1] 38/24
sheriff [3] 78/22 79/1 79/2
short [2] 46/2 46/3
should [16] 7/7 11/17 11/18 16/14 18/10 27/13 34/19 42/5 42/5 43/19 44/8 49/10 52/21 63/6 63/8 88/16
shouldn't [1] 98/25
show [7] 16/9 32/21 49/8 49/14 54/6 59/2 95/20
showed [2] 54/7 92/7
showing [3] 40/9 86/7 86/10
sic [1] 12/22
side [10] 22/2 24/7 25/22 25/23 28/4 31/4 47/21 55/24 89/11 96/9
sides [4] 20/17 87/12 89/8 89/19
sidesteps [1] 55/14
sign [4] 8/11 8/21 29/6 82/3
signatory [1] 4/22
similar [4] 17/21 18/1 18/4 92/19
simple [1] 35/3
simply [15] 9/21 13/7 23/19 34/18 40/3 65/14 70/10 72/20 75/15 76/14 79/10 83/1 83/13 84/7 84/14
since [6] 19/21 25/25 34/15 55/1 69/12 71/7
single [1] 84/20
sir [12] 3/15 14/4 14/7 17/4 56/18 58/24 79/16 85/7 86/6 87/11 97/19 97/21
sit [3] 30/12 63/12 67/2
sitting [3] 17/8 19/22 66/7
situation [8] 10/21 59/10 61/25 65/17 66/3 79/6 80/25 82/7
six [2] 77/25 92/8
skin [1] 22/7
slide [2] 46/6 70/2
slides [3] 26/19 26/22 26/23
Slow [1] 33/24
small [1] 82/23
Smalley [1] 4/24
so [194]
social [1] 74/7
sole [3] 43/25 44/1 47/18
solely [1] 51/19
some [50] 3/8 3/8 6/21 8/4 9/23 10/18 11/1 11/4 11/19 12/22 12/24 14/1 18/1 18/1 19/10 24/10 24/24 25/12 26/19 26/20 35/7 35/14 35/15 35/16 36/16 38/4 38/13 39/3 40/18 41/1 41/21 50/10 50/20 52/17 64/14 64/15 65/9 66/5 70/11 70/20 74/16 75/16 78/8 79/10 84/2 86/20 88/14 96/8 96/23 98/17
somebody [5] 60/25 61/1 67/2 81/7 89/22
somehow [2] 52/21 57/7
someone [14] 6/2 31/12 31/18 35/8 46/25 47/6 47/18 51/4 53/4 53/19 53/23 54/7 71/18 82/3
something [46] 4/24 10/14 11/5 13/8 16/24 23/18 31/13 31/18 33/9 34/3 37/21 38/8 38/19 39/20 40/24 45/9 47/6 48/4 53/1 53/21 59/24 63/2 63/10 63/14 63/17 63/18 63/23 65/3 66/5 66/5 72/21 76/16 77/2 78/23 79/3 79/11 82/23 82/24 85/15 86/3 86/3 88/15 89/7 90/10 94/1 98/25
sometime [1] 20/16
sometimes [3] 8/10 79/24 79/25
somewhat [2] 17/20 35/11
somewhere [2] 51/8 51/20
son [1] 89/25
Soo [1] 2/7
soon [4] 3/9 9/8 18/25 88/17
sorry [10] 3/19 33/23 34/1 46/4 58/24 60/10 75/18 77/12 77/24 99/8
sort [10] 9/24 10/4 25/22 46/2 59/15 64/23 73/20 76/13 83/4 98/21
sorts [1] 25/1
sought [2] 15/24 29/17
sound [1] 14/3
sounds [3] 61/5 69/9 99/6
South [1] 96/22
Southern [1] 82/13
Spahr [3] 2/15 5/12 14/23
speak [5] 10/3 16/16 23/16 33/18 76/14
speaker [1] 34/12
speaking [4] 3/10 39/18 39/18 61/20
special [17] 3/18 12/2 29/13 29/13 29/22 67/19 79/23 80/18 81/1 81/19 81/23 82/11 82/14 83/3 83/4 85/20 91/14
specific [10] 7/20 26/3 40/1 41/6 41/11 50/20 69/3 88/15 88/16 95/16
specifically [3] 15/6 28/11 84/24
speech [1] 34/7
spell [1] 14/11
Spelled [1] 14/11
spend [1] 11/1
spending [1] 63/1
spent [3] 19/6 22/16 36/11
spread [1] 96/9
St. [1] 81/4
St. Louis [1] 81/4
staff [4] 6/21 18/19 30/16 31/16
staffing [1] 35/16
stage [1] 52/9
stalling [1] 6/3
stance [1] 9/20
stand [3] 40/21 42/8 85/13
standard [3] 11/20 23/9 52/4
standing [4] 14/24 37/4 37/9 79/13
standpoint [5] 22/21 22/24 23/9 29/3 29/16
standpoint for [1] 22/24
start [6] 25/9 26/12

S

start... [4] 41/3 56/19 57/13 57/18
started [1] 71/7
starts [1] 23/12
state [14] 17/19 20/23 21/8 22/1 22/5 32/25 33/3 35/8 53/4 54/7 66/19 67/4 74/23 94/12
State's [3] 53/5 53/19 53/24
statement [4] 10/16 26/7 34/11 59/23
statements [8] 24/4 39/4 42/6 51/18 54/15 54/20 59/4 59/7
states [19] 1/1 1/10 3/7 3/16 3/18 11/1 13/2 13/6 13/22 57/20 59/6 72/16 77/1 77/5 78/19 81/17 81/23 83/9 99/19
statute [38] 27/24 40/17 42/25 44/8 44/17 44/20 44/25 45/2 45/9 45/16 45/18 46/14 46/21 47/7 47/16 47/19 47/23 48/7 48/8 48/15 48/16 51/16 53/1 53/22 60/1 60/16 61/20 61/23 62/1 62/4 63/9 63/11 63/14 63/21 64/23 68/24 69/2 69/6
statutes [2] 44/17 44/18
stay [4] 40/3 67/6 83/3 88/1
stay within [1] 88/1
stayed [1] 9/3
steal [1] 46/9
stenography [1] 1/15
stepping [1] 81/13
stevens [2] 23/3 23/3
still [7] 13/1 35/12 60/1 61/1 61/21 61/23 62/6
stolen [1] 74/10
stop [1] 72/24
story [3] 49/20 73/5 73/5
strictly [2] 17/11 17/25
strong [1] 30/7
struck [2] 30/13 34/2
students [1] 73/9
stuff [18] 8/11 8/14 8/14 11/4 12/13 19/10 22/3 22/7 22/8 26/8 38/5 49/7 61/10 62/12 73/11 81/25 88/13 99/2
stuffing [1] 44/22
stupid [1] 47/10
stymied [2] 72/20 72/22
subdivision [1] 11/13
subject [7] 5/25 12/8 18/1 47/12 52/15 68/7 71/12
submit [2] 48/3 94/1
submitted [3] 49/21 87/16 92/4
subpoena [73] 1/4 7/15 7/17 7/18 9/3 9/5 9/6 15/7 15/17 15/18 15/22 16/3 16/7 16/10 16/12 26/10 27/13 27/16 27/17 27/21 27/23 28/2 28/5 28/6 28/10 28/12 28/13 28/16 28/17 29/6 30/13 30/15 31/2 31/24 35/22 41/5 42/20 42/25 43/4 43/6 43/7 43/14 43/20 43/22 44/12 49/12 51/1 51/10 51/25 52/15 52/22 54/3 55/21 57/3 57/4 67/12 69/13 69/18 70/5 75/9 79/10 82/20 83/10 83/16 84/5 84/7 84/13 84/14 84/17 89/10 91/3 95/12 95/17
subpoenaed [1] 43/3
subpoenas [8] 15/12 23/23 28/21 29/4 29/20 50/11 79/15 82/21
subsection [4] 77/11 77/13 77/16 77/17
subset [1] 78/6
such [5] 8/24 15/14 25/6 29/25 65/21
sudden [1] 58/22
sued [4] 36/24 47/12 74/5 97/9
sufficiently [1] 16/8
suggest [4] 47/7 48/19 57/15 62/2
suggested [1] 49/19
suggesting [1] 84/16
suggestions [1] 33/20
suggests [1] 69/5
suing [1] 14/24
Suite [1] 1/24
superior [5] 8/16 8/20 78/21 79/1 94/11
supervise [1] 52/8
supervising [1] 82/2
supplement [1] 61/14
supplemental [4] 87/16 87/18 87/24 89/17
support [2] 34/4 34/23
supported [1] 44/9
supports [3] 50/25 55/1 94/4
supposed [1] 42/2
supposition [1] 79/11
Supreme [7] 20/1 22/13 24/4 37/6 37/15 38/24 45/22
sure [34] 4/18 5/22 8/17 10/13 13/11 13/17 18/9 18/22 33/11 36/25 54/10 55/25 58/1 63/12 65/1 66/11 67/16 68/6 70/18 70/22 72/2 74/1 77/18 78/15 79/4 87/2 87/21 88/1 89/19 90/7 91/7 95/8 98/7 98/24
surged [1] 35/25
surrounding [1] 59/8
survive [1] 41/24
suspect [1] 58/14
suspended [1] 39/1
suspicion [1] 66/4
SW [1] 1/24
swallow [1] 84/9
sway [1] 22/8
switch [1] 41/22
sympathize [1] 79/9
system [4] 62/2 72/11 74/17 97/17

T

tabulate [2] 44/21 46/10
tabulated [1] 53/13
tabulation [1] 45/3
tailor [1] 84/15
tailored [1] 84/24
take [15] 18/19 27/2 27/8 31/11 35/23 48/13 56/3 56/3 58/1 65/2 67/13 67/24 91/8 98/20 98/25
taken [5] 17/22 25/17 26/6 56/7 58/22
takes [4] 24/17 41/2 97/2 97/7
talk [24] 3/9 4/10 6/12 19/11 22/13 24/11 25/10 28/11 29/3 29/5 29/8 31/9 32/17 35/6 35/6 35/20 42/24 49/9 66/11 73/12 76/6 86/4 94/19 94/19
talked [5] 15/7 15/20 16/17 52/4 55/4
talking [35] 11/1 11/11 12/6 13/23 24/18 25/7 29/13 30/2 32/1 32/2 35/12 35/24 36/13 38/10 39/19 39/23 40/7 41/13 42/21 43/13 48/9 50/19 57/14 60/21 64/5 64/6 67/21 68/4 74/19 78/7 80/3 81/3 81/4 81/5 98/22
talks [5] 33/3 34/4 34/14 50/8 64/17
targets [2] 12/24 13/2
teaching [1] 43/8
team [1] 69/21
Tech [7] 96/16 96/20 96/21 97/4 97/9 97/16 97/17
Ted [1] 1/24
television [1] 17/8
tell [16] 6/15 12/13 36/10 45/24 47/5 53/10 61/15 62/16 65/9 65/15 66/12 67/10 73/12 88/17 93/1 94/11
teller [1] 73/5
telling [1] 66/9
tells [1] 28/18
temporary [2] 3/6 35/16
ten [3] 56/4 73/6 73/17
ten-year-old [1] 73/17
tend [1] 78/20
terms [14] 30/14 32/10 36/2 50/12 53/22 54/12 54/14 58/6 70/9 70/10 84/9 90/6 95/14 95/23
testifies [1] 68/17
testify [1] 68/11
testifying [2] 68/14 73/15
testimony [4] 49/14 54/5 78/9 91/24
Texas [4] 38/4 38/6 38/6 38/6
text [4] 57/20 57/20 76/25 95/16
textualism [1] 95/10
textualist [3] 22/10 22/13 56/22
than [17] 8/18 14/18 21/17 24/16 27/2 27/5 28/22 29/25 48/1 53/14 65/23 66/4 68/17 83/19 84/2 85/5 92/8
Thank [31] 3/14 3/15 3/23 6/24 7/25 8/1 14/8 16/15 26/18 27/11 33/8 33/13 55/16 55/18 56/5 56/6 56/8 61/19 81/21 85/14 87/25 88/5 88/24 90/5 90/19 95/1 95/6 96/10 97/19 97/21 99/10
thanks [1] 99/7
that [719]
that's [93] 3/22 5/3 5/10 5/18 10/12 10/14 10/24 13/8 15/24 19/9 22/21 23/11 23/21 23/21 25/3 26/5 29/7 30/24 32/10 35/5 36/4 36/7 36/22 36/22 37/8 38/16 38/20 38/25 40/17 41/20 42/21 44/9 46/2 46/25 47/2 49/1 49/4 51/21 54/3 54/23 54/24 56/12 56/25 57/2 57/2 57/16 58/21 59/17 59/22 60/17 61/4 61/24 62/8 63/13 64/3 64/20 64/22 65/4 65/21 66/16 66/16 67/12 70/4 70/23 72/5 72/7 73/3 73/24 74/9 74/24 75/3 75/5 76/5 76/7 78/4 80/9 81/15 82/5 82/6 83/23 88/16 88/18 89/21 89/23 90/24 91/10 91/20 94/2 94/18 95/15 95/24 95/25 98/21
their [42] 3/9 7/19 10/10 10/10 13/24 24/24 24/24 24/25 24/25 24/25 25/1 31/16 32/20 34/8 34/11 34/13 34/18 34/23 37/17 37/22 43/21 44/11 47/7 64/13 64/13 65/22 67/3 69/14 71/2 71/4 71/13 71/17 72/10 72/11 76/19 77/3 83/18 94/3 94/4 95/14 95/21 95/22
them [34] 6/22 24/9 25/12 28/10 28/14 28/14 28/15 29/21 40/23 43/17 45/10 45/12 45/20 47/18 64/9 64/13 66/5 67/4 71/23 71/24 73/13 76/6 77/2 80/8 82/11 83/15 83/15 90/25 90/25 95/3 95/4 95/14 96/13 98/7
themselves [8] 4/17 18/12 25/19 59/19 75/24 76/17 95/14 95/20
then [73] 3/8 4/21 6/3 6/13 8/15 9/8 9/9 9/25 11/5 12/16 13/25 19/5 20/12 21/8 23/23 25/4 25/13 25/19 26/15 28/1 28/20 34/14 38/2 40/25 41/2 41/5 41/22 43/16 45/6 48/25 50/1 50/2 51/24 52/24 54/12 58/9 58/22 61/4 61/14 62/23 63/6 63/10 63/23 63/25 65/1 65/1 67/12 68/3 68/3 68/4 69/9 69/21 72/23 73/23 82/11 83/6 83/10 84/12 84/13 85/3 86/11 87/14 88/22 89/16 89/20 89/23 90/13 90/21 91/11 91/16 91/17 96/2 99/1
theory [1] 46/8
there [115]
there'd [1] 25/8
there's [52] 3/8 7/8 7/9 8/15 8/19 15/15 15/15 24/3 25/16 28/4 30/7 30/8 31/5 32/23 36/8 37/7 37/19 41/17 41/18 41/21 42/3 45/1 46/15 47/3 48/21 49/25 50/4 50/5 52/11 53/18 62/1 62/5 62/6 66/21 66/24 69/4 69/7 69/8 77/3 79/10 81/6 81/6 82/22 87/4 87/22 88/15 89/8 89/9 89/15 90/8 97/1 98/25
therefore [1] 16/11
these [32] 21/13 22/14 25/6 25/10 25/10 26/20 30/9 30/23 31/17 32/19 32/19 32/19 33/20

T

these... [19] 35/14 37/7 37/18 38/11 40/3 42/15 48/4 48/25 49/5 49/7 50/3 58/18 65/11 66/17 70/5 82/1 92/9 92/17 95/3
they [74] 10/10 12/25 15/8 15/12 15/24 18/3 18/12 26/22 26/23 29/10 34/19 34/24 36/21 36/25 40/4 42/7 44/11 44/11 45/8 45/12 45/14 46/22 47/2 47/22 52/20 57/8 57/9 57/14 57/18 57/23 59/18 60/4 60/6 61/3 61/9 63/21 64/12 65/15 65/22 66/14 66/14 67/1 67/3 71/3 71/14 71/16 71/17 72/8 72/21 75/12 75/12 75/24 76/1 78/18 78/19 78/20 80/15 80/17 80/20 82/3 82/11 93/3 93/22 93/25 94/1 94/1 94/19 94/22 95/20 95/21 96/23 97/25 98/8 98/20
they'd [1] 53/21
they'll [1] 80/22
they're [29] 8/10 23/24 24/10 25/12 28/6 31/15 35/18 36/17 38/5 39/25 42/13 43/10 44/12 44/19 44/22 44/23 50/18 60/23 60/24 65/23 66/21 66/21 66/22 68/17 68/18 79/14 79/22 80/8 80/19
they've [8] 23/23 27/25 59/14 63/4 74/20 75/7 77/2 82/14
thick [1] 22/7
thin [1] 50/12
thing [21] 7/14 9/25 10/5 16/2 25/3 25/4 29/22 35/5 38/12 39/22 40/9 42/1 44/12 48/23 49/13 49/21 52/1 54/19 76/13 89/22 95/18
things [27] 7/4 8/9 8/10 9/7 17/16 30/23 34/2 39/4 41/17 42/5 42/5 46/16 48/6 54/13 59/1 63/22 67/8 68/13 70/2 71/12 75/13 79/6 87/7 88/17 93/13 94/19 98/21
think [81] 7/5 7/6 7/8 7/11 7/11 8/15 8/17 8/18 12/16 13/21 13/25 16/21 18/16 18/21 23/8 23/21 24/15 26/12 27/5 27/13 29/15 31/5 31/17 34/3 35/5 35/6 37/25 38/5 39/1 41/8 41/9 41/20 42/6 45/7 46/23 46/24 47/5 47/19 48/21 49/10 53/22 54/25 56/21 59/5 60/22 62/9 62/19 63/8 64/24 65/6 65/13 65/21 66/9 66/10 66/14 70/4 70/6 71/2 71/17 72/4 72/9 79/7 79/13 80/9 81/7 85/23 86/9 86/12 86/13 86/14 87/21 88/11 95/11 95/11 95/16 95/20 95/20 98/2 98/5 98/12 98/25
think of [1] 47/19
thinking [7] 4/7 32/4 36/11 52/14 66/15 66/16 71/17
thinks [1] 20/7
third [4] 7/14 27/23 37/9 90/21
third-party [1] 37/9
this [222]
Thomas [1] 58/13
those [22] 8/21 10/7 12/22 12/24 15/8 15/21 16/1 16/8 16/8 39/5 40/23 41/18 43/22 47/8 57/11 62/23 74/13 84/24 91/11 93/25 95/23 98/8
though [7] 6/7 17/25 21/24 37/16 61/21 67/7 85/15
thought [4] 45/11 71/8 73/7 94/15
thoughts [1] 12/19
thousands [5] 27/16 27/18 31/17 52/22 75/20
threat [1] 92/24
threatened [2] 37/11 40/8
threatening [1] 78/23
threats [2] 40/7 92/23
three [7] 7/4 17/23 25/17 35/13 58/6 61/8 73/9
through [23] 16/2 17/7 17/15 27/17 29/4 29/23 35/15 36/19 43/5 57/19 57/19 58/22 59/11 59/14 70/14 70/21 70/21 73/10 82/2 83/10 84/13 90/22 90/25
throw [1] 44/8
Thursday [3] 18/21 18/22 18/22
thus [2] 9/1 23/20
time [29] 11/1 17/15 19/8 21/18 22/16 24/3 27/8 27/9 31/22 32/14 36/11 39/6 44/19 49/7 56/3 58/20 63/1 63/22 66/18 68/21 68/21 72/1 75/22 78/22 87/15 87/20 87/22 94/17 96/11
timeframe [2] 46/13 89/24
times [3] 30/5 30/13 66/19
timing [2] 86/24 87/3
Tindall [1] 33/1
title [1] 89/15
today [23] 3/11 4/21 10/21 11/1 19/14 19/22 20/13 20/15 25/16 32/17 50/24 57/8 61/13 65/8 65/10 72/2 72/4 85/12 87/14 92/11 93/15 95/5 99/1
today's [1] 87/24
together [2] 26/16 85/22
told [3] 6/1 18/16 18/20
Tom [1] 81/16
ton [1] 25/17
tones [1] 22/13
tonight [1] 99/1
too [9] 13/9 30/10 43/18 51/10 56/3 64/22 69/8 72/25 87/8
took [2] 6/4 57/24
top [1] 28/18
topic [2] 19/21 67/7
touch [1] 48/18
touched [1] 31/4
tough [1] 58/21
towards [1] 18/19
town [2] 89/25 90/2
track [1] 75/18
transcript [3] 1/9 1/15 99/16
transfer [2] 18/10 18/12
transferred [1] 30/20
transferring [1] 55/4
treat [2] 71/23 71/24
trial [3] 22/1 65/24 65/25
tries [1] 38/8
triggers [1] 38/18
troubling [2] 52/17 53/16
truck [1] 96/19
true [6] 10/13 10/20 13/4 15/5 38/25 46/22
try [4] 27/6 48/9 51/3 52/20
trying [9] 5/21 21/18 25/10 35/18 35/25 38/3 40/8 44/23 80/5
Tuesday [1] 18/6
tunnel [1] 18/17
turn [1] 12/23
turned [1] 34/15
Turner [1] 1/24
turnout [1] 25/20
tweet [1] 77/2
twice [1] 58/19
two [21] 4/10 14/17 17/8 17/23 18/22 28/1 28/17 34/2 36/23 44/17 44/18 54/13 57/18 58/7 61/8 62/18 89/8 93/16 93/18 95/7 95/13
type [4] 29/22 32/8 70/11 76/1
types [1] 50/8
typical [4] 29/20 29/25 32/7 79/23
typically [3] 65/23 66/1 66/3

U

U.S [4] 4/3 19/25 29/13 45/25
ultimately [1] 8/3
unauthorized [1] 15/14
uncle [1] 22/4
uncover [1] 45/8
under [19] 7/12 8/23 15/9 15/11 16/21 20/11 42/14 43/12 44/14 45/15 52/6 57/6 61/5 68/14 70/3 75/8 85/3 85/23 86/1
Undergrad [2] 96/7 96/8
understaffed [1] 39/14
understand [8] 20/20 20/24 41/4 68/23 68/25 79/21 90/16 94/25
understanding [2] 12/2 82/8
undue [1] 22/23
unfortunately [1] 17/10
unilaterally [1] 31/20
unintentional [1] 74/16
UNITED [18] 1/1 1/10 3/7 3/16 3/18 11/1 13/2 13/6 13/22 57/20 72/16 77/1 77/4 78/19 81/17 81/23 83/8 99/19
units [1] 39/14
University [2] 96/13 97/17
unless [5] 42/20 69/8 71/5 86/3 93/19
unlikely [1] 12/9
unprecedented [3] 32/2 52/13 52/16
unreasonable [4] 43/8 57/7 69/5 95/10
unreasonableness [3] 57/11 57/13 69/5
unrelated [1] 82/13
unseal [7] 7/1 9/14 9/18 15/2 16/1 88/7 88/10
unsealing [3] 7/2 7/4 15/8
until [11] 4/19 9/6 17/17 19/5 60/6 64/12 65/7 67/3 68/2 75/1 88/13
up [24] 3/24 8/4 8/5 13/25 16/24 19/7 22/4 32/21 36/24 39/21 40/9 42/8 46/7 48/9 52/12 52/25 60/20 65/4 76/13 88/6 88/18 91/5 95/20 95/20
urgent [2] 8/9 8/10
us [18] 5/15 13/10 21/12 41/2 42/8 62/24 65/15 72/5 75/9 76/25 78/25 83/2 86/10 87/16 87/18 88/8 93/15 96/11
USAO [2] 2/12 80/16
USAO's [1] 82/9
use [7] 32/2 43/19 44/5 48/6 50/1 51/1 55/23
used [2] 61/3 61/4
useful [1] 82/11
using [3] 29/14 70/5 80/19
usually [3] 29/9 78/9 88/3
utilizing [1] 12/1

V

valid [3] 45/5 49/12 74/24
value [1] 36/8
variety [2] 5/16 57/9
various [1] 82/9
vehicle [1] 16/23
venue [3] 80/1 80/3 80/4
versed [1] 4/12
version [4] 21/14 98/4 98/5 98/13
versus [2] 41/11 41/15
very [13] 12/22 20/1 23/7 28/11 31/18 32/20 46/1 50/24 62/17 68/9 73/25 95/12 96/10
vicariously [1] 79/19
Vice [1] 15/17
view [3] 10/6 53/5 53/6
viewed [1] 22/12
vindictive [1] 55/5
violate [2] 44/24 75/17
violation [5] 40/2 49/1 49/25 50/2 69/23
violation of [1] 49/25
violations [2] 50/6 50/20
virtually [1] 31/3
vital [2] 60/13 62/15
volunteer [3] 30/19 35/3 95/25
volunteered [1] 75/24
volunteers [3] 34/22 83/13 92/25
vote [3] 21/13 25/21 83/22
voted [1] 66/13
voters [1] 31/16
votes [1] 24/19
voting [9] 21/9 21/10

V
voting... [7] 21/16 25/19 30/21 30/24 32/17 33/19 59/5

W
wait [2] 65/6 68/2
walk [2] 27/17 90/25
walked [2] 43/5 93/15
wall [1] 55/7
want [64] 3/9 4/10 5/23 6/15 8/3 14/5 16/16 18/19 21/24 26/7 27/1 28/8 31/20 33/5 34/4 40/5 40/22 40/25 42/11 42/12 42/24 44/5 44/6 45/7 47/9 47/24 48/18 50/14 50/23 52/1 52/24 54/9 54/13 54/14 56/19 57/15 63/24 67/13 67/25 68/3 68/6 68/25 71/13 77/13 79/6 82/18 83/3 83/24 87/25 88/6 88/8 89/20 89/21 90/7 90/13 90/14 90/14 90/17 93/1 95/18 96/3 96/4 98/9 99/7
wanted [12] 5/15 42/17 53/11 69/15 75/4 85/15 85/16 89/1 94/18 94/19 98/6 98/14
wanting [3] 10/9 18/9 36/21
warrant [9] 47/22 47/23 48/19 49/23 52/9 53/3 67/20 67/23 91/21
was [150]
Washington [3] 80/6 80/22 82/9
wasn't [12] 4/18 4/19 5/16 9/6 17/14 25/8 43/20 53/12 74/7 74/7 94/10 97/16
watching [1] 17/9
way [35] 12/10 19/9 29/21 32/21 33/11 41/8 42/17 43/12 43/14 43/19 44/24 45/11 46/8 46/23 52/7 53/20 55/14 66/16 67/7 72/2 73/22 75/2 76/25 77/3 77/4 79/4 83/8 83/12 83/16 84/2 90/12 94/2 95/11 95/15 95/17
ways [3] 31/6 43/21 95/13
we [155]
we'd [4] 21/12 32/24 90/9 93/14
we'll [9] 26/12 26/15 27/17 28/11 45/8 46/24 49/9 85/22 95/4
we're [36] 6/11 10/25 12/6 13/23 14/2 14/3 19/23 24/18 26/14 38/10 39/23 40/16 42/21 51/5 61/20 64/1 64/5 65/2 70/7 74/19 75/5 75/6 75/8 75/23 75/23 75/25 78/3 81/5 83/13 84/21 84/22 86/25 90/7 91/19 95/3 98/22
we've [10] 6/5 28/2 32/23 40/23 55/12 64/6 78/17 82/17 84/4 90/15
website [1] 19/2
wedding [1] 87/6
Wednesday [3] 18/7 18/21 18/22
week [8] 8/7 18/7 73/14 86/25 87/2 87/7 90/1 90/2
weeks [4] 17/8 18/23 25/18 87/5
weigh [2] 67/11 69/10
weighs [2] 50/21 72/17
weight [1] 79/13
well [48] 8/11 9/18 10/13 11/4 12/23 13/10 17/6 17/18 18/13 20/1 22/17 26/22 27/12 28/25 31/11 31/14 31/14 31/17 36/1 36/4 38/13 39/17 45/8 45/11 45/24 47/2 48/4 48/20 49/19 55/6 59/20 62/6 63/3 65/4 67/6 68/2 68/9 68/14 77/7 78/24 86/10 88/10 91/2 93/18 96/21 97/1 98/16 98/24
went [8] 19/1 19/2 53/4 64/4 71/14 73/6 73/12 94/15
were [38] 4/7 4/17 10/18 10/21 11/19 14/16 15/21 17/22 29/24 35/15 36/23 47/13 49/2 51/19 52/16 52/17 52/18 53/11 56/21 58/3 59/13 60/21 66/10 66/10 70/2 70/16 78/24 81/10 84/1 87/19 91/11 93/7 93/10 93/21 93/22 94/24 97/12 98/8
what [97] 3/4 5/6 5/11 5/22 6/15 7/21 10/10 12/12 12/17 12/23 13/8 14/16 15/24 16/22 19/17 20/10 22/9 22/14 23/21 23/21 26/16 27/13 28/25 29/5 30/1 31/10 31/14 36/4 38/18 39/23 40/6 40/12 41/4 41/10 41/13 42/16 44/5 45/8 49/6 49/7 49/9 56/13 57/23 57/25 59/15 60/2 61/8 61/12 62/20 63/12 63/18 64/8 64/10 65/15 65/15 65/16 66/9 66/16 68/5 68/12 68/17 68/19 69/1 71/6 71/14 71/16 71/16 72/3 72/12 73/7 73/13 73/16 74/9 78/15 78/16 78/20 78/23 78/24 80/25 82/19 83/1 84/2 84/3 85/12 85/21 86/17 89/21 91/11 91/18 93/17 94/5 94/7 94/8 94/18 97/11 98/9 99/3
what's [11] 3/19 10/15 16/25 16/25 30/3 32/4 32/4 32/18 59/11 65/23 85/18
whatever [10] 27/7 27/8 61/10 61/16 72/6 73/18 78/11 80/18 88/1 98/7
when [52] 6/22 8/10 8/23 11/10 13/23 18/2 19/3 20/12 20/16 21/1 21/15 22/1 22/7 22/10 24/13 25/20 29/12 31/9 32/17 34/4 34/24 35/6 35/20 35/24 37/20 38/14 39/3 41/13 43/20 47/9 50/20 52/14 53/6 56/1 56/22 58/3 61/3 61/9 62/16 63/21 64/22 66/15 73/6 78/7 78/21 81/25 94/12 94/15 94/19 95/19 96/15 96/19
whenever [5] 8/13 20/7 38/19 51/4 89/13
where [55] 5/14 5/17 5/23 10/21 13/18 15/5 19/23 21/12 26/5 26/14 26/14 29/3 30/5 30/5 30/8 30/25 32/1 36/2 36/4 37/7 37/9 37/13 38/5 38/7 38/21 40/8 41/20 42/7 43/18 47/23 48/4 49/6 49/23 50/4 50/5 58/8 61/25 65/1 66/3 72/24 73/8 74/6 74/8 78/22 78/22 80/1 82/7 82/14 91/14 94/21 94/24 95/21 96/16 96/18 99/9
whereby [1] 67/8
whether [22] 22/25 22/25 23/16 34/19 43/13 43/25 48/6 48/21 49/11 50/10 50/21 52/2 52/21 59/19 62/12 65/17 67/11 69/15 75/2 80/17 83/7 94/6
which [29] 3/6 7/14 7/16 7/18 9/4 11/12 17/11 21/17 28/11 30/23 31/11 38/14 38/16 39/14 42/16 47/21 52/25 60/15 62/15 63/2 69/9 83/16 89/5 90/8 90/22 93/10 94/24 96/16 98/16
Which really [1] 93/10
while [5] 17/25 35/18 36/16 61/20 68/4
white [1] 41/21
who [41] 3/10 8/25 13/7 13/24 22/5 24/20 24/22 24/23 24/23 25/11 30/16 30/18 30/20 31/3 33/1 33/20 34/6 34/17 35/14 38/3 40/9 40/22 40/25 42/16 45/8 58/1 58/13 71/3 71/10 71/12 76/11 76/12 76/13 76/15 76/16 77/8 78/8 78/25 83/13 84/24 97/7
who's [2] 81/17 96/5
whoever [1] 60/2
whole [5] 24/14 25/5 41/2 63/13 76/20
wholly [1] 82/12
whom [1] 71/10
whose [7] 24/8 37/10 40/4 66/22 70/7 71/16 98/11
why [21] 15/7 28/9 40/13 42/21 50/24 52/4 56/2 56/3 61/15 61/16 64/3 64/22 65/21 66/21 68/2 70/1 70/2 73/3 73/24 79/22 86/14
will [42] 3/17 3/19 3/25 10/4 10/9 19/14 19/24 20/13 20/14 22/8 23/14 23/15 24/7 24/9 27/3 27/6 27/7 27/21 31/18 31/21 34/10 36/3 36/6 40/3 47/3 63/23 65/15 68/9 72/12 73/21 80/13 80/20 82/9 85/21 85/22 88/11 88/13 89/12 94/11 98/18 98/20 98/24
willfully [1] 44/21
William [2] 1/10 2/11
willing [4] 5/16 20/7 20/9 62/22
willingly [1] 74/20
willingness [2] 62/14 63/7
window [1] 44/9
winner [1] 24/20
wipe [1] 46/13
within [12] 11/14 39/20 40/17 44/17 45/16 63/14 64/17 79/13 84/6 87/23 88/1 89/20
without [12] 7/20 30/4 30/18 31/2 33/14 49/18 50/10 75/15 83/20 85/25 86/18 86/23
witness [7] 15/5 16/10 40/20 68/16 73/1 75/10 83/10
witnesses [8] 10/2 10/9 72/23 75/2 75/6 76/1 83/15 84/12
WMR [1] 1/6
Wofford [4] 55/25 89/24 97/20 98/23
woke [1] 19/7
women [1] 36/23
won [3] 36/24 40/9 97/10
won't [4] 19/10 40/4 50/12 76/8
words [4] 13/6 22/15 37/20 40/22
work [13] 5/20 5/21 11/23 35/18 45/23 46/24 71/6 72/11 78/18 78/19 80/14 82/15 96/23
worked [7] 66/17 71/19 73/14 76/15 83/14 84/18 84/25
worker [8] 34/5 34/12 34/19 35/3 38/23 41/7 84/20 84/20
workers [32] 24/8 24/23 25/15 27/17 27/18 27/22 31/12 32/1 32/8 34/7 34/17 34/25 35/4 36/7 36/14 36/17 36/20 40/8 40/20 40/23 41/7 41/16 50/11 71/3 75/21 77/2 92/20 92/24 92/25 95/13 95/15 95/19
workers' [2] 52/22 54/1
working [1] 56/1
works [4] 4/13 46/8 78/25 84/21
world [4] 72/4 72/17 88/21 90/8
worried [1] 70/17
would [85] 5/22 6/2 7/7 7/13 7/21 9/21 10/1 10/6 10/20 10/22 11/6 12/16 12/20 13/1 16/21 17/1 18/4 18/15 21/13 22/23 23/25 27/5 32/11 32/12 37/10 40/2 43/7 46/13 47/14 47/21 48/3 48/13 48/25 50/2 54/2 55/20 57/23 59/2 59/9 60/15 62/2 65/2 65/25 67/11 67/24 69/10 69/23 70/6 71/3 71/8 71/9 72/2 72/24 73/16 74/14 74/15 75/17 75/20 76/4 76/6 76/11 76/14 77/5 77/19 78/15 84/8 85/3 86/1 86/4 86/4 86/8 86/12 87/18 87/23 88/8 88/23 89/19 90/3 90/3 91/16 91/17 93/13 93/17 93/23 94/16
wouldn't [6] 7/12 11/23 13/15 23/25 76/3 85/24

W

wrap [1] 48/9
wreck [5] 96/16 96/24 97/1 97/3 97/7
write [1] 33/10
writer [1] 88/21
writing [2] 64/17 94/1
written [3] 11/2 20/15 21/23
wrong [2] 29/1 88/22
wrongdoing [1] 70/12
wrongly [2] 71/23 71/24
wrote [5] 59/5 60/2 64/10 67/19 97/13

Y

y'all [9] 3/2 5/20 6/3 21/23 26/3 56/8 94/7 97/21 98/24
yeah [11] 70/25 74/24 77/18 80/5 81/12 82/7 85/10 87/22 88/12 93/5 97/14
year [7] 4/13 45/1 48/15 48/16 62/4 73/17 73/18
years [15] 21/25 29/24 34/11 58/4 61/1 61/2 61/7 61/8 71/19 71/20 71/20 73/6 73/6 94/18 94/18
yes [23] 4/5 5/5 9/13 9/16 32/16 33/7 55/20 56/18 58/25 61/17 77/25 79/16 81/16 85/7 85/10 85/17 86/6 87/11 89/4 91/22 92/18 97/19 97/21
yesterday [1] 19/8
yet [2] 14/3 63/19
York [1] 5/15
you [349]
you'd [3] 38/22 44/7 86/13
you'll [2] 90/13 97/20
you're [42] 4/3 4/8 6/22 13/21 29/13 32/1 32/4 35/24 36/12 37/12 37/20 38/23 39/3 39/18 39/18 39/19 41/4 41/13 42/2 43/13 44/3 50/19 52/6 56/10 59/20 60/5 62/11 62/25 63/1 66/12 68/2 68/4 68/10 73/2 78/10 80/3 81/16 83/19 83/20 85/8 94/21 96/17
you've [6] 36/19 41/10 44/21 46/9 49/8 50/4
your [78] 3/12 3/17 3/19 3/22 4/2 4/5 5/6 6/14 6/15 6/24 9/11 9/13 9/16 10/16 14/22 16/11 16/20 17/5 20/18 26/13 26/18 26/19 26/24 27/11 30/22 32/5 32/16 33/5 33/7 36/15 38/13 39/5 39/20 40/17 48/3 48/10 48/17 50/3 50/24 51/6 51/24 53/20 55/18 55/20 56/12 56/19 60/11 61/14 61/17 63/3 67/15 67/18 68/21 68/21 74/17 78/4 81/9 81/9 85/6 86/5 87/25 88/5 88/14 89/2 90/5 90/17 90/19 93/12 93/14 93/19 94/25 95/1 95/4 95/6 96/10 96/11 96/11 97/22

Z

Zimbabwe [1] 33/17
Zoom [2] 5/16 5/23

19

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **In re Grand Jury Subpoena No. 2026R00350-01.** | **Case No. 1:26-cv-02777-WMR** |

**POSTHEARING BRIEF OF UNITED STATES OF AMERICA
ON PETITIONER'S MOTION TO QUASH AND
CROSS-MOTION TO ENFORCE GRAND JURY SUBPOENA**

At the motion hearing, the Court instructed the parties to brief whether *Grunewald v. United States*, 353 U.S. 391 (1964), means that the statute of limitations would bar any criminal charges arising from this grand jury investigation. The Court also posited that the pending cross-motions turn on whether the subpoena at issue is "reasonable." *R. Enterprises*, 498 U.S. 292 (1991), as the Court recognized, is the central case. The Court indicated that the majority opinion contains "preamble-type" language, and that the Court is inclined to take guidance from Justice Stevens' concurrence and may deem the subpoena unreasonable if possible criminal charges would be time-barred.

*Grunewald* does not render the subpoena unreasonable. It is true that the statute of limitations begins to run when the object of a conspiracy is completed and acts to merely conceal the crime do not extend the period in which a charge must be brought. But the procedural posture of *Grunewald* was entirely different. *Grunewald* involved an appeal of a conviction at trial. An indictment had been returned that defined the scope of the conspiracy and a

record of evidence had been developed at trial. Against that backdrop, the Supreme Court concluded that a jury charge left open the possibility that "the convictions were based on a finding that the overt acts of concealment were done with the single intention of protecting the conspirators' own interests." *Id*. at 414. In contrast, this investigation is currently collecting evidence from which a charging instrument may be drawn. One would have to anticipate the allegations in an eventual indictment to decide now that *Grunewald* barred prosecutions. Given that the investigation is ongoing, that simply is not feasible or procedurally proper. It would circumvent the grand jury's chief function as an investigative body.

In addition, relying on Justice Steven's concurrence to define "reasonableness" would contravene binding authority. In *R. Enterprises,* the Court noted that it had "emphasized on numerous occasions that many of the rules and restrictions that apply at a trial do not apply in grand jury proceedings." *R. Enterprises*, 498 U.S. at 298. "This guiding principle" grounded the Court's decision. *Id.* It is precedent that must be followed, not preamble that can be ignored.

## Table of Contents

POSTHEARING BRIEF OF UNITED STATES OF AMERICA ON PETITIONER'S MOTION TO QUASH AND CROSS-MOTION TO ENFORCE GRAND JURY SUBPOENA .................... i

Table of Contents .................... iii

Table of Authorities .................... iv

ARGUMENT .................... 1

I. *GRUNEWALD* IS INAPPOSITE BECAUSE IT IS PROCEDURALLY DISTINGUISHABLE. .................... 1

II. THE CONCURRING OPINION IN *R. ENTERPRISES* IS NOT THE LAW. .................... 5

III. THE *R. ENTERPRISES* MAJORITY OPINION'S REASONING IS PART OF ITS BINDING AUTHORITY. .................... 9

CONCLUSION .................... 16

CERTIFICATE OF COMPLIANCE .................... 17

# Table of Authorities

## Cases

*Blair v. United States,* 250 U.S. 273 (1919) ........ 5, 13
*Bormuth v. Cty. of Jackson*, 870 F.3d 494 (6th Cir. 2017) ........ 9
*Branzburg v. Hayes*, 408 U.S. 665 (1972) ........ 10, 11, 13
*Bucklew v. Precythe*, 587 U.S. 119 (2019) ........ 9
*Cooper v. Aaron*, 358 U.S. 1 (1958) ........ 6
*Costello v. United States*, 350 U.S. 359 (1956) ........ 12
*Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554 (11th Cir. Sep. 9, 2025) ........ 9
*Grunewald v. United States*, 353 U.S. 391 (1957) ........ 1, 2, 3
*Hutto v. Davis*, 454 U.S. 370 (1982) (per curiam) ........ 5
*In re Sealed Case,* 877 F.2d 976 (D.C. Cir. 1989) ........ 16
*In re United States*, 441 F.3d 44, 57 (1st Cir. 2006) ........ 14
*Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232 (11th Cir. 2025), *cert. denied sub nom. Littlejohn v. Sch. Bd. Leon Cnty.*, No. 25-259, 2026 WL 1127219 (U.S. Apr. 27, 2026) ........ 8
*Marks v. United States*, 430 U.S. 1977 (1977) ........ 6
*Maryland v. Wilson*, 519 U.S. 408 (1997) ........ 7
*National Institutes of Health v. American Public Health Association,* 606 U.S. ___, 145 S. Ct. 2658 (2025) ........ 9
*Ramos v. Louisiana,* 590 U.S. 83 (2020) ........ 6
*Rivers v. Roadway Exp., Inc.*, 511 U.S. 298 (1994) ........ 6
*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ........ 6
*Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006) ........ 8
*Trump v. Vance*, 480 F. Supp. 3d 460 (S.D.N.Y.), *aff'd,* 977 F.3d 198 (2d Cir. 2020) ........ 4, 5
*Trump v. Vance*, 591 U.S. 786 (2020) ........ 4
*Trump v. Vance*, 977 F.3d 198 (2d Cir. 2020) ........ 5
*United States v. Calandra*, 414 U.S. 338 (1974) ........ 12, 13
*United States v. Doe*, 457 F.2d 895 (2d Cir. 1972) ........ 5
*United States v. Maloid,* 71 F.4th 795 (10th Cir. 2023) ........ 6
*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........ 10
*United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) ........ 7, 8, 10, 12
*United States v. Williams*, 504 U.S. 36 (1992) ........ 13, 14, 15, 16

## Other Authorities

Amdts. to Fed. R. Crim. P., H.R. Doc. No. 107-203 (2002), https://www.govinfo.gov/app/details/CDOC-107hdoc203/CDOC-107hdoc203 ........ 12

Igor Kirman, *Standing Apart to Be A Part: The Precedential Value of Supreme Court Concurring Opinions*, 95 Colum. L. Rev. 2083, 2084 (1995) ........ 7

Thomas B. Bennett, et al., *Divide & Concur: Separate Opinions & Legal Change*, 103 Cornell L. Rev. 817 (2018) ........ 7

## Constitutional Provisions

U. S. Const., Art. III, § 1 ........ 6

# ARGUMENT

## I. *GRUNEWALD* IS INAPPOSITE BECAUSE IT IS PROCEDURALLY DISTINGUISHABLE.

The Court requested supplemental briefing on Petitioner's argument that *Grunewald v. United States*, 353 U.S. 391 (1957) precludes any federal criminal violations from the 2020 Fulton County election that are not time-barred for prosecution. It does not. *Grunewald* in no way undermines any of the reasons given in the government's opening brief that the statute of limitations might not have expired for various indictable offenses.

The holding in *Grunewald* is merely that "after the central criminal purposes of the conspiracy have been attained," "mere overt acts of concealment," "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy," are not part of the conspiracy or overt acts in furtherance of a conspiracy that extend the statute of limitations for the completed conspiracy. *Id.* at 402.

> But a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Id.* at 405. The former do extend the limitations period, the Court observed. "Kidnappers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen

car would be in furtherance of the conspiracy to steal," each of which *would* extend the applicable statute of limitations. *Id.*

None of this contradicts the government's comments on limitations in its opening brief: "[H]ow applicable limitations periods will be calculated given conduct that may have occurred during various inquiries and investigations following the November 2020 election (as detailed in the affidavit) remains to be seen. Any subsequent criminal acts, or acts in furtherance of the criminal conspiracy, would restart the limitations period." Resp. and Cross-Mot. at 16. Until a specific conspiracy or other criminal charge is identified and defined, it is impossible to determine when its "main criminal objectives" are complete, and whether specific acts of concealment are part of those objectives or merely cover-up afterward. As stated, that "remains to be seen."

In *Grunewald*, defining the contours of the conspiracy remained an open question even after trial and appeal to the United States Supreme Court. *Id.* at 408. The evidence, the Court held, was sufficient to support a theory of conspiracy that was not contemplated by the jury instructions at the first trial but could be at a new trial. *Id.* at 408-15. Here, the subtleties of defining the objectives of the conspiracy in *Grunewald* serve only as a reminder how premature it is to attempt to do so at the outset of the grand jury investigation. That is why the many Supreme Court holdings on grand jury practice forbid imposing such an obligation on the government.

Although this fully dispenses with *Grunewald* as a conceivable obstacle to a grand jury investigation, the government never suggested relying on mere concealment of events that occurred in November and December 2020 as the factual predicate to avoid time bars. Rather, the government pointed out, as did Judge Boulee, evidence in the probable cause affidavit that ballot image files bore indications of being altered as recently as January 2024. The affidavit also recites the unexplained disappearance of hundreds of thousands of ballot images. These may have been destroyed when tabulator data cards were repurposed for use for the 2022 election without having been uploaded or saved. The timing is unknown but may have occurred before the 2022 primary or general election, still well within the applicable statute of limitations.

Moreover, the only conspiracy-type conduct anticipated by the government's brief is "conduct that may have occurred during various inquiries and investigations following the November 2020 election (as detailed in the affidavit)." The probable cause affidavit describes inquiries and investigations ongoing as late as December 2025. Conspiracies to obstruct those proceedings would certainly be timely for prosecution. In *Grunewald*, along with the principal conspiracy charge, obstruction charges were maintained without any limitations issue. *Id.* at 415 ("What we have held as to the statute of limitations disposes of the conviction of the three petitioners under Count 1, but does not touch Halperin's conviction on Counts 5, 6, and 7 for violating 18 U.S.C. §

1503."). Whether a conspiracy to obstruct justice occurred in the present matter will be a subject of the grand jury investigation.

Given the many possibilities for timely criminal indictments, a subpoena for information back to the time of the election is well within norms for a grand jury. "Meticulous" consideration of this issue occurs in the district court opinion in *Trump v. Vance*, 480 F. Supp. 3d 460, 484 (S.D.N.Y.), *aff'd,* 977 F.3d 198 (2d Cir. 2020), following the Supreme Court's remand in *Trump v. Vance*, 591 U.S. 786 (2020).[1] It speaks for itself:

> "No magic figure limits the vintage of documents subject to a grand jury subpoena. The law requires only that the time bear some relation to the subject matter of the investigation." *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978) (citing *[In re Grand Jury Subpoena Duces Tecum Addressed to] Provision Salesmen [and Distribs. Union, Local 627, AFL-CIO]*, 203 F. Supp. 575). ... Thus, it is clear that, in accordance with the grand jury's broad investigatory powers, a grand jury subpoena may seek documents dating from years outside of the specific time period during which a crime is thought to have been committed.
>
> Furthermore, even if "some of the requested records are so old as to be beyond the potentially applicable statute of limitations," that "does not render the subpoena unreasonable." *Id.* n.5. Thus, the "subpoena need not be limited to calling for records from a period within the statute of limitations. The grand jury should be able to determine whether there were illegal activities which were begun before the statutory period and continued within it." *Provision Salesmen*, 203 F. Supp. at 578; *see also United*

[1] Petitioner's motion/brief cited *Trump*, 591 U.S. at 805, as articulating the standard for quashal, which the district court then applied "meticulously" on remand.

> *States v. Doe*, 457 F.2d 895, 901 (2d Cir. 1972) ("[T]he grand jury's scope of inquiry is not limited to events which may themselves result in criminal prosecution, but is properly concerned with any evidence which may afford valuable leads for investigation of suspected criminal activity during the limitations period." (internal quotation marks and citations omitted)); *United States v. Cohn*, 452 F.2d 881, 883 (2d Cir. 1971) (rejecting argument that witness's testimony, which related "to events which had occurred prior to the limitations period, could not be a basis for indictment").

480 F. Supp. 3d at 496–97; *see also Trump v. Vance*, 977 F.3d 198, 212 n.11 (2d Cir. 2020) (explicitly affirming nine-year sweep of grand jury subpoena, adopting the quote from *United States v. Doe*, 457 F.2d 895, 901 (2d Cir. 1972), and holding, "For the same reason, *the President's argument that the relevant period for the subpoena should be limited by the criminal statutes of limitation has no merit*.") (emphasis added). Petitioner "is not entitled to set limits to the investigation that the grand jury may conduct." *Blair v. United States,* 250 U.S. 273, 282 (1919). There is thus no basis to deem the subpoena unreasonable.

## II. THE CONCURRING OPINION IN *R. ENTERPRISES* IS NOT THE LAW.

It would conflict with *R. Enterprises*' majority opinion to use a general skepticism about timeliness of a possible future indictment to truncate the investigation under a "balancing" approach suggested by Justice Stevens' concurrence. Lower courts are duty-bound to respect "the hierarchy of the federal court system created by the Constitution and Congress." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam). They must follow a precedent of the

Supreme Court unless and until that Court overrules it. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312 (1994) ("[O]nce the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law."). This is called "vertical stare decisis." *See, e.g., United States v. Maloid,* 71 F.4th 795, 808 (10th Cir. 2023) ("rigid adherence to vertical stare decisis is paramount"); *Ramos v. Louisiana,* 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring) (distinguishing horizontal stare decisis: "By contrast, vertical stare decisis is absolute, as it must be in a hierarchical system with 'one supreme Court.' U. S. Const., Art. III, § 1.").

The holding of an opinion of the Court joined by five justices is a precedent that binds a lower court. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (except when the Court is splintered, the holding is "a single rationale explaining the result [that] enjoys the assent of five Justices"); *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("the interpretation of the [law] enunciated by this Court … is the supreme law of the land"). Except in rare circumstances, concurrences are not the law.[2] That is so even for a concurrence

[2] Only when no opinion has garnered a majority vote, a concurring opinion may be looked to for the holding, which "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks*, 430 U.S. at 193.

by a justice who joins and elaborates on or nuances the majority opinion. *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (observing that a statement in a prior-case concurring opinion by a justice who joined the majority opinion did not "implicitly decide[ ] this question" because such a statement does not "constitute[ ] binding precedent"); Igor Kirman, *Standing Apart to Be A Part: The Precedential Value of Supreme Court Concurring Opinions*, 95 Colum. L. Rev. 2083, 2084 (1995) (terming this a "simple" concurrence). It is doubly so for a "concurrence in judgment," which "is really a dissent from the rationale of the majority opinion." Igor Kirman, *supra*, at 2084; Thomas B. Bennett, et al., *Divide & Concur: Separate Opinions & Legal Change*, 103 Cornell L. Rev. 817, 841 (2018) ("lower courts … must obey majority opinions, and … not follow concurrences at odds with those majority opinions").

In *R. Enterprises*, Justice Stevens and two other Justices concurred only in the judgment and the parts of the majority opinion (Parts I and II) setting forth the procedural history and general legal background. 498 U.S. 292, 306 (1991). They dissented in effect from:

- Part III-A defining "unreasonable" in the context of grand jury subpoenas to mean "no reasonable possibility that the category of materials" sought "will produce information relevant to the general subject of the grand jury's investigation." *Id.* at 299-301.

- Part III-B stating in dictum that "a court may be justified … in requiring the Government to reveal the general subject of the

grand jury's investigation" in camera and possibly to a respondent alleging unreasonableness. *Id.* at 301-02.

- Part IV concluding that the Court of Appeals erred by quashing subpoenas against two companies not shown by the government to have shipped sexually explicit materials; common ownership of those companies and a third that *did* ship such materials made it "a reasonable possibility" that subpoenaed records "would produce information relevant to the grand jury's investigation." *Id.* at 302-03.

Because at least six justices joined all parts of the majority opinion, it binds this Court.[3] The approach of the concurrence — "balanc[ing] the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other," in order to "constrain[ ] the overzealous prosecutor" — is not the law. *See id.* at 303-04, 306. This Court's assessment of reasonableness must conform to the majority's constraints in *R. Enterprises* and take no guidance from the concurring opinion.

[3] Part III-B may be non-binding on grounds that it is explicit dictum. That, of course, does not limit the persuasive value of that part of the opinion. After all, "there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); *see also Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1242 (11th Cir. 2025), *cert. denied sub nom. Littlejohn v. Sch. Bd. Leon Cnty.*, No. 25-259, 2026 WL 1127219 (U.S. Apr. 27, 2026) (explaining that the Eleventh Circuit has "long distinguished" between "dicta" and "Supreme Court dicta" and noting that the Court gives the latter's "reasoning and its clear implications substantial weight.").

## III. THE *R. ENTERPRISES* MAJORITY OPINION'S REASONING IS PART OF ITS BINDING AUTHORITY.

Petitioner asserted in the final minute of the hearing that *R. Enterprises* "is not controlling" because the challenge to the grand jury subpoena is on grounds other than relevance.[4] But to adopt Petitioner's position would necessitate rejecting the Supreme Court's reasoning not only in *R. Enterprises* but a slew of other cases also.

"[J]ust as binding as [a] holding is the reasoning underlying it." *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019); *National Institutes of Health v. American Public Health Association,* 606 U.S. ___, 145 S. Ct. 2658, 2664 (2025) (Gorsuch, J., concurring) (a decision of the Court including "its reasoning—its *ratio decidendi*"— "binds lower courts as a matter of vertical stare decisis"). "[W]hen there is argument as to whether facts are materially distinguishable, we look to the reasoning of the majority Justices to see what facts and reasoning led to the majority holding." *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 520 (6th Cir. 2017) (Rogers, J., concurring); *see also Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *5 (11th Cir. Sep. 9, 2025)

---

[4] This abruptly departed from Petitioner's motion/brief, which cited *R. Enterprises* three times in the opening argument with no such caveat. Mot. at 3 & n.2

(answering dissent's claim to distinguish precedent by observing that Supreme Court's reasoning nonetheless binds).

The *R. Enterprises* majority's reasoning thoroughly explained the nature of the grand jury in statements this Court termed "preamble" language. It quoted *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), which used the analogy of the grand jury to contrast administrative authority to compel information from the judicial subpoena power. Unlike courts, *Morton Salt* explained, an administrative agency's "power of inquisition" is "more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but **can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not**." *Id.* at 642-43 (language excerpted by *R. Enterprises* bolded). *R. Enterprises* emphasized the breadth and independence of the grand jury inquisitorial function "to inquire into all information that might possibly bear on its investigation," not only until "it has identified an offense" but alternatively "has satisfied itself that none has occurred." 498 U.S. at 297. Implicitly, the latter outcome includes the possibility that no indictable crime is timely for prosecution, but that doesn't preclude the investigation.

The *R. Enterprises* majority quoted *Branzburg v. Hayes*, 408 U.S. 665 (1972), which declined to hold that the First Amendment exempts reporters from grand jury subpoenas:

> Similar considerations dispose of the reporters' claims *that preliminary to requiring their grand jury appearance*, the State *must show that a crime has been committed* and that they possess relevant information not available from other sources, *for only the grand jury itself can make this determination*. The role of the grand jury … necessarily includes an investigatory function with respect to *determining whether a crime has been committed* and who committed it. … When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation. **A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed**. Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. It is *only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made*.

*Branzburg*, 408 U.S. at 701-02 (1972) (italics added; language excerpted by R. *Enterprises* bolded; internal citations and quotes omitted). Following this, *R. Enterprises* concluded, "[T]he Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." It is incongruent that the government be obliged to show not only probable cause but also timeliness of some resulting charge to justify such a subpoena. That would flout the Supreme Court's binding reasoning.

Other Supreme Court holdings cited by the *R. Enterprises* majority illuminate other aspects of the grand jury's independence and function.

*Costello v. United States*, 350 U.S. 359 (1956), declined to enforce the hearsay rule in grand jury proceedings, since that "would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules." *Id.* at 364, *cited by R. Enterprises*, 498 U.S. at 298. Another case cited, *United States v. Calandra*, 414 U.S. 338 (1974), held that a grand jury witness cannot invoke the exclusionary rule — amid circumstances especially relevant here — because to do otherwise would disrupt and delay the grand jury's "historic role and functions" and "wide latitude." *Id.* at 343, 349.

In *Calandra,* the grand jury witness was an investigational target who *won a Rule 41(g)*[5] *motion* on grounds that a warrant under which incriminating evidence was seized issued without probable cause. *Id.* at 340-42. But the Court *reversed* lower court orders excusing the target from a grand jury subpoena, even though he would face questions derived from unlawfully seized evidence. *Id.* at 341-42. Moreover, the Court explicitly approved use before the grand jury of "both the evidence seized during the course of an unlawful search and seizure and any question or evidence derived therefrom." *Id.* at 354-55.

---

[5] At the time of *Calandra*, Rule 41(g) was subsection (e). *See* Amdts. to Fed. R. Crim. P., H.R. Doc. No. 107-203 at 420 (physical p. 424) (2002), https://www.govinfo.gov/app/details/CDOC-107hdoc203/CDOC-107hdoc203.

The Court rejected the dissent's urging that to do so would "sanction illegal government conduct." *Id.* at 355 n.11. It observed that the witness "may have other remedies" including a *Bivens* claim against officers, the right to "seek return of the illegally seized property," and exclusion of it and its fruits "as evidence against him in a criminal trial," *id.* at n.10 — but not quashal of grand jury testimony.[6] This reasoning is sharply at odds with the notion that this Court could refuse to enforce a grand jury subpoena against a party that *lost* a Rule 41(g) motion on grounds that a resulting indictment would be time-barred.

*R. Enterprises*, *Branzburg*, *Calandra*, and *Costello* are not the Supreme Court's final or maximal word on the independence of the grand jury. *United States v. Williams*, 504 U.S. 36 (1992), once again "sharply cabined" the

---

[6] Amazingly, Petitioner quoted *Calandra* in its motion/brief — with no disclosure of this holding or supporting reasoning — as its lead authority to argue that an expired statute of limitations renders a grand jury subpoena improper. Even the quote — that the grand jury's purpose is "to determine whether a crime has been committed and whether criminal proceedings should be instituted," Mot. at 12 (quoting 414 U.S. at 343-44) — is stripped from its immediate context. The quoted language is sandwiched between "'It [the grand jury] is a grand inquest … the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime,'" 414 U.S. at 343 (quoting *Blair*, 250 U.S. at 282), and an extended quote from *Branzburg* mostly recapitulated above, which concluded, "It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made," *id.* at 344 (quoting 408 U.S. at 701-02).

supervisory authority of district courts over grand juries. *In re United States*, 441 F.3d 44, 57 (1st Cir. 2006). It held that a district court may not dismiss an indictment because of the government's failure to disclose exculpatory evidence to the indicting grand jury. *Williams*, 504 U.S. at 37, 52. Again, the Court reasoned from the nature of the grand jury:

> … [T]he grand jury is mentioned in the Bill of Rights, but not in the body of the Constitution. It has not been textually assigned, therefore, to any of the branches described in the first three Articles. It is a constitutional fixture in its own right. In fact the whole theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people. Although the grand jury normally operates, of course, in the courthouse and under judicial auspices, its institutional relationship with the Judicial Branch has traditionally been, so to speak, at arm's length. Judges' direct involvement in the functioning of the grand jury has generally been confined to the constitutive one of calling the grand jurors together and administering their oaths of office.
>
> The grand jury's functional independence from the Judicial Branch is evident both in the scope of its power to investigate criminal wrongdoing and in the manner in which that power is exercised. …. It need not identify the offender it suspects, or even the precise nature of the offense it is investigating. The grand jury requires no authorization from its constituting court to initiate an investigation, *nor does the prosecutor require leave of court to seek a grand jury indictment*. And in its day-to-day functioning, the grand jury generally operates without the interference of a presiding judge.

*Id.* at 47-48 (citations and internal quotes omitted; emphasis added).

Having thus emphasized anew the grand jury's robust independence, *Williams* addressed limits on the power of the district court to deny aid to its subpoenas:

> True, the grand jury cannot compel the appearance of witnesses and the production of evidence, and must appeal to the court when such compulsion is required. And the court will refuse to lend its assistance **when the compulsion the grand jury seeks would override rights accorded by the Constitution**, see, *e.g., Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972) (grand jury subpoena effectively qualified by order limiting questioning so as to preserve Speech or Debate Clause immunity), **or even testimonial privileges recognized by the common law**, see *In re Grand Jury Investigation of Hugle,* 754 F.2d 863 (CA9 1985) (opinion of Kennedy, J.) (same with respect to privilege for confidential marital communications). **Even in this setting, however, we have insisted that the grand jury remain "free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it."** *United States v. Dionisio,* 410 U.S. 1, 17–18, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973). Recognizing this tradition of independence, we have said that the Fifth Amendment's "constitutional guarantee *presupposes* an investigative body acting independently of either prosecuting attorney *or judge* ...." *Id.* at 16.

*Id.* at 48-49 (bold emphasis added; italics by Court).

*Williams* then concluded that "any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings. It certainly *would not permit judicial reshaping* of the grand jury institution, substantially *altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself*. *Id.* at 50 (internal

citation omitted; emphasis added). Thus, under *Williams*, district courts lack general supervisory authority over grand jury proceedings as a mechanism for policing prosecutorial decisions and actions. *Id.* at 54 & n.8; *see also id.* at 65 (Stevens, J., dissenting) ("the Court today … seems to suggest that the court has no authority to supervise the conduct of the prosecutor in grand jury proceedings so long as he follows the dictates of the Constitution, applicable statutes, and Rule 6 of the Federal Rules of Criminal Procedure"); *In re Sealed Case,* 877 F.2d 976, 981 (D.C. Cir. 1989) (affirming district court's refusal to quash grand jury subpoenas where government had already obtained allegedly attorney-client privileged documents).

*Williams* reflects yet another binding precedent and additional, binding reasoning incompatible with denying enforcement to a grand jury subpoena on grounds that the government has not made a prior showing that conceivably indictable offenses are not time-barred. Correspondingly, Petitioner has not identified a single authority suggesting that as a sufficient basis to quash.

## CONCLUSION

For these further reasons, the Court should deny Petitioner's motion to quash and should correspondingly grant the government's cross-motion to enforce.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina
N.C. State Bar Number 17333
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
Telephone: (336) 332-6333
E-mail: Dan.Bishop@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to LR 5.1(C) and 7.1(D), that I prepared the foregoing brief using Century Schoolbook, 13 point font.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina

32

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **In re Grand Jury Subpoena No. 2026R00350-01** | **Case No. 1:26-cv-02777-WMR** |

# MOTION TO FILE SUPPLEMENTAL POSTHEARING BRIEF OF UNITED STATES OF AMERICA IN CAMERA AND ACCOMPANYING MEMORANDUM OF LAW

The United States moves this Court to allow it to file a supplemental brief *in camera*. As grounds, the United States asserts as follows:

1. The Court has asked the United States to set forth "any arguments concerning any potential theory of wrongdoing that it contends supports the subpoena at issued." (Doc. 15.) In its Order, the Court recognized "that the information relevant to this issue may involve confidential investigative material." (Doc. 15 at 2.)

2. The proper procedure to protect this sensitive investigative material is *in camera* review by the Court. *See United States v. R. Enters., Inc.*, 498 U.S. 292, 302 (1991)("[A] district court may require that the Government reveal the subject of the investigation to the trial court *in camera* . . . ."); *see also In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 836 (3d Cir. 1999) ("We have consistently endorsed the use of *in camera* proceedings to preserve grand jury secrecy.").

3. The United States will submit a copy of its supplemental brief to the Court's Sealed Docketing inbox for consideration by the Court. If the Court declines to consider the supplemental brief *in camera*, the United States asks that it be placed under seal.

WHEREFORE, the United States asks that the Court consider its supplemental brief *in camera*, or, in the alternative, place it under seal.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina
N.C. State Bar Number 17333
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
Telephone: (336) 332-6333
E-mail: Dan.Bishop@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to LR 5.1(C) and 7.1(D), that I prepared the foregoing motion using Century Schoolbook, 13 point font.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina

## CERTIFICATE OF SERVICE

I certify that the foregoing motion has been filed with the Court using its CM-ECF system, which will generate notice to counsel of record.

This 5th day of June, 2026.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General and United States Attorney for the Middle District of North Carolina

# 33

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE: GRAND JURY SUBPOENA NO. 2026R00350-01 | Case No. 1:26-cv-02777-WMR |

**FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO QUASH**

By its text, Federal Rule of Criminal Procedure 17(c)(2) authorizes the Court to quash a subpoena if compliance would be "unreasonable or oppressive." Yet Respondent asks this Court to enforce a subpoena that is "unreasonable" by any measure. Grand Jury Subpoena 2026R00350-01 (the "Subpoena") amounts to an arbitrary fishing expedition into potential offenses that cannot be prosecuted because they fall outside of any applicable statute of limitations. The Subpoena is untethered to any valid prosecutorial need, and its sweeping demand for the sensitive personal information of thousands of election officials and volunteers would chill the participation of election workers and impair Fulton County's ability to administer its elections.

Instead of engaging in the "reasonableness" balancing that the text of Rule 17 demands, Respondent suggests that a subpoena can never be quashed if it bears any *relevance* to a hypothetical criminal offense, regardless of when that offense

occurred. But neither *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991), nor any other case supports such an expansive theory of subpoena power. Federal courts of appeals have repeatedly confirmed this Court's intuition that "reasonableness" must "mean[] something," and it does not mean "that the Government gets to simply decide" what is reasonable. Hearing Transcript ("Tr.") at 23. As those courts have recognized, assessing reasonableness requires weighing the government's need to enforce a subpoena—*i.e.*, the ends—against the costs of compliance—*i.e.*, the means.

Because the five-year statute of limitations has lapsed on an investigation into the 2020 election, which was certified on January 7, 2021, Respondent's need for the requested information is at best de minimis. Respondent now concedes that *Grunewald v. United States*, 353 U.S. 391 (1957), remains good law, and that acts of concealment done after the central criminal purposes of the conspiracy have been accomplished do not extend the limitations period. Supp. Br. at 1–3. So, in the face of this obvious prosecutorial bar, Respondent proposes novel theories for indefinitely extending statutes of limitations. Under Respondent's position that the mere possibility of an obstruction charge cures any statute-of-limitations problem, this Court would be powerless to quash a subpoena in furtherance of a criminal investigation into any historical event, whether it is the 2000 presidential election, the 1960 Kennedy-Nixon election, or the disputed election of 1876. None of this

would be remotely "reasonable." Fed. R. Crim. P. 17(c)(2). Moreover, the Subpoena is unreasonable because it is irrelevant and overbroad. Respondent has yet to articulate why, for example, it would need the home address and cell phone number of a bus driver who drove people to polling stations during the 2020 election.

Notably, Respondent does not dispute the record evidence establishing the cost, burden, and oppressiveness of compliance. There is no debate that enforcing the Subpoena would chill the participation of poll workers and impair Fulton County's ability to recruit volunteers and staff to administer its elections.[1] Instead, Respondent attacks only the legal foundation for Petitioner's *First Amendment challenge* to the Subpoena, which would be an independent basis for quashal. But under Rule 17, Petitioner need not establish a First Amendment violation to show that the Subpoena is "unreasonable." Through multiple rounds of briefing and a full hearing, Respondent has not disputed that compliance would have grave consequences for the administration of elections. Courts routinely quash grand jury subpoenas based on the costs of compliance. In this case, the burden on Petitioner's ability to administer elections would be severe. There is simply no basis for finding this Subpoena "reasonable" under Rule 17.

---

[1] *See* Pet'r's Ex. 11, Declaration of Sara Ghazal [Doc. 17-12] ("Ghazal Decl.") ("The risk of having nonpublic personal information, including home addresses, mobile phone numbers, and email addresses disclosed to federal law enforcement, based on service as a volunteer or a simple poll worker, is highly likely to discourage many individuals from participating in elections as poll workers.").

## I. Respondent's Cramped Conception of "Reasonableness" Under Rule 17 Is Divorced from Text and Precedent.

The text of Federal Rule of Criminal Procedure 17(c)(2) provides that a subpoena may be quashed if it is oppressive or "unreasonable." But Respondent brushes past the plain meaning of "reasonableness" and addresses only *relevance*. *See* Supp. Br. at 7–9. That approach is contrary to both text and precedent. Though Respondent treats relevance as dispositive, courts have repeatedly explained that relevance is merely one of several considerations in assessing the overall "reasonableness" of a subpoena. *See, e.g.*, *In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d 768, 773 (8th Cir. 2020) (hereinafter, "*The 2019 Subpoena Case*") (expressly rejecting the government's argument that if the evidence is relevant, "the judiciary may not engage in the balancing of interests"); *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585–86 (4th Cir. 2007) (Wilkinson, J.) (hereinafter, "*John Doe*") (affirming quashal upon weighing the balance of the interests). Under Rule 17, the fact that a subpoena seeks relevant information is necessary to establish "reasonableness," but it is far from sufficient. *See, e.g.*, *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984) (explaining that "whether the materials requested are relevant" is *not* one of the only questions "a judge may ever ask in the exercise of his [R]ule 17(c) supervisory power"). Rule 17 demands a weighing of additional considerations that, in this case, leave no doubt that the Subpoena is unreasonable.

**a. Misreading *R. Enterprises*, Respondent Conflates Relevance with Reasonableness.**

Respondent's implausibly narrow interpretation of Rule 17's "reasonableness" test is based on a flawed reading of *R. Enterprises*. According to Respondent, *R. Enterprises* held that a subpoena cannot be quashed so long as there is a "reasonable possibility" that subpoenaed records will "produce information *relevant* to" the grand jury's investigation. Supp. Br. at 7 (quoting *R. Enters.*, 498 U.S. at 301) (emphasis added). That is wrong for the reasons that multiple federal courts have identified. *See, e.g.*, *The 2019 Subpoena Case*, 964 F.3d at 773; *United States v. Bergeson*, 425 F.3d 1221, 1225–27 (9th Cir. 2005); *Matter of a Grand Jury Subpoena*, No. 20-3050, 2022 WL 2817606, at *2 (7th Cir. July 19, 2022) (per curiam); *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *8 (D.D.C. Mar. 13, 2026); *In re Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d 1085 (E.D. Wash. 2007).

Relevance and reasonableness are not the same thing. Respondent conflates the *relevance* inquiry at issue in *R. Enterprises* with the broader question of "reasonableness" under Rule 17. But *R. Enterprises* made clear that relevance was not the only basis on which a subpoena could be quashed as unreasonable. *R. Enters.*, 498 U.S. at 301. As the Court explained, it "did not consider" other aspects of "reasonableness" under Rule 17 because the movants objected to the subpoena only

"on relevancy grounds" and "did not challenge the subpoenas as being too indefinite nor did they claim that compliance would be overly burdensome." *Id*. Accordingly, the Court expressly confined its assessment to *relevance* and did not purport to set forth the considerations necessary to evaluate the broader question of "reasonableness." *Id.*; *see also id.* at 306 (Stevens, J., concurring in part and concurring in the judgment) ("[T]he Court's opinion should not be read to suggest that the deferential *relevance* standard the Court has formulated will govern decision in every case, no matter how intrusive or burdensome the request.") (emphasis added). In overlooking the bounds of the majority's analysis in *R. Enterprises*, Respondent wrenches words from their context and ignores its own admonition that the "reasoning underlying" *R. Enterprises* is "just as binding as [the] holding." Supp. Br. at 9 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019)). Unsurprisingly, Respondent does not point to a single court that shares its interpretation of *R. Enterprises* as holding that *relevance* is the sole criterion for "reasonableness" under Rule 17.

In addition to conflating *relevance* with "reasonableness," Respondent is mistaken about how to assess relevance under the *R. Enterprises* framework. Supp. Br. at 7–10. The Court in *R. Enterprises* held that a subpoena may not be quashed "on relevancy grounds" unless "there is no reasonable possibility" that it will produce information relevant to the investigation. *R. Enters.*, 498 U.S. at 301. But

the Court qualified this holding by warning that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions." *Id.* at 299.

Ignoring this limitation, Respondent reads *R. Enterprises* to suggest that the size of the haystack does not matter so long as there might be a needle somewhere within it. Under Respondent's approach to evaluating relevance, the Subpoena at issue here need not have been limited to Fulton County and 2020. Instead, Respondent implies that the DOJ could have requested the personal information of every election worker in the entire *country* for the past dozen presidential elections, as *some* of that information could be relevant to whether a crime was committed in Fulton County in 2020. According to Respondent, "[t]he *category* of documents identifying witnesses to these possible crimes is plainly relevant. Under the *R. Enterprises* standard, that forecloses arguments about whether every one of the persons whose identities are revealed to the grand jury will turn out to be the correct ones." Cross-Mot. at 9 (emphasis in original).

But as the Ninth Circuit has recognized, "*R. Enterprises* does not suggest that by self-defining the 'category of materials' sought as broadly as possible, the government insulates its subpoenas from review." *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1089 (9th Cir. 2016). The Ninth Circuit explained that if Respondent's theory of relevance were correct, the government could seek "all material of a broad generic type that a party possesses," such as "every piece of paper

in a corporation's files" or "all of an individual's emails over a several year period," and the "possibility that *some* of that material would be relevant would suffice to validate the subpoena," regardless of the "vast[ness] [of] its sweep, and no matter the degree to which the subpoena would reach private material of no pertinence to the grand jury's inquiry." *Id.* The Ninth Circuit thus concluded that under a proper reading of *R. Enterprises*, "a subpoena may be quashed when no effort is made to tailor the request to the investigation, even if some fraction of the material the subpoena seeks is relevant." *Id.* In this case, Respondent can hardly pretend that it made a reasonable effort to tailor the request to the investigation. The Subpoena seeks the sensitive personal information of every election worker—from bus drivers to volunteers distributing stickers—who worked on the 2020 election in Fulton County.

Respondent has not identified any legitimate need for the names and personal contact information of thousands of election workers, especially in the context of an investigation where no criminal charges can be brought. Indeed, when the Court asked Respondent whether it was reasonable to request such a broad swath of information, Respondent conceded that "it's difficult to answer that question, particularly now, simply because we don't know what [this information] will tell us as far as what happened or what improprieties may or may not have happened in the 2020 election cycle . . . I don't know that we can definitively say." Tr. at 65. But that

profession of ignorance is not a defense to the Subpoena's overbreadth or unreasonableness. Here, Respondent cannot articulate why it believes proceeding in this manner is appropriate or is likely to yield useful information.

Further, the "relevance" inquiry in *R. Enterprises* was of a fundamentally different character than the one at issue here. In *R. Enterprises*, the movant's "relevance" argument was that the subpoena lacked a sufficient nexus to the underlying investigation, the legitimacy of which was unquestioned. *R. Enters.*, 498 U.S. at 295–96. The Court's analysis thus concerned the likelihood that the subpoena would result in evidence useful to the investigation. *Id.* at 300–01. But here, Petitioner's contention is that the *investigation* is itself irrelevant to any prosecutable crime, as the statute of limitations has expired for the reasons detailed below. Therefore, even if every record produced in response to the Subpoena yielded evidence useful to the "investigation," the subpoenaed information would still be "irrelevant" because the investigation has no nexus to any chargeable criminal offense. In conducting a similar "relevance" analysis in the context of a motion to quash a civil investigative demand, which is subject to "[t]he standards applicable to subpoenas," *Blue Cross & Blue Shield of Ohio v. Klein*, 117 F.3d 1420, 1997 WL 400095, at *2 (6th Cir. 1997) (unpublished table decision), the Sixth Circuit explained that "[o]bviously, the government's investigation must be legitimate in order for it to issue a [civil investigative demand]. If . . . the [policy under

investigation] could never violate antitrust laws, then the investigation is not legitimate." *Id.* at *3. Because this investigation could never lead to a prosecutable offense, the "relevance" framework set forth in *R. Enterprises* is of limited utility in assessing the relevance of the Subpoena.

In attempting to stretch *R. Enterprises* beyond recognition, Respondent ignores the text of Rule 17 and the considerable body of precedent interpreting it. The *relevance* analysis in *R. Enterprises* simply does not cover the Rule 17 "reasonableness" analysis at issue in this case. "Reasonableness" is a far broader inquiry. Further, the relevance framework set forth in *R. Enterprises* lends no support to Respondent's argument that *this* Subpoena is relevant.

**b. Assessing "Reasonableness" Necessarily Entails Balancing the Government's Need Against the Burdens of Enforcement.**

As courts have repeatedly explained, evaluating "reasonableness" under Rule 17 requires weighing the government's need for the requested information against the costs that enforcement would impose. *See, e.g.*, *John Doe*, 478 F.3d at 585; *The 2019 Subpoena Case*, 964 F.3d at 773; *Bergeson*, 425 F.3d at 1225–27; *In re Grand Jury Matters*, 751 F.2d at 18.

When a grand jury subpoena is challenged on reasonableness grounds, the Court may consider a wide range of factors. Among other reasons, a subpoena may be "unreasonable" if it is excessively broad, *see In re Grand Jury Proceedings*, 601 F.2d 162, 165 (5th Cir. 1979); overly vague, *see In re Corrado Bros., Inc.*, 367 F.

Supp. 1126, 1129 (D. Del. 1973); unduly burdensome, *see John Doe*, 478 F.3d at 585; issued for an improper purpose, *see In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *8; or irrelevant, *see R. Enters.*, 498 U.S. at 301. "Reasonableness" is context-dependent and "requires a discretionary, case-by-case inquiry." *Bergeson*, 425 F.3d at 1225. The overarching consideration, however, is whether the government's ends justify the means. *Cf. R. Enters.*, 498 U.S. at 303 (Stevens, J., concurring) ("Rule [17] requires the district court to balance the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other.").

Respondent fails to cite the numerous court decisions that have interpreted "reasonableness" as requiring a weighing of interests. *See, e.g.*, *The 2019 Subpoena Case*, 964 F.3d at 773; *John Doe*, 478 F.3d at 585; *In re Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d at 1088–90. Each of these courts has converged on the interest-balancing approach articulated in Justice Stevens's *R. Enterprises* concurrence. *R. Enters.*, 498 U.S. at 303. That is so notwithstanding Respondent's contention that relying on this commonsense textual interpretation of "reasonableness" would somehow "contravene binding authority." Supp. Br. at ii. As courts understand, there is nothing inconsistent about both (a) recognizing the "guiding principle" that "many of the rules and restrictions that apply at trial do not apply in grand jury proceedings," Supp. Br. at ii (citing *R. Enterprises*, 498 U.S. at

298), and (b) evaluating the reasonableness of a grand jury subpoena under an interest-balancing approach. Respondent apparently believes that federal courts of appeals across the country have repeatedly flouted binding Supreme Court authority by adopting the approach articulated in Justice Stevens's concurrence.

Precedent confirms that this Court's initial instinct was correct: "reasonableness" must "mean[] something," and it does not mean "that the Government gets to simply decide" what is reasonable. Tr. at 23. Rather, it requires weighing the government's need for the requested information—*i.e.*, the ends—against the costs that compliance would impose—*i.e.*, the means. Here, that balancing decisively favors quashal.

## II. Because the Statute of Limitations for This Baseless Investigation Has Lapsed, Respondent's Interest in Enforcing the Subpoena Is De Minimis.

Respondent has a negligible interest in enforcing this dragnet Subpoena to explore the faint possibility of a six-year-old misdemeanor that could not be prosecuted. The relevant statute of limitations is five years, and the 2020 presidential election was certified on January 7, 2021. Respondent attempts to circumvent this glaring prosecutorial bar by advancing three defective workarounds: (1) a theory of conspiracy that is foreclosed by *Grunewald*; (2) a theory of obstruction that would extend every statute of limitations forever; and (3) a theory of 2024 conduct that fails to articulate a criminal offense, inaccurately describes the relevant events, and has

nothing to do with the individuals whose information this Subpoena seeks. Because the applicable statute of limitations bars any prosecution of the events that this "investigation" purports to concern, Respondent's need to enforce this Subpoena is de minimis.

**a. Respondent Concedes That *Grunewald* Remains Good Law.**

In attempting to end-run the statute of limitations and justify enforcement of this Subpoena, Respondent recasts its initial theory that "[a]ny subsequent criminal acts, or acts in furtherance of a criminal conspiracy, would restart the limitations period." Cross-Mot. at 16. Confronted with *Grunewald*, Respondent now concedes that "acts of concealment" done "after the central criminal purposes of the conspiracy have been attained" do not extend the limitations period. Supp. Br. at 1 (quoting *Grunewald*, 353 U.S. at 402, 405).

Respondent does not dispute that *Grunewald* remains binding Supreme Court precedent. Instead, it argues that the "central criminal purposes" of any 2020 election conspiracy are unknown, and that *Grunewald* "serve[s] only as a reminder [of] how premature it is to attempt" to "defin[e] the objectives of the conspiracy" at the "outset of the grand jury investigation." Supp. Br. at 1–3. Respondent openly acknowledges that the subject of *this* investigation is "irregularities in the Fulton County 2020 election." Cross-Mot. at 3. Yet Respondent reads *Grunewald* to suggest that so long as the government avoids defining the "central criminal purpose[]" of the potential

crime, the statute of limitations never comes into play. To indulge the premise that the "central purpose" of a 2020 election conspiracy remains unknown, a court must accept the fiction that until an investigation is over, we have no way of knowing whether the statute of limitations has run on potential crimes, including offenses related to the 2000 election or, for that matter, the election of 1876. That cannot be correct. Respondent does not point to a single case suggesting that a court must suspend disbelief and allow a party to circumvent a statute-of-limitations issue through artful characterization of the "central purpose" of a crime, or by declining to characterize such a purpose.

Respondent's reliance on *Trump v. Vance*, 480 F. Supp. 3d 460 (S.D.N.Y. 2020), and *United States v. Doe*, 457 F.2d 895 (2d Cir. 1972), is misplaced. *See* Supp. Br. at 4–5. Those cases stand for the unremarkable proposition that in investigating a timely offense, the government may subpoena pertinent *documents* "from years outside of the specific time period during which a crime is thought to have been committed," including documents that predate the offense's statute of limitations. *Trump v. Vance*, 480 F. Supp. 3d at 496; *accord United States v. Doe*, 457 F.2d at 901. Therefore, even where the relevant statute of limitations is five years, the government could potentially subpoena six-year-old documents as part of an investigation into a timely offense. But that uncontroversial principle has no bearing on this motion to quash. Here, the fatal defect is that any *offense* being

investigated fell outside of the statute of limitations, not that the Subpoena seeks *documents* generated outside of the statute of limitations. *Trump* and *Doe* are thus entirely inapposite.

**b. The Possibility of Obstruction Does Not Indefinitely Extend the Statute of Limitations.**

Recognizing that the binding precedent of *Grunewald* likely forecloses its initial argument for blowing past the five-year statute of limitations, Respondent attempts to bootstrap its way into timeliness with a new theory. It argues that the mere fact of an ongoing investigation gives rise to the possibility of criminal obstruction, which would itself be a timely offense. *See* Supp. Br. at 3–4. Respondent seems to believe that the potential for obstruction—which necessarily exists in every investigation—is a silver bullet that pierces through any statute of limitations bar. Under Respondent's boundless theory, there is nothing stopping the government from issuing subpoenas to investigate Iran-Contra, Watergate, or the Teapot Dome Scandal. In Respondent's view, the potential for criminal interference with these investigations would wipe away any statute-of-limitations problem. *See* Supp. Br. at 3–4. Respondent thus asks this Court to adopt a rule that would invite future administrations to subject their political rivals to probes into decades-old controversies. That cannot be what Rule 17's "reasonableness" test allows.

**c. The Purported Post-2020 Alteration of Ballot Images Does Not Give Rise to a Prosecutable Criminal Offense.**

The only supposedly timely conduct Respondent identifies is the alleged post-2020 alteration of ballot images. *See* Supp. Br. at 3. But this conduct (1) is inaccurately described, (2) would not be a crime, and (3) has nothing to do with the information sought by this Subpoena. In arguing that a hypothetical prosecution could be timely, Respondent points to "evidence in the probable cause affidavit" submitted in *Pitts v. United States*, Civil Action No. 1:26-CV-00809-JPB (N.D. Ga. May 6, 2026) (hereinafter, "*Pitts*") that "ballot image files bore indications of being altered as recently as January 2024." *See* Supp. Br. at 3; *see also* Petitioner's Ex. 4, Search Warrant Affidavit [Doc. 17-5] ("Affidavit"). And Respondent asserts that Judge Boulee "pointed out" this fact in *Pitts*. Supp. Br. at 3.

Respondent fails to mention, however, that Judge Boulee "pointed out" these allegations in the context of emphasizing the Affidavit's *defects*. *See Pitts*, slip op. at 36–37. Judge Boulee characterized the Affidavit's description of these events as "troubling," noting that the government "failed to explain that this [January 2024] modification date could have been caused by personnel from the Secretary of State's Office simply renaming the file." *Id.* at 37.

Moreover, even if the ballot images from the 2020 election were somehow altered in January 2024, Respondent cites no authority suggesting that this conduct would be criminal. The only relevant records retention statute, 52 U.S.C. § 20701,

makes it a misdemeanor to modify records within *22 months* of the election. Any modification of ballot images in January 2024 occurred long after the final date on which it would have been unlawful to modify such records.

Puzzlingly, Respondent relies on the Affidavit's purported recitation of "the unexplained disappearance of hundreds of thousands of ballot images," which "may have been destroyed when tabulator data cards were *repurposed* for use for the 2022 election." Supp. Br. at 3 (emphasis added). But that depiction of the Affidavit is wrong in multiple ways. The Affidavit never describes the "unexplained disappearance" of "hundreds of thousands" of ballot images. *See generally* Affidavit. Nor does it raise the possibility that tabulator cards "were repurposed" in 2022, as the Affidavit does not discuss the 2022 election at all. *See generally id.* Instead, the Affidavit recites a witness's allegation that "there were 17,852 missing ballot images" from the Georgia Secretary of State's website.[2] Affidavit ¶ 14. This witness's theory, however, is that 17,852 votes without corresponding ballot images were tallied during the *2020 election recount*, not that 17,852 ballot images existed but then mysteriously "disappeared" in 2022 or at any point after the 2020 election. *See id.* None of the Affidavit's witnesses so much as hypothesize about potential

[2] Notably, there is no explanation in the Affidavit or any of Respondent's briefing as to why Fulton County election workers would have any knowledge of the records maintained and provided by the Georgia Secretary of State's Office through its website.

wrongdoing in 2022 that would resuscitate the possibility of a prosecution within the statute of limitations.

Moreover, even if the Affidavit contained an allegation that ballot images were "destroyed when tabulator cards were repurposed for use for the 2022 election," Supp. Br. at 3, which it does not, this incidental occurrence would not amount to a crime. 52 U.S.C. § 20701 penalizes only "willful[]" destruction of records. The Affidavit does not come close to speculating that tabulator cards were repurposed in 2022 in order to intentionally destroy evidence of improprieties from 2020. Respondent claims that its need for the requested documents "is sufficiently clear from the probable cause affidavit," Cross-Mot. at 3, but it mischaracterizes the allegations in that Affidavit and invents unsupported new theories of wrongdoing out of whole cloth.

Further, none of the alleged post-2020 conduct described in the Affidavit is remotely related to the individuals whose sensitive personal information this Subpoena seeks. Because that alleged conduct concerns only the potential actions of individuals at the Georgia Secretary of State's Office, that conduct offers no justification for enforcing this Subpoena, which seeks information about poll workers and not Secretary of State officials. The ballot-images allegation repeated in the Affidavit is that the Georgia Secretary of State's Office provided a witness with two flash drives containing files with ballot images, and that one of those files

was modified on January 11, 2024. *See* Affidavit ¶ 22. Setting aside the numerous other defects with this allegation, it has nothing to do with the election workers swept up in this Subpoena. There is no nexus between (a) this Subpoena, which targets thousands of 2020 election workers from Fulton County, and (b) conduct by the *Secretary of State's Office* that occurred well after the 2020 election. In short, Respondent's post-2020 allegations about ballot images cannot stave off the statute-of-limitations issue that undercuts Respondent's purported need for this information. The timely conduct that the Respondent supposedly identifies is mischaracterized, not criminal, and not related to this Subpoena's targets.

## III. The Record Shows That Enforcement of the Subpoena Would Deter Poll Worker Participation and Undermine Petitioner's Ability to Administer Elections.

Respondent does not dispute that enforcing this Subpoena will impose grave costs—namely, deterring individuals from participating in future elections as poll workers and undermining Petitioner's ability to administer elections.[3] Instead, Respondent solely contests whether the First Amendment applies to poll workers. That is wrong for the reasons explained below. But even if the Court rejects Petitioner's First Amendment argument, the Court should still quash the Subpoena because of the undue burden and cost that compliance would impose on Petitioner. *See* Fed. R. Crim. P. 17(c)(2).

[3] *See* Ghazal Decl.

Petitioner administers elections for the most populous county in Georgia, and it cannot function without a reliable supply of poll workers, volunteers, and temporary staff. Petitioner's Exhibit 11 establishes, without any challenge or contradiction, that the Subpoena threatens that supply of crucial election workers, who are needed to administer elections. Given these costs of compliance, the Subpoena is unreasonable under Rule 17 for this reason alone.

**IV. The Subpoena Burdens the First Amendment Associational Rights of Election Workers.**

Though Petitioner need not establish a First Amendment violation to show that the Subpoena is unreasonable under Rule 17, Respondent is wrong that the First Amendment is inapplicable. The Subpoena raises serious First Amendment concerns that require quashal. Courts have recognized that "although a grand jury subpoena is presumed valid and enforceable, if the [subpoena recipient] demonstrates a legitimate First Amendment concern raised by the subpoena, then the government must make an additional showing that the grand jury actually needs the disputed information." *In re Grand Jury Subpoena to Amazon.com Dated August 7, 2006*, 246 F.R.D. 570, 572 (W.D. Wis. 2007); *see also In re Grand Jury Subpoena Issued to Twitter, Inc.*, No. 3:17-MC-40-M-BN, 2017 WL 9485553, at *4 (N.D. Tex. Nov. 7, 2017) (collecting cases). And the Eleventh Circuit in particular has required the government to meet a higher burden of scrutiny where a subpoena implicates First Amendment rights. *See In re Grand Jury Proceeding*, 842 F.2d 1229, 1233–35 (11th

Cir. 1988) (citing *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963)). These decisions establish that if a grand jury subpoena impairs the exercise of the First Amendment right to expressive association, the government must show (1) the subpoena serves a compelling state interest, and (2) the requested evidence is *substantially related* to this compelling state interest. *E.g.*, *In re Grand Jury Proceeding*, 842 F.2d at 1233.

This heightened standard applies to the Subpoena, which attempts to compel the disclosure of the expressive associational activities of every single election worker in Fulton County. There is no disputing that the "previous disclosure of the identity" of election workers has exposed those workers to "actual and threatened reprisal." *Id.* at 1235. As one 2020 election worker explained, she received "hundreds of racist, threatening, horrible calls and messages" after her identity was disclosed. Mot. to Quash at 11. The First Amendment protects not just political or ideological association but *any* association whose disclosure would chill constitutionally protected activity. "[I]t is immaterial to the level of scrutiny whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters. Regardless of the type of association, compelled disclosure requirements are reviewed under *exacting scrutiny*." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021) (emphasis added) (citations and quotation marks omitted). Poll workers, including volunteers, engage in acts of

civic expression and participate in the process of democratic self-governance. *See* Petitioner's Ex. 11. They need not be partisan to have constitutional protection surrounding their activities; the act of administering a free and fair election is itself an expression of democratic participation. These protected associational rights are directly impaired here because compelled disclosure of personal information—home addresses, personal phone numbers, and personal emails—to the federal government constitutes a First Amendment harm, regardless of whether the government promises to keep the list secret. *See First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1130–31 (2026) (citing *Bonta*, 594 U.S. at 615–16).[4]

Respondent principally argues that working for a public election authority can never implicate constitutionally protected "private expressive association" under the First Amendment, and that no case has directly so held. Cross-Mot. at 10. But Respondent does not identify any case that has held to the contrary, either, and Respondent cannot cite a single instance of the U.S. Department of Justice seeking

[4] At the hearing, the Court inquired about the applicability of the principles established in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), a case holding that public employees do not retain First Amendment protection for speech made pursuant to their official duties. That case has no application to the First Amendment associational claims here. Petitioner is not asserting that election workers have a right to speak freely about their election work free from employer discipline. Instead, Petitioner asserts that their personal identifying information cannot be extracted by federal subpoena and delivered to law enforcement in a criminal investigation targeting them. *Garcetti* speaks to the conditions of public employment; it says nothing about whether the federal government can extract sensitive associational information through a grand jury subpoena.

such an enormous swath of personal data belonging to election workers. So, the absence of direct precedent is unsurprising; it says more about the unprecedented nature of what Respondent has done here than about the legal basis for Petitioner's First Amendment argument.

Respondent also ignores key factual differences between poll workers and run-of-the-mill government employees, including that poll workers participate in elections as a form of political expressive association and not purely as a means of traditional employment. And even if parts of a poll worker's job are non-expressive, that alone does not deprive a poll worker of First Amendment associational protection. *See In re Grand Jury Proceeding*, 842 F.2d at 1235 (explaining that organizations can have multiple purposes and still retain associational protection under the First Amendment); *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (emphasizing that public employees do not forfeit all First Amendment rights to free association).

Respondent also suggests in passing that the First Amendment cannot apply because the information sought could be obtained through the Georgia Open Records Act. Not so. The Georgia Open Records Act expressly exempts from public disclosure a public employee's "home address, home telephone number, personal mobile or wireless telephone number." O.C.G.A. § 50-18-72(a)(21). That is precisely the information the Subpoena demands. The legislature's separate

provision allowing disclosure of that exempt information to a grand jury upon written request, *id.* § 50-18-77, does not render it "public"—it confirms that the legislature recognized the sensitivity of this data and deliberately limited its disclosure to specific, controlled circumstances. Respondent's invocation of the Open Records Act thus cuts against its position: Georgia law treats this information as sensitive enough to withhold from the general public.

In sum, the Subpoena raises legitimate, non-speculative First Amendment concerns sufficient to require the government to meet a higher level of scrutiny. Respondent has failed to show that the Subpoena passes that test. Moreover, even if the Court rejects Petitioner's First Amendment argument, the Court should still quash the Subpoena because of the uncontested burden and cost that the Subpoena's chilling effect would impose.

## V. Conclusion.

For the foregoing reasons, Petitioner Fulton County Board of Registration and Elections requests that the Court quash Grand Jury Subpoena 2026R00350-01.

Respectfully submitted, this 11th day of June, 2026.

*/s/ Y. Soo Jo*
Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON
COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30303
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

*/s/ Kamal Ghali*
Kamal Ghali
Georgia Bar No. 805055
Matthew A. Josephson
Georgia Bar No. 367216
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

*/s/ Abbe David Lowell*
Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202) 964-6110
jbolen@lowellandassociates.com
alowellpublicoutreach@lowellandassociates.com

*/s/ Stephen Jonas*
Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 1580
Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Fulton County Board of Registration and Elections*

**Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record. Pursuant to LR 5.1(C) and 7.1(D), I prepared the brief using Times New Roman 14 point font.

This 11th day of June, 2026.

*/s/ Kamal Ghali*
Kamal Ghali

34

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA NO. 2026R00350-01 | Case No. 1:26-cv-02777-WMR |

**FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS' OPPOSITION TO RESPONDENT'S REQUEST FOR *EX PARTE* REVIEW OF AFFIDAVIT AND SUPPLEMENTAL BRIEF**

## INTRODUCTION

Because Respondent cannot establish that its sweeping and unprecedented grand jury subpoena is reasonable, *see* Fed. R. Crim. P. 17(c)(2), it has resorted to using ex parte and in camera submissions—a process that would insulate whatever evidence it presents from any adversarial scrutiny whatsoever. But "[i]n camera proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process." *In re Taylor*, 567 F.2d 1183, 1187–88 (2d Cir. 1977). The use of "in camera *affidavits*," in particular, "has generally been disfavored," *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 580 (D.C. Cir. 1996) (emphasis added).[1]

[1] Notably, *Armstrong* involved a party's request for in camera review in a Freedom of Information Act ("FOIA") lawsuit. But even in the context of FOIA, which provides a limited statutory authorization for in camera review, the ex parte consideration of affidavits requires courts to explain "why none of that affidavit could be shared with [the other party]." *Armstrong*, 97 F.3d at 580; *see also* 5

Undaunted by the constitutional issues at play, Respondent appears to have submitted ex parte (1) an affidavit authored by the same FBI agent who submitted the now-unsealed affidavit at issue in *Pitts v. United States*, 1:26-CV-00809-JPB (N.D. Ga.) ("*Pitts*"), and (2) a supplemental brief that purports to establish a theory of wrongdoing justifying the subpoena. But Respondent has failed to establish a "compelling state interest[]," to overcome "the presumption . . . against the use of secret proceedings." *In re Taylor*, 567 F.2d at 1188. Respondent has not argued, let alone demonstrated, that allowing Petitioner Fulton County Board of Registration and Elections ("FBRE") to review these submissions would compromise grand jury secrecy. And even if Respondent's submissions did implicate grand jury secrecy concerns, the government's interest in secrecy under these circumstances would be "minimal," and outweighed by the interest in "the fundamental instrument of judicial judgment: an adversary proceeding in which both parties may participate." *Id.* (internal quotation marks and citation omitted). To the extent that the Court has any concerns about disclosure to FBRE, those concerns can and should be addressed through a narrowly tailored protective order.

---

U.S.C. § 552(a)(4)(B). Here, with no such statutory authorization, requests for in camera review are even more suspect.

## BACKGROUND

On January 28, 2026, FBI Special Agent Hugh Raymond Evans submitted an affidavit in support of a search warrant authorizing the seizure of Fulton County election records. Pet'r Ex. 4 (Doc. 17-5). In subsequent litigation concerning the constitutionality of that search warrant, Respondent did not oppose the unsealing of the search warrant affidavit. *See Pitts*, Docs. 9, 22. Judge Boulee thus unsealed the affidavit, and it became part of the public record. *Id.*, Docs. 22-1, 22-2.

Though Judge Boulee did not require SA Evans to defend his allegations under cross-examination, Petitioners in *Pitts* had the opportunity to challenge the validity of the affidavit, identify material omissions, and to subject the affidavit to adversarial scrutiny. That adversarial process led Judge Boulee to conclude that the affidavit contained "misleading" allegations, *id.* at 36; was "defective in some respects," *id.*; and had multiple "problematic" features, *id.* at 37.

Respondent initially relied on the *Pitts* affidavit to justify the reasonableness of its subpoena in this case, *see, e.g.*, Cross-Mot. (Doc. 9) at 3, 13, 16–17. But in its opposition to the motion to quash, Respondent noted its interest in "proffer[ing] an in camera showing of findings from its analysis of the seized ballots, the revelation of which to [FBRE] or the public would impair the prospects of the ongoing investigation." *Id.* at 3.

At the May 19 hearing before the Court, Respondent submitted "an affidavit from [SA Evans,] the investigative agent" who "wrote the affidavit for the search warrant" for in camera review. *See* May 19, 2026, Transcript of Hearing on Motion to Quash (Doc. 16) ("Transcript") at 67. After receiving that affidavit, the Court noted that any ex parte reliance on SA Evans's affidavit may require the agent to testify and to be subject to the Court's questioning. *Id.* at 68. The Court also cautioned that if Respondent wanted to proceed ex parte, "there may need to be some disclosure to opposing counsel with a protective order so that [the Court] can hear a different perspective so [it is] not only hearing one perspective on that." *Id.* at 86.

After the May 19 hearing, the Court ordered supplemental briefing from the parties, including a brief from Respondent regarding its purported basis for the grand jury subpoena. *See* May 22 Order (Doc. 15) at 1–2 ("Respondent shall also file a separate brief addressing any arguments concerning any potential theory of wrongdoing that it contends supports the subpoena at issue . . . .").

On June 5, 2026, Respondent filed a two-page motion for leave to submit its supplemental post-hearing brief for in camera review under seal. (Doc. 32). In support of its perfunctory motion, Respondent offered no justification for secrecy except for citations to *United States v. R. Enters., Inc.*, 498 U.S. 292, 302 (1991) and *In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 836 (3d Cir. 1999). But neither of those cases nor any other authority supports granting

Respondent's request for ex parte treatment of either (1) the affidavit, or (2) its supplemental brief that appears to rely on the ex parte affidavit.

## ARGUMENT

### I. GRAND JURY SECRECY RULES DO NOT COVER THE AFFIDAVIT OR THE SUPPLEMENTAL BRIEF

Ex parte proceedings "can only be justified and allowed by compelling state interests." *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (quoting *In re Taylor*, 567 F.2d at 1187–88). "[N]ot only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969).

Though grand jury secrecy concerns can constitute a compelling interest in some (but not all) cases, Respondent does not assert that the Rule 6(e) grand jury secrecy requirements apply to the ex parte affidavit and supplemental brief. Nor could it on this record.

Rule 6(e) provides secrecy protections for "a matter occurring before the grand jury." The rule does not require secrecy of criminal investigations in general; rather, it is limited to the grand jury's actual, independent investigation and evidence obtained from it. *See United States v. Phillips*, 843 F.2d 438, 441 (11th Cir. 1988) ("[O]nly documents that reveal some secret aspect of the grand jury investigation should be subject to the restrictions of rule 6(e)."). Courts recognize that Rule 6(e)

secrecy covers "the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1139–40 (D.C. Cir. 2006) (internal quotation marks and citation omitted).

On the other hand, when a government investigator simply authors an affidavit based on his or her own investigation and does not incorporate evidence gathered by the grand jury itself, disclosure of the affidavit in open court is usually appropriate. *See In re Grand Jury Subpoena (Legal Servs. Ctr.)*, 615 F. Supp. 958, 966 (D. Mass. 1985) ("Disclosure of the affidavit in open court is particularly appropriate where, as here, the information contained therein is a fruit of the Government's own investigatory activity and does not bear the imprint of the Grand Jury's independent initiative.") (internal quotation marks and citation omitted); *In re Grand Jury Proceedings*, 814 F.2d 61, 72 (1st Cir. 1987) ("In camera proceedings are extraordinary events; the presumption is against such proceedings when rights of individuals are to be adjudicated.") (internal quotation marks and citation omitted); *United States v. Lilly*, 185 F.R.D. 113, 114–15 (D. Mass. 1999) ("It also appears that the agent who made out the affidavit relied at least in part on independent investigations and other non-grand jury derived evidence, thus weakening the claim for protection.").

Here, Respondent does not argue, let alone show, that either the ex parte affidavit or the supplemental brief contain evidence gathered by an independent grand jury investigation. To the contrary, Respondent has expressly requested in camera review of evidence reflecting the results of the FBI's investigation. *See, e.g.*, Cross-Mot. at 3 ("[T]he government proffers an in camera showing of findings from its analysis of the seized ballots . . . ."); Transcript at 67–68 (submitting the affidavit of an FBI agent for in camera review). Although Respondent suggests the *ex parte* affidavit from the same FBI agent is "new," Transcript at 67, the only new evidence identified in Respondent's opposition memorandum is the *agent's* purported analysis of Fulton County election records—not grand jury testimony or anything of the like. *See* Cross-Mot. at 3. In short, Rule 6(e) does not require that the affidavit and the supplemental brief remain secret in this case.

## II. THE INTEREST IN ADVERSARIAL SCRUTINY OUTWEIGHS RESPONDENT'S INTEREST IN SECRECY

Even if Respondent's affidavit and brief implicated grand jury materials, that fact alone is not enough to justify in camera review. *See In re Taylor*, 567 F.2d at 1187–88 ("[T]he court's in camera examination of the affidavit *and grand jury minutes* was not justified by the need for grand jury secrecy in this case . . . In the present case, the Government's interest in the secrecy of the grand jury minutes in question is minimal.") (emphasis added); *See also In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 56–57 (7th Cir.1980) (necessity of preserving grand

jury secrecy weak where evidence to be revealed is merely a government affidavit not containing testimony elicited from grand jury witnesses, disclosure of which will not discourage grand jury witnesses from testifying).

Respondent asserts that secrecy is necessary because disclosure of the affidavit would "impair the prospects of the ongoing investigation." *See* Cross-Mot. at 3. But that assertion is unsupported. Aside from counsel's speculation at the May 19 hearing that revealing any ex parte submission to FBRE might "alert[] the possible targets of the course of the United States investigation," Transcript at 12, Respondent has offered no rationale for submitting the affidavit or its supplemental brief in camera. Moreover, nothing about this purported investigation into potential six-year-old offenses has been secret.

Respondent cannot show that grand jury secrecy concerns justify in camera review of its submissions. Though Respondent relies on *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) to support proceeding in camera, nothing in *R. Enterprises* demands that the Court shield the affidavit or the supplemental from adversarial scrutiny. Indeed, the Court was "confident that *district courts will be able to craft appropriate procedures* that balance the interests of the subpoena recipient against the strong governmental interests in maintaining secrecy, preserving investigatory flexibility, and avoiding procedural delays." *Id.* at 302 (emphasis added). In determining those "appropriate procedures," a court must endeavor to

balance the government's interest in maintaining secrecy against "the interests of the adversary process." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1385 (D.C. Cir. 1979) (in camera review in FOIA litigation).

### A. Respondent's Interest in Keeping the Affidavit and Supplemental Brief Secret Is De Minimis.

Respondent's interest in keeping the affidavit and supplemental brief secret is de minimis for at least five reasons. First, Respondent's investigation is widely publicized in the media. The President of the United States himself has publicly commented on the investigation. The notion that this is an investigation into an unfolding crime that requires secrecy before targets flee or evidence is destroyed is not credible.

Second, Respondent consented to unsealing the search warrant affidavit from this exact same affiant discussing this exact same investigation. *See Pitts*, Docs. 9 & 22. Accordingly, the factual basis for this investigation is already substantially public due to Respondent's own disclosure decisions. In fact, Respondent offered the exact same "ongoing criminal investigation" justification as a basis for initially sealing the search warrant affidavit in *Pitts*—claiming in boilerplate fashion that the search warrant affidavit should remain sealed because "premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution." *Pitts*, Doc. 22-1 at 18 (¶ 85); *id.* Doc. 22-2 at 18 (¶ 86). And yet

Respondent chose to publicly disclose that affidavit months before the grand jury subpoena at issue. Respondent has yet to identify any harm from its previous disclosure decision, and the investigation has continued without any reported issue. This investigation, moreover, has been part of the public political discourse for over five years and is a secret to no one.

Third, there is no risk that disclosure of a second affidavit will have *any* effect on the availability of witnesses. Potential witnesses are either already aware of this very public investigation or could easily learn of its details by surfing the internet. The idea that a witness would become more reluctant because of the disclosure of a second affidavit or supplemental brief ignores the well-publicized nature of this case.

Fourth, Respondent's apparent concern that disclosure of the affidavit could somehow cause FBRE to alert a particular election worker who in turn would alter the investigation is speculative and outlandish. For starters, Respondent's subpoena itself is not limited to a particular worker, a particular group of workers, or even a particular election issue. So it is anyone's guess *who* FBRE would even be able to identify based on a new affidavit. Moreover, the subpoena is directed at conduct that took place over five years ago and is barred by the statute of limitations. To credit concerns about disclosure at this point, one would have to assume that an election worker participated in a crime five years ago (which still has not been identified and is now barred by the statute of limitations), waited until Respondent executed a

public search warrant on FBRE's office, waited again until Respondent issued a grand jury subpoena for their personal information, waited again until Respondent drafted a second affidavit in this case, and then decided based on this "new" affidavit and brief, that it is time to disrupt the investigation in some unspecified manner. Such layered speculation does not justify keeping the affidavit and brief insulated from adversarial scrutiny.

Fifth, Respondent has not indicated that FBRE is an actual or potential defendant in any criminal proceeding, either pending or reasonably likely to follow from the public investigation it is conducting. And any secrecy interests are significantly lessened when disclosure to a governmental body is requested. *Cf. In re Request for Access to Grand Jury Materials*, 833 F.2d at 1441 (weighing public interest in favor of disclosing grand jury materials pursuant to request of government movant). In short, Respondent's de minimis interest in secrecy does not justify its requests for in camera review.

### B. The Court Has a Significant Interest in Subjecting Respondent's Claims to Adversarial Scrutiny.

The proposed ex parte affidavit is authored by the same agent who drafted the unsealed search warrant affidavit in *Pitts*. In that case, the court had the benefit of FBRE's adversarial review of the affidavit itself and heard testimony regarding that affidavit from FBRE's expert. Through this adversarial process, Judge Boulee found that the affidavit was defective in numerous respects. *See Pitts*, Doc. 108 at 36

(noting that the affidavit was "defective in some respects," including through inclusion of "misleading" ballot figures); *id.* at 37 ("[T]he Court agrees with [FBRE] that such features within the Affidavit are problematic."). Respondent now argues that the same affiant should get to submit a new, secret affidavit and avoid any adversarial scrutiny whatsoever. The prior problems with the search warrant affidavit clearly illustrate need for the adversary system and its benefits to both courts and litigants.

In addition, if the affidavit is kept secret, then the Court would not hear from the party best positioned to respond to any allegations of supposed improprieties or errors in an election that Fulton County administered. Moreover, FBRE would be denied sufficient participation in this action such that significant due process concerns will arise. *See In re Taylor*, 567 F.2d at 1188 ("In camera proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process.").

## III. ANY CONCERNS ABOUT DISCLOSURE OF THE AFFIDAVIT AND SUPPLEMENTAL BRIEF CAN BE ADDRESSED THROUGH A NARROWLY TAILORED PROTECTIVE ORDER

As explained above, Rule 6(e) does not require that Respondent's affidavit and supplemental brief remain secret in this case, and the judiciary's interest in an adversarial process far outweighs any secrecy interest. Accordingly, FBRE requests that the Court provide it access to both the affidavit and Respondent's supplemental

brief so that it can subject them to adversarial scrutiny. To the extent the Court has concerns about disclosure of certain information in the affidavit, those concerns can be addressed through targeted redactions or a narrowly tailored protective order that limits disclosure to the parties in the case.

## CONCLUSION

For the foregoing reasons, FBRE requests access to (1) the affidavit of FBI Special Agent Hugh Evans submitted for in camera review at the motion to quash hearing and (2) Respondent's supplemental brief discussing its theories of wrongdoing in support of the grand jury subpoena. FBRE further requests that upon granting access to those submissions, the Court permit FBRE to file supplemental briefing as appropriate to address any related evidentiary issues or arguments.

Respectfully submitted, this 19th day of June, 2026.

*/s/ Y. Soo Jo*
Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30309
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

*/s/ Kamal Ghali*
Kamal Ghali
Georgia Bar No. 805055
Matthew A. Josephson
Georgia Bar No. 367216
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

*/s/ Abbe David Lowell*
Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202)-964-6110
jbolen@lowellandassociates.com
alowellpublicoutreach@
lowellandassociates.com

*/s/ Stephen Jonas*
Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 1580
Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Fulton County Board of Registration and Elections*

**Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.

This 19th day of June, 2026.

*/s/ Michael C. Duffey*
Michael C. Duffey

36

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CIVIL ACTION FILE NO:<br><br>1:26-cv-02777-WMR |

**ORDER**

This matter is before the Court on Petitioner Fulton County Board of Registration and Elections' (hereinafter, "Fulton County") Motion to Unseal Docket [Doc. 7] and Movants'[1] Motion to Intervene and for Access to Court Records [Doc. 11].

[1] Movants include Advance Publications, Inc.; Bloomberg L.P., the publisher of Bloomberg News; Cable News Network, Inc.; The E.W. Scripps Company; Gray Local Media, Inc., d/b/a WANF; NBCUniversal Media, LLC d/b/a NBCUniversal News Group; The New York Times Company; Pro Publica, Inc.; Reuters News & Media Inc.; and WP Company LLC d/b/a The Washington Post (hereinafter the "Media Intervenors").

## I. Motion to Unseal Docket [Doc. 7]

Fulton County requests that the Court unseal the docket in this case. [Doc. 7]. The United States opposes this request. At a hearing on May 19, 2026, the Court orally granted the motion and later granted the motion on the docket by minute order. *See* [Doc. 16 at 88]; [Doc. 15].[2]

Grand jury proceedings are traditionally conducted in secret, and that principle is codified in Federal Rule of Criminal Procedure 6(e). *Pitch v. United States*, 953 F.3d 1226, 1232 (11th Cir. 2020). "Rule 6(e) is exhaustive[,]" and district courts "do not possess the inherent, supervisory power to order the release of grand jury records in instances" outside of Rule 6(e)(3)'s enumerated exceptions. *Id.* at 1241. The matters at issue in this case are not themselves grand jury proceedings. Rather, they concern whether a subpoena, seeking information that may ultimately be presented to a grand jury, should be quashed. Accordingly, Rule 6(e)'s grand jury secrecy provision does not apply.[3]

---

[2] At the hearing, the Court also stated that if the United States wished to file a response to Fulton County's motion, it may, and that the Court would revisit this decision if necessary. However, to date, the United States has not filed a response.

[3] Further, even if this case implicated grand jury secrecy concerns, Federal Rule of Criminal Procedure 6(e)(3)(E)(i) permits a court to authorize disclosure of grand jury records "preliminarily or in connection with a judicial proceeding." A party seeking disclosure must show that "the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. of Ca. v. Petrol Stops NW*, 441 U.S. 211, 222 (1979). Those considerations favor disclosure here. The public has a substantial interest in access to judicial proceedings concerning the validity of a subpoena issued in connection with the 2020 Election. By contrast, the need for continued secrecy is minimal since unsealing the

At best, the materials in this case are related to a possible grand jury proceeding. Federal Rule of Criminal Procedure Rule 6(e)(6) provides that records related to grand jury proceedings should be "kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6). However, only filings which "reveal some secret aspect of the grand jury investigation should be subject to the restrictions of rule 6(e)." *United States v. Phillips*, 843 F.2d 438, 441 (11th Cir. 1988).

Nothing currently filed in this case reveals any secret aspect of the grand jury investigation, and "the documents in question in no way indicate[] . . . the deliberations of the grand jury." *Id*. Accordingly, unsealing the docket will not "compromise the secrecy of the grand jury proceedings." *Id*. Instead, the Court believes, as it stated at the hearing, that "there is a legitimate overriding reason to make [these] proceedings public." [Doc. 16 at 20]; *see also In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence*, 678 F. Supp. 3d 135, 140 (D.D.C. 2023) (holding that "judicial proceedings relating to, but at arm's length from" grand jury proceedings, including proceedings related to "resolving a grand-jury witness's motion to quash a subpoena . . . are not themselves subject to grand-jury secrecy.") (citation and internal

---

docket so not reveal any grand jury deliberations, witness testimony, or any other matter potentially occurring in front of the grand jury. Therefore, even assuming Rule 6(e) applies, disclosure would still be warranted.

quotations omitted).[4] Therefore, the Court grants Fulton County's Motion to Unseal. [Doc. 7].

## II. Motion to Intervene [Doc. 11]

The Media Intervenors seek to intervene in this action. [Doc. 11]. They do not seek to participate as parties; rather, they request that the Court unseal the docket. [*Id*. at 1–2]. Because the Court has already granted Petitioner's motion [Doc. 7], the case is now unsealed. The Media Intervenors' motion is therefore moot.[5]

## III. Conclusion

Accordingly, Petitioner's Motion to Unseal [Doc. 7] is **GRANTED** and the Media Intervenors' Motion to Intervene [Doc. 11] is **TERMINATED AS MOOT**.

**IT IS SO ORDERED** this 24th day of June, 2026.

William M. Ray II
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

[4] If, at any time, either party believes that there may need to be a discussion of material that is not open to the public, the Court will consider such material on a case-by-case basis. The Parties can then, if necessary, file any matters under seal or file motions for the Court to review filings *in camera.*

[5] The unsealed docket is, of course, subject to the possibility that select filings or documents may need to be inspected *in camera* by the Court or filed under seal to protect potential confidential information.

37

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

CIVIL ACTION FILE NO:

1:26-cv-02777-WMR

**ORDER**

This matter is before the Court on Petitioner Fulton County Board of Registration and Elections' Motion to Quash Grand Jury Subpoena [Doc. 1] and Respondent the United States of America's Response in Opposition to Petitioner's Motion to Quash [Doc. 9] and Cross-Motion to Enforce Grand Jury Subpoena [Doc. 10].

The breadth of the Grand Jury Subpoena No. 2026R00350-01 [Doc. 1-1] (hereinafter, the "Subpoena") is staggering. It seeks the "name, position/function, residential and email addresses, and personal telephone numbers" of all individuals who reviewed Mail-in Ballots, were assigned to the Voter Review Panel/Board, assigned to any Mobile Voting Location, were involved in the transferring of results or transportation of ballot stock or media, worked in or for the Fulton County Board

of Registration and Elections generally, worked or volunteered on election day to review or tabulate ballots, worked or volunteered in the Risk Limiting Audit, worked or volunteered for the Recount, and/or served as precinct managers and assistant managers, for the November 2020 General Election in Fulton County (hereinafter, the "2020 Election").

The Fulton County Board of Registration and Elections (hereinafter, "Fulton County"), in objecting to the Subpoena, points out that the Department of Justice (hereinafter, the "DOJ") is seeking personal identifying information on what would amount to thousands of employees and volunteers who participated in election day activities, the counting of votes, and any audit or recount of votes. Of note is that Fulton County is the most populous county in the State of Georgia per the 2020 census (1,066,710 people) and one of the largest in land area, with approximately 527 square miles.[1] Thus, there is little doubt that Fulton County employs and uses the services of large numbers of people to conduct its elections.

Why is the DOJ seeking this information? It argues that it is engaged in legitimate law enforcement activities. Against that claim is the fact that it has long been the view of the current President of the United States, both before and after he was elected in the 2024 General Election, that he was denied re-election to a second

---

[1] *See* U.S. Census Bureau, *QuickFacts Fulton County, Georgia*, https://www.census.gov/quickfacts/fact/table/fultoncountygeorgia/POP010220#POP010220 (last visited July 6, 2026).

consecutive term in 2020 due to election fraud. Particularly, he has alleged fraud in states that he won during the 2016 Election, but lost in 2020, which includes Georgia. It was alleged, both then and now, that the genesis of his defeat in Georgia came from supposed fraud at the hands of election officials and others in Fulton County, which provided the final margin of votes in Georgia that decided the 2020 Election. Thus, perhaps it makes sense that the DOJ, now unquestionably under the current President's control, is seeking to identify individuals who might possess information or opinions in support of his claim that the 2020 Election was not legitimate. And, in doing so, the DOJ is using the subpoena power of the Grand Jury.[2]

It should be noted, however, that while the Grand Jury is an independent entity in many respects, it operates under the auspices of the District Court. It is the District Court that summons citizens to serve on the Grand Jury; it is the District Court that selects the individuals to serve on the Grand Jury; it is the District Court that administers the oath of service to the selected members of the Grand Jury; and, it is the District Court that receives the work product of the Grand Jury, namely the indictments of individuals who are alleged to have committed prosecutable crimes. It is true that the Grand Jury works with the DOJ and the applicable United States

[2] To be clear, no evidence has been presented to the Court that the actual Grand Jury in the Northern District of Georgia seeks this information, as opposed to the out-of-district prosecutors who the DOJ has appointed to lead this inquiry who have served this Subpoena in the name of the Grand Jury.

Attorney to investigate alleged criminal actions, but that does not give the DOJ the right to use the Grand Jury to do whatever the DOJ wants. The Grand Jury and the tools (i.e. subpoenas) that it uses are tethered to the its authority and the fulfillment of its authorized mission.

So, is there anything wrong with the DOJ using the Grand Jury to subpoena these records from Fulton County? In this Court's view, yes. These records, even if they lead to the DOJ finding individuals who worked for Fulton County in the 2020 Election who support the theory that the 2020 Election was not fair, would not lead to information that could be used to charge anyone with anything, at least not any viable charge. That is because the statute of limitations for any possible crime arising from the 2020 Election has long expired, as the DOJ must have brought such a case, if it could, no later than late 2025 or the early weeks of 2026.[3]

The 2020 Election occurred on November 3, 2020. Audits and recounts occurred in the 2–3 weeks immediately thereafter. The electors of each state (making up the Electoral College) met to cast their vote for President on December 14, 2020. And, the Congress of the United States met to count the certified votes of the Electoral College on January 6, 2021 (although the process was not completed until January 7, 2021, due to well-chronicled events). Thus, an investigation of alleged

[3] Had the DOJ moved expeditiously to seek this information after the current President returned to office on January 20, 2024, and within the applicable period of limitations, this Court's analysis may well have been different.

criminal conduct of anyone that may have led to the certification of the 2020 Election in Georgia would not be a legitimate use of the Grand Jury and its subpoena power, in that no valid indictment could issue from said Grand Jury due to the expiration of the applicable statutes of limitations.

The DOJ argues that it has a legitimate interest in investigating potential criminal actions in the years that followed the 2020 Election, including an alleged failure on the part of Fulton County to preserve its ballot images from 2020 for the time required by law. Such alleged failure to preserve records arguably would not be barred by the statute of limitations.[4] However, even if such allegations prove true, of which this Court offers no opinion, the fact remains that the focus of the Subpoena is on what happened (or did not happen) during the 2020 Election and the weeks immediately thereafter, not what may or may not have happened in the years that followed after that election was long over and certified. Thus, acting under its authority (and indeed its responsibility) pursuant to Rule 17(c)(2) of the Federal Rules of Criminal Procedure, the Court grants Fulton County's Motion to Quash.

In these hyper-political times in which we currently live, there are sure to be some who disagree with this decision because they believe the allegations of fraud in the 2020 Election and believe that "light" should be brought to those claims. But,

[4] The DOJ also alleges that a certain number of the actual 2020 ballots that it seized pursuant to a search warrant look suspicious.

a couple points are in order. First, nothing prevents a continued inquiry into those allegations by those who believe such claims, such as Congress and perhaps even by the DOJ. It is just that the power of the Grand Jury, which exists to investigate potential crimes and to bring viable indictments thereof, cannot be used as their tool to do so. Second, and relatedly, that this result is fitting is clear if one considers the alternative; otherwise, anyone in power (perhaps the next administration of a different party) could use the Grand Jury process similarly to subpoena personal information of citizens (perhaps that of their political opponents) with no legitimate law enforcement purpose. The information sought herein (names, addresses, phone numbers, emails) is private and sensitive, so much so that should a private company fail to protect such information from electronic thieves, such company would most likely be sued in a data breach class action lawsuit.[5] Thus, everyone, whether you support the President or you do not, or whether you believe the 2020 Election was fair or believe that it was not, should be concerned about the DOJ's ability to utilize the power of the Grand Jury to appropriate your private information without a legitimate purpose.

---

[5] *See e.g.*, *Quincey Hall v. Bitcoin Depot, Inc.*, No. 1:25-cv-04317-WMR (N.D. Ga. 2025), ECF No. 1 at 1 (containing another one of this Court's cases where a class of plaintiffs sued a company due to its "failure to safeguard, monitor, maintain and protect their highly sensitive Personally Identifiable Information" which were disclosed during a data breach).

In this Court's view, the DOJ does not possess a need to enforce the Subpoena greater than the burden of disclosure on Fulton County, and as such, the Court will not enforce it.

## I. BACKGROUND

### A. The Subpoena

The Subpoena, dated April 17, 2026, requests the following information:

> Rosters of Election Staff Members who served in the November 2020 General Election, sufficient to identify name, position/function, residential and email addresses, and personal telephone number(s), including for the following persons, without limitation:
>
> a. Individuals assigned to review Mail-In Ballots
> b. Individuals assigned to the Voter Review Panel/Board
> c. Individuals assigned to Mobile Voting Locations
> d. Individuals assigned to transfer results to or from media or to transport ballots, ballot stock, or media
> e. Individuals employed or contracted by the Fulton County Board of Registration and Elections
> f. Individuals who worked or volunteered on Election Day who were assigned to review or tabulate ballots
> g. Individuals who worked or volunteered for the Risk Limiting Audit
> h. Individuals who worked or volunteered for the Recount
> i. Individuals who served as precinct managers and assistant managers

[Doc. 1-1 at 3] (hereinafter, the "subpoenaed information").

On May 4, 2026, Fulton County filed its Motion to Quash the DOJ Subpoena. [Doc. 1]. Fulton County asks the Court to quash the Subpoena because it claims: (1) that the DOJ issued the Subpoena for an improper purpose; (2) that the Subpoena is

overbroad and untethered to any reasonable need; (3) that the Subpoena cannot yield evidence relevant to a criminal prosecution; (4) that the Subpoena burdens the First Amendment rights of election workers; and (5) that the Subpoena unreasonably interferes with Georgia's ability to conduct elections. *See* [Doc. 1 at 2].

The DOJ filed a Cross-Motion to Enforce the Grand Jury Subpoena and a Response to the Motion to Quash on May 15, 2026. [Docs. 9, 10].[6] The DOJ argues that the Subpoena is proper and "completely orthodox." [Doc. 10 at 7].

The Court held a hearing on May 19, 2026. *See* [Doc. 14]. During the hearing, Fulton County supported its argument with additional law and facts. Thus, the Court ordered supplemental briefing. [Doc. 15].[7]

---

[6] For the sake of brevity, in the remainder of the Order, the Court cites only to docket entry 10 because docket entries 9 and 10 are identical. *See* [Docs. 9, 10].

[7] Specifically, the Court requested the following briefing from the parties:

> 1. Respondent shall file a supplemental brief addressing the additional authority and evidence referenced by Petitioner during the hearing within **FOURTEEN (14) DAYS** of the date of the hearing. Petitioner may file a response brief within **FOURTEEN (14) DAYS** after Respondent files its supplemental brief.
>
> 2. Respondent shall also file a separate brief addressing any arguments concerning any potential theory of wrongdoing that it contends supports the subpoena at issue within **FOURTEEN (14) DAYS** of the date of this Order. The Court recognizes that the information relevant to this issue may involve confidential investigative material and, therefore, directs the brief to be filed separately so that Respondent may seek leave to file it under seal.

[Doc. 15 at 1 –2]. The DOJ filed its supplemental brief on May 28, 2026. [Doc. 19]. Fulton County filed its response on June 11, 2026. [Doc. 33].

Also at the hearing, the DOJ gave the Court an affidavit that it claimed supported the Grand Jury's investigation and need for the subpoenaed information. *See* [Doc. 16 at 85–86]. The DOJ also filed a Motion for *In Camera* Review. [Doc. 32]. In that Motion, the DOJ requests that the Court review both the affidavit and related briefing *in camera*. [*Id.*]. Fulton County opposes that request. [Doc. 34].

**B. Related Litigation**

The DOJ references a related but different case[8] also in the Northern District of Georgia. [Doc. 10 at 1, 16]; *see Robert L. "Robb" Pitts, et al. v. United States*, No. 1:26-cv-00809-JPB (N.D. Ga. May 6, 2026) (hereinafter "*Pitts*").[9]

On January 28, 2026, a Magistrate Judge signed a warrant which authorized the seizure of over 600 boxes of election records from Fulton County. *See Pitts*, ECF

[8] The Court takes judicial notice of the *Pitts* case and its record. Fed. R. Evid. 201(c); *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.*, 938 F.2d 1239, 1243 (11th Cir. 1991) ("A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases.") (citations omitted).

[9] It is important to note that while *Pitts* is related to the current dispute, the findings of that case are in no way binding on this Court, or on any court for that matter. *See Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 428 (2011) ("[F]ederal district judges, sitting as sole adjudicators, lack authority to render precedential decisions binding other judges, even members of the same court."); *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022) ("[A] district court's decisions do not bind other district courts, other judges on the same court, or even the same judge in another case."). The Court summarizes the *Pitts* case due to the DOJ's reliance on it, as well as for background.

No. 108 at 22. As part of the search warrant application, an FBI agent provided an affidavit to demonstrate probable cause. *Pitts*, *id*. at 11.

After the DOJ executed the search warrant, on February 5, 2026, Fulton County (along with others) filed a Federal Rule of Criminal Procedure 41(g) Motion seeking the return of the election records. *Pitts*, ECF No. 1. On March 27, 2026, United States District Court Judge Boulee held an evidentiary hearing on the Rule 41(g) Motion. *Pitts*, ECF No. 70. On May 6, 2026, Judge Boulee denied Fulton County's Rule 41(g) Motion. *Pitts*, ECF No. 108.

In that order, Judge Boulee found that Fulton County did not satisfy its burden of showing that the Government "callously disregarded" Fulton County's rights through the execution of the search warrant. *Pitts, id*. at 53. At the same time, Judge Boulee noted that the events leading up to the Rule 41(g) Motion were "unprecedented," that the affidavit proffered to obtain the warrant "was defective in some respects," that the affidavit's inclusion of certain statements was "troubling," and that Fulton County had correctly identified some of the affidavit's "features" as "problematic[.]" *Pitts*, *id*. at 68, 36, 37.

## II. LEGAL STANDARD

Grand juries operate with broad investigatory powers. *See United States v. Calandra*, 414 U.S. 338, 343 (1974) ("Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law."). In *United States*

*v. R. Enterprises, Inc.*, the Supreme Court provided a background on the role of the grand jury and its unique subpoena power:

> The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike [Article III Courts], whose jurisdiction is predicated on a specific case or controversy, the grand jury can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.
>
> A grand jury subpoena is thus much different from a subpoena issued in the context of a prospective criminal trial, where a specific offense has been identified and a particular defendant charged. The identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. In short, the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists

*United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991) (citations and internal quotation marks omitted). When analyzing a subpoena, courts must begin with the presumption that, "absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority." *Id*. at 300.

The reach of the grand jury is undoubtedly broad; however, "the powers of the grand jury are not unlimited and are subject to the supervision of a judge[.]"

*Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) (citing *United States v. Bryan*, 339 U.S. 323, 331 (1950); *Blackmer v. United States*, 284 U.S. 421, 438 (1932)); *see also R. Enters., Inc.*, 498 U.S. at 299 (stating that "[t]he investigatory powers of the grand jury are nevertheless not unlimited" and that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions[.]").

For example, under Rule 17 of the Federal Rules of Criminal Procedure, a "court may quash or modify" a subpoena if it determines that "compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2); *see also Calandra*, 414 U.S. at 346 n.4 ("The grand jury is subject to the court's supervision in several respects . . . . [t]he court may quash or modify a subpoena on motion if compliance would be 'unreasonable or oppressive.'") (citing Fed. R. Crim. P. 17(c)).

Rule 17(c)(2) requires a case-by-case, fact specific inquiry. There is no legal standard which states that, without some facts, the government cannot enforce a subpoena, or that if those facts exist, the government could enforce a subpoena. Rather, the factors that the court must consider under Rule 17(c)(2)—unreasonableness and oppressiveness—cannot be converted into a mechanical rule. Although the terms "unreasonable" and "oppressive" are not defined within Rule 17, courts have determined that those words have "a common sense meaning[.]" *United States v. Cory*, No. 3:20-cr-99-MMH-JRK, 2021 WL 3709797, at *4 (M.D. Fla. Aug. 20, 2021) *objections overruled*, No. 3:20-cr-99(S1)-MMH-LLL, 2022 WL 997336

(M.D. Fla Apr. 1, 2022) (quoting *United States v. Simmons*, 515 F. Supp. 3d 1359, 1364 (M.D. Ga. 2021) (other citations omitted)).

## III. DISCUSSION

Fulton County argues that the Court should quash the Subpoena since it claims that the Subpoena is the DOJ's "latest effort to target and harass the President's perceived political enemies—this time election officials, poll workers, and volunteers in Fulton County whom Donald Trump continues to disparage as he perpetuates his false claim that they 'stole' the 2020 [E]lection." [Doc. 1 at 1].[10]

The DOJ refutes this claim and contends that Fulton County, by opposing the Subpoena, attempts "to undermine the grand jury's very purpose" by obstructing the next step in the investigative process. [Doc. 10 at 6].

Under Rule 17(c)(2), in determining whether to quash a subpoena, courts must assess if a subpoena is unreasonable or oppressive. Therefore, the Court will weigh the Government's investigatory need for the personal information of election workers against the competing burden that Fulton County will suffer in compliance. *See R. Enters., Inc.*, 498 U.S. at 303 ("This Rule requires the district court to balance

---

[10] Fulton County argues that the DOJ possesses a political motivation in enforcing the Subpoena. "[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *PDK Lab'ys, Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring)). Since the Court has sufficient other grounds to quash the Subpoena, the Court does not reach Fulton County's political motivation arguments. The Court also does not address Fulton County's claims that the Subpoena is, at the very least, overbroad. The Court is doubtful that Fulton County can assert alleged first amendment claims on behalf of its employees or volunteers, but that issue also is not decided herein.

the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other.") (Stevens, J., concurring). Importantly, "what is reasonable depends on the context." *Id.* at 299 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985)).

The Court derives this standard from Justice Stevens' concurrence in *R. Enterprises, Inc.*, 498 U.S. at 303 (Stevens, J., concurring).[11] In its briefing, the DOJ devoted many pages to explaining to the Court that concurrences are not binding precedent and/or that a majority opinion is binding precedent. *See* [Doc. 19 at 5–8 and 9–16]. To be clear, the Court understands that it is not bound by this concurrence, or any concurrence, except in certain circumstances. *See Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (stating that a concurrence does not "constitute[] binding precedent"). But, neither must the Court disregard such reasoning when a concurrence addresses an issue before the Court. This is especially true where there is scant binding authority which defines "reasonableness" under Rule 17(c)(2). *R. Enterprises, Inc.* undoubtedly remains the controlling precedent, but presented a different factual dispute.[12] As Justice Stevens observed, the majority opinion may

[11] Even without relying on Justice Stevens' concurrence, the Court understands the plain meaning of "reasonable" to be fair, sensible, and logical. Justice Stevens' approach in weighing the need for the information against the burden of compliance seems to engage in a weighing of whether a subpoena is fair, sensible, and logical.

[12] Specifically, in *R. Enterprises, Inc.,* companies challenged a subpoena for its "relevance" rather than its reasonableness. *See R. Enters., Inc.*, 498 U.S. at 301 ("[W]e conclude that where, as here, a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the

not have "provide[d] adequate guidance to the district court" regarding reasonableness; therefore, the Court finds Justice Stevens' additional reasoning persuasive when examining "reasonableness" under Rule 17(c)(2). *R. Enters., Inc.*, 498 U.S. at 305 (Stevens, J., concurring).[13]

Justice Stevens stated that a movant can "satisfy the initial hurdle" and show "some valid objection to compliance" by illustrating the "volume and location of the requested materials, the mere cost in terms of time, money, and effort of responding to a dragnet subpoena[,]" or a movant can show "that compliance with the subpoena would intrude significantly on [the movant's] privacy interests, or call for the disclosure of trade secrets or other confidential information[.]" *Id*. at 305 (Stevens, J., concurring).

---

district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation."). Therefore, the Supreme Court did not reach the issue of whether the subpoena in *R. Enterprises, Inc.* was otherwise reasonable.

[13] Notably, several federal courts have adopted the approach (or a substantially similar approach) articulated in Justice Stevens' concurrence. *See, e.g.*, *In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d 768, 773 (8th Cir. 2020) (weighing an organization's confidentiality and internal affairs investigations against "the federal government's interest in enforcing a subpoena to produce documents relevant to a grand jury investigation[.]"); *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585–86 (4th Cir. 2007) (concluding that the district court did not abuse its discretion where it weighed a city's interest against the United States' interests to determine the reasonableness of a subpoena); *United States v. Bergeson*, 425 F.3d 1221, 1225–27 (9th Cir. 2005) (weighing the "risk of imminent physical harm to others, magnitude of the case, [and] scarcity of evidence" against "the potential harm from enforcing the subpoena" to determine reasonableness under Rule 17(c)(2)); *In re Grand Jury Subpoena for THCF Med. Clinic Recs.*, 504 F. Supp. 2d 1085, 1089 (E.D. Wash. 2007) (weighing the State of Oregon's various interests against the Government's interest in information related to an investigation).

The DOJ claims that the "list of employees and workers involved in the 2020 Fulton County election" is needed to further investigate potential crimes associated with the 2020 Election. [Doc. 10 at 7]. Fulton County combats this claim by arguing that it is burdened by compliance because "[t]he Subpoena is untethered to any valid prosecutorial need, and its sweeping demand for the sensitive personal information of thousands of election officials and volunteers would chill the participation of election workers and impair Fulton County's ability to administer its elections." [Doc. 33 at 1].

For reasons explained hereinbelow, the Court agrees with Fulton County that, in pursuing the Subpoena, the DOJ is engaged in an "arbitrary fishing expedition," such that the Subpoena is unreasonable and must be quashed. *Trump v. Vance*, 591 U.S. 786, 805 (2020) (quoting *R. Enters., Inc.*, 498 U.S. at 299); *see also Ealy v. Littlejohn*, 569 F.2d 219, 227 (5th Cir. 1978) (stating that "[w]hen the grand jury goes on a fishing expedition in forbidden waters, the courts are not powerless to act.").[14]

**A. The DOJ'S Need for the Subpoenaed Information is Low**

"The federal grand jury serves two primary roles, sometimes referred to as the 'sword' and 'shield 'functions." 1 Charles Alan Wright & Arthur R. Miller, Federal

[14] Decisions of the Fifth Circuit prior to the Eleventh Circuit's split from the Fifth Circuit are binding on the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

Practice and Procedure § 102 (5th ed. 2026) (citations omitted). A grand jury has "broad subpoena power," which gives it "the authority to compel the testimony of witnesses and the production of documents and other things, thereby assisting the prosecutor in the investigation of crimes—this is the 'sword' function." *Id*. Then, "[a]fter the evidence is gathered, the grand jurors vote on whether the prosecutor has enough evidence to justify charging someone with a crime; in this capacity, it can act as a shield for the accused against unsupported accusations." *Id*.

The primary purpose of any grand jury is "to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *Calandra*, 414 U.S. at 343–44. Thus, the grand jury's broad investigatory power should not override its ultimate purpose: to help the prosecutor indict valid criminal charges. *See Costello v. United States*, 350 U.S. 359, 362 (1956) ("There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes.").

Importantly, the Supreme Court has made clear that "the applicable statute of limitations . . . is usually considered the primary guarantee against bringing overly stale criminal charges." *United States v. Ewell*, 383 U.S. 116, 122 (1966). It is true that "[a] subpoena is not objectionable merely because it seeks documents beyond

the period of the statute of limitations[.]" 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 276 (4th ed. 2026) (citations omitted). However, when a subpoena seeks information that is unlikely to result in a prosecutable offense because the applicable statute of limitations has expired, the Court finds that the DOJ's need for that information is diminished compared to circumstances in which the statute of limitations remains open, and prosecution is still possible.

As Fulton County lays out in its briefing, the applicable five-year statute of limitations has run on any alleged crime related to the 2020 Election. [Doc. 1 at 12–14]. Since Congress certified the electoral results at 3:44 a.m., the morning of January 7, 2021,[15] the five-year statute of limitations on any purported crime related to the 2020 Election ran, at the latest, on Wednesday, January 7, 2026, which was six months ago.

Under 18 U.S.C. § 3282, a noncapital offense has a five-year statute of limitations. That statute of limitations applies to offenses under Section 20511 or Section 20701, and the following potential crimes: 18 U.S.C. § 371 (conspiracy to defraud the federal government); 18 U.S.C. § 594 (voter intimidation); 18 U.S.C. § 610 (coercion of political activity); 18 U.S.C. § 1001 (false representations to federal government); 18 U.S.C. § 1512 (tampering with a witness, victim, or informant). *See* 52 U.S.C. § 20511 (knowing and willful effort to interfere with fairly and impartially

[15] *See* Nat'l Archives, 2020 Electoral College Results.

conducted election process subject to five-year statute of limitations); 52 U.S.C. § 20701 (willful failure to preserve election records for twenty-two months subject to five-year statute of limitations).

Thus, investigation into these alleged offenses is now "stale." *See Ewell*, 383 U.S. at 122. Without a showing that the subpoenaed information will result in a prosecutable crime, the Court finds the DOJ's need for the subpoenaed information to be questionable, at best. Surely, the DOJ could articulate a "need" for almost any evidence. However, that is not the legal standard. Instead, that low need for the information does not outweigh the burden on Fulton County. The DOJ has made various arguments to revive the statute of limitations for potential wrongdoing related to the 2020 Election, but the Court remains unconvinced by those arguments.[16]

**1. The DOJ is Not Entitled to Indefinitely Extend the Statute of Limitations to Usurp Established Limitations on Crimes**

First, the DOJ argues that the expired statute of limitations on crimes does not mean that the Court should quash the Subpoena. [Doc. 10 at 16]. The DOJ contends

[16] The DOJ places great reliance on the "relevance" standard in *R. Enterprises, Inc.* The DOJ essentially suggests, in its briefing, that a subpoena cannot be quashed if the subpoena bears relevance to any possible criminal offense. *See* [Doc. 10 at 7]. But, *R. Enterprises, Inc.*, stated that relevance was not the only basis on which a subpoena could be quashed. *R. Enters. Inc.*, 498 U.S. at 301. The *R. Enterprises, Inc.* Court confined its assessment to relevance and did not purport to set forth considerations necessary to evaluate the broader question of "reasonableness." *Id.*; *see also id*. at 306 ("[T]he Court's opinion should not be read to suggest that the deferential relevance standard the Court has formulated will govern decision in every case, no matter how intrusive or burdensome the request.") (Stevens, J., concurring).

that "[a]ny subsequent criminal acts, or acts in furtherance of a criminal conspiracy, would restart the limitations period." [*Id.*]. In the DOJ's view, the possibility of criminal obstruction creates a timely offense. [Doc. 19 at 3]. However, as Fulton County pointed out at the hearing and in its subsequent briefing, *Grunewald v. United States*, 353 U.S. 391 (1957), forecloses this argument.

In *Grunewald*, three individuals were convicted of conspiracy to defraud the United States. *Id*. at 393. On certiorari, the Supreme Court considered multiple issues, including whether the statute of limitations for a conspiracy offense could be extended by evidence that the conspirators engaged in acts of concealment after the conspiracy's principal objective had already been accomplished. *Id*. at 400. The Supreme Court held that acts of concealment undertaken after the central objectives of the conspiracy had been achieved do not, by themselves, extend the duration of the conspiracy for statute-of-limitations purposes. *Id*.

Any alleged criminal conspiracy to interfere with the results of the 2020 Election was completed on December 14, 2020, when the Georgia Electors met to cast their vote, or at the latest on January 7, 2021, when the Congress certified the results. Based on *Grunewald*, the DOJ cannot rely on alleged acts of concealment that any purported conspirators hypothetically engaged in after the principal objective (the current President losing the 2020 Election) was achieved to indefinitely extend the statute of limitations.

The DOJ does not dispute that *Grunewald* is binding law and that it stands for the proposition that "mere overt acts of concealment" done "after the central criminal purposes of the conspiracy have been attained" do not extend the limitations period. [Doc. 19 at 1] (citing *Grunewald*, 353 U.S. at 402). Essentially, the DOJ attempts to contravene that opinion by arguing that "*Grunewald* is inapposite because it is procedurally distinguishable." [*Id.* at 1].[17] However, what the DOJ requests this Court to recognize is essentially a limitless extension of the statute of limitations, such that a court is powerless to quash a subpoena despite the existence of *Grunewald* if the DOJ theorizes possible evidence supporting obstruction.

As Fulton County states, under the DOJ's "position that the mere possibility of an obstruction charge cures any statute of limitations problem, this Court would be powerless to quash a subpoena in furtherance of a criminal investigation into any historical event," even if the event occurred many years or even many decades earlier. [Doc. 33 at 2] (internal punctuation omitted). Such a position is unreasonable. The DOJ cannot evade the statute of limitations based merely on a theory that someone, somewhere, somehow did something that was illegal.

---

[17] The DOJ states that, in *Grunewald*, the "contours of the conspiracy remained an open question even after trial and appeal to the United States Supreme Court." [*Id.* at 2] (citing *Grunewald*, 353 U.S. at 408). Therefore, the DOJ argues that the present case lacks evidence of a definite conspiracy, making it impossible for the Court to determine whether the principal objective has been achieved. This argument is unpersuasive, however, since the principal objective of election interference is logically interfering with and changing the election's results; any alternative objective is purely speculative and self-serving. Such speculation does not illustrate an increased need by the DOJ for the subpoenaed information.

The DOJ also argues that any statute of limitations defense is not for this Court to determine, but instead, is an affirmative defense that must be brought by a criminal defendant *after* prosecution has already begun. [Doc. 10 at 15–16] (quoting *Musacchio v. United States*, 577 U.S. 237, 248 (2016) ("[A] statute of limitations defense becomes part of a case only if the defendant puts the defense in issue.") (internal punctuation omitted).

While the Court acknowledges the DOJ may be correct in stating "when" a party may bring up a statute of limitations defense, the DOJ's argument is also unreasonable in this discussion. The fact that the statute of limitations is an affirmative defense does not establish that the DOJ has any greater need for information related to un-prosecutable crimes. It is inescapable that a defendant would bring up a statute of limitations bar. Indeed, it would be malpractice and constitute ineffective assistance of counsel for such party's attorney not to raise such defense.

The DOJ essentially asks the Court to turn a blind eye to the DOJ's investigation of nonspecific allegations and/or crimes which have no possibility of a conviction. In essence, the DOJ's argument is that it would be proper for a grand jury to investigate a time-barred crime, indict a defendant or defendants, and allow pretrial procedures to begin, when the conclusion is inevitable—the statute of limitations on the relevant crimes has run. Therefore, the DOJ asks the Court to use

its already scarce judicial resources on what would be a dead-end prosecution. The Court is not convinced that it must ignore the clear existence of a time bar against any hypothetical crimes.

**2. The Government's Proffered Affidavit and Subsequent Briefing Does Not Support an Extension of the Statute of Limitations**

Second, the DOJ attempts to use an affidavit and subsequent briefing given to the Court for *in camera* review to support its contention that it has a high need for the subpoenaed information that overrides Fulton County's burden in compliance. However, even after the Court reviewed the proffered affidavit and briefing, the Court is not convinced that the DOJ possesses a strong need for the subpoenaed information. There is nothing in these materials that changes the Court's analysis or conclusions[18]

**3. *Pitts* Does Not Support an Extension of the Statute of Limitations**

Finally, the DOJ attempts to articulate a reason to extend the statute of limitations from the *Pitts* case. [Doc. 10 at 16]; *see Pitts*. Specifically, the DOJ

[18] The DOJ filed a Motion for *In Camera* Review [Doc. 32], which was granted by implication since the Court reviewed these materials. Fulton County filed a Response in Opposition [Doc. 34], requesting access to both the Affidavit and the DOJ's briefing. The Court does not grant Fulton County's request given the Court's conclusion that the information included in the DOJ's *in camera* materials is not compelling. If the Eleventh Circuit (on appeal) disagrees with the Court on this and remands this matter back to this Court, the Court likely would give Fulton County access to such documents for purposes of making a counterargument to that of the DOJ, subject to an appropriate protective order. Accordingly, the Fulton County's request for access [Doc. 34] is terminated as moot.

claims that "Judge Boulee determined that the Court could not 'ignore that a witness told [an FBI Special Agent] that some of the ballot images may have been modified as recently as January 11, 2024—which is well within the statutory period.'" [*Id.*].

However, Judge Boulee did not rely on these alleged wrongdoings to support his conclusion. Rather, Judge Boulee stated that the description of the events in *Pitts* was "troubling" and that the Government "failed to explain that this modification date could have been caused by personnel from the Secretary of State's Office simply renaming the file." *Pitts*, ECF No. 108 at 37. In ruling for the DOJ, Judge Boulee determined that it was not proven that the DOJ had "callously disregarded" the rights of Fulton County in seeking the search warrant for the election ballots. *Pitts, id*. at 53. Nothing within Judge Boulee's order convinces this Court that the DOJ has a high need for the election workers' personal, private information, which is something altogether different than the ballots in *Pitts*.

Additionally, even if the ballot images from the 2020 Election were altered in January 2024, the relevant statute would be 52 U.S.C. § 20701. That statute makes it a *misdemeanor* to modify records within twenty-two months of an election. 52 U.S.C. § 20701. Any modification of ballot images in January 2024 occurred long after the date that it became unlawful to alter such records. So, even with the allegation from January 2024, it is still unclear how the subpoenaed information regarding 2020 would help the DOJ's investigation.

Finally, and relatedly, it is not clear how poll workers from November 2020 would have anything to do with alleged alterations in January 2024. To the Court, it seems that if the ballots were altered in 2024, that would be a crime (if it were a crime) independent of anything that happened in 2020.[19] Therefore, *Pitts* certainly does not increase the DOJ's need for the subpoenaed information.

**B. The Subpoena Places an Undeniable High Burden on Fulton County**

As compared to the DOJ's low need for the subpoenaed information, the burden of compliance for Fulton County is severe. As stated, Fulton County is the most populous county in the State of Georgia. Undoubtedly, Fulton County depends on thousands of workers, volunteers, and other staff to run its elections. The Subpoena requests disclosure of personal identifying information of thousands of employees and volunteers who participated in activities related to the 2020 Election. Such a large disclosure of information threatens to chill participation in future elections, which will surely impact Fulton County.[20]

This "chilling effect" is not hypothetical or unfounded. *See* [Doc. 17-12 at 2] (containing the declaration of Sarah Tindall Ghazal, a member of the Georgia State Election Board); [*Id.*] ("The risk of having nonpublic personal information,

[19] Further, it seems disingenuous to argue that the DOJ cannot possibly know if the ballots were altered in 2024 unless it fully investigates what happened in 2020.

[20] It is not lost on the Court that 2026 is an election year. Fulton County will need many workers and volunteers to effectively run the General Election come November.

including home addresses, mobile phone numbers, and email addresses disclosed to federal law enforcement, based on service as a volunteer or a simple poll worker, is highly likely to discourage many individuals from participating in elections as poll workers."); [*Id*. at 1] ("[E]lection workers have testified as to their deep concerns over their own and their staff's well-b[e]ing after being targeted by name in social media posts related to elections."); [*Id*. at 2] ("After news stories were published detailing the federal demand for personal information from 2020 poll workers, I received calls from individuals who had served in that capacity expressing deep concerns over their potential exposure for simply having served as a poll worker . . . I had other conversations with election officials discussing concerns over the likelihood that the subpoena would make recruiting poll workers even more challenging at a time when counties were already having trouble filling positions.").[21] In fact, at no point has the DOJ disputed that the subpoenaed information would chill the participation of poll workers.

---

[21] The well-known reports of Ruby Freeman and her daughter, Shaye Moss, illustrate the real threat that identity disclosure and the potential of false allegations pose related to the 2020 Fulton County Election. Both women faced false allegations of "rigging" the 2020 Election. On May 31, 2022, Ms. Freeman gave an interview to the House Select Committee detailing the impact of the allegations against her. *See Transcribed Interview of Ruby Freeman Before the House Select Committee to Investigate the January 6th Attack on the United States Capitol* (May 31, 2022) (available at CTRL0000086315 - Transcribed Interview of Ruby Freeman, (May 31, 2022) - Content Details -). In that interview, Ms. Freeman recounted the harassment she underwent. *Id*. ("I am just one name, one reputation, one life devastated by disinformation, but there are so many more, and there will be even more if things don't change."). These events further support a chilling effect on Fulton County's election volunteers.

Is there a chance that questioning poll workers may yield *some* evidence? Maybe. But, the disclosure of the requested information would cause substantial harm to Fulton County's interest in enlisting poll workers and other election volunteers in the future, at least during the current Administration which seems so laser focused to cast the 2020 Election as illegitimate, even though it changes nothing practically.

Those who work to run elections (particularly those who volunteered their time during the COVID-19 pandemic) should be valued and are necessary for successful elections in Fulton County going forward. Allowing the DOJ to obtain by subpoena the Fulton County volunteers and workers' personal information, given its inability to prosecute anyone due to the time lapse, would be unreasonable and place a heavy burden on Fulton County that cannot be ignored.

## IV. CONCLUSION

The subpoena power of the Grand Jury is broad, but it is not absolute. If it were, the Supreme Court could simply say so, which it has not. Given the low need for the subpoenaed information and the highly burdensome nature of the disclosure of the same, the Subpoena is unreasonable and must be quashed pursuant to Federal Rule of Criminal Procedure 17(a)(2).

Based on the foregoing, Fulton County's Motion to Quash Grandy Jury Subpoena [Doc. 1] is **GRANTED** and the United States of America's Cross-Motion

to Enforce Grand Jury Subpoena [Doc. 10] is **DENIED**. Accordingly, the Subpoena (Subpoena No. 2026R00350-01) [Doc. 1-1] is **QUASHED** and Fulton County is under no obligation to comply. Fulton County's request [Doc. 34] for access to the materials included in United States' Motion for *In Camera* Review [Doc. 32] is **TERMINATED AS MOOT**. The Clerk of Court is **DIRECTED TO TERMINATE** this case.

**IT IS SO ORDERED** this 7th day of July, 2026.

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

# 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Respondent.** | **Case No. 1:26-cv-02777-WMR** |

## NOTICE OF APPEAL

The United States of America gives notice of its appeal to the United States Court of Appeals for the Eleventh Circuit from the district court's order of July 7, 2026, Docket number 37, granting the Fulton County Board of Registration and Election's Motion to Quash Grand Jury Subpoena and denying the United States of America's Cross-Motion to Enforce Grand Jury Subpoena.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General and United States Attorney for the Middle District of North Carolina
N.C. State Bar Number 17333
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
Telephone: (336) 332-6333
E-mail: Dan.Bishop@usdoj.gov

# 44

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**Fulton County Board of Registration and Elections,**

Petitioner,

v.

**United States of America,**

Respondent.

**Case No. 1:26-cv-02777-WMR**

## MOTION TO SUPPLEMENT RECORD FOR APPEAL

The United States moves this Court to supplement the record for appeal by adding documents it submitted for *in camera* review as part of the proceedings on Petitioner's Motion to Quash Grand Jury Subpoena. As grounds, the United States asserts as follows:

1. At the May 19, 2026 Motion Hearing, the United States provided the Court an affidavit from FBI Special Agent Hugh Evans for the Court to review *in camera*. *See* (Doc. 16 at 85-86.)

2. Following the hearing, the United States filed a Motion for *in camera* review of a supplemental brief (doc. 32) addressing the Court's request for "any arguments concerning any potential theory of wrongdoing that it contends supports the subpoena at issue." (Doc. 15.) A copy of the brief was submitted to the Court's chambers email.

3. Neither the affidavit nor the supplemental brief appears on the docket. When the Court granted Petitioner's motion, it deemed the United States' motion for in camera review and the Petitioner's opposition to that motion moot. (Doc. 37 at 23 n.18.) In the Order, the Court noted that it had reviewed and considered these *in camera* materials as part of its decision. *(Id.*) (noting that the motion for *in camera* review "was granted by implication since the Court reviewed these materials.").

4. Under Rule 10(e)(2)(B) of the *Federal Rules of Appellate Procedure*, "[i]f anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded . . . by the district court before or after the record has been forwarded." "[T]he purpose of Rule 10(e) is to ensure that the record on appeal 'truly discloses what occurred in the district court.'" *Hoover v. Blue Cross & Blue Shield of Alabama*, 855 F.2d 1538, 1543 (11th Cir. 1988) (quoting FED. R. APP. 10(e)). As these documents were considered by the district court, the United States believes they should be part of the record on appeal.

WHEREFORE, the United States asks that the Court to add Special Agent Evans's affidavit and the United States' Supplement *In Camera* Brief as docket entries available only to the United States and the Court and certify a

supplemental record for the appeal to the Eleventh Circuit. If the Court would prefer, the United States can resubmit these materials to the Court as directed.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina
N.C. State Bar Number 17333
101 S. Edgeworth St., Fourth Floor
Greensboro, NC 27401
Telephone: (336) 332-6333
E-mail: Dan.Bishop@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to LR 5.1(C) and 7.1(D), that I prepared the foregoing motion using Century Schoolbook, 13 point font.

*/s/ DAN BISHOP*
DAN BISHOP
Special Attorney to the Attorney General
and United States Attorney for the Middle
District of North Carolina